No. 24-60231

In the

# United States Court of Appeals
## for the Fifth Circuit

AIRLINES FOR AMERICA, NATIONAL AIR CARRIER ASSOCIATION, INTERNATIONAL AIR TRANSPORT ASSOCIATION, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC., JETBLUE AIRWAYS CORPORATION, AND UNITED AIRLINES, INC.,

*Petitioners,*

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent.*

On Petition for Review of a Final Rule of the
United States Department of Transportation

## MOTION TO STAY PENDING JUDICIAL REVIEW

Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners Airlines for America (A4A), National Air Carrier Association (NACA), and International Air Transport Association (IATA)*

*(additional counsel information on inside cover)*

*(additional counsel information continued from front cover)*

Paul W. Hughes
Andrew A. Lyons-Berg
Nicole E. Wittstein
MCDERMOTT WILL
  & EMERY LLP
500 North Capitol St. NW
Washington, DC 20001

*Counsel for Petitioners A4A, NACA, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

**No. 24-60231**, *Airlines for America et al. v. Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are so the judges of this Court may evaluate possible disqualification or recusal.

## I.    Petitioners

Petitioner Airlines for America has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner National Airline Carrier Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner International Air Transport Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner Alaska Airlines, Inc., is a wholly owned subsidiary of Alaska Air Group, Inc., a publicly held corporation. Blackrock, Inc., and The Vanguard Group each own 10% or more of Alaska Air Group, Inc.'s stock. No other publicly held corporation holds 10% or more of Alaska Airlines, Inc.'s or Alaska Air Group, Inc.'s stock.

Petitioner American Airlines, Inc., is a wholly owned subsidiary of American Airlines Group Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner Delta Air Lines, Inc., is a publicly held corporation. It has no parent corporation, and no other publicly held corporation holds 10% or more of its stock.

Petitioner Hawaiian Airlines, Inc., is a wholly owned subsidiary of Hawaiian Holdings, Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner JetBlue Airways Corporation is a publicly held corporation. It has no parent corporation, and Blackrock, Inc., and The Vanguard Group each own 10% or more of JetBlue Airways Corporation stock. No other publicly held corporation holds 10% or more of JetBlue Airways Corporation's stock.

Petitioner United Airlines, Inc., is a wholly owned subsidiary of United Airlines Holdings Inc. No other publicly held corporation holds 10% or more of United Airlines, Inc.'s stock.

## II.    Respondent

The United States Department of Transportation is an agency of the federal government.

## III.    Interested parties

### A.    Counsel for Petitioners

Counsel for Petitioners in the litigation are:

- Shay Dvoretzky, Alisha Nanda, Parker Rider-Longmaid, Kyser Blakely, and Nicole Welindt; Skadden, Arps, Slate, Meagher & Flom LLP, for Petitioners Airlines for America, National Air Carrier Association, and International Air Transport Association

- Paul W. Hughes, Andrew A. Lyons-Berg, and Nicole E. Wittstein; McDermott Will & Emery LLP, for Petitioners Airlines for America, National Air Carrier Association, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.

### B.    Opposing counsel

Opposing counsel in the litigation are:

- Nicholas S. Crown and Michael Raab, U.S. Department of Justice

- Subash S. Iyer, U.S. Department of Transportation

### C.    Other interested parties

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.

Dated: June 14, 2024          */s/ Shay Dvoretzky*
                              Shay Dvoretzky

                              *Counsel for Petitioners*
                              *A4A, NACA, & IATA*

## REQUEST FOR ORAL ARGUMENT

Petitioners request oral argument on this stay motion. The Department of Transportation has issued a rule that will upend how airlines convey certain information to consumers. As the motion explains, the Department has no authority to issue the rule, and it violated the Administrative Procedure Act to boot. Moreover, as several airlines have attested, *see infra* pp. 23-25, the rule will cause immense, immediate, and irreparable harm unless it is stayed. As the Court has recognized in other cases, oral argument is likely to help it decide whether to grant a stay in such an urgent and important matter. *See, e.g., Basinkeeper v. United States Army Corps of Engineers*, 715 F. App'x 399, 400 (5th Cir. 2018); *Whole Woman's Health v. Lakey*, 769 F.3d 285, 289 (5th Cir.), *vacated in part*, 574 U.S. 931 (2014); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

REQUEST FOR ORAL ARGUMENT.................................................. iv

TABLE OF AUTHORITIES................................................................ vii

INTRODUCTION ............................................................................1

BACKGROUND ...............................................................................5

    A.    Legal background ................................................................5

    B.    Procedural background ......................................................6

ARGUMENT ...................................................................................11

I.    The Airlines are likely to succeed on the merits. ...................11

    A.    The Rule exceeds DOT's statutory authority. .............................11

        1.    DOT may only *prohibit* unfair or deceptive practices, but it has *mandated* particular practices. ...........................11

        2.    The Rule unlawfully regulates practices that are not unfair or deceptive.................................................14

