[This page is intentionally left blank]

# INDEX OF SPECIAL APPENDIX

**Page**

The Airlines' request of the Department of Transportation to stay the effective date of *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule) (May 31, 2024) ............................................................... SA1

The Department of Transportation's denial of the Airlines' request to stay the effective date of the Rule (June 10, 2024) ......................... SA9

Declaration of Yanik Hoyles, Director of Distribution, International Air Transport Association (June 10, 2024) ................ SA17

Declaration of Charu Jain, Senior Vice President, Merchandising and Innovation, Alaska Airlines, Inc. (June 10, 2024) ..................... SA25

Declaration of Anshuman Singh, Managing Director, Customer Experience Digital Transformation, American Airlines, Inc. (June 7, 2024) ........................................................................... SA34

Declaration of Michael Hecht, Managing Director, Product Management, Delta Air Lines, Inc. (June 11, 2024) .......................... SA42

Declaration of Kristina Larson, Managing Director, Distribution, Sale Analytics, & Alliances, Hawaiian Airlines, Inc. (June 7, 2024) ........................................................................... SA62

Declaration of Tracy Behler, Senior Director, Online Experience, Hawaiian Airlines, Inc. (June 6, 2024) ................................................. SA70

Declaration of Carol Clements, Chief Digital and Technology Officer, JetBlue Airways Corporation (June 10, 2024) ..................... SA79

Declaration of Michael Petermann, Managing Director–Customer Strategy and Innovation, United Airlines, Inc. (June 5, 2024) ........ SA93

# INDEX OF SPECIAL APPENDIX
(continued)

**Page**

Declaration of John Pepper, Vice President, Corporate
Development & Government Affairs, Allegiant Travel Co.
(June 7, 2024)............................................................................. SA99

Joint Declaration of Edward M. Christie III, President and Chief
Executive Officer, Spirit Airlines, Inc., and Barry L. Biffle,
Chief Executive Officer, Frontier Group Holdings, Inc.
d/b/a Frontier Airlines (June 14, 2024).......................................... SA112

Declaration of Rose Neale, Senior Vice President and General
Counsel, Sun Country Airlines (June 6, 2024)................................ SA124

**THE AIRLINES' REQUEST OF THE
DEPARTMENT OF TRANSPORTATION TO STAY THE
EFFECTIVE DATE OF *ENHANCING TRANSPARENCY OF AIRLINE
ANCILLARY SERVICE FEES*, 89 FED. REG. 34,620 (APR. 30, 2024)
(THE RULE) (MAY 31, 2024)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL
(202) 371-7370
DIRECT FAX
(202) 661-2370
EMAIL ADDRESS
SHAY.DVORETZKY@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

May 31, 2024

Hon. Peter Buttigieg
United States Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave., SE
Washington, DC 20590

RE:    Request to stay the effective date of *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule)

Dear Secretary Buttigieg:

Airlines for America (A4A), on behalf of itself and the other petitioners challenging the Rule before the U.S. Court of Appeals for the Fifth Circuit in *Airlines for America et al. v. Department of Transportation*, No. 24-60231 (5th Cir.) (collectively, the Airlines), respectfully request that the Department of Transportation stay the effective date of the Rule such that the Rule's "Compliance/Implementation Period" (89 Fed. Reg. at 34,622) begins to run from the Fifth Circuit's issuance of its mandate resolving the Airlines' petition for review. As explained below, the Rule exceeds the Department's statutory authority and is unlawful under the Administrative Procedure Act (APA). Additionally, without a stay, the Rule will work immense irreparable harm on the Airlines.

The Airlines respectfully request that the Department respond to this stay request no later than June 10, 2024. If the Department does not respond by that date, the Airlines will move the Fifth Circuit to stay the Rule.

**ARGUMENT**

The Department, similar to a court, "may postpone the effective date of action taken by it, pending judicial review," when "justice so requires." 5 U.S.C. § 705. Whether to issue a stay turns on (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without a stay; (3) whether a stay will substantially harm other parties; and (4) whether the public interest supports a stay. *See Alliance*

- SA2 -

*for Hippocratic Medicine v. FDA*, 78 F.4th 210, 241 (5th Cir. 2023). All four factors support a stay here.

## I.     The Airlines are likely to succeed on the merits.

A stay is warranted, because the Fifth Circuit is likely to hold that the Department exceeded its statutory authority and violated the APA.

### A.     The Rule exceeds the Department's statutory authority.

Congress has authorized the Department to "investigate and decide whether an air carrier, foreign air carrier, or ticket agent has been or is engaged in an unfair or deceptive practice," and, if so, "order" the specific entity "to stop the practice." 49 U.S.C. § 41712(a). That narrow provision doesn't grant the Department authority to issue the Rule. The Rule is thus "unlawful" and must be "set aside." 5 U.S.C. § 706(2)(C).

#### 1.     The Department may only *prohibit* unfair or deceptive practices, but it has instead *mandated* particular practices.

If the Department decides, after conducting an investigation, that a covered entity "has been or is engaged in an unfair or deceptive practice," then it "shall order" the entity "to *stop* the practice." 49 U.S.C. § 41712(a) (emphasis added). As a matter of ordinary English, the power to "stop" supposedly unfair or deceptive practices doesn't include the power to "prescribe" lawful practices. That ordinary meaning is consistent with statutory history. The Department's predecessor, the Civil Aeronautics Board, could prohibit *and* prescribe unjust practices of air carriers. *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, §§ 411, 1002(d), 72 Stat. 731, 769, 787-90. But Congress eliminated the prescriptive power when it enacted the ADA. "The most likely inference in these circumstances is that Congress deliberately" eliminated the power to prescribe yet preserved the power to prohibit. *United States v. Wells*, 519 U.S. 482, 493 (1997).

The Rule is prescriptive and therefore unlawful. It tells airlines and ticket agents *what* they must do (disclose fees for ancillary services), *when* they must do it (the precise moment they provide fare and schedule information in response to a consumer search), *where* (in most cases on their online platforms, and in some cases on *the first page* of those platforms), and *how* they must do it (not through hyperlinks, and sometimes with specific words). *See generally* 89 Fed. Reg. at 34,621, 34,676-77. Section 41712(a) does not authorize these comprehensive mandates.

#### 2.     The Rule unlawfully regulates practices that are not unfair or deceptive.

The Rule also exceeds the Department's authority, and is thus arbitrary and capricious, because the practices it regulates are not "unfair" or "deceptive" under § 41712(a).

**a.** An unfair practice under § 41712(a) is one that "causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition." 14 C.F.R. § 399.79(b)(1). That definition follows from the meaning of the Federal Trade Commission Act, on which Congress modeled § 41712(a), and which expressly provides that a practice is not "unfair" unless it "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition," 15 U.S.C. § 45(n). *See Defining Unfair or Deceptive Practices*, 85 Fed. Reg. 78,707, 78,708, 78,714 (Dec. 7, 2020). The test requires evaluating "net effects," because "some practices may be harmful to consumers in some respects, but beneficial to consumers in other respects." *Guidance Regarding Interpretation of Unfair and Deceptive Practices*, 87 Fed. Reg. 52,677, 52,679 (Aug. 29, 2022). An example of an "unfair" practice is "delaying passengers on the tarmac for a substantial length of time without the opportunity to deplane or without adequate food, water, lavatory facilities, and medical attention," because it "imposes substantial harm" that a passenger who "lacks the opportunity to deplane" cannot reasonably avoid. *Id.*

The practices the Rule regulates are not "unfair." As A4A explained (Comments 45-46, https://tinyurl.com/3ac8hn48), any harm to consumers from not having ancillary-fee disclosures on the *first* page in response to a search is reasonably avoidable because consumers can find the disclosures on webpages that are just a click away. Indeed, "every A4A passenger carrier displays or makes available at first search results the ancillary fee information—that DOT proposes" for an anonymous search—they just may use hyperlinks, which the Rule now prohibits. A4A Comments 17-18. Unlike where passengers cannot deplane and do not have access to food, water, or restrooms during a lengthy tarmac delay, consumers here suffer minimal harm (if any), and any harm is reasonably avoidable, because consumers simply have to click a mouse or touch a screen to navigate all the disclosures, and can do so before purchase. *See Enhancing Transparency of Airline Ancillary Service Fees - Regulatory Impact Analysis* 15 (April 2024), https://tinyurl.com/2024-RIA (2024 RIA). And even assuming consumers suffer "harm" from navigation to an additional webpage, the benefits of clear, easily navigable search results substantially outweigh it. The Rule has a net negative effect, because it adds "unwieldy clutter" to online search results, leading to a "less efficient, less clear e-commerce platform." A4A Comments 40, 48. The Department's own analysis proves the point: The Rule demonstrably slows consumers down, whereas any benefit to consumers is "uncertain." 2024 RIA 18, 25, 27.

**b.** A practice is "deceptive" "if it is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material matter," 14 C.F.R. § 399.79(b)(2), like "express misrepresentations, implied representations, and omissions," 87 Fed. Reg. at 52,680. Consumer reasonableness turns on the totality of the circumstances, including "the familiarity of the public with the product, and the availability of alternate sources for the information." *Id.* Airlines are not responsible for consumers'

3

"feeling[s] or opinion[s]." *Id.* at 52,680 & n.49. For example, "an airline's frequent flyer programs were not deceptive simply because consumers may have assumed that airlines could not make such changes to the program, or were surprised that miles could not be sold, when the terms of the plan themselves were clear." *Id.* at 52,680 n.49.

The practices the Rule regulates are not "deceptive." The Department concluded that current practices are deceptive because "consumers do not know the amount of the fees that will apply to them, given the complexity of fee structures." 89 Fed. Reg. at 34,633. But the Department provided *no evidence* that consumers were being misled about change or cancellation fees. A4A Comments 53. Consumers have alternate sources of information about baggage fees, because airlines disclose that information on their websites. A4A Comments 50-51. Reasonable consumers know that fees and policies vary across airlines even if they do not know "the amount of [those] fees," 89 Fed. Reg. at 34,633. Thus, a reasonable consumer would not think that the standard fare is automatically the final price (inclusive of all ancillary services) or that ancillary fees are uniform across airlines.

> **3.    The statutory authority to stop an unfair or deceptive practice based on case-by-case adjudications does not include the authority to issue generally applicable regulations.**

Congress gave the Department the authority to "investigate and decide whether *an* air carrier, foreign air carrier, or ticket agent has been or is engaged in an unfair or deceptive practice," and, if it so finds "after notice and an opportunity for a hearing," to "order *the* air carrier, foreign air carrier, or ticket agent to stop the practice." 49 U.S.C. § 41712(a) (emphases added). That language makes clear that the statute, on its face, contemplates only case-by-case enforcement via case-by-case hearings and factfinding, not generally applicable rulemaking. Under well-established interpretive principles, that specific adjudicatory authority controls, leaving no space for the general authority to "take action" that the Department "considers necessary ... , including conducting investigations, prescribing regulations, standards, and procedures, and issuing orders," 49 U.S.C. § 40113(a), when it comes to "unfair or deceptive practice[s]," 49 U.S.C. § 41712(a). In other words, § 41712(a), the specific provision, "must be complied with," because it "is construed as an exception to the general [provision]," § 40113(a). *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Because § 41712(a) grants the Department only the authority to stop an unfair or deceptive practice on a case-by-case basis, and because the Rule mandates specific and generally applicable practices, the Department has exceeded its statutory authority.

Even if Congress granted the Department authority to promulgate some generally applicable regulations governing unfair or deceptive practices, it did not authorize the Department to decide the major question of how air carriers and ticket agents *must* run their businesses so as to not engage in unfair or deceptive practices. The major question doctrine embodies the "common sense" principle that Congress typically does not use

"modest words," "vague terms," or "subtle device[s]" when delegating to federal agencies massive regulatory authority. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022) (alteration in original). But the Department's reading of § 41712(a) is potentially limitless. If Section 41712(a) enables the Department to tell airlines and ticket agents, in the context of ancillary-fees disclosure, *what* they must do, *when* they must do it, *where* they must do it, and *how* they must do it, then presumably the Department can tell airlines and ticket agents, in granular detail, how to run every other aspect of their business that the Department deems "unfair." Nothing in the statute—certainly no "clear congressional authorization," *West Virginia*, 597 U.S. at 723—supports such regulatory power. If anything, the fact that Congress left "the selection and design of marketing mechanisms" "to the airlines themselves" in the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705, *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 230 (1995), shows that the Department lacks the expansive authority it claims to possess. Moreover, reading the phrase "unfair or deceptive" as such a vague, open-ended term would mean that the term lacks an intelligible principle to guide the Department, in violation of the Constitution's restriction on delegating legislative powers. *See Mistretta v. United States*, 488 U.S. 361, 371-72 (1989). Indeed, that concern supports "read[ing] the [law] narrowly to avoid constitutional problems." *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974).

## B.    The Rule violates the APA.

The APA requires courts to "set aside agency action, findings, and conclusions" that are (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or (2) "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (D), including the requirement to "give interested persons an opportunity to participate" through public comment, *id.* § 553(c). The Rule fails both tests.

### 1.    The Rule does not reflect reasoned decisionmaking.

Agency action is "arbitrary and capricious" if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Failing to rationally consider the expected costs or adequately substantiate the supposed benefits violates the APA. *See, e.g., Mexican Gulf Fishing Co. v. United States Department of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023); *Chamber of Commerce of the United States v. United States SEC*, 85 F.4th 760, 777-78 (5th Cir. 2023).

The Rule is arbitrary and capricious because the Department failed to substantiate the supposed benefits and failed to seriously consider the costs. The Department stated that the "key driver" in the cost-benefit analysis was "the share of consumers who find the information on ancillary fees relevant to their purchase decision." 2024 RIA 26-27. But the Department has no idea what that share is, because it does "not have reliable

measures" of those passengers *or* of how much "time these passengers will save while searching for air travel on airline and non-airline websites under the final rule." 2024 RIA 25. Moreover, while the Department asserts that 46% is a "plausible" guess about how many consumers will consider ancillary-services fees when purchasing a ticket, 2024 RIA 16-18, it does not rationally explain how benefits supposedly extending to less than 50% of consumers outweigh the costs (*e.g.*, confusion and inefficiency) exacted on all consumers. The Rule is thus arbitrary and capricious.

### 2.    The Department unlawfully relied on new data without giving the public a meaningful opportunity to comment.

Under 5 U.S.C. § 553(c), an agency must provide the public an opportunity to comment on its proposed rules, including "the underlying factual data relied on by the agency." *Chemical Manufacturers Ass'n v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989). The failure to provide notice of and an opportunity to comment on new data—*i.e.*, data that does more than just supplement or confirm existing data—constitutes an APA violation. *See Texas Ass'n of Manufacturers v. United States Consumer Product Safety Commission*, 989 F.3d 368, 382-83 (5th Cir. 2021); *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995).

The Department violated the APA, because it issued the Rule in reliance on the 2024 RIA—which included data that wholly replaced the data from its earlier analysis, *Enhancing Transparency of Airline Ancillary Service Fees - Regulatory Impact Analysis* 26-27 (September 2022), https://tinyurl.com/2022-RIA (2022 RIA)—without giving the public an opportunity to comment on the 2024 RIA. The differences between the 2024 RIA and 2022 RIA are clear and significant. For example, the 2022 RIA "did not provide quantitative analysis of benefits and costs," 2024 RIA 5, because it was "not possible to quantify total benefits or total costs" or "to quantify whether the proposed rule would yield benefits that exceed costs," 2022 RIA at ii. The 2024 RIA, by contrast, concluded that "the estimate of annual net benefits ranges from $30.3 million to $254 million" and that "the probability of net benefits being positive is roughly 53 percent." 2024 RIA at i.

