No. 24-60231 c/w No. 24-60373

---

In the
# United States Court of Appeals
### for the Fifth Circuit

---

No. 24-60231

---

AIRLINES FOR AMERICA; ALASKA AIRLINES, INC.;
AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; HAWAIIAN AIRLINES, INC.;
JETBLUE AIRWAYS CORPORATION; UNITED AIRLINES, INC.; NATIONAL AIR
CARRIER ASSOCIATION; INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners*,

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent*;

consolidated with

---

No. 24-60373

---

SPIRIT AIRLINES, INC.,

*Petitioner*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent*.

---

On Petition for Review of a Final Rule of the
United States Department of Transportation
Agency No. 89 Fed. Reg. 34,620

---

## OPENING BRIEF OF PETITIONERS
## IN CASE NO. 24-60231

---

*(counsel information on inside cover)*

Alisha Q. Nanda
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners Airlines for America (A4A), National Air Carrier Association (NACA), and International Air Transport Association (IATA)*

Paul W. Hughes
Andrew A. Lyons-Berg
Nicole E. Wittstein
MCDERMOTT WILL
  & EMERY LLP
500 North Capitol St. NW
Washington, DC 20001

*Counsel for Petitioners A4A, NACA, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

**No. 24-60231**, *Airlines for America et al. v. Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are so the judges of this Court may evaluate possible disqualification or recusal.

## I.     Petitioners

Petitioner Airlines for America has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner National Air Carrier Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner International Air Transport Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner Alaska Airlines, Inc., is a wholly owned subsidiary of Alaska Air Group, Inc., a publicly held corporation. Blackrock, Inc., and The Vanguard Group each own 10% or more of Alaska Air Group, Inc.'s stock. No other publicly held corporation holds 10% or more of Alaska Airlines, Inc.'s or Alaska Air Group, Inc.'s stock.

Petitioner American Airlines, Inc., is a wholly owned subsidiary of American Airlines Group Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner Delta Air Lines, Inc., is a publicly held corporation. It has no parent corporation. The Vanguard Group owns 10% or more of Delta's stock. No other publicly held corporation holds 10% or more of its stock.

Petitioner Hawaiian Airlines, Inc., is a wholly owned subsidiary of Hawaiian Holdings, Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner JetBlue Airways Corporation is a publicly held corporation. It has no parent corporation, and Blackrock, Inc., and The Vanguard Group each own 10% or more of JetBlue Airways Corporation stock. No other publicly held corporation holds 10% or more of JetBlue Airways Corporation's stock.

Petitioner United Airlines, Inc., is a wholly owned subsidiary of United Airlines Holdings Inc. No other publicly held corporation holds 10% or more of United Airlines, Inc.'s stock.

## II.   Respondent

The United States Department of Transportation is an agency of the federal government.

## III.   Interested parties

### A.   Counsel for Petitioners

Counsel for Petitioners in the litigation are:

- Shay Dvoretzky, Alisha Nanda, Parker Rider-Longmaid, Kyser Blakely, and Nicole Welindt; Skadden, Arps, Slate, Meagher & Flom LLP, for Petitioners Airlines for America, National Air Carrier Association, and International Air Transport Association

- Paul W. Hughes, Andrew A. Lyons-Berg, and Nicole E. Wittstein; McDermott Will & Emery LLP, for Petitioners Airlines for America, National Air Carrier Association, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.

### B.   Opposing counsel

Opposing counsel in the litigation are:

- Martin Vincent Totaro, Nicholas S. Crown, and Michael Raab, U.S. Department of Justice

- Subash S. Iyer, U.S. Department of Transportation

### C.   Other interested parties

The Court consolidated this case, No. 24-60231, and *Spirit Airlines, Inc.*

*v. Department of Transportation*, No. 24-60373. Petitioners in No. 24-60231—

the lead case—incorporate the certificates of interested persons that have

been and will be filed in connection with *Spirit Airlines*, No. 24-60373.

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.

Dated: September 9, 2024         */s/ Shay Dvoretzky*
                                 Shay Dvoretzky

                                 *Counsel for Petitioners*
                                 *A4A, NACA, & IATA*

## REQUEST FOR ORAL ARGUMENT

On July 29, 2024, the Court stayed the Department of Transportation (DOT) rule that Petitioners challenge here because it "enacts a code of online disclosure practices" for airlines, and the Petitioners in *Airlines for America v. Department of Transportation*, No. 24-60231 (Airlines), "made a strong showing" that the rule thus exceeds DOT's authority under 49 U.S.C. § 41712(a). *Airlines for America v. Department of Transportation*, 110 F.4th 672, 674-75 (5th Cir. 2024). The Court also expedited resolution of the petition "to the next available oral argument panel." *Id.* at 677. Thus, consistent with the Court's order, the Airlines request oral argument.

Because the Court (1) agreed with the Airlines' argument that the rule "doesn't just prohibit—it prescribes," *id.* at 675, and (2) designated the Airlines' challenge—which the Airlines diligently filed first on behalf of the entire airline industry, *see* Doc. 60—as "the lead case" when it consolidated the actions, Doc. 67, at 1, the Airlines respectfully request that the Court give them the same amount of argument time as DOT, no matter how much time the Court might additionally give the petitioner and intervenor in *Spirit Airlines, Inc. v. U.S. Department of Transportation*, No. 24-60373.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

REQUEST FOR ORAL ARGUMENT.................................................. v

TABLE OF AUTHORITIES................................................................ ix

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF ISSUES ..................................................................5

STATEMENT OF THE CASE...............................................................6

      A.    Legal background.................................................................6

      B.    Procedural background .......................................................8

SUMMARY OF ARGUMENT ............................................................14

STANDARD OF REVIEW .................................................................19

ARGUMENT......................................................................................19

I.     The Rule exceeds DOT's authority, because 49 U.S.C. § 41712(a)
      does not authorize DOT to enact a code of practices. ...........................19

      A.    Section 41712(a) does not confer prescriptive authority. ...........20

           1.    Section 41712(a)'s plain text authorizes DOT only to
               order an air carrier to stop an unfair or deceptive
               practice or method. .................................................20

           2.    When Congress confers prescriptive authority, it
               does so clearly—and it didn't do so in § 41712(a).............22

           3.    The history of airline deregulation supports reading
               § 41712(a) to mean what it says. .........................................25

# TABLE OF CONTENTS
## (continued)

**Page**

  4. DOT also exceeded its authority because § 41712(a) confers only adjudicatory authority....................................26

 B. Reading § 41712(a) to confer prescriptive authority raises grave constitutional concerns..........................................28

  1. The government's interpretation would require an unconstitutional delegation of legislative power..............28

  2. The major questions doctrine likewise shows why the government's statutory interpretation is wrong. .......32

 C. The Rule unlawfully prescribes a code of practices....................35

 D. DOT's counterarguments fail. ........................................36

  1. DOT ignores the plain text of § 41712(a) and misunderstands statutory context. ......................................36

  2. DOT cannot seize power that Congress did not confer by pointing to earlier regulations. ............................39

  3. The Seventh Circuit decision DOT relies on is wrong and distinguishable....................................41

II. The Rule exceeds DOT's authority, because it regulates practices that are not "unfair" or "deceptive." ......................................43

 A. The regulated practices are not "unfair." .....................................44

 B. The regulated practices are also not "deceptive." .......................49

III. The Rule violates the APA, because it does not reflect reasoned decisionmaking. .........................................................53

 A. An agency must consider the relevant parts of the problem in promulgating a regulation. .........................................53

# TABLE OF CONTENTS
(continued)

**Page**

B.      DOT failed to adequately substantiate the supposed need for and net benefits of the Rule. .....................................................55

IV.   The Rule violates the APA, because DOT relied on new data without giving the public an opportunity to comment. ......................60

A.      An agency must give the public an opportunity to comment on data that supposedly justifies the final action. ...............................................................................60

B.      DOT justified the Rule using new data the public never saw. ....................................................................................61

CONCLUSION .................................................................................64

CERTIFICATE OF COMPLIANCE ................................................65

CERTIFICATE OF SERVICE .........................................................66

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A. L. A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ........................................................................ 30, 31

*Abitron Austria GmbH v. Hetronic International, Inc.*,
  600 U.S. 412 (2023) ..............................................................................34

*Air Alliance Houston v. Environmental Protection Agency*,
  906 F.3d 1049 (5th Cir. 2018) .............................................................37

*Airlines for America v. Department of Transportation*,
  110 F.4th 672 (5th Cir. 2024) ........................................... 1, 3, 4, 5, 14,
  ........................................................................... 15, 16, 20, 22, 24,
  ........................................................................... 26, 27, 28, 31, 33, 35,
  ........................................................................... 36, 37, 38, 39, 40, 42, 43

*Allegheny Defense Project v. Federal Energy Regulatory Commission*,
  964 F.3d 1 (D.C. Cir. 2020) (en banc) ...............................................37

*American Airlines, Inc. v. Wolens*,
  513 U.S. 219 (1995) ...................................................... 1, 7, 25, 33

*Azar v. Allina Health Services*,
  587 U.S. 566 (2019) ..............................................................................42

*Bowen v. Georgetown University Hospital*,
  488 U.S. 204 (1988) ..............................................................................39

*Braidwood Management, Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ..............................................................64

*Brown v. Gardner*,
  513 U.S. 115 (1994) ..............................................................................40

*Career Colleges & Schools of Texas v. United States
  Department of Education*,
  98 F.4th 220 (5th Cir. 2024) ................................................................39

*Carlson v. Postal Regulatory Commission*,
  938 F.3d 337 (D.C. Cir. 2019) .............................................................43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Chamber of Commerce of the United States v. U.S.*
  *Securities & Exchange Commission,*
  85 F.4th 760 (5th Cir. 2023) ................................................ 54, 55, 56

*Chemical Manufacturers Ass'n v. U.S.*
  *Environmental Protection Agency,*
  870 F.2d 177 (5th Cir. 1989) ...................................................... 60, 61

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ...................................................................... 42

*Community Financial Services Ass'n of America v.*
  *Consumer Financial Protection Bureau,*
  51 F.4th 616 (5th Cir. 2022) ...................................................... 44, 46

*Connecticut National Bank v. Germain,*
  503 U.S. 249 (1992) ................................................................ 26, 37

*Davis v. HSBC Bank Nevada, N.A.,*
  691 F.3d 1152 (9th Cir. 2012) ............................................... 44, 45, 47

*Fletcher v. Peck,*
  10 U.S. (6 Cranch) 87 (1810) ........................................................ 21

*Flight Training International, Inc. v. Federal Aviation Administration,*
  58 F.4th 234 (5th Cir. 2023) .......................................................... 5

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................. 32, 33, 34

*Funeral Consumer Alliance, Inc. v. Federal Trade Commission,*
  481 F.3d 860 (D.C. Cir. 2007) ...................................................... 51

*Garland v. Cargill,*
  602 U.S. 406 (2024) ...................................................................... 43

*Gulf Fishermens Ass'n v. National Marine Fisheries Service,*
  968 F.3d 454 (5th Cir. 2020) ...................................................... 37, 38

*Gundy v. United States,*
  588 U.S. 128 (2019) ................................................................ 29, 30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hodges v. Delta Airlines, Inc.*,
  44 F.3d 334 (5th Cir. 1995) ................................................................. 25, 26, 33

*Idaho Farm Bureau Federation v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ..................................................................... 60, 62

*In re Bradley*,
  588 F.3d 254 (5th Cir. 2009) ..................................................................... 42, 43

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) ................................................................................... 29, 30

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................................ 28

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ............................................................... 29, 39, 40, 42, 43

*Louisiana v. U.S. Department of Energy*,
  90 F.4th 461 (5th Cir. 2024) ................................................................ 53, 54, 58