    B.    The Rule violates the APA. ...........................................19

        1.    The Rule does not reflect reasoned decisionmaking. .......20

        2.    DOT unlawfully relied on new data without giving the public a meaningful opportunity to comment...........22

II.    The Rule will cause the Airlines irreparable harm................23

III.    The balance of harms and the public interest support a stay. .............25

CONCLUSION ................................................................................26

# TABLE OF CONTENTS
(continued)

**Page**

CERTIFICATE OF COMPLIANCE ....................................................27

CERTIFICATE OF CONFERENCE ....................................................28

CERTIFICATE OF SERVICE ...............................................................29

INDEX OF SPECIAL APPENDIX........................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Airlines, Inc. v. Wolens,*
  513 U.S. 219 (1995)..................................................................1, 6

*Career Colleges & Schools of Texas v.*
  *United States Department of Education,*
  98 F.4th 220 (5th Cir. 2024).................................................24

*Carlson v. Postal Regulatory Commission,*
  938 F.3d 337 (D.C. Cir. 2019)..............................................14

*Chamber of Commerce of the United States v. United States*
  *Securities & Exchange Commission,*
  85 F.4th 760 (5th Cir. 2023).................................................20

*Chemical Manufacturers Ass'n v. Environmental Protection Agency,*
  870 F.2d 177 (5th Cir. 1989).................................................22

*Idaho Farm Bureau Federation v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995).............................................22, 23

*Louisiana v. Biden,*
  55 F.4th 1017 (5th Cir. 2022)..............................................4, 25

*Mexican Gulf Fishing Co. v. United States Department of Commerce,*
  60 F.4th 956 (5th Cir. 2023).................................................20

*Restaurant Law Center v. United States Department of Labor,*
  66 F.4th 593 (5th Cir. 2023).............................................23, 24

*Reves v. Ernst & Young,*
  494 U.S. 56 (1990)...............................................................5

*Texas Ass'n of Manufacturers v. United States*
  *Consumer Product Safety Commission,*
  989 F.3d 368 (5th Cir. 2021).................................................22

*United States v. Wells,*
  519 U.S. 482 (1997).............................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

Federal Aviation Act of 1958,
Pub. L. No. 85-726, 72 Stat. 731 ........................................................5

Pub. L. No. 85-726, § 411, 72 Stat. at 769 ......................................5, 6

Pub. L. No. 85-726, § 1002(b), 72 Stat. at 788-89 .............................5

Pub. L. No. 85-726, § 1002(d), 72 Stat. at 789 ........................ 5, 6, 12

Pub. L. No. 85-726, § 1002(f), 72 Stat. at 789-90............................5, 6

Administrative Procedure Act,
5 U.S.C. § 551 *et seq.*............................................... 1, 4, 19, 22

5 U.S.C. § 553(c) .............................................................................22

5 U.S.C. § 706(2)(A) ........................................................................19

5 U.S.C. § 706(2)(C) ........................................................................11

5 U.S.C. § 706(2)(D) ........................................................................19

Federal Trade Commission Act,
15 U.S.C. § 41 *et seq.*......................................................................14

15 U.S.C. § 45(n)..............................................................................14

Airline Deregulation Act of 1978,
49 U.S.C. § 1371 *et seq.*............................................... 1, 3, 5, 6

49 U.S.C. § 40101(a)(6) .....................................................................1

49 U.S.C. § 41712........................................................... 7, 9, 11

49 U.S.C. § 41712(a) ................................................... 3, 5, 6, 11,
....................................................................... 13, 14, 17, 19

49 U.S.C. § 46301(a)(1)(B) ..............................................................25

REGULATIONS, FINAL AND PROPOSED RULES, AND GUIDANCE

14 C.F.R. § 399.79(b)(1) ...................................................................14

14 C.F.R. § 399.79(b)(2) .............................................................. 17, 18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Defining Unfair or Deceptive Practices,*
　　85 Fed. Reg. 78,707 (Dec. 7, 2020)....................................................................14

*Enhancing Transparency of Airline Ancillary Service Fees,*
　　87 Fed. Reg. 63,718 (Oct. 20, 2022) ...........................................................6, 9

*Enhancing Transparency of Airline Ancillary Service Fees,*
　　89 Fed. Reg. 34,620 (Apr. 30, 2024) .............................................. 1, 2, 3, 4, 6, 7,
　　................................................................................................ 8, 9, 10, 11, 12,
　　................................................................................................ 13, 14, 15, 16, 17,
　　................................................................................................ 18, 19, 20, 21, 23, 24, 25

*Guidance Regarding Interpretation of Unfair and Deceptive Practices,*
　　87 Fed. Reg. 52,677 (Aug. 29, 2022).............................................. 14, 15, 17, 18

OTHER AUTHORITIES

Airlines for America, Comment Letter on Proposed Rule
　　*Enhancing Transparency of Airline Ancillary Service Fees*
　　(Jan. 23, 2023), https://tinyurl.com/3ac8hn48.................... 1, 2, 7, 15, 16, 17

Regulatory Impact Analysis on Final Rule
　　*Enhancing Transparency of Airline Ancillary Service Fees*
　　(Apr. 23, 2024), https://tinyurl.com/2024-RIA ......................... 9, 10, 15, 17,
　　................................................................................................ 20, 21, 22, 23

Regulatory Impact Analysis on Proposed Rule
　　*Enhancing Transparency of Airline Ancillary Service Fees*
　　(Sept. 25, 2022), https://tinyurl.com/2022-RIA ........................... 6, 7, 22, 23

## INTRODUCTION

Petitioners (the Airlines) move for a stay pending this Court's resolution of their Petition challenging a new Department of Transportation (DOT) regulation, *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule). The Rule exceeds DOT's authority and violates the Administrative Procedure Act (APA). Unless stayed, the Rule will impose immense irreparable harm on the Airlines.