Because the 2022 RIA did not have *any data* supporting the cost-benefit analysis, the 2024 RIA necessarily replaced the nonexistent data. The Department was required to give the public another opportunity to comment. Its failure to do so violated the APA.

## II.    The Rule will cause the Airlines irreparable harm.

Without a stay, the Airlines will suffer irreparable harm. "[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Restaurant Law Center v. United States Department of Labor*, 66 F.4th 593, 597 (5th Cir. 2023). "Alleged compliance costs need only be 'more than de minimis,'" and courts consider parties' "descriptions of harms." *Career Colleges & Schools of Texas v. United States Department of Education*, 98 F.4th 220, 236 (5th Cir. 2024).

The Airlines will incur both immediate and downstream nonrecoverable costs. Digital platforms for providing information to consumers would need to be completely reengineered, as would systems for sharing data with ticket agents. Those changes would be expensive, potentially costing airlines at least $5 to $10 million each, excluding labor and other related costs. Indeed, several carriers are continuing to evaluate the costs of compliance and some anticipate facing significantly greater costs. The Airlines would also be forced to divert resources from other projects and renegotiate contracts with ticket agents. Additionally, if and when the Fifth Circuit holds that the Rule is unlawful, the Airlines will need to spend more time and money *re*tooling their systems to eliminate the consumer confusion the Rule will have caused.

## III.    The balance of harms and the public interest support a stay.

The Rule is unlawful, so the public interest and the equities also support a stay. *See Alliance for Hippocratic Medicine*, 78 F.4th at 251.

### CONCLUSION

The Airlines respectfully request that the Department stay the effective date of the Rule such that the Rule's "Compliance/Implementation Period" (89 Fed. Reg. at 34,622) begins to run from the Fifth Circuit's issuance of its mandate resolving the Airlines' petition for review.

Sincerely,

Shay Dvoretzky
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com
parker.rider-longmaid@skadden.com

*Counsel for Airlines for America*

**THE DEPARTMENT OF TRANSPORTATION'S DENIAL OF THE
AIRLINES' REQUEST TO STAY THE EFFECTIVE DATE OF THE RULE
(JUNE 10, 2024)**



**U.S. Department
of Transportation**
Office of the Secretary
of Transportation

**General Counsel**

1200 New Jersey Avenue, SE
Washington, D.C. 20590

June 10, 2024

Shay Dvoretzky
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave. NW
Washington, DC 20005
(202) 371-7000
shay.dvoretzky@skadden.com
Counsel for Airlines for America

      RE:    Denial of Airlines for America's Request to Stay the Effective Date of *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Ancillary Service Fees Rule)

Dear Mr. Dvoretzky:

      I write in response to Airlines for America's (A4A) letter motion of May 31, 2024, in which A4A seeks a stay of the effective date of the Ancillary Service Fees Rule on behalf of A4A and the other petitioners challenging the Rule in *Airlines for America, et al. v. DOT*, No. 24-60231 (5th Cir.). After due consideration, the U.S. Department of Transportation (DOT) declines to stay the effective date of the Ancillary Service Fees Rule. If A4A and the other petitioners move the Fifth Circuit to stay the Rule, the Department will oppose. The Department is committed to taking actions to promote the interests of American workers, businesses, and consumers. The Ancillary Service Fees Rule is a lawful and critical piece of the Department's efforts to protect American consumers from unfair and deceptive practices by air carriers such as petitioners, and we strongly believe it is not in the public interest to stay the rule pending review of A4A's petition.

      The purpose of the Rule is to prevent unfair and deceptive practices in air transportation and the sale of air transportation. Specifically, the Rule protects airline passengers from surprise fees when purchasing a ticket. The Department promulgated the Rule after conducting notice-and-comment rulemaking and a public hearing, during which A4A and the other petitioners had the opportunity to be heard. While the Rule goes into effect July 1, 2024, the deadline for airlines to provide ancillary fee data to ticket agents is October 30, 2024, and the deadline for airlines to comply with the other regulatory requirements of the Rule is April 30, 2025. 89 Fed. Reg. at 34,620, 34,622. We understand A4A's letter motion to request a stay of all such deadlines.

As recognized in A4A's letter motion, DOT has the discretion to postpone the effective date of the Rule, *see* 5 U.S.C. § 705, when "justice so requires." *Id.*; *see also Nken v. Holder*, 556 U.S. 418, 433-34 (2009). Here, however, a stay is not warranted; indeed, none of the stay factors weighs in A4A's favor. A4A is unlikely to prevail on the merits: The Rule is rooted in well-established statutory authority, *see, e.g.*, 49 U.S.C. § 41712, and the Department complied with the standards set forth in the Administrative Procedure Act. The equitable factors likewise tilt against a stay: A4A's allegation of harm relies on the conjectural assertion that data sharing with ticket agents and changing digital platforms could "potentially cost[] airlines at least $5 to $10 million each, excluding labor and other related costs," Ltr. at 7—while criticizing as unreliable the Department's estimates of substantial annual net benefits and annual time savings benefits. The Rule protects American consumers, and a stay would not serve the public interest.

49 U.S.C. § 41712(a) charges the Department with protecting consumers from unfair and deceptive practices in air transportation and the sale of air transportation. In promulgating the Ancillary Service Fees Rule, the Department acted based on consumer complaints, public comments, and information provided directly by consumer advocates, by State attorneys general, and indirectly through the Department's Aviation Consumer Protection Advisory Committee (ACPAC) and predecessor committees, and made the requisite findings under 49 U.S.C. § 41712, § 40113, § 40101, and other statutory provisions that the failure to clearly disclose critical baggage, change, and cancellation fees constitutes an unfair and deceptive practice.

As explained in the final rulemaking, the Department has been concerned about and has been evaluating the transparency of change fees, cancellation fees, and baggage fees for some time. "Consumer advocates had asserted at an ACACP [Advisory Committee on Aviation Consumer Protection, predecessor of ACPAC] meeting held on June 23, 2015, that [change and cancellation] fees had become significant and difficult to ascertain" and noted "that baggage allowance rules were confusing to consumers and that it was difficult for consumers to understand which airline's rules apply." 89 Fed. Reg. at 34,623. Also, "[a]t the same meeting, a ticket agent representative stated that every baggage fee scheme had 'multiple layers and exceptions' that were not always dynamically available to ticket agents." *Id.* In the final rule, the Department also recognized that the U.S. Government Accountability Office reported in September 2017 that consumer group representatives stated that it had become "increasingly difficult for consumers to compare airfare ticket prices, fees, and associated rules, and understand what is included in their purchases." *Id.* Further, in December 2017, the Department received a letter from attorneys general from 16 States and the District of Columbia stating that they "regularly hear reports from consumers in [their] states who are confused and frustrated by these fees, which significantly alter the total cost of travel." *Id.* In 2019, after DOT tasked the ACPAC with addressing this issue again, consumer organizations again "recommended that ancillary fee information should be clearly displayed early in consumer purchase decisions." *Id.* at 34,624. In June 2022, the ACPAC met yet again to address ancillary service fees and "a consumer advocate stated that consumers still do not know the specific amounts of baggage and change and cancellation fees that apply during the ticket purchase process" while "[a]nother consumer advocate expressed concerns with drip pricing." *Id.*

In issuing the Rule, the Department explained that it "determined that this rulemaking is necessary to address ongoing inadequacies in existing ancillary fee disclosure requirements"

based on the "history of concerns raised by consumer organizations and individual consumers, including the individual complaints the Department has received reflecting the confusion consumers experience regarding ancillary fees." *Id.* As discussed in the final rulemaking, "[t]he Department continues to receive hundreds of consumer complaints each year regarding ancillary fees." *Id.* Importantly, "[b]ased on past experience, the Department understands that the number of consumer complaints it receives directly from consumers is a small fraction of the total complaints received each year by airlines and ticket agents." *Id.* More specifically, DOT's Office of Aviation Consumer Protection received over 550 complaints regarding change and cancellation fees and over 140 complaints regarding seat fees in 2021, and over 750 complaints regarding change and cancellation fees in 2022. *Id.* The Department included redacted samples of these complaints on the public docket for this rulemaking. *See* www.regulations.gov/ document/DOT-OST-2022-0109-0022; www.regulations.gov/document/DOT-OST-2022-0109-0757.[1] Regarding change and cancellation fees in particular, the rulemaking provides specific examples of change and cancellation fees that airlines list on their websites as $0-$1000, $0-$400, and "up to $750"—none of which allows consumers to determine the change and cancellation fees that apply to them in their circumstances. 89 Fed. Reg. at 34,629 n.63 (listing fees for United Airlines, Delta Air Lines, and American Airlines); *see also* www.regulations.gov/ document/DOT-OST-2022-0109-0755.

In response to these practices and continued complaints, the Department published its Notice of Proposed Rulemaking, opened and then extended the period for public comment, and held a public hearing pursuant to 14 C.F.R. § 399.75.[2] 89 Fed. Reg. at 34,625-26. A4A raised two issues that the Department considered at the public hearing: (1) whether consumers are or are likely to be substantially injured or are misled by airlines' current disclosures of ancillary service fees; and (2) whether disclosures of itinerary-specific ancillary fees at the time of first search will result in the display of incomplete or inapplicable ancillary fee information, cause consumer confusion, and distort the marketplace. *Id.* at 34,626. After careful consideration of all the evidence presented and the comments received from the public—including evidence and comments received from A4A—the Department concluded that the failure to clearly, conspicuously, and accurately disclose critical bag fees and change and cancellation fees with the quoted airfare is unfair and deceptive. *Id.* at 34,627-32.

In promulgating the Ancillary Service Fees Rule, the Department relied on its authority under 49 U.S.C. § 41712, § 40113, and § 40101, in addition to other statutory provisions. 89 Fed.

---

[1] Contrary to A4A's assertion that "the Department provided no evidence that consumers were being misled about change or cancellation fees," Ltr. at 4, DOT disclosed public comments and consumer complaints as well as other statements in which consumer advocates expressed concern about consumer confusion over ancillary fees. *See, e.g.,* 89 Fed. Reg. at 34,633, 34,642.

[2] The Department's regulations provide for a hearing "when the Department proposes a discretionary aviation consumer protection rulemaking declaring a practice to be unfair or deceptive. This is consistent with section 41712, which requires notice and an opportunity for a hearing before a finding that an air carrier, foreign air carrier, or ticket agent is engaged in an unfair or deceptive practice or an unfair method of competition." *Defining Unfair or Deceptive Practices,* 85 Fed. Reg. 78,707, 78,711-12 (Dec. 7, 2020); *see* 49 U.S.C. § 41712(a).

Reg. at 34,674. Section 41712 authorizes the Department to prohibit unfair and deceptive practices in air transportation and the sale of air transportation. Section 40113 specifically authorizes the Department to take action, "as appropriate," to "prescrib[e] regulations" as the Department considers necessary "to carry out" Part A of the Act, which includes the unfair-and-deceptive practices provision in section 41712(a) (Part A, subpart ii, ch. 417).

A4A's argument that the Department cannot rely on section 40113, Ltr. at 4, ignores the clear authority that provision grants the Secretary of Transportation to take appropriate action that he "considers necessary to carry out *this part*, including conducting investigations, *prescribing regulations*, standards, and procedures, and issuing orders." 49 U.S.C. § 40113(a) (emphasis added). It is black letter law that courts "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883). The case A4A cites in support of its argument, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), does not compel the result A4A seeks. *See* Ltr. at 4. We agree that "[t]he terms of the specific authorization must be complied with." 566 U.S. at 645. We disagree, however, that compliance with section 41712 means the Department has no complementary rulemaking authority under section 40113.

Notwithstanding the applicability of section 40113, DOT has long exercised the authority to promulgate rules pursuant to 49 U.S.C. § 41712. For decades, the Department's Office of Aviation Consumer Protection has regulated other practices by air carriers and ticket agents determined to be unfair and deceptive under section 41712. *See, e.g., Disclosure of Change of Gauge Services*, 64 Fed. Reg. 12,854 (Mar. 15, 1999); *Enhancing Airline Passenger Protections I*, 74 Fed. Reg. 68,983 (Dec. 30, 2009); *Enhancing Airline Passenger Protections II*, 76 Fed. Reg. 23,110 (Apr. 25, 2011); *Enhancing Airline Passenger Protections III*, 81 Fed. Reg. 76,800 (Nov. 3, 2016); *Tarmac Delay Rule*, 86 Fed. Reg. 23,260 (May 3, 2021).

Congress has consistently ratified DOT's authority to protect consumers under section 41712 and has not once called into question DOT's ability to do so. Most recently, in the Federal Aviation Administration Reauthorization Act of 2024, Congress acted on this very Rule. Congress provided for amendments to the Ancillary Service Fees Rule's procedures regarding offline ticket disclosures and importantly, did not question DOT's ability to regulate online ticket disclosures or any other aspect of the Rule. *See* FAA Reauthorization Act of 2024, H.R. 3935, 118th Cong. (2024), Sec. 513 ("Not later than 18 months after the date of enactment of this Act, the Secretary shall take such action as may be necessary to update the process by which an air carrier or ticket agent is required to fulfill disclosure obligations in ticketing transactions for air transportation not completed through a website."); *see also id.* § 513(b)(3) (expressly endorsing Department regulations promulgated under section 41712). In the past, Congress has similarly provided for the amendment of other rules promulgated under section 41712 without calling into question DOT's authority to promulgate those rules. *See, e.g.*, FAA Extension, Safety, and Security Act of 2016, Public Law No. 114-190, Sec. 2308 (directing the Department to update provisions of *Enhancing Airline Passenger Protections I*, 74 Fed. Reg. 68,983, which the Department duly updated in *Tarmac Delay Rule*, 86 Fed. Reg. 23,260).

Further, the U.S. Court of Appeals for the District of Columbia Circuit has upheld the Department's authority to regulate the advertising of airfares, refund plans, and post-purchase

4

pricing changes under section 41712's prohibition on unfair and deceptive practices in an APA challenge of a previous rule. *Spirit Airlines v. DOT*, 687 F.3d 403 (D.C. Cir. 2012). There, the D.C. Circuit upheld the Department's "authority to prohibit 'unfair or deceptive practice[s] . . . in air transportation or the sale of air transportation.'" *Id.* at 408 (quoting 49 U.S.C. § 41712(a)); *see also* 687 F.3d at 411 (finding that the Department's requirement that airlines must make the total, final price of airfare the most prominently listed figure was an appropriate "exercise of DOT's statutory authority to prevent 'unfair or deceptive practice[s]'" (quoting 49 U.S.C. § 41712(a))).

For similar reasons, A4A's invocation of the major-questions doctrine is misplaced. This rulemaking shares none of the hallmarks of the handful of "extraordinary cases" in which the major-questions doctrine has been applied. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The Department's authority to prohibit unfair or deceptive practices in air transportation or the sale of air transportation is not a "newfound power" rooted in "vague," "cryptic," "ancillary," or "modest" statutory terms. *Id.* at 721, 723, 724 (citations omitted). To the contrary, and as detailed above, the Department has consistently exercised this regulatory authority for decades under a plain and judicially recognized statutory mandate. *See Spirit Airlines*, 687 F.3d at 408-11 (upholding regulations prohibiting unfair or deceptive practices under 49 U.S.C. § 41712(a)); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (explaining that consistent "past practice under" the relevant statutory authority bears directly on compliance with the major-questions doctrine). In attempting to transform section 41712's settled meaning and application into a "major question," A4A also overstates the burdens imposed by the Rule on petitioners: During the public comment period, multiple carriers noted that ancillary fees were already listed on airline websites. 89 Fed. Reg. at 34,632. A4A also stated that "[e]very A4A passenger air carrier displays or makes available at first search results the ancillary fee information that DOT proposes for a consumer conducting an anonymous search in the direct channel via rollovers or links." *Id.* All the Rule requires is that carriers and ticket agents provide specific information about these fees—change fees, cancellation fees, and baggage fees (first checked bag, second checked bag, and carry-on bag)—to consumers upfront, in a more accessible way. Further, A4A's contention that DOT's reasonable interpretation of section 41712 to encompass ancillary fees is "potentially limitless" is without merit, because, among other reasons, the terms "unfair" and "deceptive" have established definitions in this context. *See* 14 C.F.R. § 399.79.