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ....................................................................................... 42

*Mexican Gulf Fishing Co. v. U.S. Department of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ................................................................ 54, 57, 58

*National Ass'n of Manufacturers v. U.S.
  Securities & Exchange Commission*,
  105 F.4th 802 (5th Cir. 2024) ........................................................................ 62

*National Cable Television Ass'n v. United States*,
  415 U.S. 336 (1974) ....................................................................................... 31

*National Mining Ass'n v. Department of Labor*,
  292 F.3d 849 (D.C. Cir. 2002) ................................................................. 26, 27

*New York v. Federal Energy Regulatory Commission*,
  535 U.S. 1 (2002) ........................................................................................... 21

*Ohio v. Environmental Protection Agency*,
  144 S. Ct. 2040 (2024) ....................................................................... 53, 54, 58, 59

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pan American World Airways, Inc. v. United States*,
371 U.S. 296 (1963)............................................................................44

*Paul v. United States*,
140 S. Ct. 342 (2019).......................................................................29

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995).........................................................................30

*Polselli v. Internal Revenue Service*,
598 U.S. 432 (2023).........................................................................24

*Rapanos v. United States*,
547 U.S. 715 (2006) ................................................................... 39, 42

*Reed v. Taylor*,
923 F.3d 411 (5th Cir. 2019) .............................................................21

*Reves v. Ernst & Young*,
494 U.S. 56 (1990)........................................................................6, 26

*Sam L. Majors Jewelers v. ABX, Inc.*,
117 F.3d 922 (5th Cir. 1997) ................................................. 7, 25, 33

*Sierra Club v. U.S. Environmental Protection Agency*,
939 F.3d 649 (5th Cir. 2019) .............................................................53

*Texas Ass'n of Manufacturers v. U.S.*
*Consumer Product Safety Commission*,
989 F.3d 368 (5th Cir. 2021) ..................................................... 61, 62

*United Air Lines, Inc. v. Civil Aeronautics Board*,
766 F.2d 1107 (7th Cir. 1985) ............................................... 41, 42, 43

*United States v. Wells*,
519 U.S. 482 (1997)...........................................................................25

*VanDerStok v. Garland*,
86 F.4th 179 (5th Cir. 2023) ....................................................... 39, 43

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) ...........................................................29

# TABLE OF AUTHORITIES
(continued)

Page(s)

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) ........................................................................ 32, 33, 34

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................. 29

**CONSTITUTION AND STATUTES**

U.S. Const. art. I ........................................................................................ 31

    U.S. Const. art. I, § 1 ............................................................................ 28

U.S. Const. art. II, § 1 ................................................................................ 28

Administrative Procedure Act,
    5 U.S.C. § 551 *et seq*. ..................................................... 4, 6, 18, 42,
    .......................................................................................... 53, 54, 60, 61, 62

    5 U.S.C. § 553(c) .................................................................................... 60

    5 U.S.C. § 706(2) .................................................................................... 19

7 U.S.C. § 591 ............................................................................................ 24

10 U.S.C. § 12603(b) .................................................................................. 24

12 U.S.C. § 5531(b) ............................................................................. 23, 24

Federal Trade Commission Act,
    15 U.S.C. § 41 *et seq*. ............................................................................ 49

    15 U.S.C. § 45(n) .................................................................................... 44

15 U.S.C. § 57a(a)(1)(B) ............................................................................ 23

49 U.S.C. § 20138(a) .................................................................................. 27

Airline Deregulation Act of 1978,
    49 U.S.C. § 1371 *et seq*. ........................................... 1, 6, 7, 14, 25, 33

49 U.S.C. § 40101(a)(6) ....................................................................... 1, 7, 8

49 U.S.C. § 40101(a)(9) ......................................................................... 7, 8

49 U.S.C. § 40102(a)(25) ........................................................................... 34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

49 U.S.C. § 40103(b)............................................................................38

49 U.S.C. § 40103(b)(2)....................................................................22

49 U.S.C. § 40113................................................................................38

49 U.S.C. § 40113(a) ............................................................... 37, 38, 41

49 U.S.C. § 41712 ...................................................... 4, 5, 9, 11, 15,
......................................................................... 20, 25, 36, 38, 39

49 U.S.C. § 41712(a) ............................................... 1, 3, 4, 5, 6, 7,
............................................................ 14, 15, 19, 20, 21, 22,
............................................................ 24, 25, 26, 27, 28, 31, 35,
............................................................ 36, 37, 38, 41, 43, 44, 48, 49

49 U.S.C. § 44903(b)................................................................ 22, 23, 38

49 U.S.C. § 44903(b)(4)(B) ........................................................ 22, 23

49 U.S.C. § 46110................................................................................5

49 U.S.C. § 46110(a) .........................................................................5

49 U.S.C. § 46110(c) .........................................................................5

49 U.S.C. § 46301(a) ..........................................................................38

49 U.S.C. § 46301(a)(1)(A) ............................................................38

49 U.S.C. § 46301(a)(1)(B) ............................................................38

Federal Aviation Act of 1958, Pub. L. No. 85-726,
72 Stat. 731 .........................................................................................6

Pub. L. No. 85-726, § 204(a), 72 Stat. at 743 ...............................41

Pub. L. No. 85-726, § 411, 72 Stat. at 769 ....................... 6, 7, 25, 41

Pub. L. No. 85-726, § 1002(b), 72 Stat. at 788-89.........................7

Pub. L. No. 85-726, § 1002(d), 72 Stat. at 789 .............................7

FAA Extension, Safety, and Security Act of 2016,
Pub. L. No. 114-190, § 2305, 130 Stat. 615, 640 ..........................23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

FAA Reauthorization Act of 2018, Pub. L. No. 115-254,
§ 421, 132 Stat. 3186, 3337 ...................................................................23

FAA Reauthorization Act of 2024, Pub. L. No. 118-63,
138 Stat. 1025 ......................................................................................40

FAA Reauthorization Act of 2024, Pub. L. No. 118-63,
§ 503, 138 Stat. 1025, 1188-90, *codified at*
49 U.S.C. § 42305.................................................................................40

**REGULATIONS**

14 C.F.R. § 399.79(b)(1) ................................................................. 16, 45

14 C.F.R. § 399.79(b)(2) ....................................................... 16, 17, 49, 50

*Defining Unfair or Deceptive Practices*,
85 Fed. Reg. 78,707 (Dec. 7, 2020)...................................... 43, 44, 49

*Enhancing Transparency of Airline Ancillary Service Fees*,
87 Fed. Reg. 63,718 (Oct. 20, 2022) ........................................8, 11

*Guidance Regarding Interpretation of Unfair and Deceptive Practices*,
87 Fed. Reg. 52,677 (Aug. 29, 2022)............................... 45, 46, 50, 51

*Enhancing Transparency of Airline Ancillary Service Fees*,
89 Fed. Reg. 34,620 (Apr. 30, 2024) ................................. 1, 2, 3, 4, 5,
........................................................................ 6, 9, 10, 11, 12, 13,
.............................................................. 14, 15, 16, 17, 18, 19, 20,
............................................................ 34, 35, 36, 38, 39, 40, 41, 42,
......................................................... 43, 44, 46, 47, 48, 49 50, 51, 52,
................................................................... 53, 55, 56, 57, 58, 59, 60, 61, 62, 63

*Refunds and Other Consumer Protections*,
89 Fed. Reg. 32,760 (Apr. 26, 2024) ...............................................40

**OTHER AUTHORITIES**

*Airline Customer Service Dashboard*, U.S. Department of Transportation
(last updated May 31, 2024), https://www.transportation.gov/
airconsumer/airline-customer-service-dashboard.....................................49

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Airlines for America, Comment Letter on Proposed Rule
*Enhancing Transparency of Airline Ancillary Service Fees*
(Jan. 23, 2023), DOT-OST-2022-0109-0090 ............................................. 1, 2, 9,
............................................................................................ 12, 46, 47, 48

Antonin Scalia & Bryan A. Garner,
*Reading Law* (2012)...............................................................................................27

*Impact*, Airlines for America (last visited Sept. 9, 2024),
https://www.airlines.org/impact/ ..............................................................34

Merriam-Webster, https://www.merriam-webster.com
(last visited Sept. 9, 2024) ...................................................................................49

Regulatory Impact Analysis on Final Rule
*Enhancing Transparency of Airline Ancillary Service Fees*
(Apr. 23, 2024), DOT-OST-2022-0109-0753 ..................................... 11, 12, 13,
....................................................................................... 48, 51, 55, 56,
..................................................................................... 57, 58, 59, 61, 62, 63

Regulatory Impact Analysis on Proposed Rule
*Enhancing Transparency of Airline Ancillary Service Fees*
(Sept. 25, 2022), DOT-OST-2022-0109-0002 ....................................... 8, 11, 61

The Federalist No. 47 (James Madison)
(Jacob E. Cooke ed., 1961) ....................................................................... 28, 29

*Webster's Third New International Dictionary*
(Philip Babcock Gove et al. eds., 1981)...........................................................21

**INTRODUCTION**

Petitioners (the Airlines) challenge a Department of Transportation (DOT) rule that mandates when, where, and how airlines must disclose certain fees to consumers during the online booking process. *See Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule). DOT issued the Rule under 49 U.S.C. § 41712(a). As this Court explained when it stayed the Rule pending review, "the Rule essentially enacts a code of online disclosure practices," but such regulatory power "is not authorized by the statute." *Airlines for America v. Department of Transportation*, 110 F.4th 672, 675 (5th Cir. 2024). For that reason and others, the Court should set aside the Rule.

1.    In the Airline Deregulation Act (ADA), Congress "plac[ed] maximum reliance on competitive market forces" "to provide the needed air transportation system." 49 U.S.C. § 40101(a)(6). The ADA left "the selection and design of marketing mechanisms" "to the airlines themselves," confident that "[m]arket efficiency" was the best policy. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 230 (1995).

The results have been an overwhelming success for consumers and the industry alike. Fares have reached "historically low" levels, enabling more

air travel and more carriers to enter the market. Airlines for America (A4A) Comments Attachment C 5, 11, DOT-OST-2022-0109-0090. Because the industry is "highly competitive," airlines compete for customers by allowing passengers to pay for the services that meet their needs—whether their preference is ticket flexibility, checked bags, seat location, or something else. *Id.* at 17, 19-20. Passengers can "customize their travel experience to meet budget and individual travel preferences and needs." *Id.* at 15-17.

Airlines transparently disclose all those choices—ancillary services—and the associated fees. They also share that information with ticket agents through contractual agreements that promote consumer choice. Indeed, transparency is the only way to succeed in a competitive market. Consumers know that each airline has its menu of options, that not every menu looks the same, and that not every choice is on the menu's first page. Reasonable consumers also know that ancillary services often cost money.

**2.**     Against that backdrop, DOT issued the Rule—a solution in search of a problem. Although the Airlines already provide consumers with convenient links to all ancillary-fee information, the Rule requires airlines and ticket agents to disclose those fees online in specific places at specific times and, sometimes, with DOT-scripted language. For example, airlines

*must* disclose ancillary fees at the first step of the search process, including detailed passenger-specific information when possible. Put differently, airlines must flood consumers with information—which *most* consumers find immaterial—that will make a computer or smartphone screen so difficult to navigate that consumers will be unable to efficiently search for and book flights. Different flight times, airports, connections, and class and ticket types are enough for one screen, without also cramming carry-on, checked-bag, change fees, and cancellation fees onto the very first display. The Rule makes no sense for consumers or the Airlines, because it creates rather than solves problems.