1.  In the Airline Deregulation Act (ADA), Congress "plac[ed] maximum reliance on competitive market forces" "to provide the needed air transportation system." 49 U.S.C. § 40101(a)(6). The ADA left "the selection and design of marketing mechanisms" "to the airlines themselves," confident that "[m]arket efficiency" was the best policy. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 230 (1995).

The results have been an overwhelming success for consumers and the industry alike. Fares have reached "historically low" levels, enabling more air travel and more carriers to enter the market. Airlines for America (A4A) Comments Attachment C 5, 11, https://tinyurl.com/3ac8hn48. Because the industry is "highly competitive," airlines compete for customers by allowing passengers to pay for the services that meet their needs—whether their

preference is ticket flexibility, checked bags, seat location, or something else. *Id.* at 17, 19. Passengers can "customize their travel experience to meet budget and individual travel preferences and needs." *Id.* at 15-17.

Airlines transparently disclose all those choices—ancillary services— and the associated fees. They also share that information with ticket agents via contractual partnerships that promote consumer choice. Indeed, transparency is the only way to succeed in a competitive market. Consumers know that each airline has its menu of options, that not every menu looks the same, and that not every choice is on the first page of the menu. Reasonable consumers also know that ancillary services often cost money.

**2.**    Against that backdrop, DOT issued its Rule in search of a problem. Although the Airlines already provide consumers with convenient links to all ancillary-fee information, the Rule requires airlines and ticket agents to disclose those fees online in specific places at specific times and, sometimes, with DOT-scripted language. For example, airlines *must* disclose ancillary fees at the first step of the search process, including detailed passenger-specific information when possible. Put differently, airlines must flood consumers with information—which *most* consumers find immaterial—that will make a computer or smartphone screen so difficult to navigate

that consumers will be unable to efficiently search for and book flights. Different flight times, airports, connections, and class and ticket types are enough for one screen, without also cramming checked-bag and cancellation fees onto the very first display. Whatever its value as a political soundbite, the Rule makes no sense for consumers or the Airlines, because it creates rather than solves problems.

**3.**     It also violates the law. DOT may order an airline or ticket agent "to stop" engaging in "unfair or deceptive" practices. 49 U.S.C. § 41712(a). But the power "to stop" "unfair or deceptive" practices doesn't include the power to prescribe particular "fair" or "honest" practices. DOT's predecessor had both powers, but Congress eliminated the prescriptive power when it enacted the ADA. The Rule thus exceeds DOT's authority: it dictates when, where, and how airlines *must* disclose ancillary fees, without establishing that DOT can prohibit *every other* disclosure method as unfair. The Rule also exceeds DOT's authority because the practices it regulates aren't "unfair or deceptive." Consumers already know how to get the information they need. They aren't deceived by hyperlinked disclosures, the standard practice.

In concluding otherwise, DOT failed to rely on meaningful data and to grapple with the harm the Rule will cause *all* consumers. It acknowledged,

for instance, that it lacked "reliable measures" of the supposed "key driver" of the cost-benefit analysis—how many consumers find information about ancillary fees relevant. Justifying a rule based on the quantitative benefits the agency itself cannot quantify is casebook *un*reasoned decisionmaking violating the APA. DOT then compounded the violation by trying to justify the Rule, which applies to *all* consumers, based on how many *students* in a survey said they cared about baggage-fee information—without providing a chance to comment on that inexplicable approach.

**4.** The Court should stay the Rule. The Rule is unlawful, so the public interest and equities also support a stay. *Cf. Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). And without a stay, the Airlines will immediately suffer immense irreparable harm. With the compliance deadline just months away, the Airlines must begin the expensive and time-consuming process of reengineering their digital platforms. Those efforts won't help consumers— the changes will only waste their time and energy on too much information that is more efficiently available elsewhere. What's more, those costly measures will divert resources from airlines' improvement projects, delaying other market-driven benefits to airlines and consumers alike.

## BACKGROUND

### A.    Legal background

DOT may "investigate and decide whether an air carrier, foreign air carrier, or ticket agent has been or is engaged in an unfair or deceptive practice," and, if it so finds "after notice and an opportunity for a hearing," it "shall order" the entity "to stop the practice." 49 U.S.C. § 41712(a). That language and "the backdrop of what Congress was attempting to accomplish," *Reves v. Ernst & Young*, 494 U.S. 56, 62-63 (1990), in the ADA make clear that DOT's authority is only prohibitory, not prescriptive.