A4A's assertion that the Rule does not address unfair and deceptive practices is without merit. *See* Ltr. at 2-4. As the Department explained in the final rulemaking, "[t]he Department has concluded that a carrier commits an unfair and deceptive practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable fees for a first and second checked bag and a carry-on bag and when it fails to disclose weight and dimension information for that baggage before ticket purchase on an online platform." 89 Fed. Reg. at 34,627. Further, "[t]he Department concludes that a carrier commits an unfair practice in the sale of air transportation when it discloses an airfare in response to a consumer's itinerary search without providing accompanying information on applicable change and cancellation fees and fails to provide change and cancellation policies before ticket purchase on an online platform." *Id.* at 34,629. In so finding, the Department addressed the objections A4A made during the public comment period:

The Department disagrees that there is insufficient evidence of substantial injury. Consumer complaints are only one metric that the Department uses to gauge whether an unfair or deceptive practice is occurring. The Department also relies on the statements of consumer advocates, all of which have consistently expressed concern about consumer confusion over ancillary fees throughout the years that rulemaking has been contemplated on this subject. The Department finds it reasonable to rely on the statements of the many consumer advocates, State attorneys general, and consumer organizations as representative of the views of consumers, and, when further confirmed by consumer complaints, to determine that substantial harm is occurring or is likely to occur.

*Id.* at 34,633. A4A's arguments reveal a disagreement with the outcome and do not support any contention that the Department failed to make the requisite findings based on substantial evidence.

As noted above, the Rule reflects reasoned decisionmaking by the Department, in full compliance with the requirements of the APA. The APA's arbitrary and capricious standard is "narrow and highly deferential" to agency action. *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (citing *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010)). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

A4A's unsupported contention that the Ancillary Service Fees Rule will lead to consumer "confusion and inefficiency," Ltr. at 6, is not validated by the evidence and comments the Department received during the rulemaking. By requiring airlines and ticket agents to tell consumers upfront the fees for a first or second checked bag, a carry-on bag, and for canceling and changing a reservation, the Rule will provide consumers with the necessary information to make an informed decision when shopping for airfare, while also reducing the amount of time consumers will need to spend to determine the full price of air travel when purchasing airfare. A4A's letter motion does not explain how the Rule, which will help consumers identify all relevant fees upfront when booking an airfare, could lead to consumer confusion or inefficiency. Moreover, to the extent there is confusion and inefficiency associated with these ancillary fees, it is a problem of design rather than disclosure. Allowing carriers to keep their fees hidden does not make them less confusing or more efficient; it makes them harder for consumers to avoid.

During the rulemaking, DOT carefully considered A4A's comments and evidence. *See, e.g.*, 89 Fed. Reg. at 34,634-35, 34,640-42, 34,646-50. Nothing more is required under the APA. *Prometheus Radio Project*, 141 S. Ct. at 1158 (stating that the agency only needs to have "reasonably considered the relevant issues and reasonably explained the decision"). That A4A and the other petitioners disagree with DOT's assessment does not render the Rule arbitrary and capricious. Rather, this "arbitrary-and-capricious challenge boils down to a policy disagreement," which offers "no basis for substituting" A4A's views for the Department's. *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2571 (2019) (declaring that courts are not to "second-guess[]" an agency's "weighing of risks and benefits" associated with a

rulemaking). The rationale provided in the Rule amply justifies the decision made, and A4A's letter motion offers no compelling argument to the contrary.[3]

A4A asserts that data sharing with ticket agents and changing digital platforms could "potentially cost[] airlines at least $5 to $10 million each, excluding labor and other related costs," *see* Ltr. at 7, while criticizing as unreliable the Department's estimates of annual net benefits ranging from $30 to $254 million, 89 Fed. Reg. at 34,668, and annual time savings benefits ranging from $365 million to $484 million, *id.* at 34,622. The Department considered A4A's arguments concerning the costs they and their members may allegedly be subjected to under the Rule. *See id.* at 34,647-50. In fact, in the final rulemaking, the Department acknowledged A4A's concerns around the cost and feasibility of the Rule—incorporating some parts of A4A's analysis and rejecting other parts as not credible. *See id.* at 34,650 ("To address these concerns [about the cost and technological feasibility], the Department is providing additional flexibility for ticket agents and airlines in how they disclose the required fees. This final rule requires that fees be 'clearly and conspicuously' disclosed but does not limit the display of critical ancillary fees to only static text next to the fare.").

On the other side of the ledger, a stay would significantly harm the public. For the reasons stated above and detailed in the rulemaking, there is strong public interest in the Rule's protections for American consumers against unfair and deceptive practices in air transportation, and the public interest is best served by allowing the Rule to go into effect. Indeed, A4A has not demonstrated a likelihood of success on the merits or that petitioners will suffer irreparable harm, and it makes no substantive argument regarding the balance of harms or the public interest. *See* Ltr. at 7 (incorporating A4A's mistaken merits arguments).

The Department hereby denies A4A's request to stay the effective date of the Ancillary Service Fees Rule.

Sincerely,

*Blane A. Workie*
_____
Blane A. Workie
Assistant General Counsel
Office of Aviation Consumer Protection

---

[3] A4A's contention that the "Department unlawfully relied on new data without giving the public a meaningful opportunity to comment," Ltr. at 6, is similarly without merit. The Department did not rely on any new data in arriving at the conclusions in the economic analysis.

**DECLARATION OF YANIK HOYLES, DIRECTOR OF
DISTRIBUTION, INTERNATIONAL AIR TRANSPORT
ASSOCIATION (JUNE 10, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals
### *for the*
## Fifth Circuit

---

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners,*

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

---

## DECLARATION OF YANIK HOYLES OF THE
## INTERNATIONAL AIR TRANSPORT ASSOCIATION

---

Pursuant to 28 U.S.C. § 1746, I, YANIK HOYLES hereby declare as follows:

1.      I am the Director of Distribution at the International Air Transport Association (IATA). IATA's principal place of business is 33, Route de l'Aeroport PO Box 146 1215 Geneva – 15 Airport, Switzerland.  I am authorized to make this declaration on IATA's behalf, and I am personally familiar with the facts stated herein.

2.      IATA is the trade association of the world's airlines, representing approximately 320 airlines around the world, including all of the airlines named as parties to this action.

3.      I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.      I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.      My understanding is that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's

1

weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." I understand it similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform and requires airlines to provide fare, schedule and availability information to ticket agents that is "useable, current and accurate." 89 Fed. Reg. at 34,677. Finally, it is my understanding that the Rule requires airlines to provide this information to agents by October 30, 2024 and meet the remaining requirements of the Rule by April 30, 2025.

6.      Today, airlines distribute their service offers—that is, what flight and seat class the customer might book and at what cost,  which can include a bag and / or a paid lounge access, for example—through either the direct channel (airline websites, airline mobile apps and airline-controlled call centers) or the indirect channel (via travel agents:  brick and mortar or online travel agencies).  In the case of the direct channel, airlines have traditionally constructed their offers using their schedules, flight availability, and fares that are filed with the Airline Tariff Publishing Company (ATPCO), an industry-owned database. For indirect distribution, this content is processed by Global Distribution Systems (GDSs), which provide the information to travel agencies and enable travel agencies to present the offers to their customers.  The so-called "fare filing" process utilizes a pre-Internet computer language that is only capable of displaying static, rather than dynamic (or personalized) offers.

7.    In 2015, IATA and the airlines introduced the first version of the New Distribution Capability (NDC), a data exchange format that enables airlines to distribute their fares and ancillaries to travel agencies in a dynamic fashion without necessarily relying on the fare filing process. Today, approximately 70 airlines have deployed some aspect of NDC, with some delivering over 40% of their content to agents through this standard.

8.    There are a number of significant challenges presented to airlines by the Rule.

9.    First, on display, the calculation of fees for first and second checked bags is extremely complex, in part because of existing US Department of Transportation rules dictating whose baggage fees apply on code share or interline itineraries, which I understand are contained at 14 C.F.R. § 399.87. Today, an airline's first search page may present 40+ different direct and indirect itineraries for each city pair they serve. Calculating baggage fees for each of these itineraries would require substantial IT investments in both the airline website interface as well as the back-office offer construction functions. Including that information on each itinerary would slow the display of that information to consumers and likely overload them with information that may or may not be relevant to them.

10.    This challenge is made exponentially more difficult by the Rule's requirement that these fees be personalized if consumers choose to identify themselves before initiating their fare and availability search. Airlines today set

3

the baggage fee by taking that static information and making adjustments to, or eliminating, those fees, based on the pre-existing relationship the customer has with the airline (normally frequent flyer or airline card holder) or if they have a special status (e.g., military). Translating that static information into dynamic personalized information on the first search page for each of the itineraries presented to passengers who identify themselves will require substantial IT investments and a complete change in the airline distribution system. While passengers generally can log into an airline website via their frequent flyer number prior to their initial search, airlines determine if an airline credit cardholder or active military receives discounts on ancillary fees at the time of ticket purchase. Airlines that have fully implemented NDC would be able to display these dynamic offers more easily than airlines that rely solely on the fare filing process. However, they would still have to make substantial investments in upgrading their first search pages to allow for this display. It would be extremely challenging to make the investment and implement these changes within the twelve months provided by the DOT, particularly given the scarcity of IT companies supporting the airline industry. IATA estimates it could take five years for airlines to display dynamic fees on the first search page in a manner that would be useful to consumers.

11.     The Rule's requirement that airlines provide fare, schedule, and availability information in a dynamic fashion to ticket agents will require a radical restructuring of today's airline distribution process. As noted, today's

fare filing system enabled by the GDSs and ATPCO only store and distribute static data on these ancillaries via a proprietary computer language and are, in most cases, not able to deliver personalized data to either airlines or travel agents. There are two possible ways for airlines to meet the requirement in the Rule to deliver this data in a "useable, current and accurate" manner.

12.    First, airlines can establish a connection with a travel agent either directly or through an aggregator (GDS or other technology company) whereby the airline will create a personalized offer to the agent's customer based on the customer's prior relationship with the airline and present it directly to the travel agent. This is a costly and time-consuming process that cannot be accomplished within the six months provided by the Department, as it requires airlines to change their IT platforms, GDSs to change the way that they provide information to travel agencies, and travel agencies to update their technological capacities.

13.    Second, airlines that are fully NDC enabled would be able to deliver the personalized content directly to travel agents. However, the travel agent itself (or the GDS on its behalf) would also need to fully implement NDC and develop an interface to allow the customer to access that information on the agent's first search page. Travel agents that serve multiple airlines would have to collect a consumer's information for all potential airlines at the outset, which would require collecting an extensive amount of information, as each airline may have different benefits (e.g., military, credit card holder, or other status)

and different frequent flyer programs.

14.    IATA estimates it will take substantial investments by both airlines and agents and at least five years for NDC to be fully implemented widely enough by both the airlines and agents to meet the Rule requirement. The time it will take for airlines to develop business relationships with the agents and/or GDSs to enable this data transfer also needs to be considered.

15.    In light of the industry's current technology, IATA anticipates that airlines will need to make significant and costly changes to comply with the Rule. Airlines have limited resources, and the technological updates required for compliance are significant. Moreover, some airlines outsource their IT needs to a limited number of external companies experienced in this field. Consequently, there is likely to be a shortage of industry-wide resources to complete these changes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June ⬧, 2024

       Geneva, Switzerland                Yanik Hoyles

6

**DECLARATION OF CHARU JAIN, SENIOR VICE PRESIDENT,
MERCHANDISING AND INNOVATION, ALASKA AIRLINES, INC.
(JUNE 10, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

———————————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC., JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners*,

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

———————————————

**DECLARATION OF CHARU JAIN,
SENIOR VICE PRESIDENT, MERCHANDISING AND INNOVATION
OF ALASKA AIRLINES, INC.**

———————————————

Pursuant to 28 U.S.C. § 1746, I, CHARU JAIN, hereby declare as follows:

1.    I am Senior Vice President, Merchandising and Innovation at Alaska Airlines, Inc. ("Alaska"). Alaska's principal place of business is 19300 International Blvd., Seattle, WA 98188. Alaska is a member of Airlines for America. I am authorized to make this declaration on Alaska's behalf, and I am personally familiar with the facts stated herein.  As Senior Vice President, Merchandising and Innovation, I am responsible for overseeing, designing and implementing all aspects of our guest digital experience, as well as related policies and procedures required to comply with applicable laws and regulations.

2.    Alaska and its regional partners serve more than 120 destinations in the United States, the Bahamas, Belize, Canada, Costa Rica, Guatemala and Mexico. Alaska strives to be the most caring airline, and boasts award-winning customer service and an industry-leading loyalty program. As a member of the oneworld alliance, and with its additional global partner airlines, Alaska's guests (also referred to herein as "passengers") can travel to more than 1,000 destinations on more than 25 airlines while earning and redeeming miles on flights to locations around the world.  In 2023, Alaska carried approximately 44.5 million guests.

3.    I am aware that the Department of Transportation ("DOT") has finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the

1

above-referenced case.

4.    I understand that the Rule imposes new consumer disclosure requirements on airlines, including Alaska, for what the DOT deems "critical ancillary services," including fees and policies for a first checked bag, second checked bag, and carry-on bag, as well as any flight changes or cancellations. I understand that the Rule requires airlines and ticket agents to disclose fee information "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.    My understanding is that the Rule additionally requires carriers and ticket agents to disclose policies about critical ancillary services, including "ticket change and cancellation policies" as well as any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform.

6.    Alaska already discloses ancillary fees associated with baggage, as well as those associated with flight change and cancellation, on its website and mobile app. On Alaska's homepage (www.alaskaair.com), a disclosure is posted next to the Flight Search form under the label "Baggage & optional fees." Once an individual completes a Flight Search and is presented with Flight Options, a notice appears above those Flight Options regarding baggage and optional fees.  Alaska

2

also displays baggage and cancellation disclosures on the Payment page, Cart page, Confirmation page, and Check-in page.

7.     To provide our guests with the information in the form the Rule requires — "at the first point where a fare and schedule is provided in connection with a specific itinerary" — Alaska will have to significantly restructure its marketing platforms and reprogram its itinerary search functions. This will be a daunting and complex task, particularly because, under the Rule, airlines and ticket agents will have to disclose fees for critical ancillary services on either a passenger-specific or anonymous itinerary search basis, at the consumer's option. The DOT defines a "passenger-specific search" as "a search that takes into account information specific to the passenger (e.g., the passenger's status in the airline's frequent flyer program, the passenger's military status, or the passenger's status as a holder of a particular credit card) that was affirmatively provided by that passenger and information specific to the itinerary (e.g., geography, travel dates, cabin class, and ticketed fare class) that may impact the critical ancillary service fees to be charged or policies to be applied." The DOT defines an "anonymous itinerary search" as "a search that does not take into account information specific to the itinerary (e.g., geography, travel dates, cabin class, and ticketed fare class) that may impact the critical ancillary service fees to be charged or policies to be applied." In order to address the complexity associated with tailoring the required

3

disclosures to "passenger-specific" searches, Alaska anticipates that it will have to substantially reconstruct key components of its website and mobile app, and reprogram other aspects of its existing technology systems. Alaska also expects that in order to comply with the Rule for certain passenger-specific search disclosures, it will have to require that consumers "log-in" before they are able to begin shopping for flights.