**3.** It also violates the law. This Court has already explained one of the many reasons why: "the Rule doesn't just prohibit—it prescribes" "a code of online disclosure practices," and Congress did not give DOT such authority in § 41712(a) or any other provision. *Airlines for America*, 110 F.4th at 675 (alteration adopted). All Congress authorized in § 41712(a) is for "DOT to adjudicate whether certain practices are 'unfair or deceptive' and, if so, to order the carrier to 'stop' them." *Id.* But the power "to stop" "unfair or deceptive" practices through case-by-case adjudication doesn't include the power to prescribe particular fair or honest practices. *See id.* If it did, then

- 3 -

§ 41712(a) would be an unconstitutional delegation of legislative power and violate the major questions doctrine. The Court should read § 41712(a) to mean what it says. Stop means stop, not prescribe.

**4.** The Rule is unlawful for other reasons, too. The Rule also exceeds DOT's authority because the regulated practices aren't "unfair or deceptive." Consumers know how to get the information they need and aren't deceived by hyperlinked disclosures.

Additionally, the Rule is arbitrary and capricious, violating the Administrative Procedure Act (APA), because DOT's analysis doesn't reflect reasoned decisionmaking. DOT failed to establish a genuine problem that needs solving. It also inadequately analyzed the Rule's supposed benefits and significant costs. For example, DOT in fact acknowledged that it lacked "reliable measures" supporting its benefits theory. Lastly, DOT violated the APA by justifying the Rule based on new data the public never had a chance to comment on.

This Court should grant the petition for review and vacate the Rule.

## JURISDICTIONAL STATEMENT

**1.** On April 30, 2024, DOT issued the Rule, invoking 49 U.S.C. § 41712. 89 Fed. Reg. at 34,627. As explained below (at 19-53), "the Rule … is

- 4 -

not authorized by [that] statute" or any other. *Airlines for America*, 110 F.4th at 675.

**2.** The Court has jurisdiction to review the Rule under 49 U.S.C. § 46110 because the Rule is an "order" that the Court "has exclusive jurisdiction to … set aside." *Id.* § 46110(c); *see Flight Training International, Inc. v. Federal Aviation Administration*, 58 F.4th 234, 240 & n.4 (5th Cir. 2023). The Airlines timely filed their petition on May 10, 2024, and amended petition on June 12, 2024, *see* Docs. 1-1, 16-1—less than 60 days after DOT issued the Rule on April 30, 2024. *See* 49 U.S.C. § 46110(a). Venue is proper because Petitioner American Airlines has its principal place of business within this Circuit in Fort Worth, Texas. *See id.*

## STATEMENT OF ISSUES

**1.** Whether the Rule exceeds DOT's authority because Congress did not authorize DOT to enact prescriptive rules under 49 U.S.C. § 41712, like the Rule's code of online disclosure practices.

**2.** Whether the Rule exceeds DOT's authority because it purports to regulate practices that aren't "unfair" or "deceptive." 49 U.S.C. § 41712(a).

**3.** Whether DOT's failure to adequately substantiate the supposed need for and net benefits of the Rule violates the APA's reasoned-decisionmaking requirement.

**4.** Whether DOT's reliance on new data to justify the Rule without giving the public an opportunity to comment on that data violates the APA's notice-and-comment requirement.

## STATEMENT OF THE CASE

### A. Legal background

DOT may "investigate and decide whether an air carrier, foreign air carrier, or ticket agent has been or is engaged in an unfair or deceptive practice," and, if it so finds "after notice and an opportunity for a hearing," it "shall order" the entity "to stop the practice." 49 U.S.C. § 41712(a). That language and "the backdrop of what Congress was attempting to accomplish," *Reves v. Ernst & Young*, 494 U.S. 56, 62-63 (1990), in the ADA make clear that DOT's authority is only prohibitory, not prescriptive.

Before the ADA, the Civil Aeronautics Board (DOT's predecessor) had broad authority to regulate the airline industry. *See* Federal Aviation Act of 1958 (1958 Act), Pub. L. No. 85-726, 72 Stat. 731. For example, Title IV of the 1958 Act authorized the Board to "investigate and determine whether any

- 6 -

air carrier … has been or is engaged in unfair or deceptive practices" and to order the carrier to "cease and desist from such practices." *Id.* § 411, 72 Stat. at 769. Title X detailed the general procedures applicable to investigations involving "*any* question [that] may arise under *any* of the provisions of [the] Act." *Id.* § 1002(b), 72 Stat. at 788-89 (emphases added). If, for instance, the Board determined that a carrier had engaged in a "practice affecting [a] rate, fare, or charge" that was "unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial," it could "determine and *prescribe* … the lawful … practice." *Id.* § 1002(d), 72 Stat. at 789.

In 1978, however, Congress "largely deregulated" the airline industry, enacting the ADA to "promote 'maximum reliance on competitive market forces.'" *Wolens*, 513 U.S. at 222, 230. Congress replaced the Board with DOT and withdrew certain powers that the Board had possessed. For example, Congress "eliminated the Civil Aeronautic[s] Board's power to *prescribe* and determine the reasonableness … of the air carrier's rates, rules, and *practices.*" *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 929 (5th Cir. 1997) (emphases added). But Congress left the narrow authority to *prohibit* unfair and deceptive carrier practices. 49 U.S.C. § 41712(a). Congress directed that, in exercising that power, DOT "shall consider" certain matters "as being in

the public interest," like "preventing unfair, deceptive, predatory, or anti-competitive practices in air transportation," and "placing maximum reliance on competitive market forces and on actual and potential competition." 49 U.S.C. § 40101(a)(6), (9).

## B.    Procedural background

**1.**    In 2022, DOT proposed mandating ancillary-fee disclosures for certain entities, in certain ways, in certain places, and at certain times in the air-travel search process. *See Enhancing Transparency of Airline Ancillary Service Fees*, 87 Fed. Reg. 63,718 (Oct. 20, 2022). DOT thought the mandates would be "helpful to consumers." *Id.* at 63,721. But it had *no data* supporting that view. For example, in its initial Regulatory Impact Analysis (2022 RIA), DOT-OST-2022-0109-0002, DOT acknowledged that it did "not have an estimate" of how much "search time" the proposed rule might save consumers (*i.e.*, benefits) or "information on the size of the potential offsets" (*i.e.*, costs). 2022 RIA 21, 23. Given the total "lack of data" supporting DOT's theory of costs and benefits, 87 Fed. Reg. at 63,732, DOT said it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs." 2022 RIA, at ii.

A4A submitted comments questioning DOT's authority to issue the proposed rule and explaining that the proposed rule was arbitrary and capricious, especially given DOT's "cursory and severely flawed cost-benefit analysis." A4A Comments 12-16, 20-31, 34, 48-58. Unlike DOT, A4A relied on quantitative data from a survey of A4A's members, the Campbell-Hill Survey. A4A Comments Attachment B 4. Survey participants "accounted for approximately 50% of all [roundtrip] passengers to/from the U.S. in 2019." *Id.* at 9 n.7. The results showed that "only 20 percent of all passengers check and pay for their first checked bag." *Id.* at 10. Moreover, A4A explained, the rule would hurt *all* consumers by mandating "disclosures [that] would consume scarce screen real estate"—"often on mobile devices with smaller screens"—"and cause fewer flights from the search results to be shown at a time on customers' screens." A4A Comments 38.

**2.**    On April 30, 2024, DOT issued the Rule, invoking 49 U.S.C. § 41712 as authority. 89 Fed. Reg. at 34,627.

**a.**    The Rule contains numerous requirements. *See generally id.* at 34,621-22. Among other things, carriers and ticket agents must disclose fees for critical ancillary services—"transporting the first checked bag, the second checked bag, or a carry-on bag" and "the ability for a consumer to cancel or

change a reservation" — at "the first time that fare and schedule information is disclosed," and not "through a hyperlink." *Id.* at 34,675. Disclosures must state "not available" or a similar notation where a critical ancillary service is not available. *Id.* For "passenger-specific" searches, carriers must also make "passenger-specific" disclosures — they must "take[] into account" "the passenger's status in the airline's frequent flyer program," "military status," and "status as a holder of a particular credit card." *Id.* And before final purchase, carriers must conspicuously disclose "weight and dimension limitations" for first and second checked bags and carry-on bags, and "components of change and cancellation policies." *Id.* at 34,676. Carriers must also display, verbatim, whenever offering "a seat selection for a fee: 'A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel.'" *Id*. Moreover, carriers must disclose all this critical-ancillary-fee information to ticket agents, in a manner "useable, current, accurate, and sufficient to ensure" ticket agents' compliance with the Rule. *Id.* at 34,677.

DOT imposed aggressive compliance deadlines. By October 30, 2024, carriers would have to comply with the Rule's ticket-agent-sharing mandate,

and by April 30, 2025, carriers would have to comply with the disclosure mandates. *Id.* at 34,667.

    **b.**    DOT justified the Rule primarily on two grounds.

*First*, DOT concluded that failing to disclose ancillary-fee information when first displaying fare and schedule information in response to a consumer search is unfair and deceptive. For instance, DOT stated — without evidence — that, under current practices, consumers might spend additional time searching for total travel costs or pay higher prices given their inability to easily compare carrier prices. *Id.* at 34,627. DOT recognized that "many consumers may be aware of the existence of fees." *Id.* at 34,633. DOT nonetheless claimed that current practices could cause misunderstandings about the total purchase price or change or cancellation policies. *Id.* at 34,630. In DOT's view, the *only* way to comply with the law is to follow the Rule: "the failure to provide and adhere to the disclosures required by this [Rule]" is "an unfair and deceptive practice" under § 41712. *Id.* at 34,677.

*Second*, despite the lack of data that it acknowledged in the 2022 RIA, DOT decided that the Rule's benefits outweigh its costs. DOT tried fixing its "lack of data" problem, 87 Fed. Reg. at 63,732, with a new Regulatory Impact Analysis (2024 RIA), DOT-OST-2022-0109-0753. The 2024 RIA relies on "new

research" from Nicholas Rupp, 2024 RIA 16, published after the comment period. *See id.*; 89 Fed. Reg. at 34,625. But DOT conceded that even its new results—which it had given the public no chance to comment on—were "driven by values of uncertain parameters," 2024 RIA 25. Additionally, in assessing "the share of consumers who find the information on ancillary fees relevant to their purchase decision" (*i.e.*, the purported beneficiaries), DOT dismissed the Campbell-Hill Survey, which accounted for 50% of 2019 U.S. roundtrip airline travelers and found that only 20% of passengers pay for a checked bag, simply because it thought that result "appears to be low." 2024 RIA 16-18, 26-27; *see* A4A Comments Attachment B 9-10 & n.7. DOT instead relied on a survey of individuals at a university, claiming "that 46 percent of student participants consider baggage fee information when they search for airfare." 2024 RIA 16-18, 26-27. DOT asserted it was more "plausible" that this single university survey reflected general consumer behavior. 2024 RIA 16-17.

Then, using estimates that between 46% and 61% of consumers consider ancillary fees, DOT estimated the benefits "to range from $365 million to $484 million annually," while the costs to consumers would "range from $239 million to $331 million annually." 89 Fed. Reg. at 34,622. DOT estimated

costs to air carriers and ticket agents at around $46 million. 2024 RIA, at ii.

DOT put the odds that the Rule's "net benefits" are "positive" at "roughly

53%." 2024 RIA, at i. The "net benefits" would "range[] from $30.3 million to

$254 million." *Id.*; *see also* 89 Fed. Reg. at 34,668-69. DOT admitted that add-

ing more information on ancillary fees "may reduce space to show other

items of interest, like alternative flight options," which increases the search

time for consumers. 2024 RIA 18-19. But DOT didn't account for the costs

that *all* consumers—including those who care about ancillary fees—would

incur from difficulty navigating search results given the increased disclo-

sures. 2024 RIA, at ii.