Before the ADA, the Federal Aviation Act of 1958 (1958 Act), Pub. L. No. 85-726, 72 Stat. 731, enabled the Civil Aeronautics Board to *prescribe* certain practices and *prohibit* others. Title IV authorized the Board to "investigate and determine whether any air carrier … has been or is engaged in unfair or deceptive practices" and to order the carrier "to cease and desist from such practices." *Id.* § 411, 72 Stat. at 769. Relatedly, Title X detailed the procedures applicable to investigations involving "*any* question [that] may arise under *any* of the provisions of [the] Act." *Id.* § 1002(b), 72 Stat. at 788-89 (emphases added). If the Board determined that a carrier had engaged in a "practice affecting [a] rate, fare, or charge" that was "unjust or

unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial," it could "prescribe … the lawful … practice" *or* "order" the carrier to "discontinue … [the] practice." *Id.* § 1002(d), (f), 72 Stat. at 789-90.

In 1978, however, Congress "largely deregulated" the airline industry, enacting the ADA to "promote 'maximum reliance on competitive market forces.'" *Wolens*, 513 U.S. at 222, 230. Congress replaced the Board with DOT and withdrew certain powers the Board had possessed, including the "power to prescribe rates and practices of air carriers." 1958 Act, § 1002(d), 72 Stat. at 789 (capitalization altered). Congress left DOT with the narrow authority to *prohibit* unfair and deceptive carrier practices. *See id.* §§ 411, 1002(f), 72 Stat. at 769, 789-90; 49 U.S.C. § 41712(a).

**B.    Procedural background**

**1.**    In 2022, DOT proposed mandating ancillary-fee disclosures for certain entities, in certain ways, in certain places, and at certain times. *Enhancing Transparency of Airline Ancillary Service Fees*, 87 Fed. Reg. 63,718 (Oct. 20, 2022). Given "a lack of data," DOT could "not … evaluate the effects of the proposed rule quantitatively." *Id.* at 63,732. For example, its Regulatory Impact Analysis (2022 RIA), https://tinyurl.com/2022-RIA, cited *no data* supporting its benefits theory, because DOT "[did] not have an estimate" of

how much "search time" the Rule might save consumers or "information on the size of the potential offsets"—*i.e.*, costs. 2022 RIA 21, 23. DOT thus concluded it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs." *Id.* at ii.

In comments, A4A questioned DOT's authority to issue the rule and explained that the rule was arbitrary and capricious, especially given DOT's "cursory and severely flawed cost-benefit analysis." A4A Comments 12-16, 20-31, 34, 48-58. Unlike DOT, which made clear that it *lacked* data, A4A cited a survey (Campbell-Hill survey) of A4A's members finding that "only 20 percent of all passengers check and pay for their first checked bag." A4A Comments Attachment B 10. Moreover, A4A explained, the rule would hurt *all* consumers by mandating "disclosures [that] would consume scarce screen real estate"—"often on mobile devices with smaller screens"—"and cause fewer flights from the search results to be shown at a time on customers' screens." A4A Comments 38.

**2.**   On April 30, 2024, DOT issued the Rule, invoking § 41712 as authority. 89 Fed. Reg. at 34,627.

**a.**   The Rule contains numerous requirements. *See generally id.* at 34,621-22. Among other things, carriers and ticket agents must disclose fees

for critical ancillary services—"transporting the first checked bag, the second checked bag, or a carry-on bag" and "the ability for a consumer to cancel or change a reservation"—at "the first time that fare and schedule information is disclosed," and not "through a hyperlink." *Id.* at 34,675. For "passenger-specific" searches, carriers must also make "passenger-specific" disclosures—they must "take[] into account" "the passenger's status in the airline's frequent flyer program," "military status," and "status as a holder of a particular credit card." *Id.* And before final purchase, carriers must conspicuously disclose "weight and dimension limitations" for first and second checked bags and carry-on bags, and "components of change and cancellation policies." *Id.* at 34,676. Carriers must also display, verbatim, whenever offering "a seat selection for a fee: 'A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel.'" *Id.* Moreover, carriers must disclose all this critical-ancillary-fee information to ticket agents, in a manner "useable, current, accurate, and sufficient to ensure" ticket agents' compliance with the Rule. *Id.* at 34,677.

- 8 -

Carriers have six months to "share data with ticket agents as required in this rule" and twelve months to "meet the critical ancillary service fee disclosure requirements." *Id.* at 34,667.

**b.**     DOT justified the Rule primarily on two grounds.

*First*, DOT concluded that failing to disclose ancillary-fee information when first displaying fare and schedule information in response to a consumer search is unfair and deceptive. For instance, DOT stated—without evidence—that, under current practices, consumers might spend additional time searching for total travel costs, or pay more given their inability to easily compare carrier prices. *Id.* at 34,627. DOT also stated that current practices could cause misunderstandings about the total purchase price or change or cancellation policies. *Id.* at 34,630. In DOT's view, the *only* way to comply with the law is to follow the Rule: "the failure to provide and adhere to the disclosures required by this [Rule]" is "an unfair and deceptive practice" under § 41712. *Id.* at 34,677.