8.    In addition, the Rule requires Alaska and other airlines to disclose critical ancillary fees whenever a fare is quoted and also provide related policy information during in-person and telephonic communications with consumers. This will require employees to read disclaimer language and search for fee details for each passenger, which will increase the average call handling time per caller and increase Alaska's costs.

9.    Alaska conservatively estimates that this substantial overhaul of its customer-facing and -supporting technology infrastructure work could take at least 24 months at an initially estimated cost of $8 million, including but not limited to costs associated with redesigning and rebuilding the shopping and booking platforms on our website and app, along with an inestimable amount for human resources and labor to implement the technological and procedural updates required to comply with the Rule as described herein. Alaska will also need to build a new ancillary fee calculator and create the technology

4

infrastructure for a new sign-in process that will allow us to show a personalized fee calculation for each guest.

10.    In addition to technology and labor cost increases, prioritizing this work to comply with the Rule's timeline means that Alaska will not be able to work on other strategic revenue initiatives as approved by our board of directors that we believe are critical to our business success.

11.    In addition to the direct costs and lost opportunity costs that Alaska will incur, we believe the changes required by the Rule will create a flight shopping experience that takes longer to complete and may becoming overwhelming for guests who are inundated with details that are not relevant to them.  We believe such tasks, in addition to being confusing for guests, will hinder commerce by negatively impacting the number of people who do or are willing to complete a flight booking with Alaska, which will result in irreparable adverse impact to our revenue.

12.    I understand that the Rule provides a compliance period of 12 months, requiring airlines to meet the fee disclosure requirements for critical ancillary service by April 30, 2025.

13.    To have any chance of meeting the Rule's compliance deadline, Alaska must immediately begin making the changes and updates described above, including but not limited to, guest account capabilities, website and app

5

functionality, information sharing capability with partners, procedures manuals, and employee training immediately, long before this litigation is resolved.

14.    If the Rule is not stayed, Alaska will suffer immediate and substantial compliance costs. Alaska would not be able to recover these significant compliance costs in the event the Rule is later found to be invalid.

15.    In addition to costs associated with the Rule's fee-disclosure provisions, I understand that the Rule requires airlines to "share critical ancillary fee information with any entity that is required by law to disclose" such fee and policy information to consumers, including ticket agents and other airlines (e.g., codeshare and interline partners). 89 Fed. Reg. at 34,659. Although the Rule does not specifically require airlines to provide guest-specific information such as frequent flyer status and credit card membership, critical ancillary fee and service information to the global distribution systems ("GDSs"), the booking systems that function as a conduit between airlines and travel agents, Alaska and other airlines may have no choice but to do so in order to communicate the DOT-required information to travel agents that rely exclusively on a particular GDS for access to Alaska's fare and schedule information. Alaska cannot dictate or control how long the GDSs may take to revise their technology platforms to enable such communication.

16.    For the data-sharing provision, the Rule provides a compliance period

6

of only 6 months, requiring airlines to share data with ticket agents no later than October 30, 2024.

17.   To comply with the Rule, Alaska may need to renegotiate existing contracts with ticket agents to account for the new disclosure requirements, which will likely result in additional costs and diversion of Alaska's human resources to complete.

18.   If the Rule is not stayed, Alaska will incur these costs immediately, and they would not be recoverable if the Rule is later found to be invalid.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 10, 2024

Seattle, WA

Charu Jain

Senior Vice President, Merchandising

and Innovation

7

**DECLARATION OF ANSHUMAN SINGH, MANAGING DIRECTOR, CUSTOMER EXPERIENCE DIGITAL TRANSFORMATION, AMERICAN AIRLINES, INC. (JUNE 7, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals
## *for the*
# Fifth Circuit

---

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners,*

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

---

## DECLARATION OF ANSHUMAN SINGH, MANAGING DIRECTOR, CUSTOMER EXPERIENCE DIGITAL TRANSFORMATION FOR AMERICAN AIRLINES, INC.

---

Case: 24-60231 Document: 37 Page: 38 Date Filed: 06/14/2024

Pursuant to 28 U.S.C. § 1746, I, Anshuman Singh hereby declare as follows:

1.      I am the Managing Director, Customer Experience Digital Transformation at American Airlines, Inc ("American").  American's principal place of business is 1 Skyview Drive, Fort Worth, TX 76155. American is a member of Airlines for America. I am authorized to make this declaration on American's behalf, and I am personally familiar with the facts stated herein.

2.      American is one of the world's largest airlines serving more than 200 million passengers annually.  American operates on average 6,700 flights per day to nearly 350 destinations in more than 50 countries, operating hubs in Charlotte, Chicago, Dallas/Fort Worth, Los Angeles, Miami, New York, Philadelphia, Phoenix and Washington, D.C.  American is a founding member of the **one**world Alliance.

3.      I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.      I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees

"during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.     My understanding is that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." My understanding is that the Rule similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

6.     American is transparent to the consumer with its fares and fees. American discloses ancillary fees associated with baggage, as well as the fees associated with seats, flight change and cancellation, on its website and on its mobile app. American provides the same transparency with its content to global distribution systems (GDSs), travel management companies (TMCs), online travel agencies (OTAs), brick-and-mortar travel agencies and meta-search engines (MSEs). American provides information as to ancillary fees and what fares include ancillary services via fare expanders or "pop-ups" as a customer scrolls across the search results page, on the check-out page and via direct links from either the search results page or the check-out page.

7.     To provide consumers with this information in the form the Rule requires — "at the first point where a fare and schedule is provided in connection

with a specific itinerary" — American would have to significantly reengineer its marketing platforms and itinerary search functions and display. Currently, American uses pop-ups on the search results page to display what the passenger would receive for that fare, e.g., whether any ancillary services are included within the fare being presented. American also currently provides a hyperlink to a robust baggage fee chart, which is found on its bags page on AA.com, and which provides bag fees by number of bags and by destination. To provide anonymous ancillary fee information, including the bag fee information, in the pop-ups, American risks having a pop-up that is so large it obscures the search results and, at the same time, risks presenting a chart that may be illegible due to how small the font must be sized to fit within the pop-up. That is a particular concern for presentation on mobile devices. Presenting ancillary fee information on a passenger-specific basis will require significant technological changes to the search and search results pages to collect information from the passenger as to whether and how many bags they may be bringing and then to present the targeted, relevant information. Building for the current method of display will be a significant effort; having to rebuild as to the entire display on the search results page will be very difficult and costly.

8.     American anticipates it will take approximately twelve (12) months comprising 25,500 labor hours to fully implement these changes. This timeline is

impacted by American's dependency upon its outside technology vendors, including Google and Sabre, to meet the time constraints. We are just in the initial stages of engaging with our technology vendors.

9. At present, a true estimate as to the direct costs from implementation will be determined by the negotiations with American's technology vendors. American estimates it will cost approximately $10,000,000 to $15,000,000 to implement each of the changes, including checked-bags on the search results page.

10. Taking on these materially significant and unplanned expenses will require American to postpone or cancel other technology improvements, enhancements or projects that are either in current production or are about to begin. American estimates the lost commercial opportunity from cancelling or delaying these planned projects to be approximately $30,000,000-$40,000,000.

11. Year to date, only 42.6% of passengers on American have checked at least one bag. Of that total number, only 43.7% of all passengers who checked a bag incurred a checked-bag fee. This number represents only 18.6% of all American passengers, year to date.

12. My understanding is that the Rule provides a compliance period of 12 months, requiring airlines to meet the fee disclosure requirements for critical ancillary services by April 30, 2025.

13. To meet the Rule's compliance deadline, American will need to begin

4

implementation of the changes required by the new rule immediately. That immediacy requirement does not factor in the time it reasonably takes to negotiate with each of American's technology vendors nor does it factor in the vendors' ability to meet the timeline. All of this effort and expense will impact American long before this litigation is resolved.

14.     If the Rule is not stayed, American will thus suffer immediate and substantial compliance costs. American would not be able to recover these significant compliance costs in the event the Rule is later found to be invalid.

15.     In addition to costs associated with the Rule's fee-disclosure provisions, I understand that the Rule requires airlines to "share critical ancillary fee information with any entity that is required by law to disclose" such fee and policy information to consumers, including ticket agents. *Id*. at 34,659.

16.     American already provides all of its content, including all of the fees and information relating to its ancillary services to travel agencies, either directly through NDC or through the GDSs. The issue is of the GDSs and the travel agencies' ability to consume and present this information. Further, American already has in its Governing Travel Agency Agreements (GTAA) to the Airline Reporting Corporation (ARC) and International Air Transport Association (IATA) requirements for travel agencies to display all of the content American provides to them.

5

17.    Because the Rule requires personalized fee disclosure for every customer, American will have to know the customer's status at the time of search. American provides benefits relating to ancillary services through its AAdvantage® program and through its co-branded credit cards, such as free checked bags and seat choice.  Currently for a passenger to obtain these benefits, they must book through the AAdvantage® program portal.  Under the Rule, though, American would be required to provide to all third-party travel agency booking channels the customer's status and cobrand affiliation to be able to provide this personalized fee disclosure information at the time of search. Such information is competitively sensitive information for American, the disclosure of which would competitively and irreparably harm American.  Further, this requirement would risk placing American in noncompliance with its privacy obligations to the customer. American would have to transmit this information to third parties. In addition, customer attributes may change between booking and departure, causing potential inconsistencies.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 7, 2024

    Fort Worth, TX

Anshuman Singh

**DECLARATION OF MICHAEL HECHT, MANAGING DIRECTOR, PRODUCT MANAGEMENT, DELTA AIR LINES, INC. (JUNE 11, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

_____

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners*,

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

_____

**DECLARATION OF MICHAEL HECHT OF DELTA AIR LINES, INC.**

_____

Pursuant to 28 U.S.C. § 1746, I, MICHAEL HECHT hereby declare as follows:

1.     I am the Managing Director, Product Management at Delta Air Lines, Inc. (Delta). Delta's principal place of business is 1030 Delta Boulevard, Atlanta, Georgia.  I am authorized to make this declaration on Delta's behalf, and I am personally familiar with the facts stated herein.

2.     Delta is an airline with over 100,000 employees that serves over 200 million passengers per year.

3.     I am aware that the Department of Transportation ("DOT") has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.     I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, a second checked bag, and for carry-on bags, as well as for any flight change or cancellation fees. The Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.     I understand that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchases on an online platform, but not necessarily "at

1

the first point where a fare and schedule is provided." It similarly requires carriers to disclose components of their change and cancellation policies, including applicable restrictions and prohibitions, the form of refund that applies, the policy regarding fare differentials if a consumer selects a lower cost replacement flight, and the ability for a consumer to hold or cancel a fare for 24 hours, before a consumer purchases a ticket on an online platform. *Id.* at 34,676.

6.     I also understand that the Rule requires airlines to provide fare, schedule, and availability information to ticket agents that is "useable, current and accurate." *Id.* at 34,631.

7.     *Delta.com:* Currently, when a customer searches potential flight options on delta.com it provides the customer with a fare display grid that clearly and efficiently lists available flights and includes key information such as dates, times, airports, connections, classes of service, and fares.  The customer need not login to delta.com nor enter any individualized information such as frequent flyer status or credit card information that may provide ancillary fee discounts or exemptions in order to quickly access this key flight option information.

8.     As shown below, delta.com's current fare display grid enables customers to scan multiple flight options on a single page.



The search page also includes a hyperlinks for baggage fees. A red box has been

added around the hyperlink for purposes of the declaration. That hyperlink takes

the consumer to a "Baggage & Travel Fees Page," with extensive information, as

the below screenshot reflects.

3



# Baggage & Travel Fees

When you travel with us, we want to help you feel prepared and that includes understanding everything you need to know about your baggage — before, during and after your trip. We encourage you to explore below to learn more about what you can and cannot travel with, possible baggage and travel service fees and more.



9.       In the event a customer is interested in learning more about any of the available class of service options, they have several options. They may select "Explore Our Cabin Experiences," which results in the popup displayed below:



This display provides Delta customers with the differences in benefits or services applicable to the different fares being offered.

10.       Alternatively, the customer may also click on each class of service

4

type (Basic, Main, Comfort+, or First) to bring up a description of each class of service, including the limitations or benefits of each.

11.    As an example, the First Class popup, shown below, discloses that in addition to the benefits of Comfort+, First Class ticket holders receive priority check-in and security lines where available, more spacious seats with greater legroom and recline, priority boarding, premium meals for longer flights, and, as indicated by the added red box, 2 Free Checked Bags. This example demonstrates a class of service that provides two checked bags as part of the ticket. Delta is unable to determine the cost of the applicable baggage fee until the Customer selects a fare class.

5



12.    In addition to receiving ancillary fee information by looking at the fare classes, customers can also access the baggage fees from a hyperlink on the delta.com homepage. A screenshot is provided below, with a red box added for purposes of this declaration.



6

13.   That hyperlink takes a customer the "Baggage & Travel Fees Page," mentioned above. That page describes Delta's baggage allowance and fee policies, including, as shown below, Common Baggage Fees. The customer can quickly and easily assess what fees may apply to their travel.



14.   As reflected by highlighting added to the above screenshot for purposes of this declaration, Delta offers discounted or exempt baggage fees for customers who have earned those benefits by reaching a certain level of loyalty with Delta. For example, SkyMiles Medallion members (customers who have reached the Silver, Gold, Platinum, or Diamond levels) are exempt from many checked bag fees. As shown in the below screenshot, these benefits differ

7

depending upon the level of loyalty.



15.     The amount of the baggage allowance at each medallion level is also dependent upon the fare the customer purchases. The screenshot above shows the baggage allowed without charge at each SkyMiles medallion level for tickets purchased in the Basic Economy, Main Cabin, and Comfort+ service levels. But if the customer buys a higher level of service, such as First Class (for domestic flights) or Premium Select or Delta One (for international flights), the baggage allowances for medallion level SkyMiles members can be greater. See below:

8



16.    *American Express Delta SkyMiles Credit Card Holders*: Delta has a relationship with American Express, and certain cardholders (as shown below) can check one bag on Delta flights without a fee.

9



17. The new DOT requirement to display ancillary fees at the first page of search results will require significant changes to Delta's fare display grid – specifically, to incorporate information regarding bag fees and change/cancel fees for each column (i.e., class of service) of the grid, as these fees vary by class of service. Displaying all of this additional information on the first page of the search results will clutter the appearance.

18. At the time a customer receives their initial flight search results, Delta often does not yet know what the ultimate cost of ancillary products will be. As described above, various factors affect what consumers pay in ancillary fees. This cost depends on, for example, what fare the customer will choose, what their frequent flyer status is, or what form of payment they will be using. Thus, if Delta does not have accurate and complete information at this juncture in the shopping process, it is not feasible to display reliable information for these customers.

10

Indeed, in many instances the search results might overstate a customer's ancillary fees because they in fact have benefits through the loyalty program or co-branded credit cards that they might not choose to enter at the time of their search. Additionally, customer searches involving multiple parties (who may each have different loyalty, credit card, fare class, or other status with Delta that may affect ancillary fee benefits), searches conducted on behalf of other persons, and complex itineraries will yield ancillary fee information that does not apply to all passengers.