DOT also estimated that the Rule would reduce "overpayment in fees

[by] consumers," thus resulting in a "transfer" to consumers of $543 million.

89 Fed. Reg. at 34,622. DOT "assumed" that this amount was "five percent

of airfare," despite admitting it did "not have any data to judge the accuracy

of this assumption." 2024 RIA 30-31.

**3.**    The Airlines timely petitioned this Court to review the Rule, *su-*

*pra* pp. 4-5, and sought a stay pending review. Doc. 31. Spirit Airlines, Inc.,

later filed a separate petition in the Eleventh Circuit, which transferred it to

this Court. *See* Doc. 60, at 2. Spirit later filed an "Emergency Motion" for a stay, and Frontier Group Holdings, Inc. moved to intervene. *Id.*

On July 29, 2024, the Court granted the Airlines' motion and stayed the Rule, holding that it "likely exceeds DOT's authority." *Airlines for America*, 110 F.4th at 674. The Court expedited resolution of the Airlines' petition, *id.*, granted Frontier leave to intervene, carried Spirit's motion with the case, Doc. 60, at 1-2, consolidated the Airlines' and Spirit's petitions, Doc. 67, and denied DOT's request to consolidate briefing, Doc. 86.

## SUMMARY OF ARGUMENT

**I.**     The Rule exceeds DOT's authority, because 49 U.S.C. § 41712(a) does not authorize DOT to enact a code of practices.

**A.**     Section 41712(a) authorizes DOT to "stop" "unfair or deceptive" practices. It doesn't authorize DOT to prescribe practices. Stop means stop, not prescribe. Congress speaks clearly when it authorizes agencies to exercise prescriptive authority, as several statutes show. But § 41712(a) is not one of them. This straightforward construction is consistent with Congress's purpose in enacting the ADA: deregulating the airline industry. What's more, construing the statute to confer prescriptive authority would be inconsistent with § 41712(a)'s adjudication-specific context.

- 14 -

**B.**    Straining to read § 41712 DOT's way would run headlong into the nondelegation doctrine. If Congress had given DOT authority to prescribe codes of fair conduct, then it would have unconstitutionally delegated its legislative power. The major questions doctrine likewise counsels against adopting DOT's statutory construction: Given the economic and political significance of aviation, and Congress's *deregulation* of the airline industry, there is ample reason to hesitate before concluding that Congress provided prescriptive authority, and Congress did not speak clearly in doing so.

**C.**    The Rule exceeds DOT's authority under § 41712(a) because it mandates various disclosure practices. It tells air carriers and ticket agents what disclosures they must make, and when, where, and how they must make the disclosures. DOT has not shown that *all* practices, other than its mandated practices, would be unfair, which DOT would have to show to act within its prohibitory authority.

**D.**    DOT's counterarguments fail. DOT does not engage with the statutory text, and it cannot expand the scope of § 41712(a) by relying on other statutory provisions conferring general rulemaking authority. Nor can DOT use its past regulations as evidence of authority, because agencies may

not arrogate authority through adverse possession. *Airlines for America*, 110 F.4th at 676.

**II.**    DOT also exceeded its statutory authority to prohibit "unfair" or "deceptive" actions because the Rule purports to regulate practices that are neither unfair nor deceptive.

**A.**    The practices the Rule regulates are not unfair. A DOT regulation defines a practice as "unfair" if it "causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers and competition." 14 C.F.R. § 399.79(b)(1). The Airlines disclose ancillary service fees elsewhere on their websites and hyperlink to the fee disclosures. Consumers do not suffer a substantial injury by clicking one link and navigating to one additional page on a website. Doing so also makes reasonably avoidable any additional costs consumers might pay because of their unawareness of fees. Additionally, any alleged harm is outweighed by the benefits to consumers of search results that clearly and efficiently display the most important information.

**B.**    The practices the Rule regulates are also not deceptive. A DOT regulation defines a practice as "deceptive" if it "is likely to mislead a consumer, acting reasonably under the circumstances, with respect to a material

matter." 14 C.F.R. § 399.79(b)(2). DOT acknowledges that consumers are aware of ancillary service fees, but contends that current practices are deceptive because consumers do not know the exact amount of fees that will apply to them. But that argument doesn't establish deception. Reasonable consumers are aware of ancillary fees. They thus know to look for applicable fees and do not assume those fees are uniform across airlines.

**III.** The Rule is also arbitrary and capricious, because DOT has not established that there is a genuine problem that needs solving and because it inadequately analyzed the Rule's supposed benefits and significant costs.

**A.** A regulation is arbitrary and capricious if the agency fails to consider an important aspect of the problem. Thus, when considering a regulation's costs and benefits, the agency must adequately substantiate and rationally consider its estimates. An agency may not merely acknowledge an important issue—it must actually address that issue.

**B.** DOT failed to substantiate the benefits of the Rule because it did not show that there was a genuine problem that needed solving. And DOT did not rationally consider and explain the costs and benefits of the Rule. The Rule imposes undisputed costs on all consumers, but its benefits rest on admittedly uncertain metrics. DOT's estimate as to how many consumers

would benefit from the ancillary-fee disclosures was itself unreasoned: DOT cherry-picked data and failed to adequately explain why it rejected data undermining its benefits theory. DOT also refused to consider costs imposed to certain consumers, irrationally inflating its net benefits calculation.

**IV.**    DOT violated the APA by justifying the Rule based on data the public never had a chance to comment on.

**A.**    An agency must provide interested parties an opportunity to challenge the data supporting the rule. If an agency promulgates a rule based on data disclosed after the comment period, the agency must provide another comment period, unless the new data merely supplements or confirms existing data.

**B.**    DOT completely supplanted its initial analysis with new data that the public never had an opportunity to comment on. DOT acknowledged that it initially had no data on the costs and benefits of the proposed rule. When issuing the final Rule, however, DOT relied on entirely new data to quantify purported costs and benefits. That new data was central to the Rule, so DOT needed—but failed—to provide another comment period.

## STANDARD OF REVIEW

The Court "shall" "set aside" the Rule if it exceeds DOT's "authority," or is "arbitrary, capricious," or "without observance of procedure required by law." 5 U.S.C. § 706(2); *see infra* pp. 19-53 (lack of statutory authority); *infra* pp. 53-59 (arbitrary and capricious); *infra* pp. 60-63 (failure to follow required procedure).

## ARGUMENT

### I.    The Rule exceeds DOT's authority, because 49 U.S.C. § 41712(a) does not authorize DOT to enact a code of practices.

Section 41712(a) is a limited grant of authority. While it authorizes DOT to order an airline "to stop" engaging in an "unfair or deceptive" practice, 49 U.S.C. § 41712(a), it doesn't authorize DOT to *prescribe* anything. Stop means stop, not create new requirements. That commonsense interpretation tracks the statute's plain text, Congress's express delegation of prescriptive power in other statutes, the statutory history, and § 41712(a)'s focus on adjudication. Additionally, if § 41712(a) were construed to confer prescriptive authority, then it likely would violate the nondelegation doctrine, the major questions doctrine, or both.

The Rule exceeds DOT's statutory authority under § 41712(a) because it "doesn't just prohibit—it prescribes." *Airlines for America*, 110 F.4th at 675. It "enacts a code of online disclosure practices," mandating when, where, and how airlines must disclose ancillary fees. *Id.* "That is not authorized by the statute." *Id.*

## A.   Section 41712(a) does not confer prescriptive authority.

### 1.   Section 41712(a)'s plain text authorizes DOT only to order an air carrier to stop an unfair or deceptive practice or method.

Section 41712 authorizes DOT to "investigate and decide whether an air carrier … has been or is engaged in an unfair or deceptive practice or an unfair method of competition in air transportation or the sale of air transportation." 49 U.S.C. § 41712(a). If DOT, "after notice and an opportunity for a hearing, finds that an air carrier … is engaged" in such a practice or method, then DOT "shall order the air carrier … to stop the practice or method." *Id.*

"By its terms," this Court has explained, "the statute authorizes DOT to adjudicate whether certain practices are 'unfair or deceptive' and, if so, to order the carrier to 'stop' them." *Airlines for America*, 110 F.4th at 675. But § 41712(a) does not authorize DOT to "prescribe[]" anything. *Id.* The statute's plain text mandates this reading.

Congress said "stop," not "prescribe." "Stop" means "keep from carrying out a proposed action," "prevent the continuance or occurrence of," or "cause to cease." *Webster's Third New International Dictionary* 2250 (Philip Babcock Gove et al. eds., 1981). "Prescribe," by contrast, "indicates authoritative dictating or commanding, with explicit clear direction." *Id.* at 1792. To prescribe is to "lay down a rule," *id.*, and such conduct is distinctively legislative: "It is the peculiar province of the legislature to prescribe general rules for the government of society." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810) (Marshall, C.J.). These two words—stop and prescribe—mean very different things in ordinary English. And "an agency literally has no power to act … unless and until Congress confers power upon it." *New York v. Federal Energy Regulatory Commission*, 535 U.S. 1, 18 (2002). So, when Congress gives an agency the power to only "stop" certain practices, it doesn't give the agency the greater power to "prescribe" other practices. Congress knows how to authorize agencies to exercise prescriptive authority when it wants to. *Infra* pp. 22-24. But Congress authorized DOT to exercise only prohibitory authority in § 41712(a). Stop means stop, not prescribe. This Court "must take Congress at its word." *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019).

Reading stop to mean stop aligns with "the adjudicatory process set out by § 41712(a)." *Airlines for America*, 110 F.4th at 675; *see infra* pp. 26-28. Congress conditioned the prohibitory power in § 41712(a) on DOT's making individualized findings, and it limited the reach of the prohibitory power to the particular airline under investigation: "If [DOT] … finds that *an* air carrier" is engaged in an unfair or deceptive practice, DOT "shall order *the* air carrier … to stop the practice." 49 U.S.C. § 41712(a) (emphases added). The statute's plain text thus shows that Congress established a mechanism allowing DOT to stop unfair and deceptive practices on a case-by-case basis—not act like a legislature and "enact[] a code of … practices" for the airline industry. *Airlines for America*, 110 F.4th at 675.

> ## 2. When Congress confers prescriptive authority, it does so clearly—and it didn't do so in § 41712(a).

Congress speaks clearly when it authorizes agencies—especially agencies within DOT—to exercise prescriptive authority. Indeed, as this Court explained, *see id.*, Congress authorized the Federal Aviation Administration to "*prescribe* air traffic regulations on the flight of aircraft," 49 U.S.C. § 40103(b)(2) (emphasis added). Congress also authorized the Transportation Security Administration to "*prescribe* specific requirements" for airport

screening and to "*prescribe* regulations to protect passengers and property …

against an act of criminal violence or aircraft piracy." *Id.* § 44903(b), (h)(4)(B)

(emphases added). Additionally, in the FAA Reauthorization Act of 2018,

Congress authorized DOT to "*promulgate regulations* that require each cov-

ered air carrier to promptly provide a refund" for certain ancillary fees. Pub.

L. No. 115-254, § 421, 132 Stat. 3186, 3337 (emphasis added). And in the FAA

Extension, Safety, and Security Act of 2016, Congress authorized DOT to "*is-

sue final regulations* to require an air carrier or foreign air carrier to promptly

provide to a passenger an automated refund for any ancillary fees paid by

the passenger for checked baggage" in certain circumstances. Pub. L.

No. 114-190, § 2305, 130 Stat. 615, 640 (emphasis added).