*Second*, DOT concluded that the Rule's benefits outweigh its costs. DOT tried fixing its "lack of data" problem, 87 Fed. Reg. at 63,732, with a new Regulatory Impact Analysis (2024 RIA), https://tinyurl.com/2024-RIA. But it acknowledged that its new results—which the public couldn't

comment on—were "driven by values of uncertain parameters," 2024 RIA 25. Additionally, in assessing "the share of consumers who find the information on ancillary fees relevant to their purchase decision" (*i.e.*, the purported beneficiaries), DOT dismissed the Campbell-Hill survey, which found that only 20% of passengers pay for a checked bag, and instead relied on a unique survey focusing on students. 2024 RIA 16-18, 26-27. That survey found "that 46 percent of student participants consider baggage fee information when they search for airfare." 2024 RIA 16. DOT claimed it was more "plausible" that a student survey reflected general consumer behavior. 2024 RIA 16-18.

Using estimates that between 46% and 61% of consumers consider ancillary fees, DOT estimated the benefits "to range from $365 million to $484 million annually," while the costs to consumers would "range from $239 million to $331 million annually." 89 Fed. Reg. at 34,622. The "net benefits" would "range[] from $30.3 million to $254 million." 2024 RIA at i; *see also* 89 Fed. Reg. at 34,668. DOT didn't account for the costs that *all* consumers— including those who care about ancillary fees—would incur from difficulty navigating search results given the increased disclosures. 2024 RIA at ii.

**3.** The Airlines asked DOT to stay the Rule pending this Court's review. SA1-8. DOT denied the request. SA9-16.

## ARGUMENT

The Court should stay the Rule. The Airlines are likely to succeed on the merits; they will suffer irreparable harm without a stay; a stay would not substantially harm other parties; and the public interest supports a stay.

**I.    The Airlines are likely to succeed on the merits.**

**A.    The Rule exceeds DOT's statutory authority.**

The Rule is "unlawful" and must be "set aside," 5 U.S.C. § 706(2)(C), because it exceeds DOT's limited authority to "stop" "unfair or deceptive practice[s]," 49 U.S.C. § 41712(a). DOT hasn't just ordered carriers and ticket agents to *stop* certain practices. It has instead *mandated* particular practices— a power it lacks. Moreover, because the regulated practices are not "unfair or deceptive," § 41712 doesn't permit DOT to regulate them.

**1.    DOT may only *prohibit* unfair or deceptive practices, but it has *mandated* particular practices.**

Section 41712(a) authorizes DOT to "investigate and decide whether" a covered entity "has been or is engaged in an unfair or deceptive practice." If so, DOT "shall order" the entity "to stop the practice." *Id*. In ordinary English, the power to "stop" doesn't include the power to prescribe.

- 11 -

Statutory history confirms that point. *Supra* pp. 5-6. Airline deregulation eliminated the federal "power to prescribe … practices of air carriers," including "the lawful … practice" when the government determines that a current "practice affecting [a] rate, fare, or charge … is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial." 1958 Act, § 1002(d), 72 Stat. at 789 (capitalization altered). "The most likely inference in these circumstances is that Congress deliberately" eliminated the power to prescribe yet preserved the power to prohibit. *United States v. Wells*, 519 U.S. 482, 493 (1997).

To be sure, prohibiting an omission might sometimes mean mandating some form of disclosure. But the power to *prohibit* omissions doesn't include the power to *prescribe* the *exclusive* means of compliance, unless every other disclosure is also unfair. Thus, while DOT might be able to prohibit omissions by generally requiring that ancillary fees be disclosed somehow, it cannot specify the mandatory method of disclosure unless it shows that it can prohibit *every other possibility* as statutorily "unfair."

The Rule fails that test—it imposes many specific mandates with no finding that alternatives are unfair:

- Airlines and ticket agents must make critical-ancillary-fee disclosures "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific flight itinerary." 89 Fed. Reg. at 34,621.

- Disclosures must note when "a fare category does not allow changing or canceling a reservation or transporting a checked or carry-on bag." *Id.*

- "Fees cannot be displayed through a hyperlink." *Id.*

- Disclosures must be passenger-specific "if a consumer conducts a passenger-specific itinerary search." *Id.*

- "[A]ny page or step of the booking process in which a consumer is offered a seat selection for a fee" must include several verbatim sentences about seat selection. *Id.* at 34,676.

- Air carriers must disclose ancillary-fee information to ticket agents in a manner "useable, current, accurate, and sufficient to ensure compliance" with the Rule by ticket agents. *Id.* at 34,677.

The Rule doesn't just prohibit—it prescribes. It tells airlines and ticket agents *what* they must do (disclose ancillary-service fees), and also *when* (the moment they provide fare and schedule information), *where* (usually online, and often on *the first page* of online search results), and *how* (not through hyperlinks, and sometimes with specific words) they must do it. Unless every other disclosure method is also "unfair"—and DOT didn't assert as much, let alone make findings to that effect—those requirements are prescriptive, not merely prohibitory, and thus exceed DOT's § 41712(a) authority.