19.    Complying with the new DOT requirements with respect to Delta's direct product distribution channels (including delta.com, the FlyDelta mobile phone app, and telephone reservations), as well as to Delta's indirect product distribution channels (including third-party travel agents, both online and conventional), will involve significant capital investments in and changes to Delta's distribution infrastructure. Additional details on the work involved and some of the compliance challenges are outlined below.

a. *Change/Cancel Fees*: While Delta does not charge change or cancellation fees on fares for Main Cabin and above tickets on travel that originates from the United States or Canada, we will still be required to display a price of $0 for each category or some notice that no change fee is applicable.  This will require IT changes, result in a cluttered appearance, and

11

slow the search process for customers.

b. *Bag Fees*: Delta will be required to display a carry-on bag fee of $0 in addition to the standard fees for first and second checked bags (typically $35 and $45 for most itineraries). This will require IT changes, resulting in a cluttered appearance, information that depends on the customer to be reliable, and a slowed the search process for customers.

c. *Basic Economy Fares*: These fares would require significant disclosure on the search results page itself, rather than on the lengthier Basic Economy "accept restrictions" modal that appears when a customer selects a Basic Economy fare today. As shown, this modal prominently displays cancellation fees and other ticket restrictions.

12



Basic Economy fares cannot be changed but can be cancelled for a fee of $99 or $199 per person, per ticket, for itineraries originating in the United States and Canada. Delta will need to devote significant resources to evaluating and/or implementing changes to the modal (and its content) for purposes of ensuring compliance.

20.   *FlyDelta App*: I understand that the new rule's fee display requirements will apply to a mobile application, such as the FlyDelta App, in addition to websites viewed from mobile devices. All of the IT costs and challenges posed by delta.com's compliance with new rule are equally applicable to the FlyDelta App. The cluttered appearance of the additional required disclosures

would make the app unwieldly given the limited screen size of mobile phones and tablets. Below is a screenshot that reflects how limited the information is on a phone screen now—even before the mandates.



21.    *Reservations*: In addition to direct digital channels noted above, DOT's rule will require Delta to develop additional technology, training protocols, and verbal scripts for customer calls to Delta's reservations line to ensure critical ancillary fees are disclosed to customers for each potential itinerary being

14

considered. These additional disclosures will increase call handling and wait times and strain staffing resources.

22.    These considerations, in the aggregate, will cost Delta up to approximately $15 million to implement.

23.    Similar to the costs and challenges associated with direct channel compliance, compliance with aspects of the new DOT ancillary fee requirements relating to the distribution of critical ancillary fee information to third party ticket agents (i.e., indirect channels) by the DOT-prescribed deadlines will impose significant cost and administrative burdens on the company.  In particular, it will require Delta to invest in, develop, and deploy enhanced technology to support dynamically priced offers for filing with the Airline Tariff Publishing Company (ATPCO) – the airline industry's primary database for publishing fares and fees. Airlines file fees to ATPCO so that third parties, like travel agents, can use them for booking.

24.    Implementing the structural changes that the new DOT requirements necessitate will be complex and cumbersome.  The bag and change fees that are covered by the DOT's new requirements are based on multiple variables, including (without limitation) the fare product and itinerary selected, waiver eligibility, SkyMiles and Medallion status, and co-branded credit card benefits.  Ensuring the distribution of usable, current, and accurate ancillary fee information by ATPCO

15

and ticket agents would require Delta to develop and implement enhanced technology to create the individualized offers, which in turn will require additional and accelerated investments in a new data transmission format called the New Distribution Capability (NDC). NDC was developed by the International Air Travel Association for the airline industry in order to permit airlines to distribute information about fares and fees to the customer more easily and dynamically than ATPCO currently allows. NDC is based on a computer language called Extensible Markup Language (XML), which provides for more flexibility in the transmission of data than what has traditionally been used by the airline industry.

25.     Leveraging the necessary internal and external resources to develop the solution for third parties will require the expenditure of up to approximately $35 million, driven by the complex carrier servicing required in corporate channels that will shift to Delta once NDC is implemented.

26.     In total, then, DOT's new ancillary fee disclosure and distribution requirements will significantly impact the way Delta displays its fares, products, and fees in both direct and third-party distribution channels – requiring Delta to expend significant cost (up to $50 million), time, and resources over the next several months absent a court-ordered stay on the effective dates of the rule pending judicial review.

27.     In striving to meet the compliance deadlines, Delta would need to

begin expending funds now to put the company in position to comply by the Rule's effective date of April 30, 2025. Full compliance will require additional investment and sizable human resources to manage the substantial technological changes. It will also force Delta to reprioritize its ancillary fee distribution initiatives and appropriate millions of dollars and extensive company resources currently allocated to other time-sensitive, high-priority, customer-facing projects, thereby delaying the deployment of other technology that will more greatly benefit customers than the requirements flowing from the DOT rule. In the event a court ultimately invalidates any aspect of the new requirements as a result of litigation, such funds would not be recoverable.

28.    If the Rule is ultimately held unlawful, Delta anticipates that it would likely attempt to undo many of the changes it made in attempting to comply with the Rule. As described previously above, Delta expects that the requirement to display ancillary fees at the first page of search results will result in a cluttered appearance. It could also result in customer confusion and in misleading customers by presenting inaccurate information, as Delta has not at that point in the search process confirmed the passenger-specific information selected by the customer, including what fare the customer will choose, what their frequent flyer status is, or what form of payment they will be using. Such information has a direct impact on the cost of Delta's ancillary products to that particular purchaser; if the

17

customer does not provide accurate information at this juncture in the shopping process, they will receive inaccurate results back.

29.    Delta anticipates that the Rule will be harmful to consumers and Delta's business by adding significant processing demands on Delta's systems and will slow search functionality for customers. In its experience evaluating customer satisfaction and desired customer experience, it is critical that search times be reasonable. The speed at which airline searches load is highly related to whether customers actually book airline tickets. Delta has thus designed its current website to efficiently processes searches. The longer a website takes to return results, the higher the risk that customers will pursue an alternative to delta.com. Given those harms, we anticipate we would likely seek to return to pre-Rule conditions if the Rule were invalidated.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2024

    Atlanta, Georgia             Michael Hecht

18

**DECLARATION OF KRISTINA LARSON, MANAGING DIRECTOR, DISTRIBUTION, SALE ANALYTICS, & ALLIANCES, HAWAIIAN AIRLINES, INC. (JUNE 7, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

————————————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC., JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners*,

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

————————————————

**DECLARATION OF KRISTINA LARSON, MANAGING DIRECTOR, DISTRIBUTION, SALE ANALYTICS, & ALLIANCES, OF HAWAIIAN AIRLINES, INC.**

————————————————

Pursuant to 28 U.S.C. § 1746, I, KRISTINA LARSON, hereby declare as follows:

1.  I am the Managing Director, Distribution, Sale Analytics, & Alliances, at Hawaiian Airlines, Inc. ("Hawaiian"). Hawaiian's principal place of business is 3375 Koapaka Street, Suite G350, Honolulu, HI 96819. Hawaiian is a member of Airlines for America. I am authorized to make this declaration on Hawaiian's behalf, and I am personally familiar with the facts stated herein.

2.  I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

3.  I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

4.  My understanding is that the Rule additionally requires airlines to "share critical ancillary fee information with any entity that is required by law to disclose" such fee and policy information to consumers, including ticket agents. *Id.*

1

at 34,659.

5.      Hawaiian supplies the travel industry with a schedule of flights that are offered at certain fares, and with ancillary fees associated with those fares.  For consumers, Hawaiian shares this flight, fare, and fee information in several different ways, and it can offer special fares from more cost efficient methods of booking.  For example, consumers can (1) book tickets directly on Hawaiian's consumer-facing website, www.hawaiianairlines.com (the "Website"), (2) go to an online travel agency (like Expedia) to reserve tickets themselves, or (3) work with a brick-and-mortar travel agency, which is often the method of choice for larger businesses that book high volumes of travel.  For travel agencies to sell flights and ancillary products to their clients, they need access to flight data from the airlines. While travel agencies receive certain ancillary content via a decades-old technology, called Electronic Data Interchange for Administration, Commerce and Transport ("EDIFACT"), travel agencies do not have the technology to access full information directly from airlines, so they work with technology companies in order to view this flight data and other related information.

6.      Sabre, Amadeus and Travelport, for example, are technology companies that operate various businesses, including so-called Global Distribution Systems or "GDSs." These legacy GDSs use EDIFACT to collect and process flight information and then distribute this information to a network of

2

subscribers through a comparison-shopping interface where travel agencies can search for flights.

7.    More recently, an alternative technology standard, called New Distribution Capability ("NDC"), has gradually emerged in the airline industry. Unlike EDIFACT, which relies on companies using GDS technologies to collect, process, and distribute flight products through their network, NDC allows the airline to generate their own offers—consisting of a particular flight, seat class, and fare—and send them directly to third parties.  Since the emergence of NDC, a next generation of technology businesses have provided software and services for travel agencies to connect directly to NDC airlines.  Some of these NDC-focused technology businesses provide travel agencies with the option to connect to numerous NDC airlines and thus are commonly referred to as "NDC Aggregators." Some companies operate both a GDS business and an NDC Aggregator business.

8.    While Hawaiian can and does distribute certain ancillary information to GDSs, Hawaiian is not presently able to use EDIFACT to disclose all of the schedule of flights and "critical ancillary fee" information in compliance with the Rule. With EDIFACT, GDSs consume static pricing and schedule data which is then augmented with real time inventory by the airline. It is not technically possible on EDIFACT to personalize itineraries based on information specific to the passenger (*e.g*., the passenger's status in the airline's frequent flyer program, the passenger's

3

military status, or the passenger's status as a holder of a particular credit card) that was affirmatively provided by that passenger.

9.    Hawaiian is investing significant cost and effort towards providing passenger-specific information via NDC, but this deployment will take time. When a passenger provides details to a ticket agent, NDC can transmit that information to the airline through the NDC Aggregator, which would then make it possible for Hawaiian to send back passenger-specific information. But there are significant hurdles to clear and developments that need to be made before this is made possible.

10.    First, Hawaiian, NDC Aggregators, and travel agencies must develop and utilize NDC. This will require significant technical investments to upgrade travel agents' and GDSs' systems, and which may take years to achieve.  Sabre, Amadeus and Travelport, the three largest companies in the world that operate GDSs , still transact the majority of air transactions through EDIFACT.

11.    Second, assuming NDC Aggregators and travel agencies implement and commit to utilizing NDC, Hawaiian would need to negotiate contracts with them to allow for NDC connectivity to account for the new disclosure requirements. These agreements typically take between 6 to 12 months to negotiate. Often technical integrations take  6 to 12 months or longer due to backlog of integration projects at the NDC Aggregators. In addition, Hawaiian will

4

require that its technology provider for NDC connectivity make modifications to the current platform to meet the disclosure requirements, which will require additional time. This puts the minimum timeline to comply at one to two years from the start of negotiations if all things go smoothly.

12.    If forced to comply, the Rule requires Hawaiian to share passenger-specific data with ticket agents no later than October 30, 2024, which would require a herculean effort based on the required timeframe for technical upgrades, especially given the number of entities that are involved.

13.    If the Rule's effective date is not stayed, Hawaiian must immediately begin incurring costs to negotiate new contracts and commence the technology upgrades required for all NDC Aggregators and travel agency partners to share passenger-specific information.  Hawaiian must also plan to disable the legacy EDIFACT distribution standard on October 30, 2024 to prevent distributing inaccurate, non-passenger-specific content to third party distribution providers who are unable to migrate to the NDC standard.  This will result in a revenue loss of millions of dollars per month, as consumers will no longer be able to book travel through those channels. Such costs and revenue losses will not be recoverable if the Rule is invalidated.

5

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June _7_, 2024

      Dubai, United Arab Emirates        _____

                                        KRISTINA LARSON

6

**DECLARATION OF TRACY BEHLER, SENIOR DIRECTOR,
ONLINE EXPERIENCE, HAWAIIAN AIRLINES, INC. (JUNE 6, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

———————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC., JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC., *Petitioners*,

– v. –

DEPARTMENT OF TRANSPORTATION, *Respondent.*

———————————

**DECLARATION OF TRACY BEHLER, SENIOR DIRECTOR, ONLINE EXPERIENCE, OF HAWAIIAN AIRLINES, INC.**

———————————

Pursuant to 28 U.S.C. § 1746, I, TRACY BEHLER, hereby declare as follows:

1.      I am the Senior Director, Online Experience, at Hawaiian Airlines, Inc. ("Hawaiian"). Hawaiian's principal place of business is 3375 Koapaka Street, Suite G350, Honolulu, HI 96819. Hawaiian is a member of Airlines for America. I am authorized to make this declaration on Hawaiian's behalf, and I am personally familiar with the facts stated herein.

2.      Hawaiian is Hawai'i's largest and longest-serving airline. Hawaiian offers approximately 150 daily flights within the Hawaiian Islands, and nonstop flights between Hawai'i and 15 U.S. gateway cities, as well as service connecting Honolulu and American Samoa, Australia, Cook Islands, Japan, New Zealand, South Korea and Tahiti.

3.      I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.      I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is

1

provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.      My understanding is that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." It similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

6.      Hawaiian already discloses ancillary fees associated with baggage, as well as flight change and cancellation, on its website.  When a consumer goes to Hawaiian's website at www.hawaiianairlines.com (the "Website"), there is a link at the top right of the page – "Optional Fees."  If a consumer clicks on that "Optional Fees" link, it takes the consumer to a page with information on baggage rules and restrictions.  Those rules and restrictions include, among other things, information regarding:

(a)      a military baggage exception;

(b)      fees for first checked bag, second checked bag and each additional checked bag;

(c)      a description of entitlements if you are, i.e., a Pualani Platinum Member;

(d)      excess weight and oversize fees applicable by destination; and

(e)      reservation and cancelation fees.

2

7. To conduct a search and create an itinerary, a consumer can start their flight search using the booking widget on the home page of the Website or by going to the "Book a Flight" page, which is accessible by hitting the "Book" link located on the top navigation bar on the Website's Home page. Once a consumer inputs travel details such as travel dates and travel destinations, it takes the consumer to a flight results page (the "Flight Results Page") that displays, among other things, options for available flights and the fares for each by flight type (*i.e.*, Main Cabin, Main Cabin Refundable, and First Class). This page includes a link to "baggage fees" displayed at the top of the page above the search results.

8. To provide consumers with the ancillary fees information in the form the Rule requires—"at the first point where a fare and schedule is provided in connection with a specific itinerary"— which would be the Flight Results Page, it would take months to develop and surface a generic, non-passenger-specific list of all baggage fees.

9. Aside from the manhours that would be required to reengineer the Website to display generic, non-passenger-specific list of all baggage fees, such reengineering would result in a cluttered user interface, which would make it more difficult for consumers to make their flight selections and complete the booking. My view is that the new interface would result in a negative guest experience where consumers are shown irrelevant or extraneous information,

3

which may confuse consumers or make their booking process less efficient, and cause them to abort the booking process, ultimately resulting in a negative impact on revenue.

10.     For example, HawaiianMiles members fly with some frequency and are likely already aware of what fees apply or do not apply to them. It is important to Hawaiian's relationship with those members to provide an efficient booking process. Many HawaiianMiles members do not sign in when they start their flight search, so Hawaiian will have no way of confirming whether the consumer is a HawaiianMiles member to be able to display which baggage entitlements they may have. If consumers do not accurately reflect their membership in the booking process, they will receive information back that is ultimately inaccurate, which will create a negative guest experience. Also, as Hawaiian offers many nonstop flights a day between the Hawaiian islands, the additional disclosures will make it more difficult for HawaiianMiles members to see the full schedule of flights. Displaying irrelevant or extraneous information will not only cause confusion but will interrupt the booking process and create a negative guest experience.