Congress likewise speaks clearly when it authorizes agencies to exer-

cise prescriptive power over "unfair or deceptive" practices. For example, it

has authorized the Federal Trade Commission (FTC) to "*prescribe* … rules

which define with specificity acts or practices which are unfair or deceptive

acts or practices." 15 U.S.C. § 57a(a)(1)(B) (emphasis added). The FTC may

establish "requirements *prescribed* for the purpose of preventing such acts or

practices." *Id.* (emphasis added). Similarly, Congress has authorized the

Consumer Financial Protection Bureau to "*prescribe* rules … identifying as

unlawful unfair, deceptive, or abusive acts or practices," and establish "requirements for the purpose of preventing such acts or practices." 12 U.S.C. § 5531(b) (emphasis added).

Congress also speaks clearly in other contexts. For example, it has authorized the Department of Agriculture "to *prescribe*, by regulations, the requirements … which the fruit"—grapes and plums—"must meet" to obtain a certificate of quality. 7 U.S.C. § 591 (emphasis added). And Congress has authorized the Department of Defense to "*prescribe* in regulations such requirements, conditions, and restrictions for" commercial travel under federal supply schedule rates in connection with inactive-duty trainings. 10 U.S.C. § 12603(b) (emphasis added).

The examples are many and the point is simple: Congress knows how "to authorize … legislative rulemaking" when it wants to, and because such prescriptive-enabling "language is found nowhere in § 41712(a)," the correct conclusion is that "Congress did not confer that authority on DOT here." *Airlines for America*, 110 F.4th at 675. Courts "assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'" *Polselli v. Internal Revenue Service*, 598 U.S. 432, 439 (2023).

### 3.    The history of airline deregulation supports reading § 41712(a) to mean what it says.

Reading § 41712(a) to mean what is says, and not to mean what it *doesn't* say, aligns with the purpose of the ADA: "federal deregulation." *Wolens*, 513 U.S. at 222-23. As this Court has recognized, Congress "eliminated" the federal "power to *prescribe* and determine the reasonableness … of the air carrier's rates, rules, and *practices*." *Sam L. Majors Jewelers*, 117 F.3d at 929 (emphases added). Congress kept, by contrast, the narrower federal power to order an airline to "cease and desist from"—*i.e.*, stop—unfair or deceptive practices. *See* 1958 Act, § 411, 72 Stat. at 769; 49 U.S.C. § 41712(a). "The most likely inference in these circumstances is that Congress deliberately" eliminated the power to prescribe yet preserved the power to prohibit. *United States v. Wells,* 519 U.S. 482, 493 (1997).

Reading § 41712 by its plain terms, to preserve a narrow prohibitory power while eliminating a broad prescriptive power, makes sense: "Congress enacted the ADA to dismantle federal economic regulation." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 (5th Cir. 1995). It determined "that efficiency, innovation, low prices, variety, and quality would be promoted by reliance on competitive market forces rather than pervasive

federal regulation." *Id.* Given "the backdrop of what Congress was attempting to accomplish," *Reves,* 494 U.S. at 62-63, the Court should conclude that § 41712(a) "means … what it says," *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992)—stop means stop.

### 4. DOT also exceeded its authority because § 41712(a) confers only adjudicatory authority.

Section 41712(a) does not confer prescriptive authority for yet another reason: the statute concerns adjudication and has nothing to do with legislative rulemaking. This Court explained it best: "the statute authorizes DOT to adjudicate whether certain practices are 'unfair or deceptive' and, if so, to order the carrier to 'stop' them." *Airlines for America*, 110 F.4th at 675. Anything "beyond adjudication" is "not authorized by the statute." *Id.*

That makes sense. Section 41712(a) concerns individual airline conduct: DOT "may investigate and decide whether *an* air carrier … is engaged in an unfair or deceptive practice" and it "shall order *the* air carrier … to stop the practice." 49 U.S.C. § 41712(a) (emphases added). The statute says nothing about industry-wide policy. Additionally, § 41712(a) speaks of findings and orders, "which typically follow adjudications," *National Mining Ass'n v. Department of Labor*, 292 F.3d 849, 856 (D.C. Cir. 2002), and says nothing about

regulations or rulemaking. *See* 49 U.S.C. § 41712(a). Because § 41712(a) is all about adjudication, and because the "expression of one thing implies the exclusion of others," Antonin Scalia & Bryan A. Garner, *Reading Law* 107 (2012), the correct inference is that § 41712(a) "*excludes* legislative rulemaking." *Airlines for America*, 110 F.4th at 676.

Congress speaks clearly when it authorizes agencies to operate outside adjudication. For instance, Congress has authorized DOT to "prescribe regulations *and* issue orders to prohibit the willful tampering with, or disabling of, any specified railroad safety or operational monitoring device." 49 U.S.C. § 20138(a) (emphasis added). Again, "orders" typically signal adjudication, whereas "regulations" typically signal rulemaking. *National Mining Ass'n*, 292 F.3d at 856. Section 20138(a) thus shows that Congress knows how to authorize both adjudication and rulemaking when it wants, and that Congress knows how to authorize both methods of regulation when it wants to "prohibit" something. 49 U.S.C. § 20138(a). The fact that § 41712(a)—which instructs DOT to stop (*i.e.*, prohibit) certain practices—speaks only of adjudication strongly indicates that Congress "intentionally and purposely" chose *not* to authorize DOT to regulate those practices through "legislative rulemaking." *Airlines for America*, 110 F.4th at 675. Of course, the Court need

not reach that question, because § 41712(a)'s plain text makes clear that, even if DOT has some rulemaking authority, that authority is *prohibitory* only. It is not *prescriptive* legislative rulemaking authority. *Supra* pp. 20-26.

## B. Reading § 41712(a) to confer prescriptive authority raises grave constitutional concerns.

This Court has already explained why § 41712(a) does not authorize DOT to prescribe anything. *Airlines for America*, 110 F.4th at 675-76. That is the only "plausible construction" of § 41712(a), so the analysis ends. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). But DOT's argument also fails because it would render the statute unconstitutional. If § 41712(a) gave DOT discretion to prescribe codes of fair conduct, it would be an unconstitutional delegation of legislative power. It also would violate the major questions doctrine, because Congress did not clearly give DOT such extraordinary regulatory authority, with great economic and political significance, over an entire industry—especially one it *deregulated*.

### 1. The government's interpretation would require an unconstitutional delegation of legislative power.

**a.** The Constitution vests the legislative power in Congress and the executive power in the President. *See* U.S. Const. art. I, § 1; art. II, § 1. It does so because when these powers are accumulated "in the same hands,"

"tyranny" follows. The Federalist No. 47, at 324 (James Madison) (Jacob E. Cooke ed., 1961). Congress therefore holds the legislative power exclusively, and the Constitution's "text permits no delegation." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *see Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2274-75 (2024) (Thomas, J., concurring). Indeed, "[i]f the separation of powers means anything, it must mean that Congress cannot give the executive branch a blank check to write a code of conduct governing private conduct for a half-million people." *Gundy v. United States*, 588 U.S. 128, 171 (2019) (Gorsuch, J., dissenting); *see also id.* at 148-49 (Alito, J., concurring in the judgment); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., respecting the denial of certiorari) (Justice Gorsuch's *Gundy* analysis "may warrant further consideration").

Of course, the Supreme Court has recognized that not every delegation is "forbidden." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). Although Congress may not "delegate … powers which are strictly and exclusively legislative," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825), "Congress may use executive officers in the application and enforcement of a policy declared in law," *J.W. Hampton*, 276 U.S. at 409. The

Constitution permits such "assistance" only if Congress enacts "an intelligible principle" for exercising the delegated authority. *Id.* at 406-07, 409.

The intelligible-principle requirement is essential. It ensures that the legislative power—the "power to 'prescribe the rules by which the duties and rights of every citizen are to be regulated,'" *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 222-23 (1995)—proceeds according to constitutional design. Each law "must win the approval of two Houses of Congress … and either secure the President's approval or obtain enough support to override his veto." *Gundy*, 588 U.S. at 154 (Gorsuch, J., dissenting). These "detailed and arduous processes" are "bulwarks of liberty." *Id.* When the legislative power is given to another branch, these protections disappear.

*A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), is an example of the intelligible-principle requirement at work. *Schechter Poultry* invalidated a law that authorized the President to "approve" or "prescribe" "codes of fair competition," because Congress supplied "no standards" for the President to adhere to. *Id.* at 521-23, 541-42. It instead gave the President "unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." *Id.* at

537-38. "Such a sweeping delegation of legislative power," the Court held, "is an unconstitutional delegation." *Id.* at 539, 542.

**b.** If § 41712(a) authorized DOT to prescribe what constitutes fair and nondeceptive practices—*i.e.*, "enact[] a code of online disclosure practices," *Airlines for America*, 110 F.4th at 675—the statute would be "an unconstitutional delegation of legislative power." *Schechter Poultry*, 295 U.S. at 542. It's one thing to authorize DOT to "stop" an "unfair or deceptive practice." 49 U.S.C. § 41712(a). It's quite another to give DOT *carte blanche* to mandate compliance with practices that it deems "fair" and "nondeceptive" as a matter of its own legislative policymaking judgment.

Yet that is precisely the power DOT claims. Nothing in § 41712(a) remotely establishes standards for DOT to adhere to. DOT would thus have "unfettered discretion" to "establish[] the standards of legal obligation," performing *Congress's* "essential legislative function," *Schechter Poultry*, 295 U.S. at 530, 537, outside the liberty-protecting guardrails in Article I of the Constitution. That's impermissible. The Court should read the Act, by its plain text, "to avoid [these] constitutional problems." *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974).

### 2. The major questions doctrine likewise shows why the government's statutory interpretation is wrong.

The government's interpretation also fails under the major questions doctrine, which helps to avoid such constitutional problems in the first place. *See West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 741-42 (2022) (Gorsuch, J., concurring). The major questions doctrine elevates "common sense" above an agency's argument, even one with "a colorable textual basis," that Congress authorized it to take the action under review. *Id.* at 722-23 (majority opinion). If "the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority," then courts will strike down the challenged action unless the "agency … point[s] to 'clear congressional authorization.'" *Id.* at 723 (alteration adopted). In *Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000), for example, the Supreme Court held that Congress did not give the Food and Drug Administration (FDA) authority to regulate tobacco as a "drug." Given tobacco's "unique place in American history and society," Congress's creation of a "distinct regulatory scheme for tobacco products," and Congress's rejection of

"proposals to give the FDA jurisdiction over tobacco," the Court reasoned, Congress could not have given the FDA authority "to regulate an industry constituting a significant portion of the American economy" "in so cryptic a fashion." *Id.*

Just so here. "[G]iven the … circumstances," *West Virginia*, 597 U.S. at 722-23, surrounding the ADA, there is no reason to think that Congress authorized DOT to prescribe, "often in great detail," how airlines must conduct themselves in the provision and sale of air transportation, *Airlines for America*, 110 F.4th at 675. "Congress enacted the ADA to dismantle federal economic regulation." *Hodges*, 44 F.3d at 335. It "eliminated" the federal "power to prescribe" the airlines' "practices," *Sam L. Majors Jewelers*, 117 F.3d at 929, leaving "the selection and design of marketing mechanisms" "to the airlines themselves," *Wolens*, 513 U.S. at 228. And Congress did so because it determined that "efficiency, innovation, low prices, variety, and quality would be promoted by reliance on competitive market forces *rather than pervasive federal regulation*." *Hodges*, 44 F.3d at 335 (emphasis added). Given this "history," "there is every reason to 'hesitate before concluding that Congress' meant to confer on [DOT] the authority it claims." *West Virginia*, 597 U.S. at 723-25.