### 2. The Rule unlawfully regulates practices that are not unfair or deceptive.

The Rule also exceeds DOT's authority because the practices it regulates are not "unfair" or "deceptive" under § 41712(a) and DOT's own interpretation of those terms, *Defining Unfair or Deceptive Practices*, 85 Fed. Reg. 78,707, 78,708 (Dec. 7, 2020) (*Definitional Rule*)—a problem that also makes the Rule arbitrary and capricious, *cf. Carlson v. Postal Regulatory Commission*, 938 F.3d 337, 345, 351 (D.C. Cir. 2019).

**a.** An unfair practice under § 41712(a) is one that "causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition." 14 C.F.R. § 399.79(b)(1). That definition tracks Section 5 of the Federal Trade Commission Act, on which Congress modeled § 41712(a), and which expressly provides that a practice is not "unfair" unless it "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n); *see Definitional Rule*, 85 Fed. Reg. at 78,708, 78,714. The test requires evaluating "net effects," because "some practices may be harmful to consumers in some respects, but beneficial to consumers

- 14 -

in other respects." *Guidance Regarding Interpretation of Unfair and Deceptive Practices*, 87 Fed. Reg. 52,677, 52,679 (Aug. 29, 2022). For example, one "unfair" practice is "delaying passengers on the tarmac for a substantial length of time without the opportunity to deplane or without adequate food, water, lavatory facilities, and medical attention," because it "imposes substantial harm" that a passenger who "lacks the opportunity to deplane" cannot reasonably avoid. *Id.*

Here, the practices the Rule regulates are not "unfair." As A4A explained (Comments 45-46), any consumer harm from not having disclosures on the *first* search page is reasonably avoidable because consumers can, and do, read those disclosures on *other* pages, which are just a click away. Indeed, DOT doesn't dispute that "every A4A passenger carrier displays or makes available at first search results the ancillary fee information that DOT proposes" for an anonymous search—they just may use hyperlinks, which the Rule now prohibits. A4A Comments 17-18; *see* 89 Fed. Reg. at 34,632. Ancillary-fee disclosures are nothing like the inability to deplane to access food, water, or restrooms: consumers can easily navigate to the disclosures in seconds. *See* 2024 RIA 15. Nor is the supposed "harm" from having to click a

link anything like the injury passengers experience while sitting on the tarmac without services.

What's more, to have prohibitory authority to mandate these requirements, DOT would have needed to conclude that *all* other practices would be unfair—meaning it would have needed to provide substantially more justification. *See supra* pp. 12-13. For example, why is every verbal formulation other than DOT's three required sentences for describing fares for seat selection, 89 Fed. Reg. at 34,676, unfair? Similarly, why is it unfair not to show individuals who have status with an airline, and thus *know* that their bags fly free, a $0 baggage fee in the initial search results, *id.* at 34,675? DOT has not even tried to show that consumers would be harmed if carriers described fares for seats differently, or that frequent flyers cannot reasonably avoid any harm by looking at the terms of their benefits when booking (if they even need to do so as *frequent* flyers).

Even assuming consumers suffer "harm" by clicking a link to access ancillary-fee information, the benefits of clear, easily-navigable search results substantially outweigh it. The Rule thus has a net *negative* effect, because it will result in a "less efficient, less clear e-commerce platform." A4A Comments 48. Screen real estate is scarce, and airlines have designed

their websites "to be as efficient as possible while showing passengers as many possible itinerary and fare options that are offered." A4A Comments 38-40. The Rule throws that clarity into chaos. Imagine searching for a flight to Chicago on a phone and sifting through information about many flights, at different times of day and with different connections, to each of Chicago's two major airports. The Rule creates instant information overload: consumers will face the daunting, "unwieldy clutter," on the *first* page of their results, of additional "information regarding bag fees, change/cancel fees, and seating fees for each fare product (e.g., first class, premium economy, main cabin, basic economy, etc.)." A4A Comments 40. The Rule will make booking flights by smartphone especially difficult.

DOT's own analysis proves the point: "In the case of disclosures, more information is not always better." 2024 RIA 18. Indeed, data shows that the Rule will slow consumers down. *Id.* And DOT admits that consumer benefits are "uncertain." 2024 RIA 25, 27. DOT's conclusory claim about harms and benefits, *see* 89 Fed. Reg. at 34,627-29, does not and cannot establish that the regulated practices are actually "unfair" and within its § 41712(a) authority.

**b.**    A practice is "deceptive" "if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material

matter," 14 C.F.R. § 399.79(b)(2), like "express misrepresentations, implied representations, and omissions," 87 Fed. Reg. at 52,680. Consumer reasonableness turns on the totality of the circumstances, including "the familiarity of the public with the product, and the availability of alternate sources for the information." *Id.* Airlines are not responsible for consumers' "feeling[s] or opinion[s]." *Id.* at 52,680 & n.49. DOT has concluded, for example, that "an airline's frequent flyer programs were not deceptive simply because consumers may have assumed that airlines could not make such changes to the program, or were surprised that miles could not be sold, when the terms of the plan themselves were clear." *Id.* at 52,680 n.49.