11.     The Rule also requires airlines to meet the passenger-specific fee disclosure requirements for critical ancillary services by April 30, 2025.

12.     To meet the Rule's requirements, Hawaiian will need to build custom logic to determine what entitlements a passenger or passengers on a booking are

4

eligible for so that Hawaiian can display the correct pricing or fee amount they are entitled to. These factors include the type of trip they are searching for (*i.e.*, neighbor island, North America, international), the class of service they want, loyalty status, credit card or military status. This would require Hawaiian to re-think and re-design its booking path user experience to recognize the user and what fees are specifically applicable to them.

13. Even assuming this can be accomplished by the deadline for compliance, there will be instances when the Rule's objectives will not be met where the ancillary fees: (a) shown at the time of building the itinerary are accurate, but at the time of purchase may change depending on the type of payment used; or (b) shown at the time of building the itinerary and at the time of purchase is accurate, but are inaccurate at the time the passenger flies.

14. An example of a situation described in 13(a) is with consumers who pay using the Hawaiian Airlines Mastercard. If consumers do not accurately provide that information in the passenger-specific search, these consumers will be shown ancillary fees related to checked bags, at which point they might not proceed with the booking but opt to book with an airline that does not charge for checked bags. But if they had proceeded with the transaction and used a Hawaiian Airlines credit card to pay for the booking, they would have seen that they are entitled to a free checked bag. Hawaiian will have lost revenue due to the

5

DocuSign Envelope ID: 785E6CAC-CB62-4333-B522-24C5ECB07F0A

inaccurate display of ancillary fees.

15.    With the situation described in 13(b), consumers who are notified of their entitlements at the time of booking – *i.e.*, elite members who have free checked bags – but who fall out of elite status at the time of flying, will have been under the impression that they would not need to pay baggage fees, so when required to pay for such fees, consumers will be left with a negative guest experience and may not want to book on Hawaiian in the future.

16.    Above describes some of the impacts that Hawaiian foresees but it anticipates that additional impacts as well the costs and time it will take to comply will become apparent once Hawaiian begins the process towards complying.  To meet the Rule's compliance deadline, significant resources allocated to other, high-priority initiatives, would need to be assigned to this project, which would impact other commercial web/mobile projects and result in decreased revenue, increased costs and negative guest experience.

17.    An example of a high priority project that Hawaiian is actively working on since January 2024 is to enable features on its web and mobile channels to allow customers to, *e.g.*, modify or cancel a flight online rather than having to call the Contact Center to complete a transaction.  This project is expected to take two years to complete.  The same business and technical resources dedicated to this project are the same as those that would be tasked with

6

implementing changes to Hawaiian's digital channels to comply with the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 6, 2024

Honolulu, Hawaii

Tracy Behler

TRACY BEHLER

**DECLARATION OF CAROL CLEMENTS,
CHIEF DIGITAL AND TECHNOLOGY OFFICER,
JETBLUE AIRWAYS CORPORATION (JUNE 10, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals
*for the*
# Fifth Circuit

———————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners,*

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

———————————

**DECLARATION OF CAROL CLEMENTS OF JETBLUE AIRWAYS CORPORATION**

———————————

Pursuant to 28 U.S.C. § 1746, I, CAROL CLEMENTS hereby declare as follows:

1.    I am the Chief Digital and Technology Officer at JetBlue Airways Corporation (JetBlue). JetBlue's principal place of business is 27-01 Queens Plaza North, Long Island City, New York 11101. I am authorized to make this declaration on JetBlue's behalf, and I am personally familiar with the facts stated herein.

2.    JetBlue is a Part 121 commercial air carrier that is New York's Hometown Airline®, and a leading carrier in Boston, Fort Lauderdale-Hollywood, Los Angeles, Orlando, and San Juan. JetBlue carries customers to more than 100 cities throughout the United States, Latin America, Caribbean, Canada, and United Kingdom

3.    I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.    I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. My understanding is that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at

34,621.

5.    I understand that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." My understanding is that the Rule similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

6.    Finally, my understanding is that the Rule requires airlines to provide fare, schedule, and availability information to ticket agents that is "useable, current and accurate." *Id.* at 34,631.

7.    JetBlue already provides consumers the information on ancillary fees the Rule covers at various points throughout the booking flow, as well as on content pages on jetblue.com. Checked baggage allowances and fees are also presented to the customer at the earliest possible point to be accurate for both the flight chosen and the specific person travelling. As shown in the below screenshot, after the customer has entered their traveler information (name, frequent flyer information, etc.) JetBlue displays the fees for checking baggage and other ancillary offerings, which are specific to the customer traveling, the dates they are traveling, and the flight they have selected.  The customer can click the "add bags" link to see the pricing per segment per bag.



Additionally, this information is available at anytime for customers to view on our jetblue.com content pages, which, as shown in the below screenshot can be accessed in a single click from the homepage with the hyperlink "Updated bag fees." The red box has been added below for ease of review by the court.



Baggage information also can be easily navigated to from our home page by clicking "Travel Info" then "Bag Info".  As shown below with screenshots, that webpage provides information on carry-on and checked bags and fees.

## Carry-on bags

**Blue, Blue Plus, Blue Extra and Mint fares** include a carry-on bag (space permitting) that fits in the overhead bin, plus a personal item like a purse, daypack, laptop bag or approved pet carrier, that fits under the seat in front of you.

Carry-on bags must not exceed 22" L (55.88 cm) x 14" W (35.56 cm) x 9" H (22.86 cm), including wheels and handles.

Personal items must not exceed 17" L (43.2 cm) x 13" W (33 cm) x 8" H (20.32 cm).

**Blue Basic fares include 1 personal item that fits under the seat in front of you**, like a purse, daypack, laptop bag or pet carrier.  Any additional or larger carry-on bags brought to the gate will incur a fee and need to be checked.  The fee is $65 (if it would be your 1st or 2nd checked bag) or $180 (if it's your 3rd).

## Checked bags

You're always welcome to check bags to your destination.

- You can add up to 2 checked bags anytime, from during the booking to when you arrive at the airport.
- Plan to check more than 2 bags? Additional bags or any items that would incur an additional fee (that's in addition to any checked bag fee), can be added to your booking starting 24 hours prior to departure or at the airport.
- If your fare does not include checked bags, you'll save money by paying in advance on jetblue.com or the JetBlue app (applies to first 2 checked bags).
- Peak-season pricing applies to checked bags during high-traffic periods, including Presidents' Week, Thanksgiving and Winter holidays, and peak spring and summer travel seasons. See the table below for applicable fees and dates.
- Traveling internationally? See bag limitations for select markets.

Before you pack, make sure your bags meet our checked bag size dimensions and weight requirements. Checked bags exceeding 62" (157.48 cm) in overall dimensions (length + width + height) or 50 pounds (22.68 kg) will also incur a fee. See below for info on overweight and oversized items.

## Checked bag fees

**Want to save on checked bag fees? Save $10 each on your first 2 checked bags when you add them before check-in (at least 24 hours before departure).** Please note that checked bag fees are only refundable if the entire booking is cancelled prior to scheduled departure.

**Within the U.S., Latin America, Caribbean and Canada:**

More than 24 hours before departure     Within 24 hours of departure

|  | **Off-Peak** | **Peak\*** |
|---|---|---|
| Blue/Blue Basic/Blue Extra | **1st Bag:** $35$^2$ (incl $10 savings) **2nd Bag:** $50$^3$ (incl $10 savings) | **1st Bag:** $40$^2$ (incl $10 savings) **2nd Bag:** $60$^3$ (incl $10 savings) |
| Blue Plus | **1st Bag:** Included **2nd Bag:** $50$^3$ (incl $10 savings) | **1st Bag:** Included **2nd Bag:** $60$^3$ (incl $10 savings) |
| Mint | **1st Bag:** Included (up to 70 lbs) **2nd Bag:** Included (up to 70 lbs) | **1st Bag:** Included (up to 70 lbs) **2nd Bag:** Included (up to 70 lbs) |
| Mosaic[1] | **1st Bag:** Included **2nd Bag:** Included | **1st Bag:** Included **2nd Bag:** Included |
| JetBlue Plus Cardmember[4] | **1st Bag:** Included[5] **2nd Bag:** $50$^3$ (incl $10 savings) | **1st Bag:** Included[5] **2nd Bag:** $60$^3$ (incl $10 savings) |

As displayed below, change and cancel fee information—as well as carry-on bag information—is presented to the customer on the fare modal pop up, which is available to view by clicking the "compare fares" link on the flight results under a specific flight.



## Compare fares

| | Blue Basic | Blue | Blue Extra |
|---|---|---|---|
| Carry-on bag allowed | ✕ | ✔ | ✔ |
| No change/cancel fee[1] | Changes not allowed Cancel for fee | ✔ | ✔ |
| Free same-day switch (& no fare diff)[2] | ✕ | ✕ | ✔ |
| Free seat selection | ✕ | ✔ | ✔ |
| Priority security[3] | ✕ | ✕ | ✔ |
| Boarding | Final | General | Early |
| Free checked bag(s) | 0 | 0 | 0 |
| TrueBlue points per $1 | 1 | 3 | 3 |

8.     To provide ancillary fee information in the manner the Rule requires, JetBlue will be forced to make substantial changes to its online platform.

9.     The Rule is entirely incompatible with JetBlue's current technology to display airfare. Its main technology partner, Sabre, does not currently support the inclusion of ancillary catalogue details (*e.g.*, 1st or 2nd checked baggage, carry-on baggage, or change/cancel rules) in the way airfare is shopped. The Sabre webservices that JetBlue's e-commerce stack uses are built in a traditional "booking flow" manner (select outbound flight/fare, select return flight/fare, enter traveler details, select any ancillaries, enter payment, confirm booking). The current construct and infrastructure does not support making the ancillary request so early in the booking flow.

10.     Determining baggage fees is a highly complex algorithm that requires several inputs of information to render fees accurately. Much of this information is captured only after the actual person travelling is identified, which does not occur on the initial 'flight results' page. Displaying the correct fees to a unique customer requires certain information, including, but not limited to, a traveler's frequent flyer number. On JetBlue's online platform, customers do not provide this information until the 'traveler details' page, thus making it impossible to display the unique pricing for any baggage fees or allowances on the 'flight results' page without completely redesigning the booking flow.

11.    Displaying accurate baggage fee information also must account for all airlines that are part of the itinerary and how the itinerary is sold, including the fare brand selected, the traveler's loyalty and/or co-brand status and passenger type, among others.  This is all stored and managed in highly complex filings within the Airline Tariff Publishing Company (ATPCO) database, an industry clearing house where airlines file and store their fares and ancillary fees.  The requests for baggage allowances and fees are sent only for the flight and fare the customer selected on shopping results to ensure an accurate response taking into account all the aforementioned variables.  Rendering "what if" ancillary pricing for every possible flight shopping result returned, for every possible variable, would drive a significant amount of up-front calculation logic that does not exist today.  This would lead to increased processing time for our digital booking channels. Given the complex logic that would have to be designed and built to obtain this information for every flight returned in as shopping request, we estimate that the changes would add at least 2 minutes in additional processing and search time to display the flight results, and all the required ancillary fee information for a single nonstop route.  This additional processing time would increase for more robust itineraries that include connecting options or flights operated by our codeshare partners.  As a result, such additional processing time would negatively impact JetBlue's booking conversion and increase our bounce rate – *i.e.*, customers who

give up on a search because it was not fast enough-a critical metric to any online point of sale.  We anticipate a drop in our conversion rate of up to 10%, resulting in less revenue for JetBlue.  In an era where the speed of online retailing platforms is near instant (sub-second processing time), a customer waiting minutes for results on standard searches would significantly damage our online booking experience, as customers would view it as slow and unresponsive.  This would have a downline negative impact on the overall JetBlue brand and user experience as being behind the times with respect to technology and modern online merchandising.

12.    Change/Cancel fees also have variation within the ATPCO filings based on route, fare option, cabin, etc.  JetBlue provides this information statically today in its fare modals—during the initial flight selection. It is also provided in great detail on our content pages located on jetblue.com. Current technology does not support displaying this information dynamically and in real time based on flight results.

13.    Similar to the costs and challenges associated with JetBlue's direct channels, compliance with the DOT rule in third party distribution channels like the Global Distribution Systems (GDS) used by travel agents, or the Online Travel Agencies (OTAs) like that of Expedia, would also be highly complex and cumbersome. The indirect channels also get their ancillary fee information from

the same ATPCO filings as the airline and follow a traditional booking flow process whereby ancillaries are priced and added to an itinerary after flight selection. Thus, the new rule would require a significant investment by both the airline and the third-party distribution partners to redesign the flow of fee information and implement enhanced levels of technology that JetBlue does not support today, and are several years away on our IT roadmap.

14.    Making the changes discussed in ¶¶ 9-13 requires a complete reworking of the underlying Sabre host PSS technology, along with rewriting JetBlue's website to support a new shopping flow. JetBlue has no control over Sabre's software development.

15.    JetBlue estimates it would need to expend $6-10 million in IT investments, including internal employee capital costs, external costs for any staff augmentation that may be required, as well as business partner costs for applications that JetBlue does not do direct development for, to comply with the Rule's disclosure requirements. This estimate does not include any joint investment Sabre may seek from all their user airlines to support the necessary underlying PSS enhancements that would also be required.

16.    In order to meet the requirements and timeline set forth by the DOT, JetBlue would have to immediately start spending a significant amount of time and money, and re-allocate critical internal and business partner resources, on this

redesign effort, which is not something the company is in a position to do at this time.  As publicly stated in our earnings, JetBlue has suffered losses over two billion dollars ($2B) since the start of Covid. The company's sole focus is on returning to a state of consistent profitability while running a safe and reliable operation. Spending money on an effort that doesn't contribute to our safety, profitability or reliability is counter to our critical and necessary objectives.

17.    In addition to the direct costs JetBlue will incur to comply with the Rule, it will also suffer significant opportunity costs. JetBlue's IT roadmap is built out for the next two years with a number of high priority loyalty and revenue driving initiatives worth over $300M that support our path to getting back to profitability as soon as possible. The Rule will enormously—and irreparably—disrupt execution on these initiatives, and delay our return to being a profitable and financially healthy airline.

18.    Additionally, if JetBlue were to make the significant investments required to adhere to the Rule and it were ultimately invalidated at a later date, the company would incur more costs to stop and unwind the development that has been done.  Any sunk costs would be taken as a financial write off, further harming our financial state and delaying our return to profitability.  Based upon my experience, the requirements of the Rule go against modern e-commerce best practices, so if not for the Rule itself, there is no way JetBlue would ever take on

such a massive redesign effort in the first place.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 10, 2024

Long Island City, NY

Carol Clements

**DECLARATION OF MICHAEL PETERMANN,
MANAGING DIRECTOR–CUSTOMER STRATEGY AND
INNOVATION, UNITED AIRLINES, INC. (JUNE 6, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals
*for the*
# Fifth Circuit

---

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners,*

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

---

**DECLARATION OF MICHAEL PETERMANN, MANAGING DIRECTOR –
CUSTOMER STRATEGY AND INNOVATION, UNITED AIRLINES, INC.**

---

Pursuant to 28 U.S.C. § 1746, I, MICHAEL PETERMANN, hereby declare as follows:

1.    I am the Managing Director – Customer Strategy and Innovation at United Airlines, Inc. ("United"). United's principal place of business is 233 South Wacker, Chicago, Illinois, 60606. United is a member of Airlines for America. I am authorized to make this declaration on United's behalf, and I am personally familiar with the facts stated herein.