The "economic and political significance" of DOT's asserted power confirms the point. *Id.* at 721. "Commercial aviation drives 5% of U.S. GDP — the equivalent of $1.37 trillion in 2023." *Impact*, Airlines for America (last visited Sept. 9, 2024), https://www.airlines.org/impact/. U.S. airlines daily "operate more than 26,000 flights carrying 2.6 million passengers to/from nearly 80 countries." *Id.* Commercial aviation "helps drive more than 10 million American jobs." *Id.* (capitalization altered). The upshot: commercial aviation is "a significant portion of the American economy." *West Virginia*, 597 U.S. at 722. It thus is "common sense" that Congress would not have silently authorized DOT to prescribe codes of fair conduct for the entire industry. *Id.* at 722-23. Congress would not speak "in so cryptic a fashion" on a matter of "such economic and political significance." *Brown & Williamson*, 529 U.S. at 160. That's doubly true because the Rule regulates flights "between two foreign points," 89 Fed. Reg. at 34,638, even though Congress didn't "affirmatively and unmistakably" authorize extraterritorial regulation in 49 U.S.C. § 40102(a)(25), *see Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412, 417-18 (2023). "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 723.

### C.    The Rule unlawfully prescribes a code of practices.

The Rule exceeds DOT's statutory authority under § 41712(a), because it "mandates, often in great detail, a host of disclosure practices." *Airlines for America*, 110 F.4th at 675. Put simply, "the Rule doesn't just prohibit—it prescribes." *Id.* (alteration adopted).

- Airlines and ticket agents must make critical-ancillary-fee disclosures "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific flight itinerary." 89 Fed. Reg. at 34,621.

- Disclosures must note when "a fare category does not allow changing or canceling a reservation or transporting a checked or carry-on bag." *Id.*

- "Fees cannot be displayed through a hyperlink." *Id.*

- Disclosures must be passenger-specific "if a consumer conducts a passenger-specific itinerary search." *Id.*

- "[A]ny page or step of the booking process in which a consumer is offered a seat selection for a fee" must include several verbatim sentences about seat selection. *Id.* at 34,676. This is the required notice: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel." *Id.*

- Air carriers must disclose ancillary-fee information to ticket agents in a manner "useable, current, accurate, and sufficient to ensure compliance" with the Rule by ticket agents. *Id.* at 34,677.

In short, "the Rule essentially enacts a code of online disclosure practices." *Airlines for America*, 110 F.4th at 675. The statute authorizes DOT to "find[]" an unfair and deceptive practice and "order" "the" air carrier to stop it, but the Rule says nothing about case-by-case adjudications, findings, and orders. *See id.* at 674-75 (quoting 49 U.S.C. § 41712(a)). Instead, it tells airlines and ticket agents *what* they must do (disclose ancillary-service fees), and also *when* (the moment they provide fare and schedule information), *where* (usually online, and often on *the first page* of online search results), and *how* (not through hyperlinks, and sometimes with specific words) they must do it. And DOT made no findings in the Rule that *every other practice* would be unfair, meaning that the Rule is mandating, not prohibiting, practices. The Rule's "mandates" are "not authorized by the statute," especially because DOT promulgated them "outside the adjudicatory process set out by § 41712(a)." *Id.* at 675. DOT exceeded its statutory authority.

### D.    DOT's counterarguments fail.

#### 1.    DOT ignores the plain text of § 41712(a) and misunderstands statutory context.

DOT "fails to grapple with § 41712(a)'s text." *Id.* Indeed, in its opposition to the Airlines' stay motion, DOT didn't even *acknowledge* that § 41712(a)

says "stop." *See* Doc. 42, at 6-11. As the Supreme Court has "stated time and again," "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut National Bank*, 503 U.S. at 253-54. Stop means stop, not prescribe. *Supra* pp. 20-22. DOT isn't even reading the statute.

DOT "cannot escape Congress's clear intent" by pointing to provisions conferring only "general authority." *Air Alliance Houston v. Environmental Protection Agency*, 906 F.3d 1049, 1061 (5th Cir. 2018). For example, § 40113(a) "does not help DOT's argument." *Airlines for America*, 110 F.4th at 675. That "general provision" authorizes DOT to "take action" it "considers necessary to carry out" its responsibilities, "including conducting investigations, *prescribing regulations*, standards, and procedures, and issuing orders." *Id.* Congress does not render superfluous specific language conferring limited authority with general language conferring "catch-all authority." *Id.* at 675-76. Authority to "carry out" other provisions is not authority to "render nugatory" those provisions. *Allegheny Defense Project v. Federal Energy Regulatory Commission*, 964 F.3d 1, 16 (D.C. Cir. 2020) (en banc). Nor can it "expand the scope of the provisions the agency is tasked with 'carrying out.'" *Gulf Fishermens Ass'n v. National Marine Fisheries Service*, 968 F.3d 454,

465 (5th Cir. 2020). Section 40113 applies to a "laundry list," *Airlines for America*, 110 F.4th at 676 n.5, of provisions—an entire "part" of Title 49. 49 U.S.C. § 40113(a). Section 40113 applies to those provisions as they are written; it does not override or expand them. Thus, § 40113(a) does not authorize the Rule. Concluding otherwise would "obliterate the directly applicable textual limits spelled out in § 41712(a)." *Airlines for America*, 110 F.4th at 676.

The civil penalty provision, 49 U.S.C. § 46301(a), doesn't authorize the Rule, either. That provision "imposes civil penalties for violating a laundry list of provisions across 13 chapters, including § 41712, and also for violating 'a regulation prescribed' under any of those provisions." *Airlines for America*, 110 F.4th at 676 n.5 (citing 49 U.S.C. § 46301(a)(1)(A), (B)). "But § 46301(a)—which references numerous provisions besides § 41712—says nothing about whether § 41712(a) in particular authorizes legislative rulemaking. And the fact that § 46301(a) references provisions that expressly authorize such rulemaking (*see, e.g.*, 49 U.S.C. §§ 40103(b) and 44903(b)) only underscores that § 41712(a) does not." *Id.* It certainly doesn't authorize prescriptive legislative rulemaking of the sort DOT engaged in here.

## 2.     DOT cannot seize power that Congress did not confer by pointing to earlier regulations.

DOT's "'history' of promulgating regulations under § 41712" does not authorize the Rule. *Id.* at 676. Agencies cannot acquire authority by "adverse possession." *Rapanos v. United States*, 547 U.S. 715, 752 (2006). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). Thus, the question is whether Congress has authorized an agency to act, not whether an agency's "incremental" power grab provides cover for its recent unauthorized action. Doc. 42, at 4. "Simply because [an agency] may have acted outside of its clear statutory limits in the past does not mandate a decision in its favor today." *VanDerStok v. Garland*, 86 F.4th 179, 190 (5th Cir. 2023). "To hold otherwise would greenlight the aggregation of Executive power 'through adverse possession,'" *Career Colleges & Schools of Texas v. United States Department of Education,* 98 F.4th 220, 241 (5th Cir. 2024), conduct the Supreme Court has held impermissible, *Rapanos*, 547 U.S. at 752.

DOT's argument is effectively that it has secured authority through congressional silence. But *Loper Bright* made clear that agencies cannot

define their authority whenever Congress is "silent." 144 S. Ct. at 2254. What matters is what Congress "says." *Id.* at 2262. Indeed, the Supreme Court has long explained that "congressional silence 'lacks persuasive significance,' particularly where administrative regulations are inconsistent with the controlling statute." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (citations omitted). Congressional silence simply cannot justify DOT's attempted power grab. That's especially true with the FAA Reauthorization Act of 2024, in which "Congress did not address [DOT's] authority to promulgate the Rule." *Airlines for America*, 110 F.4th at 676 n.6. Contrast that silence with Congress's effective codification of a different regulation that DOT issued shortly before issuing the Rule. *Compare Refunds and Other Consumer Protections,* 89 Fed. Reg. 32,760, 32,832-36 (Apr. 26, 2024), *with* FAA Reauthorization Act of 2024, Pub. L. No. 118-63, § 503, 138 Stat. 1025, 1188-90, *codified at* 49 U.S.C. § 42305. Congress's codification of one DOT rule and its failure to codify another—the Rule—only reinforces that Congress didn't consider, or disagreed with, the Rule. Thus, even if congressional silence is relevant, it *hurts* DOT.

### 3.    The Seventh Circuit decision DOT relies on is wrong and distinguishable.

*United Air Lines, Inc. v. Civil Aeronautics Board*, 766 F.2d 1107 (7th Cir. 1985), does not help DOT, and this Court need not disagree with it to find that the Rule exceeds DOT's authority.

*United Air Lines* held that the Civil Aeronautics Board (DOT's predecessor) could issue "a rule forbidding" airlines from biasing their computer reservation systems, *i.e.*, "displaying flight information in a way that favors their own flights." *Id.* at 1110-12. That "prohibition of biasing," the court explained, did not exceed the Board's specific authority to order an air carrier "to cease and desist from" "unfair or deceptive practices" and its general authority to make rules "pursuant to and consistent with" its duties. *Id.* at 1111-12 (quoting Sections 204(a) and 411 of the Federal Aviation Act, the precursors to 49 U.S.C. §§ 41712(a) and 40113(a)). *United Air Lines* did not rest on the statutory text, relying instead on agency custom and legislative history. *See id.* The court emphasized the Board's history of rulemaking even though the statute contemplated only an "adjudicative procedure," noting that "a page of history is worth a volume of textual explication." *Id.* at 1111. And from legislative history, the court thought it was "too late to inquire

whether, as an original matter of interpretation," Congress actually authorized the Board to issue rules "to prevent unfair or deceptive practices." *Id.* at 1112.

That method of interpretation contravenes Supreme Court precedent, as set out above. Agency custom cannot supersede "statutory text," *Rapanos*, 547 U.S. at 752, which doesn't include "legislative history," *Azar v. Allina Health Services*, 587 U.S. 566, 579-80 (2019). And it is never "too late" to construe the law to mean what it says. *See, e.g.*, *McGirt v. Oklahoma*, 591 U.S. 894, 897-98 (2020). Indeed, in *Loper Bright*, the Supreme Court noted that by deciding *Chevron* "[w]ithout mentioning" the APA's text, it had "defie[d] the command of the APA." 144 S. Ct. at 2264-65. Text comes first.

Regardless, *United Air Lines* is distinguishable because it involved a regulation very different from the Rule. There, the regulation was a "prohibition," "forbidding" airlines from "displaying flight information in a way that favors their own flights." 766 F.2d at 1110-12. Here, by contrast, the Rule is a "prescri[ption]," "mandat[ing], often in great detail, a host of disclosure practices." *Airlines for America*, 110 F.4th at 675. The Seventh Circuit thus had no reason to address whether the Board had prescriptive rulemaking authority—a central problem here. Because *United Air Lines* said nothing

about whether Congress "authorize[d] *this kind* of legislative rulemaking," *id.* (emphasis added), there is "no need" for this Court to choose between accepting DOT's atextual reading or splitting with the Seventh Circuit, *In re Bradley*, 588 F.3d 254, 262 (5th Cir. 2009). The Court can simply vacate the Rule and note that *United Air Lines* faced a different question.

## II. The Rule exceeds DOT's authority, because it regulates practices that are not "unfair" or "deceptive."

DOT lacks authority to issue the Rule, because the practices it regulates are not "unfair" or "deceptive" under § 41712(a). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. And "an agency has exceeded its statutory authority" where, as here, the challenged action does not fit "the plain language of the statute." *VanDerStok*, 86 F.4th at 188; *see, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 415 (2024). The terms "unfair" and "deceptive" in § 41712(a) do not cover the practices DOT seeks to regulate, even under *DOT's* interpretation of those terms. *See Defining Unfair or Deceptive Practices*, 85 Fed. Reg. 78,707, 78,708 (Dec. 7, 2020). Therefore, not only does the Rule exceed DOT's authority, it also is arbitrary and capricious. *Cf. Carlson v. Postal Regulatory Commission*, 938 F.3d 337, 345, 351 (D.C. Cir. 2019).