Here, the regulated practices are not "deceptive." Again, DOT itself recognized that carriers, in compliance with federal law, already disclose the information that the Rule covers. *See* 89 Fed. Reg. at 34,632. And those disclosures are easily accessible. Consider Delta Air Lines, Inc., and American Airlines, Inc., which, like every other Airline, link to baggage fee information on the initial search results page, next to the flight itinerary. SA46, SA38. And on both Delta's and American's websites, a consumer who clicks on a particular fare class may receive a pop-up explaining the fees and policies for that fare class. SA38, SA47-49, SA55-56.

Despite acknowledging data confirming that consumers already know about ancillary fees, DOT concluded that current practices are deceptive because "consumers do not know the amount of the fees that will apply to them, given the complexity of fee structures." 89 Fed. Reg. at 34,633, 34,641. Reasonable consumers know that fees and policies vary across airlines even if they don't know "the amount of [those] fees." *Id.* at 34,633. Thus, a reasonable consumer wouldn't think that the standard fare is automatically the final price (inclusive of all ancillary services) or that ancillary fees are uniform across airlines, and asking consumers to click a hyperlink isn't "deceptive."[*]

### B.    The Rule violates the APA.

Under the APA, courts must "set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The Rule fails both tests.

---

[*] The Rule is also unlawful because § 41712(a) confers only adjudicatory, not rulemaking, authority, as the Chamber of Commerce's amicus brief will explain.

### 1.    The Rule does not reflect reasoned decisionmaking.

**a.**    Agency action is arbitrary and capricious if it rests on an irrational or unexplained cost-benefit analysis. *Mexican Gulf Fishing Co. v. United States Department of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023). For example, *Mexican Gulf Fishing* held that a requirement was arbitrary and capricious where the government "failed to demonstrate that it would [produce] meaningful benefits." *Id.* Similarly, *Chamber of Commerce of the United States v. United States SEC*, 85 F.4th 760, 777-78 (5th Cir. 2023), held that an agency's asserted benefit was "inadequately substantiated," because the agency failed to show that the rule remedied "a genuine problem."

**b.**    The Rule is arbitrary and capricious, because DOT has not established a genuine problem that needs solving—namely, that consumers care more about ancillary-fee disclosures than they do clarity and efficiency. The purported benefit is time saved from not needing "to find information on ancillary service fees." 89 Fed. Reg. at 34,622. But the Rule indisputably slows consumers down. *Supra* pp. 16-17.

According to DOT, the "key driver" in the cost-benefit analysis was "the share of consumers who find the information on ancillary fees relevant to their purchase decision." 2024 RIA 26-27. But DOT has no idea what that

share is because—as it admits—it does "not have reliable measures" of those passengers *or* of how much "time these passengers will save while searching for air travel on airline and non-airline websites under the final rule." 2024 RIA 25. The Rule is arbitrary and capricious because the Department, relying on an uncertain metric, failed to explain how real benefits would outweigh the undisputed and extensive costs.

DOT's conjecture that 46% is a "plausible" guess about how many consumers might benefit from the confusion-inducing disclosures, *see* 2024 RIA 16-18, cannot save the Rule. The guess itself is unexplained and irrational. DOT did not explain why students—who often travel for long stretches over winter and summer breaks, thus needing to move more belongings—reflect general consumer behavior. It couldn't—students aren't representative of the traveling public. Nor did DOT rationally explain how benefits supposedly extending to less than 50% of consumers outweigh the costs exacted on all consumers. DOT also didn't account for the navigation costs of its rule to *all* consumers, including those who care about ancillary-service fees. Although the mandated disclosures might conceivably speed up consumers' discrete task of finding information about a specific fee, the clutter is likely to slow down the very same customers in other ways.

**2.    DOT unlawfully relied on new data without giving the public a meaningful opportunity to comment.**

**a.**    An agency violates its notice-and-comment obligations, 5 U.S.C. § 553(c), when it relies on data the public never saw. Agencies must "afford interested parties an opportunity to challenge the underlying factual data relied on by the agency." *Chemical Manufacturers Ass'n v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989). If an agency "supplant[s]" or "replace[s] its original data with completely new and different data," it must provide another comment period. *Id.* at 202. The key question is whether the new data does more than just "supplement or confirm existing data." *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995). Indeed, this Court recently held that the agency "violated the APA's notice-and-comment procedures by not adequately allowing for comment after it changed its primary justification for the rule but before adopting a final rule" by relying on "new data." *Texas Ass'n of Manufacturers v. United States Consumer Product Safety Commission*, 989 F.3d 368, 382-83 (5th Cir. 2021).

**b.**    DOT's failure to solicit comments on the 2024 RIA violated § 553(c), because the 2024 RIA was markedly different from the 2022 RIA. For example, the 2022 RIA said it was "not possible to quantify total benefits

or total costs" or "to quantify whether the proposed rule would yield benefits that exceed costs." 2022 RIA ii. Because the "degree to which the proposed rule generates benefits [was] unclear," 2022 RIA 27, the 2022 RIA "did not provide quantitative analysis of benefits and costs," 2024 RIA 5. The 2024 RIA, by contrast, concluded that "the estimate of annual net benefits ranges from $30.3 million to $254 million" and that "the probability of net benefits being positive is roughly 53 percent." 2024 RIA at i.