2.    United is a U.S. airline with global reach. It transports people and cargo throughout North America and to destinations in Asia, Europe, Africa, the Pacific, the Middle East, and Latin America.

3.    I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.    I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.    My understanding is that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." My understanding is that the Rule similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

6.    United already discloses ancillary fees associated with baggage, as well as flight change and cancellation, on its website. United has general disclosures concerning baggage fees throughout its website. On the initial flight search results page, United indicates that baggage fees may apply, and it hyperlinks to United's baggage fee calculator. This baggage fee calculator allows consumers to view whether there is a cost associated with a first or second checked bag on their itinerary and the maximum weight allowance per bag when factoring in the passenger's MileagePlus or Star Alliance reward membership or status or military service. Once the flights are selected, United indicates, on the first page after selection, the baggage fees that will apply for the itinerary selected based on the information that the passenger has provided to United. United also discloses the baggage fees on the confirmation/receipt and through the manage reservations function.

7.    To provide consumers with this information in the form the Rule

2

requires—"at the first point where a fare and schedule is provided in connection with a specific itinerary"—United would have to significantly reengineer its two complex marketing platforms, the mobile pathway and the website pathway. United will need to re-engineer its platforms to handle seven unique customer segments (nonmembers, general members, silver gold, platinum, 1k, and Global Services). United will need to invest significant time and resources for development, coding and testing. Since it is essential that the customer be able to conduct a search and make a purchase within a reasonable period of time, and the new requirements would significantly slow down the processing time for a search, United will be required to commit resources to significantly increase the speed of the search function that it would not have otherwise needed to commit.

8.    United anticipates it will take approximately 51,000 hours of labor and roughly $5 million to fully implement these changes.

9.    I understand that the Rule provides a compliance period of 12 months, requiring airlines to meet the fee disclosure requirements for critical ancillary services by April 30, 2025. To meet the Rule's compliance deadline, United has already begun work on sizing the scope of changes that will need to be made. Because of the amount of testing that will be needed to make the required changes, United will need to complete the coding long before the required compliance date. To make the changes required and complete the other systems

3

projects that are planned, United will need to hire additional staff, including third party contractors. Obtaining new talent takes time and United will need to begin that search and hiring process immediately. United is also doing significant work to comply with the Department's automatic refund rule. Many of the same individuals are involved in the planning and execution of our compliance with the two outstanding rules. Substantial work on compliance with the Rule will be required during the entire time that remains.

10.     If the Rule is not prevented from going into effect, United will thus suffer immediate and substantial compliance costs of about $5 million. United would not be able to recover these significant compliance costs in the event the Rule is later found to be invalid.

11.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 6, 2024

Chicago, IL

Michael Petermann

4

**DECLARATION OF JOHN PEPPER, VICE PRESIDENT, CORPORATE DEVELOPMENT & GOVERNMENT AFFAIRS, ALLEGIANT TRAVEL CO. (JUNE 7, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

———————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners*,

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

———————————

**DECLARATION OF JOHN PEPPER, VICE PRESIDENT OF CORPORATE
DEVELOPMENT & GOVERNMENT AFFAIRS AT ALLEGIANT TRAVEL
COMPANY**

———————————

Pursuant to 28 U.S.C. § 1746, I, JOHN PEPPER hereby declare as follows:

1.     I am the Vice President of Corporate Development & Government Affairs at Allegiant Travel Company. Allegiant's principal place of business is 1201 N. Town Center Dr. Las Vegas, NV 89144. Allegiant is a member of the National Air Carrier Association. I am authorized to make this declaration on Allegiant's behalf, and I am personally familiar with the facts stated herein.

2.     Allegiant Air is an ultra-low-cost carrier serving leisure customers with an emphasis on connecting small and medium-sized domestic markets with nonstop service to world class vacation destinations.

3.     I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.     I understand the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bags, as well as any flight change or cancellation fees. The Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.     I understand the Rule additionally requires carriers and ticket agents

1

to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." It similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

6.    Allegiant already discloses ancillary fees associated with baggage, as well as flight change and cancellation policies, on its website. Throughout the customer's booking journey, the pricing of all optional products and services are conspicuously displayed before the customer can select the product or service as well as before the customer completes a transaction. In addition, Allegiant's website has a page dedicated to clearly laying out the price range for each service, as well as a calculator to determine the exact price of baggage fees on all Allegiant routes for a specific day.  Ultimately, Allegiant customers utilizing the current system can only complete their transaction after seeing all selected fees applicable to their trip. I have included screenshots of each step of our booking process from a customer's perspective as well as the separate page discussing all optional fees and services (which can be accessed multiple ways through our website, including the prominent link at the start of the booking path):

2





- SA104 -



5



## Pick the Bags and Extras You Need

Save money by booking your baggage with your flight now. Baggage prices are higher after your flight purchase.



Extras



# Review & Payment



| TRIP SUMMARY | $180.00 ^ |
|---|---|

**FLIGHT**

Flight Information  EDIT

✈ **Departing: Thu, Aug 01, 2:08 PM**
Appleton, WI (ATW) > Portland, OR (PDX)

| | |
|---|---|
| Flight | $101.30 |
| Airline Fees | $22.00 |
|   Carrier Usage Charge | $22.00 |
| Government Taxes and Fees | $22.70 |
|   U.S. Federal Excise Tax | $7.60 |
|   U.S. September 11th Security Fee | $5.60 |
|   U.S. Passenger Facility Charge | $4.50 |
|   U.S. Flight Segment Tax | $5.00 |

**TRAVELER**  EDIT

**JOHN PEPPER**

SEATS  ADD

🧳 BAGS  EDIT     ATW to PDX  **1 Checked**     $34.00     $34.00

EXTRAS  ADD

- SA107 -



# Optional Services & Fees

In order to keep fares as low as possible, Allegiant offers many a-la-carte services you can add to your travel itinerary for a fee. Fees are per person, per segment, or both. A segment is one take-off and one landing.

| Service | Fee |
|---|---|
| **Seat Selection** | $0.00 to $80.00 |
| Select your seat at the time of reservation. | |
| **Priority Access** | $11.50 to $17.50 |
| The optional Priority Access upgrade affords passengers the opportunity to board the plane before general boarding. | |
| **Trip Flex** | |
| Avoid most change and cancellation fees. Protect your travel purchase with Allegiant's Trip Flex. | |
| Flight Only or Car Packages (per person, per segment) | $29.00 to $43.00 |
| Hotel Packages or Itineraries with Products (per person) | $29.00 to $43.00 |

Cancellations:

You will receive a full refund of your airfare if you cancel your reservation within 24 hours of your initial booking, unless you initially booked within one week of your flight's departure in which case no credit will be issued.

| | |
|---|---|
| Bookings with Trip Flex protection | $0.00* |
| If you choose to cancel a reservation which includes Trip Flex, credit is issued minus carrier charges, TripFlex and booking fees. Remaining funds will be applied as non-refundable credit good for future travel on Allegiant Travel. | |
| Bookings without Trip Flex | $25.00* |
| If you choose to cancel your reservation, a temporarily reduced fee of $25.00 per passenger, per segment will apply and credit will be issued minus cancellation, carrier charges and booking fees. Remaining funds will be applied as non-refundable credit good for future travel on Allegiant Travel. **No credit will be issued for no-shows or cancellations made within 7 days of flight departure.** | |

* Carrier charges and booking fees are not refunded, with or without Trip Flex.

| Service | Fee |
|---|---|
| **Food & Beverage** | $2.00 to $7.00 |
| For your convenience, Allegiant offers a variety of snacks and drinks on board many flights for purchase. | |
| **Pet-in-Cabin (per person, per segment)** | $50.00 |

| | |
|---|---|
| **Electronic Carrier Usage Charge (per person, per segment)** | $22.00 |

Fares displayed are inclusive of an electronic usage charge of $22 per passenger, per segment, applicable to all airline reservations booked through the Web site or call center.

| | |
|---|---|
| **Call Center Booking Fee (per person, per segment)** | $14.99 |

Customers that purchase travel through the Allegiant call center will be charged a call center booking fee.

| | |
|---|---|
| **Boarding Pass Printing** | $5.00 |

A $5 per boarding pass fee will apply to passengers who choose to have a boarding pass printed out at select domestic airport locations. To avoid this charge, passengers may check in online and bring a printed paper boarding pass to the airport, or use the Allegiant mobile app to get a digital boarding pass. Please note, check in closes 45 minutes prior to scheduled flight departure.

**Checked and Carry-on Baggage Fees and Allowances**

Bags are priced by route, per segment. In accordance with FAA/TSA Security Directives, each passenger is limited to 2 bags in the cabin: One (1) personal item and one (1) carry-on bag. Please measure your bags carefully. All exterior measurements include wheels, pockets, handles and decorations. View our baggage allowance policy for more information.

Baggage fees apply to carry-on and checked bags and vary depending on route and when the bag is added to your itinerary. Additional charges for sporting equipment and/or overweight and/or oversize and excess baggage may apply.

| | |
|---|---|
| Personal Item | $0.00 |

**8 in. x 14 in. x 18 in. (20 cm x 35 cm x 45 cm) maximum**
A purse, briefcase, laptop computer, small backpack, small camera or food container. The item must be stored completely underneath the seat in front of you. There is no charge for one personal item, provided it does not exceed size requirements.

| | |
|---|---|
| Carry-on Bag | $10.00 to $75.00 |

**10 in. x 16 in. x 22 in. (25 cm x 40 cm x 55 cm) maximum**
A roll-aboard bag, garment bag, or tote bag, not to exceed size requirements. Carry-on bag fees apply.

| | |
|---|---|
| Checked Bags - up to four (4) per passenger | Baggage Fees Calculator |

**80 in. (203cm) in height - width - length maximum**
Each checked bag can weight up to 50lbs (22 kilos). Save by pre-purchasing checked bags. View our baggage fee table for bag pricing by route, per segment.

| | |
|---|---|
| Overweight Bag - 51 to 70 lbs (23.1 to 31.8 kilos) | add $50.00 |
| Overweight Bags - 71 to 100 lbs (32.2 to 45.4 kilos) | add $75.00 |
| Oversized Checked Bag - height - width - depth in excess of 80 in. (203.2 cm) | add $75.00 |
| Oversized Personal Item - oversized and excess carry-on baggage will be assessed at an at-airport baggage fee. | $50.00 to $75.00 |

| | |
|---|---|
| Gate-checked Bags | $0.00 to $75.00 |

It may be necessary to gate check baggage including, but not limited to, the following circumstances: oversized bag taken to the gate, limited overhead bin space, or car seat/stroller taken to the gate.
Baggage fees do not apply to car seats/strollers, mobility aids and assistive devices.



**BAGGAGE FEES CALCULATOR**

| FROM | Appleton, WI(ATW) | | | Each checked | Each carry-on |
|---|---|---|---|---|---|
| TO | Portland, OR(PDX) | | At Booking | $34 | $41 |
| DEPARTURE DATE | 08/01/2024 | | Pre-Departure | $70 | $70 |
| | CALCULATE | | Airport | $75 | $75 |

If your flight departs on or after August 16th, 2023 the pre-departure bag fee (for checked and carry-on) will be $70, and the fee at the airport will be $75.

7.     To provide consumers with this information in the form the Rule requires—"at the first point where a fare and schedule is provided in connection with a specific itinerary"—Allegiant would have to significantly reengineer the customer experience on its marketing platforms and itinerary search functions. These changes include, but may not be limited to, recording new system requirements; creating and modifying UI (user interface) design and architecture designs; development of API (application programming interface) calls and orchestration to retrieve feeds data from the Navitaire system; development of UI changes in website, mobile apps, travel agent portal, call center booking portal; validation and testing of software changes; user acceptance testing; and finally deployment of the product.

8.     Allegiant anticipates it will likely take more time than the current rules demand to fully implement these changes assuming multiple full development teams are utilized. As a result, this rule will have direct financial and resource costs which will result in other commercial and regulatory compliance efforts being stopped to accommodate this. There will be direct support costs incurred from third party software providers who may be required to change their systems, and those costs are passed along to Allegiant.

9.     I understand that the Rule provides compliance periods of 6 and 12 months, requiring airlines to meet the fee disclosure requirements for critical

ancillary service by April 30, 2025.

10.    To meet the Rule's compliance deadline, Allegiant will need to begin the processes described in paragraph 7 immediately, long before this litigation is resolved.

11.    If the Rule is not prevented from going into effect, Allegiant will thus suffer immediate and substantial compliance costs as well as a material opportunity cost of stopping upgrades to customer facing and revenue generating initiatives. Allegiant will also have to procure additional third-party labor resources to complete this development. Allegiant would not be able to recover these significant compliance costs in the event the Rule is later found to be invalid.

12.    This ruling would have a direct negative impact on Allegiant's business by adding unnecessary friction and confusion to the customer journey. In our experience all additional friction in the transaction process results in more abandoned carts and increases volume to our customer call center.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 7, 2024

Las Vegas, Nevada

John Pepper

11

**JOINT DECLARATION OF EDWARD M. CHRISTIE III, PRESIDENT AND CHIEF EXECUTIVE OFFICER, SPIRIT AIRLINES, INC., AND BARRY L. BIFFLE, CHIEF EXECUTIVE OFFICER, FRONTIER GROUP HOLDINGS, INC. D/B/A FRONTIER AIRLINES (JUNE 14, 2024)**

No. 24-60231

_____

*In the*

# United States Court of Appeals

## *for the* Fifth Circuit

_____

AIRLINES FOR AMERICA, NATIONAL AIR CARRIER ASSOCIATION, INTERNATIONAL AIR TRANSPORT ASSOCIATION, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR LINES, INC., HAWAIIAN AIRLINES, INC., JETBLUE AIRWAYS CORPORATION, AND UNITED AIRLINES, INC.,

*Petitioners,*

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent.*

_____

**JOINT DECLARATION OF EDWARD M. CHRISTIE III, PRESIDENT AND CHIEF EXECUTIVE OFFICER, SPIRIT AIRLINES, INC. AND BARRY L. BIFFLE, CHIEF EXECUTIVE OFFICER, FRONTIER GROUP HOLDINGS, INC. D/B/A FRONTIER AIRLINES**

_____

Pursuant to 28 U.S.C. § 1746, we Edward M. Christie III and Barry L. Biffle hereby declare as follows:

1.      I, Edward M. Christie III am the President and Chief Executive Officer, and a Class III Director, at Spirit Airlines, Inc. ("Spirit").  Spirit's principal place of business is 139 South Compass Way, Dania Beach, Florida, 33004.  Spirit is a member of the National Air Carrier Association ("NACA"). I am authorized to make this declaration on Spirit's behalf, and I am personally familiar with the facts stated herein.

2.      I, Barry L. Biffle am Chief Executive Officer of Frontier Group Holdings, Inc. d/b/a Frontier Airlines ("Frontier").  Frontier's principal place of business is 4545 Airport Way, Denver, Colorado 80239.  Frontier is a member of the National Air Carrier Association ("NACA"). I am authorized to make this declaration on Frontier's behalf, and I am personally familiar with the facts stated herein.

3.      References herein to Spirit are made by Mr. Christie and references to Frontier are made by Mr. Biffle.  Use of "we" means that both Mr. Canfield and Mr. Biffle are knowledgeable of the stated fact.

4.      Spirit began service as Charter One Airlines, in 1983 following passage of the Airline Deregulation Act of 1978 ("ADA").  The ADA

included a policy statement which envisions an air transportation system based on competition and promotes the development of low fares and new entrants. In 1992, the company's name was changed to Spirit Airlines and it began scheduled service. In 2007, Spirit introduced a low-fare business model in the United States that separated the base fare for travel from additional services a customer might want, such as a checked bag, so it could offer the lowest possible base fare. Spirit's business model has generally been referred to as an "unbundled" business model. Spirit's target customers are people traveling for leisure, to visit family and friends or for small business.