## A.    The regulated practices are not "unfair."

The practices the Rule regulates are not unfair. Any supposed consumer injury is not substantial and is reasonably avoidable and outweighed by the significant benefits of clear, easily navigable search results—airlines' current practices.

**1.**    Congress modeled § 41712(a) on Section 5 of the FTC Act. *See* 85 Fed. Reg. at 78,708, 78,714; *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 306 (1963). Section 5 provides that a practice is not "unfair" unless it "is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). "An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Community Financial Services Ass'n of America v. Consumer Financial Protection Bureau*, 51 F.4th 616, 628 (5th Cir. 2022) (internal quotation marks omitted), *rev'd*, 601 U.S. 416 (2024), *judgment reinstated per curiam by* 104 F.4th 930 (5th Cir. 2024). In *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1157, 1168 (9th Cir. 2012), for example, the Ninth Circuit held

that credit card advertisements that did not disclose up front the annual fee were not "unfair." The injury was reasonably avoidable, the court explained, because the advertisement said "other restrictions may apply" and "a reasonable consumer" faced with that disclaimer "would … consult the terms and conditions." *Id.* at 1169.

DOT defines "unfair practice" similarly: a practice that "causes or is likely to cause substantial injury, which is not reasonably avoidable, and the harm is not outweighed by benefits to consumers or competition." 14 C.F.R. § 399.79(b)(1). The standard requires evaluating "net effects," because "some practices may be harmful to consumers in some respects, but beneficial to consumers in other respects." *Guidance Regarding Interpretation of Unfair and Deceptive Practices*, 87 Fed. Reg. 52,677, 52,679 (Aug. 29, 2022). One example of an "unfair" practice, according to DOT, is "delaying passengers on the tarmac for a substantial length of time without the opportunity to deplane or without adequate food, water, lavatory facilities, and medical attention," because doing so "imposes substantial harm" that a passenger who "lacks the opportunity to deplane" cannot reasonably avoid. *Id.*

**2.**     The practices the Rule purports to regulate are not unfair.

*First*, any supposed injury is not substantial. DOT describes the injury as added time spent searching for information and possible additional costs that a consumer would not have incurred had she known "the true cost of travel up front." 89 Fed. Reg. at 34,627-28. But DOT doesn't dispute that "[e]very A4A passenger air carrier displays or makes available at first search results the ancillary fee information that DOT proposes" for an anonymous search. A4A Comments 17-18; *see* 89 Fed. Reg. at 34,632; Stay Mot. SA46-SA53 (screenshots of carrier webpages). While most airlines disclose such information via hyperlinks—which the Rule now prohibits—consumers do not suffer *substantial* harm by clicking the hyperlink, which immediately takes them to the desired information. Clicking a link is nothing like sitting on a tarmac without services. *See* 87 Fed. Reg. at 52,679.

*Second*, any supposed injury from not having ancillary fee disclosures on the *first* search page is reasonably avoidable. DOT has acknowledged that "many consumers" are "aware of the existence of fees." 89 Fed. Reg. at 34,633. Accordingly, "consumers 'have reason to anticipate'" the possibility that one airline may charge higher ancillary fees than another. *Community Financial Services*, 51 F.4th at 628. Consumers can—and do—access that

airline-specific fee information, which, again, is just a click away. *See* A4A Comments 45-46. And, as explained, using the prominently displayed hyperlinks is one of many reasonable "means to avoid" overpayment. *Id.* These circumstances are similar to those in *Davis*, where a consumer with knowledge about potential additional restrictions could reasonably avoid injury by consulting the terms and conditions. 691 F.3d at 1169.

*Third*, any supposed injury the Rule might prevent is outweighed by the significant benefits of the clear, easily navigable search results that the Rule destroys. Screen real estate is scarce, and airlines have designed their websites, in response to competitive market forces, "to be as efficient as possible while showing passengers as many possible itinerary and fare options that are offered." A4A Comments 38-40. The Rule replaces that clarity with chaos—for *every* customer—by requiring airlines to display a "less efficient, less clear e-commerce platform." A4A Comments 48. Imagine searching for a flight to Chicago on a phone and sifting through information about many flights, at different times and with different connections, to each of Chicago's two major airports. The Rule creates instant information overload: consumers will face the daunting, "unwieldy clutter," on the *first* page of their results, of additional "information regarding bag fees, change/cancel fees,

and seating fees for each fare product (e.g., first class, premium economy, main cabin, basic economy, etc.)." A4A Comments 40. The Rule will make booking flights by smartphone especially difficult.

DOT's own analysis proves the point: "In the case of disclosures, more information is not always better." 2024 RIA 18. DOT's data shows that the Rule will slow each search down. *Id.* And DOT admits that consumer benefits are "uncertain." 2024 RIA 25-27. DOT's conclusory claim about harms and benefits, *see* 89 Fed. Reg. at 34,627-34,629, does not and cannot establish that the regulated practices are actually "unfair" and within its § 41712(a) authority.

*Finally*, and consistent with the prohibitory–prescriptive distinction the statute's plain language reflects, *supra* pp. 20-26, DOT could mandate compliance with its preferred practices only if it could establish that *every other* practice is "unfair." DOT thus needed to explain not only why its three-sentence formulation for disclosing seat-selection fares is fair, *see* 89 Fed. Reg. at 34,676, but also why every other possible formulation is *un*fair. DOT also needed to explain why it's unfair for an airline not to show individuals with status, who thus *know* that their bags fly free, a $0 baggage fee in the initial search results. *See id.* at 34,675. But DOT has explained none of this.

If DOT has policy preferences about what an optimal airline market-place looks like, then it can highlight whatever information it deems important on its website, as it already does. *Airline Customer Service Dashboard*, U.S. Department of Transportation (last updated May 31, 2024), https://www.transportation.gov/airconsumer/airline-customer-service-dashboard. But DOT can't strong-arm airlines into carrying out its vision of preferred practices. DOT can only "stop" unfair or deceptive practices, and the existing disclosure practices the Rule purports to regulate are not unfair.

### B.    The regulated practices are also not "deceptive."

The practices the Rule regulates are not deceptive, either, because they are not likely to mislead reasonable consumers on material matters.

**1.**    "Deceptive" means "tending or having power to cause someone to accept as true or valid what is false or invalid." Merriam-Webster, https://www.merriam-webster.com/dictionary/deceptive    (last    visited Sept. 9, 2024). Again, Congress had the FTC Act in mind when it enacted § 41712(a), *supra* p. 44, and DOT drew on an FTC policy statement in interpreting the term "deceptive practice." *See* 85 Fed. Reg. at 78,708.

DOT defines "deceptive practice" as a practice that "is likely to mislead a consumer, acting reasonably under the circumstances, with respect to

a material matter." 14 C.F.R. § 399.79(b)(2). "A matter is material if it is likely to have affected the consumer's conduct or decision with respect to a product or service." *Id.* "[E]xpress misrepresentations, implied representations, and omissions" may be "likely to mislead." 87 Fed. Reg. at 52,680. As an example, DOT provided that advertising a fare "that is no longer available" is "likely to mislead." *Id.* Consumer reasonableness turns on the totality of the circumstances, including "the familiarity of the public with the product, and the availability of alternate sources for the information." *Id.* Airlines are not responsible for consumers' "feeling[s] or opinion[s]." *Id*. at 52,680 & n.49. DOT has concluded, for example, that "an airline's frequent flyer programs were not deceptive simply because consumers may have assumed that airlines could not make such changes to the program, or were surprised that miles could not be sold, when the terms of the plan themselves were clear." *Id.* at 52,680 n.49.

**2.** The practices the Rule purports to regulate are not "deceptive." Again, DOT acknowledged that carriers *already disclose* the information that the Rule covers. *See* 89 Fed. Reg. at 34,632. DOT nonetheless concluded that current practices are deceptive because "consumers do not know the amount of the fees that will apply to them, given the complexity of fee structures."

*Id.* at 34,633, 34,641. That doesn't make sense. Reasonable consumers know that fees and policies vary across airlines even if they don't know "the amount of [those] fees." *Id.* at 34,633. Consumers are familiar with airlines' products and can find the information on airlines' websites. *See* 87 Fed. Reg. at 52,680. In fact, DOT admitted that a 2017 Government Accountability Office report found that "after airlines imposed checked bag fees, the number of checked bags per passenger declined and the number of carry-ons increased," 2024 RIA 14, underscoring that consumers *seven years ago* were aware of baggage fees and had changed their behavior accordingly. If a consumer "*expects* to pay" an additional cost, then air carriers do "not act 'deceptively' or 'unfairly' by charging such" an additional cost. *Funeral Consumer Alliance, Inc. v. Federal Trade Commission*, 481 F.3d 860, 864-65 (D.C. Cir. 2007). A reasonable consumer would not think that the standard fare is automatically the final price (inclusive of all ancillary services) or that ancillary fees are uniform across airlines, and asking consumers to click a hyperlink to access fee information is not "deceptive."

**3.** DOT's counterarguments fail. DOT first contends that current baggage disclosures are deceptive because they mislead consumers into believing the total price will be cheaper than it is. Doc. 42, at 13-16. Not so.

Consumers know that airlines charge fees for optional services. 89 Fed. Reg. at 34,633. A consumer "acting reasonably" would not be misled, because she would know to expect and look for fees for her desired services.

DOT also asserts that current change and cancellation fee practices are deceptive because consumers may think there are no change or cancellation fees post-COVID. Doc. 42, at 16-18. But DOT stated that airlines altered their ticket change rules "during the COVID–19 public health emergency." 89 Fed. Reg. at 34,630. It has provided no explanation why a reasonable consumer would expect changes to persist after that emergency ended—or would not at least know to check.

Lastly, DOT asserts that not including the seat-selection fee disclosure statement is deceptive because consumers likely will be confused and will unnecessarily pay for a seat. Doc. 42, at 18. But DOT's only support was a consumer group's statement that customers "may believe" that flights have no "free" seats. 89 Fed. Reg. at 34,644. DOT agreed that the Airlines' practices "could confuse consumers." *Id.* at 34,645. That is pure speculation. And DOT failed to explain why a *reasonable* consumer would think that she must pay for a seat in addition to paying for a ticket. What's more, even were a lack of *some* disclosure misleading, DOT did not establish that every other

disclosure besides its preferred language was misleading. Thus, DOT cannot mandate its specific statement.

## III.    The Rule violates the APA, because it does not reflect reasoned decisionmaking.

The Rule is arbitrary and capricious, because DOT has not established a genuine problem that needs solving and because it inadequately analyzed the Rule's supposed benefits and significant costs. Its benefits determination was based on uncertain data. It rejected data undermining its benefits theory without adequately explaining why. And it knowingly ignored the full picture of the Rule's costs.

### A.    An agency must consider the relevant parts of the problem in promulgating a regulation.

"The arbitrary and capricious standard" requires agencies "to engage in 'reasoned decisionmaking.'" *Sierra Club v. U.S. Environmental Protection Agency*, 939 F.3d 649, 664 (5th Cir. 2019). Agency action "is lawful only if it rests 'on a consideration of the relevant factors.'" *Id.* Thus, "an agency cannot simply ignore" or "sidestep" "an important aspect of the problem." *Ohio v. Environmental Protection Agency*, 144 S. Ct. 2040, 2053, 2055 (2024). Nor may it merely acknowledge the problem; "bare acknowledgment is no substitute for reasoned consideration." *Louisiana v. U.S. Department of Energy*, 90 F.4th

461, 473 (5th Cir. 2024). Instead, an agency must "address" the important issues and offer "a satisfactory explanation for its action." *Ohio*, 144 S. Ct. at 2053, 2055. An agency fails that requirement when, for example, it credits certain evidence over other evidence "without explaining why." *Louisiana*, 90 F.4th at 473.