The 2024 RIA did much more than "supplement or confirm existing data," because there was "no supporting data" in 2022. *Idaho Farm*, 58 F.3d at 1402-03. The 2024 RIA was "central" to the Rule, *id.* at 1403, and it was required by law, 89 Fed. Reg. 34,668. And without the (flawed) cost-benefit analysis in the 2024 RIA, DOT couldn't even purport to conclude that the regulated practices were unfair—meaning DOT would have lacked authority for the Rule. As explained, a practice is unfair only if its harm outweighs its benefits. *Supra* pp. 14-17.

## II.     The Rule will cause the Airlines irreparable harm.

Without a stay, the Airlines will suffer irreparable harm.

"[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Restaurant Law Center v.*

*United States Department of Labor*, 66 F.4th 593, 600 (5th Cir. 2023). "Alleged compliance costs need only be 'more than de minimis,'" and courts consider parties' "descriptions of harms." *Career Colleges & Schools of Texas v. United States Department of Education*, 98 F.4th 220, 236 (5th Cir. 2024).

The Airlines will incur both immediate and downstream nonrecoverable costs, *see* SA17-131, including:

- The Airlines must make massive changes to their websites and mobile displays. United would have to "significantly reengineer" both platforms. SA96-97. JetBlue (SA87) and Hawaiian (SA74) would have to redesign their user booking process. Alaska would have to "substantially reconstruct key components of its website and mobile app." SA29-30.

- These changes will be expensive. United estimates costs of $5 million. SA97. JetBlue estimates needing to spend $6-10 million, not including costs that its main technological partner, Sabre, may seek. SA90. American estimates that implementing the required changes will cost approximately $10-15 million. SA39.

- The Airlines will be forced to divert resources from other projects. Hawaiian would have to divert resources from developing features that would allow customers to modify or cancel flights online, rather than by phone. SA77-78. The Rule "will enormously—and irreparably—disrupt execution" of JetBlue's revenue-driving initiatives, which are worth over $300 million and are essential to its return to financial health after over $2 billion in losses since the COVID-19 pandemic. SA91. American estimates that the lost commercial opportunity from delaying its planned projects will be $30-40 million. SA39.

- Without a stay, the Airlines will begin incurring these costs immediately, because to strive to meet compliance deadlines, they cannot wait for resolution of this litigation on the merits. SA31-32; SA39-40; SA59-60; SA90-91; SA97-98.

- The Airlines must negotiate new contracts and upgrade their systems for sharing data with ticket agents, and stop working with those who are unable to upgrade their own systems—a result that threatens to cost Hawaiian millions of dollars per month. SA68. Delta must spend "up to approximately $35 million" "to invest in, develop, and deploy enhanced technology to support dynamically priced offers." SA58-59.

- Given the Rule's significant harms to their businesses and to consumers, the Airlines may incur additional costs unwinding changes if the Court vacates the Rule. SA60-61; SA91-92.

- Airlines risk substantial civil penalties if they cannot comply by the Rule's deadlines. *See* 49 U.S.C. § 46301(a)(1)(B).

## III.  The balance of harms and the public interest support a stay.

On a request to stay an agency rule, the balance-of-harms and public-interest analyses collapse with the merits analysis. *Cf. Louisiana*, 55 F.4th at 1035. Because the Airlines will likely prevail, these factors also favor a stay.

## CONCLUSION

The Court should stay the Rule pending review.

Dated: June 14, 2024

Respectfully submitted,

*/s/ Shay Dvoretzky*

Alisha Q. Nanda
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners Airlines for America (A4A), National Air Carrier Association (NACA), and International Air Transport Association (IATA)*

Paul W. Hughes
Andrew A. Lyons-Berg
Nicole E. Wittstein
MCDERMOTT WILL
  & EMERY LLP
500 North Capitol St. NW
Washington, DC 20001

*Counsel for Petitioners A4A, NACA, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, as calculated by Microsoft Word, it contains 5,200 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f), and (2) this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.


Dated: June 14, 2024                    */s/ Shay Dvoretzky*
                                        Shay Dvoretzky

                                        *Counsel for Petitioners*
                                        *A4A, NACA, & IATA*

## CERTIFICATE OF CONFERENCE

Pursuant to Circuit Rule 27.4, I hereby certify that this Court's conference requirement is satisfied because on June 10, 2024, Paul M. Geier, Acting Assistant General Counsel for Litigation and Enforcement, Department of Transportation, emailed me a letter signed by Blane A. Workie, Assistant General Counsel, Office of Aviation Consumer Protection, Department of Transportation (SA9-16), denying the Airlines' stay request and informing the Airlines that "[i]f A4A and the other petitioners move the Fifth Circuit to stay the Rule, the Department will oppose." SA10.


Dated: June 14, 2024                    */s/ Shay Dvoretzky*
                                        Shay Dvoretzky

                                        *Counsel for Petitioners*
                                        *A4A, NACA, & IATA*

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2024, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: June 14, 2024              */s/ Shay Dvoretzky*
                                 Shay Dvoretzky

                                 *Counsel for Petitioners*
                                 *A4A, NACA, & IATA*