5.     The current Frontier, in various iterations, dates to 1993 and began its transition to low fares in the early 2000's. In 2014, Frontier transitioned to an ultra-low-cost carrier (ULCC) business model. Frontier's target customers also are people traveling for leisure, to visit family and friends, or for small business.

6.     Spirit and Frontier are the two largest low-fare airlines in the country. Together they account for a combined market share of approximately 8.7 percent.

7.     We understand that the Department of Transportation (the

"Department") has issued a final rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

8.  We understand the Rule imposes new disclosure requirements for what the Department describes as "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees.  We understand the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

9.  We understand that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." We understand the Rule similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

10.  Spirit, under current Department rules, already discloses ancillary fees associated with baggage, as well as flight changes and cancellations,

on its website. Customers can access baggage fees quickly before even beginning the booking process on a link from the home page. Spirit has general disclosures concerning baggage fees throughout its website. On the initial flight search results page, Spirit indicates that baggage fees may apply and includes a hyperlink to Spirit's baggage fee calculator. This baggage fee calculator allows consumers to view whether there is a cost associated with a first or second checked bag on their itinerary and the maximum weight allowance per bag. Once flights are selected, Spirit displays, on the first page after selection the baggage fees that apply for the itinerary selected based on the information the passenger has provided. Spirit also discloses the baggage fees on the purchase confirmation/receipt.

11.    Frontier, under current Department rules already discloses ancillary fees associated with baggage, as well as flight changes and cancellations, on its website. Customers can access baggage fees quickly before even beginning the booking process through a link on the Frontier website homepage. Frontier has general disclosures concerning baggage fees throughout its website. On the initial flight search results page, Frontier displays the baggage fees that may apply and it includes a hyperlink to Frontier's baggage fee calculator. This baggage fee calculator allows consumers

to view whether there is a cost associated with a first or second checked bag on their itinerary and the maximum weight allowance per bag. Once the flights are selected, Frontier displays, on the first page after selection, the baggage fees that will apply for the itinerary selected based on the information that the passenger has provided. Frontier also discloses the baggage fees on the purchase confirmation/receipt.

12.   For Spirit to provide consumers with this information in the form the Rule requires "at the first point where a fare and schedule is provided in connection with a specific itinerary," it will need to completely reengineer its website and mobile platforms.  Because Spirit's baggage fees may vary based on specific markets, as well as the date and time of departure, this is an incredibly complex problem to address – requiring significant time and resources for development, coding and testing. As a low-cost carrier, Spirit does not have a large in-house IT infrastructure. Spirit's reservation/e-commerce platform is provided and managed by a third-party vendor, and Spirit will have to fund the third-party costs associated with the required changes. Spirit's experience with millions of customers has confirmed that the vast majority of travelers have no issue with the current baggage and fee displays. Moreover, it is essential that customers be able to conduct a search

and make a purchase efficiently and within a reasonable time, consistent with customer expectations of their e-commerce experiences, and the new requirements would significantly slow down the processing time for a search. Spirit will be required to commit resources and, directly or through its third-party vendor, make large investments in hardware to significantly increase the speed of the search function that it would not have otherwise needed to commit.

13.    For Frontier to provide consumers with this information in the form the Rule requires "at the first point where a fare and schedule is provided in connection with a specific itinerary," it will need to re-engineer its booking platforms.  Since Frontier uses dynamic pricing in calculating baggage fees, it will need to invest significant time and resources for development, coding and testing.  As a low-cost carrier, Frontier does not have a large in-house IT infrastructure.  Frontier's reservation system is provided by a third-party vendor and Frontier will have to fund the third-party costs associated with the required changes. It is essential that customers be able to conduct a search and make a purchase within a reasonable period of time, and the new requirements would significantly slow down the processing time for a search. Frontier will be required to commit resources to

significantly increase the speed of the search function that it would not have otherwise needed to commit.

14.    Spirit understands that to implement the changes required by the rule with respect to its website and mobile app would take between 12 and 18 months, *i.e.* longer than the April 2025 implementation date under the Rule.   Without a stay, Spirit would need to start working on these changes immediately, months before this Court can act on the merits.   These initial costs, including substantial pass-through costs from third-party vendors and internal direct costs relating to a substantial re-coding of Spirit's third-party e-commerce platform systems are expected to exceed $10 million.

15.    Spirit currently faces serious financial and commercial issues requiring an overhaul of its product offerings and business model.  Major additional harm to Spirit would arise from a chain-reaction of diverting staff and capital expenditures away from priority revenue-enhancing projects and IT upgrades to instead work on Rule compliance.  These projects, now underway or planned for the near term, include, among other areas of Spirit's business, e-commerce initiatives, changes to product design, cabin layout initiatives, revisions to the merchandising of ancillary products,

enhanced bundling options, cybersecurity initiatives, and changes to loyalty and affinity card programs. Diversion of resources from those projects will result in substantial forgone revenues estimated to range between $50-100 million over the next six months alone and continuing thereafter at some pace during the period in which Spirit would be forced to delay current and planned projects to comply with the Rule.

16. There are also significant unknowns, including inevitable costs associated with issues the Department did not foresee, but should have, when it implemented the Rule. For example, almost four percent (4%) of Spirit Guests purchase their itineraries at the airport ticket counter, and there is seemingly no current feasible solution to advertise to these customers all the various optional products the Department demands in the Rule. Spirit, and every other airline, will need to spend significant time and resources just to consider whether to build entirely new display systems – in addition to the hardware and installation costs if new systems are needed. Multiply these resource cost demands by every other potential sale or advertisement channel: websites, mobile applications, mobile websites, live contact centers, conversational interactive voice response (IVR) systems, chatbots, ticket agent channels, etc. The resources required for these activities are

extraordinary and directly compete in priority with each other.

17.    Frontier understands that to implement the changes required by the rule with respect to its website and mobile app would take between 12 and 18 months, *i.e.* longer than the April 30, 2025 implementation date under the Rule.  Without a stay, Frontier would need to start working on these changes immediately, months before this Court can act on the merits.   These costs, including substantial pass-through costs from third-party vendors and internal direct costs relating to a substantial re-coding of Frontier's third-party e-commerce platform and related IT systems are expected to exceed $5 million.

18.    In recent months, Frontier has undertaken substantial changes to its products and services.  Diverting staff and capital expenditure away from priority revenue-enhancing projects and IT upgrades to instead work on Rule compliance will lead to lost revenue.  These projects, now underway or planned for the near term, include, *e.g.*, revisions to the merchandising of ancillary products, enhanced bundling options, cybersecurity initiatives, and changes to loyalty and affinity card programs.  Diversion of resources from those projects will result in substantial forgone revenues estimated to range between $30-50 million over the next six months.

19.     Unless the Rule is stayed, should the Court later find the Rule invalid, neither Spirit nor Frontier will be able to recoup either the millions of dollars in immediate compliance costs, nor tens of millions of dollars in lost revenues resulting from having to delay or abandon new and innovative product enhancements to drive new business and new customers.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

For: Spirit Airlines, Inc.

_____

Edward M. Christie III

Dated: June 14, 2024

Dania Beach, Florida

For: Frontier Group Holdings, Inc.

_____

Barry L. Biffle

Dated: June 14, 2024

Denver, Colorado

**DECLARATION OF ROSE NEALE,**
**SENIOR VICE PRESIDENT AND GENERAL COUNSEL,**
**SUN COUNTRY AIRLINES (JUNE 6, 2024)**

No. 24-60231

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

———————————

AIRLINES FOR AMERICA, ALASKA AIRLINES, INC., AMERICAN AIRLINES, INC., DELTA AIR
LINES, INC., HAWAIIAN AIRLINES, INC.,
JETBLUE AIRWAYS CORP., UNITED AIRLINES, INC.,
*Petitioners,*

– v. –

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

———————————

**DECLARATION OF ROSE NEALE, SENIOR VICE PRESIDENT AND GENERAL
COUNSEL OF SUN COUNTRY, INC. DBA SUN COUNTRY AIRLINES**

———————————

Pursuant to 28 U.S.C. § 1746, I, ROSE NEALE hereby declare as follows:

1.      I am the Senior Vice President and General Counsel at Sun Country, Inc. dba Sun Country Airlines (hereinafter "SCA"). SCA's principal place of business is 2005 Cargo Road, Minneapolis, MN 55450. SCA is a member of Airlines for America. I am authorized to make this declaration on SCA's behalf, and I am personally familiar with the facts stated herein.

2.      SCA is a new breed of hybrid low-cost air carrier that deploys shared resources across scheduled service, charter, and cargo businesses. Based in Minnesota, SCA serves leisure and visiting friends and relatives passengers, charter customers, and provides Crew, Maintenance, and Insurance service, with flights throughout the United States and to destinations in Canada, Mexico, Central America, and the Caribbean.

3.      I am aware that the Department of Transportation has now finalized the rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) ("the Rule"), which is the subject of the above-referenced case.

4.      I understand that the Rule imposes new disclosure requirements for what it deems "critical ancillary fees," including fees for a first checked bag, second checked bag, and carry-on bag, as well as any flight change or cancellation fees. I understand that the Rule requires airlines and ticket agents to disclose these fees "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621.

5.      My understanding is that the Rule additionally requires carriers and ticket agents to disclose any applicable limits on a checked or carry-on bag's weight and dimensions before ticket purchase on an online platform, but not necessarily "at the first point where a fare and schedule is provided." I understand that it similarly requires disclosure of "ticket change and cancellation policies" before a consumer purchases a ticket on an online platform.

1

6.      SCA already discloses ancillary fees associated with baggage, as well as flight change and cancellation, on its website. Prior to conducting a flight search, passengers can access SCA's bag pricing and cancellation rules from a direct link on the SCA home page.



As shown in this screenshot, with a red box added for purposes of the declaration, the link is prominently displayed above the fold on the booking widget and takes passengers to the bag fees and optional services page, where travelers will find ancillary pricing and policies along with change and cancellation fees and policies. Once a passenger enters the booking flow, the bag fees are shown on the bags page, where SCA requires the passenger to take an action prior to moving forward in the flow. The passenger must select an underseat item (free), an overhead bag, or a checked bag before they can move forward in the booking process.

7.      To provide consumers with this information in the form the Rule requires—"at the first point where a fare and schedule is provided in connection with a specific itinerary"—SCA would have to significantly reengineer its marketing platforms and itinerary search functions. SCA would need to completely rearchitect how the information is displayed on the flights results page to include bag pricing. To show bag pricing, SCA would need to request all bag prices for each individual journey on the page and display the prices at the flight level. This would greatly impact the performance of the page resulting in slow data load times, increasing a passenger's likelihood of abandoning their shopping session. An additional risk would be the page data timing out

2

altogether resulting in a false message to the passenger that there are no flights results. This would provide for overall site stability issues and a poor passenger experience.

8.      In particular, in order to display exact pricing for ancillaries, SCA would need a passenger to attribute the ancillaries to. Since the flight results page appears before a passenger inputs their information in the booking process, SCA would run the risk of displaying inaccurate bag prices. For example, members of the SCA loyalty program who are eligible for discounted bag pricing, would be shown the full bag price amount on the flight results page. This is because SCA requires passengers to be logged in and associate a passenger with the itinerary before it can display discounted bag pricing. This information is not collected until the passenger information page, which is displayed after the flight results page. To enable a passenger to input that information at the outset of the process to enable more accurate bag pricing on the flight result page, for themselves and for any other passengers traveling with them, SCA would have to substantially reengineer its online platforms and search functions.

9.      The Rule would also significantly impact SCA's marketing programs. For example, this Rule would require SCA to display bag prices in all marketing communications, which is not possible with our current set up.  The current set up does not have a mechanism to send ancillary pricing to our marketing technology platforms. SCA would need to build a connection to send the data and a set of rules within the platform to determine which pricing to display and work with third-party advertising partners to get ancillary prices into their systems to display in all external ads. It would be expensive and time-consuming to implement bag prices on marketing and advertising materials and require SCA to share bag prices with third-party partners.

10.     SCA anticipates it will take twelve to fifteen months to fully implement these changes to the SCA website. Due to the small size of SCA's development team and the short

timeline, SCA would likely need to hire consultants to complete the work, which dramatically increases the cost. These changes impact shared experiences, including how the displayed flight and price information on the flight results page is used elsewhere on the website, so SCA would need to make updates in booking and post-booking flows. SCA would also likely require development and backend configuration changes from the third-party booking engine provider, which increases costs and makes SCA beholden to the booking engine provider's development timeline.

11.     I understand that Rule provides a compliance period of 12 months, requiring airlines to meet the fee disclosure requirements for critical ancillary service by April 30, 2025.

12.     To meet the Rule's compliance deadline, SCA will need to begin IT implementations immediately, long before this litigation is resolved.

13.     If the Rule is not prevented from going into effect, SCA will thus suffer immediate and substantial compliance costs largely related to building and maintaining the connections with third-party distribution partners. The cost and time commitment of hiring contractors, reworking the architecture of the flight results page and work needed from the third-party booking engine provider would be extensive and require us to reallocate our IT team towards this initiative effectively halting current IT initiatives, such as enhancing our mobile app, upgrading our reservation system, and making enhancements to our check-in and self-service functionality, which would affect the passenger experience.  development on current initiatives. SCA would not be able to recover these significant compliance costs in the event the Rule is later found to be invalid.

14.     In addition to costs associated with the Rule's fee-disclosure provisions, the Rule requires airlines to "share critical ancillary fee information with any entity that is required by law to disclose" such fee and policy information to consumers, including ticket agents. *Id*. at 34,659.

4

15.     SCA has a variety of distribution agreements with Global Distribution Systems (GDS), Online Travel Agents (OTA), and tour operators. These agreements contain the terms by which these distribution relationships function.

16.     To comply with this provision, SCA will need to renegotiate existing contracts with ticket agents to account for the new disclosure requirements. SCA will have to negotiate the details of the information sharing requirements, including which entity will take on the technical burden and cost. SCA will have to scope out technical requirements and build bespoke connections to each distribution partner.

17.     For the data-sharing provision, the Rule provides a compliance period of only 6 months, requiring airlines to share data with ticket agents as the Rule requires no later than October 30, 2024.

18.     To meet the Rule's compliance deadline, SCA will need to negotiate, finalize, and execute information-sharing agreements with ticket agents by October 30, 2024. SCA estimates this would be a lengthy and costly negotiation.

19.     If the Rule's effective date is not stayed, SCA would incur these costs immediately, and they would not be recoverable if the Rule is invalidated. Moreover, once effective, these new agreements will remain legally binding on carriers even if the Petitioners prevail in this action and the Rule is set aside.

20.     SCA prices ancillary products according to trip length, demand, specific seat, baggage weight, days to travel, bundles, market, loyalty membership, co-brand credit card, and other factors to allow passengers to customize the product to fit their specific circumstances. This optionality allows each passenger's trip to be priced reflective of their own conveyed value. As described above, it is incredibly onerous to display all potential outcomes on the landing page.

5

This rule would result in passengers having less options and SCA would be forced to offer a legacy airline fare structure. This rule would result in higher fares for all passengers by reducing the optionality allowing passengers to customize the flight product to fit their specific needs. Further, this rule would require SCA to convey the required information to the various intermediaries (OTA and agents) and aggregators (Google flights) used to offer fares to passengers. It is concerning that noncompliance with this rule by intermediaries and aggregators could impute liability on SCA.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 06, 2024

Minneapolis, MN

Rose Neale