One recurring issue is whether an agency satisfied its duty to rationally consider "the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. U.S. Department of Commerce*, 60 F.4th 956, 973 (5th Cir. 2023). The APA does not tolerate agency action where the supposed benefits of the action are "inadequately substantiated." *Chamber of Commerce of the United States v. U.S. Securities & Exchange Commission*, 85 F.4th 760, 777 (5th Cir. 2023). *Mexican Gulf Fishing*, for example, "set aside" a regulation where the government "failed to rationally consider the associated costs and benefits" and "failed to demonstrate" that the rule would produce "meaningful benefits." 60 F.4th at 961, 973. Similarly, *Chamber of Commerce* held that the government "acted arbitrarily and capriciously" by taking action without establishing that "a genuine problem" needed solving. 85 F.4th at 778-79.

## B. DOT failed to adequately substantiate the supposed need for and net benefits of the Rule.

**1.** DOT "acted arbitrarily and capriciously," because it took action without establishing "a genuine problem." *Id.* Even with its unreasonable assumptions, discussed below, DOT put the odds that "net benefits" are "positive" at "roughly 53%"—a mere coin flip. 2024 RIA, at i. And although DOT stated that some consumers care somewhat about ancillary-fee disclosures, *see* 89 Fed. Reg. at 34,622, it never established that consumers care *more* about those disclosures than clarity and efficiency in flight searches. DOT needed to establish that point, because the purported benefit is time saved from not needing "to find information on ancillary service fees." *Id.* But the Rule indisputably slows all consumers down, even those who value ancillary-fee disclosures. 2024 RIA 18-19. So, rather than establishing the existence of a genuine problem for some passengers, DOT created one for all passengers.

**2.** DOT also acted arbitrarily and capriciously, because it failed to adequately (i) substantiate the Rule's supposed benefits, (ii) explain why it rejected data refuting a need for the Rule, and (iii) assess the significant costs.

*i.*     DOT failed to adequately substantiate the Rule's supposed benefits. According to DOT, the "key driver" in the cost-benefit analysis was "the share of consumers who find the information on ancillary fees relevant to their purchase decision." 2024 RIA 26-27; *see also* 2024 RIA 24. DOT thus needed accurate information addressing that critical issue. But DOT admits it lacked that information: "We do not have reliable measures for the share of passengers who consider information about ancillary fees when they search for airline tickets." 2024 RIA 25. That's not all. DOT also admitted lacking "reliable measures for … the amount of time these passengers will save while searching for air travel on airline and non-airline websites under the final rule." *Id.* These admissions establish that DOT based its benefits analysis on uncertain metrics, meaning it "inadequately substantiated" the supposed benefits. *Chamber of Commerce*, 85 F.4th at 777.

DOT's reliance on a university-specific survey confirms the point. DOT noted "that 46 percent of student participants consider baggage fee information when they search for airfare." 2024 RIA 16. But DOT didn't explain why students—who often travel for long stretches over winter and summer breaks, and so need to move more belongings—exhibit model consumer behavior. It couldn't—students aren't representative of the traveling

public. True, the cited data is from "an experiment with students and staff at East Carolina University." *Id.* But DOT specifically relied on the "46 percent of *student* participants." *Id.* (emphasis added). Moreover, even assuming DOT relied on both student and staff data, there's no reason to extrapolate nationwide travel preferences from a single study of a single university in Greeneville, North Carolina. In short, DOT "did not adequately justify" the Rule's supposed benefits. *Mexican Gulf Fishing*, 60 F.4th at 971.

Lastly, DOT can't rely on the $543 million in supposed consumer over-payments, Doc. 42, at 12, because that number too is unsubstantiated. To calculate that figure, DOT set the overpayment amount at "five percent of airfare, which amounts to $12.43 using 2022 average domestic fares." 2024 RIA 31. But DOT recognized that it simply pulled a number out of thin air: "The benefits of the final rule depend on several factors, whose values are highly uncertain. In calculating benefits due to a reduction in deadweight loss, we assumed that the revelation of ancillary fees increases the total price of air travel by five percent, which amounts to $12.43 using average domestic airfare for 2022. *We do not have any data to judge the accuracy of this assumption*." 2024 RIA 30 (emphasis added).

*ii.*    DOT failed to adequately explain why it rejected data undermining any need for the Rule. The Campbell-Hill Survey, which accounted for approximately half of all roundtrip airline passengers in 2019, showed that only 20 percent of consumers pay to check bags. *Supra* p. 9. DOT rejected that data, which undermined its narrative and policy preferences, on the ground that it "appears to be low" as compared to other data, like the university-specific "Rupp study." 2024 RIA 16. That's not an explanation, much less "a satisfactory explanation," *Ohio*, 144 S. Ct. at 2053, because DOT never grappled with the *reason* for the disparate results. For instance, DOT did not consider study design, nor did it articulate why it thought the Campbell-Hill Survey produced inaccurate data. It simply acknowledged the Campbell-Hill Survey and brushed it aside. That's not "reasoned consideration." *Louisiana*, 90 F.4th at 473. DOT's missing explanation "is the touchstone of arbitrary and capricious action." *Id.*

*iii.*    DOT likewise "failed to rationally consider" the Rule's significant costs. *Mexican Gulf Fishing*, 60 F.4th at 973. DOT stated that the cost-benefit analysis turns on "the estimate of the time costs associated with navigating increased amounts of information." 2024 RIA 24. It also acknowledged that disclosing "more information is not always better,"

because adding information increases the time consumers must spend sorting through it. 2024 RIA 18-19. That makes sense. Although the mandated disclosures might conceivably speed up consumers' discrete task of finding information about a specific fee, the screen clutter will slow down *all* consumers, including those who care about ancillary service fees. DOT thus needed accurate information addressing how the Rule would both speed up and slow down *all* consumers.

But DOT knowingly ignored the full picture of costs: "we do not assign time costs for consumers who currently consider ancillary fees when they purchase airfare." 2024 RIA 19. It ignored the full picture because, in its view, consumers who care about ancillary service fees don't care about being slowed down by the Rule's mandated disclosures. *See id.* No data supports that conclusion, and common sense disproves it. If the Rule saves a consumer thirty seconds to find an ancillary service fee, but it slows down the consumer's completion of the booking process by sixty seconds, then that consumer has not saved time because of the Rule. But DOT's analysis recognizes only the thirty-second benefit for these consumers—not any costs. DOT "did not address the [time-cost] concern so much as sidestep it," *Ohio*, 144 S. Ct. at 2055, arbitrarily inflating the Rule's net benefits.

**IV.  The Rule violates the APA, because DOT relied on new data without giving the public an opportunity to comment.**

DOT also violated the APA by justifying the Rule based on cost-benefit data the public never saw. At the proposed-rule stage, DOT said that quantifying cost-benefit data was "not possible." At the final-rule stage, by contrast, DOT relied on quantified cost-benefit data to justify the Rule. DOT needed, but failed, to solicit comments on that data.

**A.  An agency must give the public an opportunity to comment on data that supposedly justifies the final action.**

An agency violates its notice-and-comment duties, *see* 5 U.S.C. § 553(c), when it relies on data the public never saw. Agencies must "afford interested parties an opportunity to challenge the underlying factual data relied on by the agency." *Chemical Manufacturers Ass'n v. U.S. Environmental Protection Agency*, 870 F.2d 177, 200 (5th Cir. 1989). If an agency consults "new data" after the comment period has ended, "the nature of … the newly-considered data determines whether it must again publish notice and invite additional comments." *Id.* at 201. New data that "merely supplement[s] or confirm[s] existing data," doesn't require another comment period. *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1402-03 (9th Cir. 1995). But if an agency relies on new data that "supplant[s]" or "replace[s] its original data," the

APA requires another comment period. *Chemical Manufacturers*, 870 F.2d at 202.

In *Texas Ass'n of Manufacturers v. U.S. Consumer Product Safety Commission*, 989 F.3d 368, 382-83 (5th Cir. 2021), for example, this Court held that the agency "violated the APA's notice-and-comment procedures" given its reliance on "new data when promulgating the Final Rule" and its failure to "make clear it was inviting comments on the use of [that new data] as a new justification for why the Final Rule is necessary." Because the new data provided *the* justification for the final rule, this Court explained, the agency had to solicit comments on the use of that new data. *See id.*

### B.     DOT justified the Rule using new data the public never saw.

**1.**     DOT cited cost-benefit data from the 2024 RIA to justify the Rule. But that was the first time DOT cited *any* cost-benefit data. In fact, when DOT solicited comments on the proposed rule, it told the public that it was "not possible to quantify total benefits or total costs" or "to quantify whether the proposed rule would yield benefits that exceed costs." 2022 RIA, at ii. Because the "degree to which the proposed rule generates benefits [was] unclear," 2022 RIA 27, DOT "did not provide quantitative analysis of benefits and costs" when it issued the proposed rule, 2024 RIA 5. The 2024 RIA,

by contrast, concluded that "the estimate of annual net benefits ranges from $30.3 million to $254 million" and that "the probability of net benefits being positive is roughly 53 percent." 2024 RIA, at i.

That "about-face" violated the APA, *National Ass'n of Manufacturers v. U.S. Securities & Exchange Commission*, 105 F.4th 802, 812 (5th Cir. 2024), because DOT never solicited comments on the data supposedly justifying the Rule. The 2024 RIA did not "merely supplement or confirm existing data." *Idaho Farm*, 58 F.3d at 1402. It instead *became* the data on which DOT relied, taking DOT from "no supporting data," *id.* at 1402-03, for the proposed rule to, suddenly, new data in the 2024 RIA supposedly justifying the Rule. That new data was "central" to the Rule, *id.* at 1403-04, because it served as a "primary justification" for it, *Texas Ass'n of Manufacturers*, 989 F.3d at 383. Indeed, without the 2024 RIA's (flawed) cost-benefit analysis, DOT would have had no justification for its conclusion that the regulated practices are unfair. *See supra* pp. 44-48.

**2.**    DOT doesn't dispute that it never solicited comments on the data supposedly justifying the Rule. It instead claims it had no duty to solicit comments, because the data was "produced in comments." Doc. 42, at 22-23. That's incorrect. The new data in the 2024 RIA stems from "new research"

by Nicholas Rupp, published *after* the comment period. 2024 RIA 16; *see* 89

Fed. Reg. at 34,625. And the Airlines haven't found "Rupp" on the docket

(https://www.regulations.gov/docket/DOT-OST-2022-0109/comments).

## CONCLUSION

The Court should grant the petition for review and vacate the Rule. *See*

*Braidwood Management, Inc. v. Becerra*, 104 F.4th 930, 951-52 (5th Cir. 2024).

Dated: September 9, 2024

Respectfully submitted,

*/s/ Shay Dvoretzky*

Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners Airlines for America (A4A), National Air Carrier Association (NACA), and International Air Transport Association (IATA)*

Paul W. Hughes
Andrew A. Lyons-Berg
Nicole E. Wittstein
MCDERMOTT WILL
  & EMERY LLP
500 North Capitol St. NW
Washington, DC 20001

*Counsel for Petitioners A4A, NACA, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that (1) this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(e), because it contains 12,845 words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: September 9, 2024        */s/ Shay Dvoretzky*
                          Shay Dvoretzky

                          *Counsel for Petitioners*
                          *A4A, NACA, & IATA*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: September 9, 2024        */s/ Shay Dvoretzky*
                                    Shay Dvoretzky

                                    *Counsel for Petitioners*
                                      *A4A, NACA, & IATA*