No. 24-60231 c/w 24-60373

# In the United States Court of Appeals For the Fifth Circuit

### No. 24-60231

AIRLINES FOR AMERICA; ALASKA AIRLINES, INC.; AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; HAWAIIAN AIRLINES, INC.; JetBlue AIRWAYS CORP.; UNITED AIRLINES, INC.; NATIONAL AIR CARRIER ASSOCIATION; INTERNATIONAL AIR TRANSPORT ASSOCIATION

*Petitioners,*

*v.*

DEPARTMENT OF TRANSPORTATION,

*Respondent.*

*consolidated with*
### No. 24-60373

SPIRIT AIRLINES, INC.,

*Petitioner,*

*and*

FRONTIER GROUP HOLDINGS, INC.,

*Petitioner-Intervenor,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

---

On Petition for Review of a Final Rule of the U.S. Department of Transportation
Agency No. 89 Fed. Reg. 34620

---

## Joint Opening Brief for Petitioners in Case No. 24-60373

---

Joanne W. Young
*Counsel of Record*
David M. Kirstein
Donald L. Crowell III
KIRSTEIN & YOUNG PLLC
1750 K Street NW, Suite 700
Washington, DC 20006
(202) 331-3348

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

**No. 24-60373**, *Spirit Airlines, Inc. v. U.S. Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

| Petitioner: | Counsel for Petitioner: |
| --- | --- |
| Spirit Airlines, Inc. | Joanne W. Young |
| | David M. Kirstein |
| | Donald L. Crowell |
| | Kirstein & Young PLLC |

Petitioner Spirit Airlines, Inc. is a publicly traded corporation with its stock publicly listed under the ticker "SAVE". It has no parent corporation. No publicly held corporation holds 10% or more of its stock.

| Petitioner-Intervenor: | Counsel for Petitioner-Intervenor: |
| --- | --- |
| Frontier Group Holdings, Inc. | Joanne W. Young |
| | David M. Kirstein |
| | Donald L. Crowell |
| | Kirstein & Young PLLC |

Petitioner-Intervenor Frontier Group Holdings, Inc. (hereinafter, "Frontier Airlines") is a publicly traded corporation with its stock publicly listed under the ticker "ULCC." It has no parent corporation. No publicly held corporation holds 10% or more of its stock.

| Respondent: | Counsel for Respondent: |
|---|---|
| United States Department of Transportation | Brian M. Boynton |
| | Michael S. Raab |
| | Martin Totaro |
| | Subash Iyer |
| | Paul M. Geier |
| | Blane A. Workie |
| | Paula Lee |
| | Emily Kveselis |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|

The certificates of interested persons that have and will be filed by the Petitioners in *Airlines for America, et al. v. Department of Transportation* (No. 24-60231), which has been consolidated with this case, are hereby incorporated by reference.

Dated: September 9, 2024            Respectfully submitted,

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the legality of an unprecedented Final Rule by which the U.S. Department of Transportation exceeded its statutory authority, violated the Administrative Procedure Act, and impermissibly infringed on core First Amendment commercial speech protections. These are issues of first impression before this Court and of particular complexity. The scope of the Department's statutory authority requires a review of legislative history dating back nearly a century. Spirit Airlines and Frontier Airlines believe oral argument will aid the Court in its decisional process. Spirit and Frontier respectfully request oral argument and that the Court allocate sufficient time for the Petitioner parties in Case 24-60373 to cover the issues and arguments raised in this brief, *see* Fed. R. App. P. 34(a), (f); 5th Cir. R. 28.2.3.—on behalf of the smaller carriers that are uniquely beneficial to ordinary American consumers.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons.................................................................i

Statement Regarding Oral Argument .....................................................iii

Table of Contents .................................................................................iv

Table of Authorities ............................................................................vii

Introduction.......................................................................................... 1

Statement of Jurisdiction ........................................................................ 8

Statement of Issues Presented.................................................................. 8

Statement of the Case ............................................................................ 9

    I.   The Airline Deregulation Act of 1978 Abolished Nearly All Direct Government Regulation Over Domestic Carrier Routes, Pricing, Services, And Accommodations ............................................... 15

    II.  The Department Already Addressed the Issue of Making Optional Service Fee Information Available Through Less Burdensome Means on A Carrier's Website in its 2011 Rulemaking...................................... 17

    III. The Department Re-Opened the Issue of Publishing Rate Information for Optional Services in 2014 and After a 10-year Rulemaking Fraught with Inconsistent Government Positions Finally Landed on the 2024 Rule...................................................................................... 18

Summary of the Argument ...................................................................... 20

Standard of Review ............................................................................... 23

Argument ............................................................................................ 24

I.   Congress Abolished Government Rate-Publication Authority for Interstate (Domestic) Air Transportation Services ................................. 24

    A.   The Rule Creates a Penalty for Not Publishing Ancillary Service Rates at the Time, Place, and in the Manner Prescribed by the Government, Exactly Like a Pre-Deregulation Tariff ................... 27

    B.   The Department Previously Observed that Prohibited Conduct Under Section 41712 Requires Deception or Threats to Competition .................................................................................. 29

    C.   The Department's Actions Violate the Major Questions Doctrine by Attempting to Re-Implement Rate-Regulation Authority in Interstate Air Transportation, which Congress Eliminated .......... 32

II.  The Rule violates the Administrative Procedure Act Because the Department Implemented an Arbitrary Decision without Considering All Required Information ........................................................................ 35

    A.   The Department Failed to Reasonably Consider The Effects of the Rule on Competition, Efficiency, Innovation, Low Prices, and the Continued Strengthening of Small Air Carriers as Expressly Required by 49 U.S.C. § 40101 .................................... 36

    B.   The Department's Economic Assessment Leaves Out Hundreds of Millions to Billions of Dollars in Implementation Costs and Is Otherwise Based on Threadbare or Unreliable Factual Information .................................................................................. 38

        1.   The Department Completely Ignored the Extensive Up-front and Ongoing Implementation Costs to Implement the Rule for Carriers that Utilize Dynamic Pricing ............ 41

        2.   The Rule's "Benefits" Are Either Made Up or Not Drawn from Any Reliable Source. ................................................. 45

    C.   The Department Failed to Address Significant Points Raised by the Public Comments .................................................................... 50

III. The Rule Violates the First Amendment by Affirmatively Restricting Truthful Advertising of Standalone Airfare Tickets and Compelling Airlines to Sell and Advertise Add-On Products Not Required for Air Travel ................................................................................................ 52

    A. The Rule Fails First Amendment Intermediate Scrutiny.............. 53

        1. There is No Substantial Government Interest in Restricting the Sale of Lawful Transportation Products (*e.g.* a Travel Ticket that Does Not Include Optional Services) ............................................................................. 54

        2. Affirmatively Restricting Airlines from Displaying Accurate Prices for Air Travel Without Optional Services Does Not Directly and Materially Advance any Government Interest ......................................................... 55

        3. The Rule is Not Narrowly Tailored and Ignores Less-Restrictive Means like Existing Fare Disclosure Requirements and the 24-Hour Refund Rule.................... 57

Conclusion.............................................................................................. 59

Certificate of Compliance ........................................................................ 60

Certificate of Service............................................................................... 61

# TABLE OF AUTHORITIES

Page

## Cases

*Am. Airlines, Inc. v. N. Am. Airlines, Inc.*, 351 U.S. 79 (1956) ............................................................................................29

*Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) ......................................................................................28

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ...........................................24

*BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905 (5th Cir. 2023) ...............................................................................................38

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) .............................36, 39

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ............................................... 6, 22, 52, 53, 55, 57

*Chamber of Com. of U.S. v. SEC*, 85 F.4th 760 (5th Cir. 2023) ...............................................................................................40

*Chamber of Commerce*, 412 F.3d 133 (D.C. Cir. 2005) .....................................39

*ExxonMobil Pipeline Co. v. U.S. Dept. of Transp.*, 867 F.3d 564 (5th Cir. 2017) ...................................................................35

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000) ...............................................................................................34

*Friedman v. Rogers*, 440 U.S. 1 (1979) .................................................................52

*Goodman v. Nat'l Airlines, Inc.*, 201 A.2d 877, 880 (D.C. 1964) ...............................................................................................25

*Hodges v. Delta Airlines*, 4 F.3d 350 (5th Cir. 1993) .........................................1, 3

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ........................................................38, 50

*In re Transpacific Passenger Air Transp.ortation Antitrust Litigation*, No. C 07-05634 CRB (N.D. Cal. Sep. 23, 2014) ...................................................................................11

*Lichten v. E. Airlines, Inc.*, 189 F.2d 939 (2d Cir. 1951) ......................................13

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ..................................................................................35

*Maislin Indus., U.S. v. Primary Steel*, 497 U.S. 116, 132 (1990) ..................................................................................28

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ..........................................39

*MCI Telecomms. Corp.* v. *Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994).........................................................................24, 26, 27

*Mex. Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956 (5th Cir. 2023) ..............................................35, 50

*Michigan v. EPA*, 576 U.S. 743 (2015) .................................................35

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ..................................14, 30

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ......................................38, 39

*N. Am. Airlines, Inc. v. Civ. Aeronautics Bd.*, 228 F.2d 432 (1955).....................................................................30

*N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (2020) ............................................23

*Nader v. Allegheny Airlines*, 426 U.S. 290 (1976) .................................................13

*Nat'l Assoc. of Priv. Fund Mgrs. v. SEC*, Case No. 23-60471 (5th Cir., June 5, 2024)............................................................24

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 595 U.S. 109
(2022) .................................................................................26

*Nebraska Dept. of Aeronautics v. CAB*, 298 F.2d 286 (8th
Cir. 1962).............................................................................13

Order 81-8-30, Civ. Aeronautics Bd., Docket 37481 (Aug.
6, 1981) ....................................................................3, 10, 27

*PAN AM v. United States*, 371 U.S. 296 (1963) ...................................36

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374
F.3d 1209 (D.C. Cir. 2004).................................................39

*Robinson v. Baltimore and Ohio R. Co.*, 222 U.S. 506
(1912)...................................................................................24

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ..................6, 22, 52, 53

*Spirit Airlines*, 687 F.3d 403 (D.C. Cir. 2012) ..............................55, 56

*Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247
(D.C. Cir. 2021) ..................................................................38

*Statland v. Am. Airlines*, 998 F.2d 539 (7th Cir. 1993) .......................15

*Stone v. INS*, 514 U.S. 386 (1995) .................................................26, 29

*Sullivan v. Zebley*, 493 U.S. 521 (1990).............................................23

*Texas and Pacific R. Co. v. Abilene Cotton Oil Co.*, 204
U.S. 426 (1907) ...................................................................24

*Trailways of New England, Inc. v. Civ. Aeronautics Bd.*,
412 F.2d 926 (1st Cir. 1969).........................................12, 24

*Transcon. Bus Sys., Inc. v. Civil Aeronautics Bd.*, 383 F.2d
466 (5th Cir. 1967) ..................................... 3, 12, 13, 24, 34

*U.S. v. Wells*, 519 U.S. 482 (1997) .....................................................26

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of
    Health & Hum. Servs.,* 985 F.3d 472 (5th Cir. 2021) ........................................39

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) .............................................52

*West. Virginia. v. EPA,* 597 U.S. 697 (2022) ..........................................34

*Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457 (2001) .......................................33

## Statutes

2 U.S.C. § 1532 ........................................................................................40

28 U.S.C. § 2112 .......................................................................................8

44 U.S.C. § 3501 .......................................................................................40

49 U.S.C. § 40101 ..................................................................................31, 36

49 U.S.C. § 41109 ....................................................................................31

49 U.S.C. § 41504 ....................................................................................32

49 U.S.C. § 41712 ..............................................................13, 15, 25, 26, 29, 30

49 U.S.C. § 46110 .....................................................................................7, 8

49 U.S.C., Subtitle VIII, Part A ...............................................................8

5 U.S.C. § 603 ..........................................................................................40

5 U.S.C. § 604 ..........................................................................................40

5 U.S.C. § 706 ......................................................................................23, 35

## Other Authorities

124 Cong. Rec. H38525-26 (Oct. 14, 1978) (Statement
    of Rep. Harsha) .........................................................................14, 15

124 Cong. Rec. S37418 (Oct. 14, 1978) (statement of
    Sen. Kennedy) ..............................................................................16

*Airline Advert. Reform Act of 1991, Hearing before the Subcomm. on Aviation of the H. Comm. on Public Works and Transportation*, 102nd Cong. (Sept. 24, 1992) ............................................................................................................14

Comments of Airlines for America(A4A) 8 (Jan. 23, 2023), DOT-OST-2022-0109-0090 ....................................................5

Comments of Frontier Airlines (Jan. 23, 2023), DOT-OST-2022-0109-0020............................................................................48

Comments of Spirit Airlines, Inc. (Jan. 23, 2023), DOT-OST-2022-0109-0092................................................................19, 45

ECF No. 12-2, Special Appendix to Opposed Emergency Mot. for Stay, No. 24-60373 (5th Cir. July 26, 2024).......................................21

Frontier Airlines, The NPRM is a Solution Searching for a Problem: Consumer Confusion, Not Consumer Protection (Mar. 30, 2023), DOT-OST-2022-0109-0728 ............................................................................................................19

H.R. Rep. No. 96-5 (1979) ....................................................................37

*House Committee on Public Works and Transportation Report* on the *Civil Aeronautics Board Sunset Act of 1983*, H. Rep. No. 98-793 (May 21, 1984) .......................................................30

Number of Consumer Complaints Received by the U.S. DOT OACP regarding Ancillary Fees, 2019-2021, Docket DOT-OST-2022-0109-0021................................................................56

Order 72-2-61, Docket 20853, Civ. Aeronautics Bd. (Feb. 16, 1972) ............................................................................................................11

Order 92-5-60, Dep't of Transport. Dockets 46280 & 47539 (May 29, 1992) ....................................................................................30

Regulatory Impact Analysis (Apr. 2024), DOT-OST-2022-0109-0753 ................................................................................................41, 49

Regulatory Impact Analysis (Sep. 26, 2022), DOT-OST-
    2022-0109-0002 ................................................................. 47

*Regulatory Reform in Air Transportation, Hearings
    before the Subcomm. on Aviation of the S. Comm. on
    Commerce, Science, and Transportation*, 94th Cong.
    (Mar. 21, 1977) (emphasis added) ................................. 1, 4

Spirit Airlines Request for Stay of Ancillary Service Rule,
    DOT-OST-2022-0109-0809 (June 5, 2024) ....................... 44

Supplemental Comments of Frontier Airlines (Apr. 6,
    2023), DOT-OST-2022-0109-0739 ................................... 49

## Rules

Fed. R. App. Proc. 28(i) .......................................................... 9

## Regulations

14 C.F.R § 399.85(d) ................................................... 2, 17, 57

14 C.F.R. § 259.5(b)(4) ........................................................... 2

14 C.F.R. § 399.85(b) ............................................................ 57

14 C.F.R. Part 221 ................................................................ 10

47 Fed. Reg. 14892 (Apr. 7, 1982) ....................................... 32

75 Fed. Reg. 32318 (June 8, 2010) ....................................... 16

79 Fed. Reg. 29970 (May 23, 2014) ...................................... 17

82 Fed. Reg. 58778 ............................................................... 22

82 Fed. Reg. 58778 (Dec. 14, 2017) ..................................... 17

87 Fed. Reg. 63718 (Oct. 20, 2022) ...................................... 17

Airfare Advertising, Advanced Notice of Proposed
Rulemaking, Docket DOT-OST-2021-0007 (Jan. 15,
2021) ............................................................................................... 52

*Deutsche Lufthansa Aktiengesellschaft v. Civil
Aeronautics Bd.*, 479 F.2d 912 (D.C. Cir. 1973) ............................... 11

Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18,
2011) ............................................................................................... 40

### Legislation

Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat.
1705 (Oct. 24, 1978) ........................................................................ 2

Federal Aviation Act of 1958, Pub. L. 85-726, 72 Stat.
731 (1958) ....................................................................................... 3

Pub L. 85-726, § 403 ............................................. 3, 10, 11, 12, 13, 15, 24, 25, 32

Pub L. 85-726, § 404 ..................................................................... 12, 13, 24

Pub. L. 85-726, § 411 ............................................. 13, 14, 15, 25, 26, 29

Pub. L. 85-726, § 1002(d) ................................................................. 12, 24

## INTRODUCTION

In 1978, Congress enacted the Airline Deregulation Act to begin a decade-long process of "dismantle[ing] the pervasive federal economic regulation of the interstate airline industry." *Hodges v. Delta Airlines*, 4 F.3d 350, 353 (5th Cir. 1993). Congress decided the former system of intrusive Government control over the minutia of air carrier economics had worked to deny travelers the savings and myriad benefits that a deregulated environment could usher in. "The stranglehold of regulation has ironically failed to serve airline interests while it obviously **has not served the public interest**." *Regulatory Reform in Air Transportation, Hearings before the Subcomm. on Aviation of the S. Comm. on Commerce, Science, and Transportation*, 2, 94th Cong. (Mar. 21, 1977) (emphasis added) *Regulatory Reform in Air Transportation*).

This case involves the Department of Transportation's unlawful attempt to reinstate excessive government control over the air transportation industry, in a way which history demonstrates and Congress decided was harmful to the traveling public and the airlines that serve them. In short, the Final Rule at the center of this case, entitled Enhancing Transparency of Airline Ancillary Service Fees, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule), ignores Congressional and Constitutional limits on the Department's power. The Rule effectively restores rate-publication power

eliminated by the Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705 (Oct. 24, 1978) (Deregulation Act), runs roughshod over the Administrative Procedure Act (APA) requirements to reasonably consider statutory policy and reliable economic factors in its Rulemaking, and violates airlines' core First Amendment rights by affirmatively limiting their ability to advertise the lawful sale of travel without optional add-on services. For these reasons, the Rule should be vacated.

Before the Rule was passed, the marketplace and pre-existing regulations ensured that anyone who buys a ticket, bag, or other ancillary service in air transportation knows exactly what they are paying for before making a purchase, 14 C.F.R § 399.85(d)—and as an extra precaution, every traveler has 24 hours after a purchase where they are guaranteed cancellation and a full refund, *id.* § 259.5(b)(4). This new Rule unlawfully exceeds the limitations of the regulatory framework Congress established and purports to address a solution for a nonexistent problem. It will hurt the industry, airlines, and most importantly the traveling public who have most benefited from the innovation and low fares of a deregulated air transportation industry.

Prior to deregulation, the Civil Aeronautics Board (Board) freely exercised rate-regulation authority over air transportation services under "[t]he regulatory scheme created by the Civil Aeronautics Act of 1938 [the 1938 Act], 52 Stat. 973,

977, and subsequently re-enacted in the Federal Aviation Act [the 1958 Act] of 1958, 72 Stat. 731 ….". *Transcon. Bus Sys., Inc. v. Civil Aeronautics Bd.*, 383 F.2d 466, 477 (5th Cir. 1967). Under the 1958 Act, the government required publication of the price and terms of every component of air transportation services through a tariff system, including, *e.g.*, the fare, carry-on bags, checked bags, access to an airport lounge, or drinks and meals, among others. The Board dictated where and how tariff information was to be published, including when certain information about air transportation services needed to be advertised in a special manner. *See, e.g.*, Order 81-8-30, Civ. Aeronautics Bd., Docket 37481 (Aug. 6, 1981) (explaining the Board's special notice authority under Sec. 403(a) of the 1958 Act).

"In 1978, Congress amended the [1958 Act] after determining that efficiency, innovation, low prices, variety, and quality would be best furthered by reliance on competitive market forces in the airline industry." *Hodges*, 4 F.3d at 353. Congress determined the CAB's intrusive control was both killing the airline industry and working against the public interest. In a 1977 hearing considering the legislation which became the Deregulation Act, Senator Cannon explained the situation aptly:

> Investors and financial institutions have blacklisted airline debt and securities because of the paucity of reasonable profits and poor expectations for future profits. The public, on the other hand, has been denied the savings which might have been realized as a result of higher load factors, price competition and less restrictive charter rules. … In

– 3 –

short, there has been little incentive to keep costs in line
and to operate efficiently.

*Regulatory Reform in Air Transportation* at 2.

Passage of the Deregulation Act substantially eliminated government micromanagement of airlines and their relationships with customers, and directly rescinded government authority to mandate publication of rates and charges in interstate air transportation. A new "hands off" era of innovative, efficient air transportation was characterized by a greater diversity of airline products, lower prices, and significant innovation in merchandising, distribution, and other attributes of air travel that provided huge convenience and other benefits to consumers.

The Government took a new focus in "favoring greater reliance upon market forces in the industry," *Regulatory Reform in Air Transportation* at 190, including by way of "encouraging entry into air transportation markets by new and existing air carriers and **the continued strengthening of small air carriers** to ensure a more effective and competitive airline industry." 49 U.S.C. § 40101 (emphasis added). These expectations were met in large part through a new breed of airlines enabled to offer low fares to customers who, before deregulation, could not afford to fly. A key cost-cutting innovation has been the unbundled business model, in which customers pay a base fare for air transportation, and select as needed or desired other

– 4 –

Optional Services, *i.e.* ancillary services such as the ability to change or cancel flights, select specific seats, or take a checked bag.

The unbundled model is now used by virtually all airlines at some level and has been in place for well over a decade. Over this period, the Ultra Low Cost Carriers (ULCCs) found that advertising the base cost of travel first emphasizes that customers do not need to pay for anything more than the cost of their seat. Customers then decide whether they want each ancillary service and always see the total cost before purchase. They are accustomed to how airlines provide prices, but the Department apparently does not trust consumers to understand what they already understand.

Ignoring industry precedent, the Department now seeks to reintroduce a *de facto* rate-filing system which Congress eliminated and flies against decades of Congressional mandates and consumer benefits which will impose costs on the industry and travelers of "more than $33 billion over 10 years." *See* Comments of Airlines for America (A4A) 8 (Jan. 23, 2023), DOT-OST-2022-0109-0090 (citing Campbell Hill Report). With no apparent consideration of consequences, the Rule also redefines the commercial relationships between airlines and ticket agents by substantially shifting commercial bargaining power to the latter, requiring airlines to share real-time rate information or be subject to tens of thousands of dollars in fines each time

a passenger searches for a fare. But most detrimental to the traveling public, the Rule will produce a blizzard of mostly useless information, slowing down consumers' search process and sowing confusion for passengers seeking the lowest fares with just the services they want.

Even if, arguably, the Department had some authority to issue this Rule, the Department failed to consider policy, industry, and economic factors as it was required to do under the Administrative Procedures Act and 49 U.S.C. § 40101. The information the Department **did** consider in its Regulatory Impact Analysis was replete with errors—including a failure to consider the disproportionate costs the Rule imposes on smaller carriers, foreign carriers, and the substantial number of airlines that use dynamic as opposed to static pricing for Optional Services.

Finally, the Rule violates the First Amendment right of airlines by prohibiting the truthful advertising of airline services for the stated purpose of providing convenience to consumers. The Rule fails to satisfy the intermediate scrutiny review required here by *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980), as well as the heightened scrutiny standard applicable under *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). The purported interest to convenience a select group of passengers, while confusing others, is not one which can be claimed as substantial to the Government. The Rule tells airlines there is only one fair way, in

the Government's wisdom, to advertise rates for certain Optional Services—*i.e.* by placing the price of these fees alongside the non-optional airfare price. This deals **not** with an interest in the accuracy of commercial information, unfairness, or deception, but rather features of market competition in which the Government has **no** interest regulating.

The upshot is a threat to not only the broader air transportation industry, but an existential threat to smaller airlines like Spirit and Frontier which rely predominantly on leisure, family, and small business travelers who take advantage of the base fares, a price that is exceptionally low because it does not include Optional Services. Indeed, many customers choose no Optional Services, and a substantial majority do not choose all the Optional Services required to be displayed by the Rule.

Implementing these wholesale changes to airline price-publication requirements will instead overwhelm all travelers with mostly irrelevant information and obscure the fact that fare-conscious customers need not pay any of the extra fees the Rule demands be shown. Confusion will in turn lead to reduced bookings, as customers question whether they can even afford to fly. Ultimately, it is the cost-sensitive public that relies on the unbundled model which faces the most harm.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 49 U.S.C. § 46110 which permits "a person disclosing a substantial interest in an order issued by the Secretary of Transportation … in whole or in part under this part" [49 U.S.C., Subtitle VIII, Part A] to obtain review of that rule in a United States Court of Appeals. Spirit filed its petition for review in the U.S. Court of Appeals for the Eleventh Circuit on June 28, 2024, where venue was proper based on its principal place of business in Dania Beach, Florida. *Id.* Because the petitioners in the Airlines for America (A4A) case, No. 24-60231, filed a petition in this Court challenging the same Rule on May 10, 2024, the Eleventh Circuit was required to and did transfer Spirit's petition to this Court under 28 U.S.C. § 2112(a)(5). Spirit's petition is timely because it was filed "not later than 60 days after" the Rule was issued. 49 U.S.C. § 46110. On July 26, 2024, Frontier timely moved to intervene in Spirit's case under Federal and Fifth Circuit Rule 15(d), which this Court granted on July 29, 2024. ECF No. 27, Order, No. 24-60373 (5th Cir. July 29, 2024).

## STATEMENT OF ISSUES PRESENTED

1. Whether the Rule should be vacated because the Department lacks authority to mandate the time, place, and manner of publishing pricing information for

interstate air transportation components following passage of the Airline De-
regulation Act of 1978.

2. Whether the Rule should be vacated because it is arbitrary, capricious, an
   abuse of discretion, or otherwise contrary to law for failing to consider its ef-
   fects on competition, efficiency, innovation, low prices, the continued
   strengthening of small air carriers as expressly required by 49 U.S.C. § 40101,
   and because it was based on a regulatory-impact analysis lacking valid infor-
   mation.

3. Whether the Rule should be vacated because it violates the First Amendment
   by restricting airlines from truthfully advertising the price of standalone air-
   fare tickets, when less restrictive means exist and are already in place to pro-
   vide consumers information regarding optional services and products.[1]

## STATEMENT OF THE CASE

Before 1978, airline routes and fares were regulated like a public utility re-
quiring Government approval. All airline prices and associated restrictions and fees

---

[1] Spirit and Frontier adopt by reference the issues and arguments raised in the Brief of
Petitioners for Case No. 24-60231. *See* Fed. R. App. Proc. 28(i).

required Government-approved Tariffs available for review at airports. Bargain travel was virtually non-existent.

Several pre-deregulation statutory provisions must be considered to understand the scope of the government's previous authority to regulate the airline industry. Under section 403(a) of the 1958 Act, the Government "require[d] carriers to disclose specific information to passengers" about the charges for air transportation, whether by publication or by "imposing special notice requirements with respect to any specific tariff rule." Order 81-8-30, at 2, *Capitol Int'l Airways, Inc., Scheduled Flight Cancellations Enforcement Proceeding*, Civ. Aeronautics Docket 37481 (Aug. 6, 1981).

Section 403(a) of the 1958 Act stated as relevant here:

> (a) Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it … and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe ....

Pub L. 85-726, § 403(a). This authority required carriers to publish information on the face of an airline ticket or to make it available at places where customers interacted with the airline (*e.g.,* at the airport and ticket sales offices).

Section 403 requirements, as formerly implemented through 14 C.F.R. Part 221, are explained in the 1972 *Lufthansa* case in which the D.C. Circuit upheld the Board's rate publication authority in considering a stay to rules implementing a special notice requirement to passengers of baggage liability terms and conditions.

> Section 403(a) of the Act regulates the Board's authority to order the filing, posting and publication of tariffs and regulates the information to be contained in the tariff. We believe the reason Congress requires that the tariffs be published is to provide the public with the information the tariffs contain and to insure that the public receives adequate notice of the tariff's contents.

*Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Bd.*, 479 F.2d 912, 919 (D.C. Cir. 1973); *accord* Order 72-2-61, Docket 20853, Civ. Aeronautics Bd. (Feb. 16, 1972) ("We [] concluded that the public interest required that we invoke the posting provisions of section 403(a), in conjunction with our broad regulatory powers under section 204(a), to require air carriers and foreign air carriers to include, in their passenger tickets, a notice reflecting the specifics [of baggage liability limitations]....") (emphasis added).

The Deregulation Act "effectively removed the DOT's jurisdiction over domestic fares and the DOT ceased approving or accepting tariff filings on January 1, 1983." *In re Transpacific Passenger Air Transp. Antitrust Litigation*, No. C 07-05634 CRB, 5 n.6 (N.D. Cal. Sep. 23, 2014) (quoting 14 C.F.R. § 399.40; Tariffs for Post-

– 11 –

1982 Domestic Travel (April 7, 1982), 47 FR 14892-01 ("the intent of the statute would be best fulfilled by reading it to prohibit tariff filings for transportation provided after the sunset date")).

Section 404 of the 1958 Act made it a violation for airlines to provide, with or without charge, any component of air travel without first publishing its price, terms, or policies in a tariff or in compliance with any special notice requirements established by the Board. A violation occurred if a service provided was not listed in a tariff, as well as if a service was listed in a tariff but offered for more or less, or on different terms, than the tariff.

Through section 1002(d) of the 1958 Act, the Board reviewed alleged violations of sections 404 and 403, after "notice and hearing," to determine whether a practice was "unjust, unreasonable, unduly preferential and prejudicial, unjustly discriminatory and otherwise unlawful." *Trailways of New England, Inc. v. Civ. Aeronautics Bd.*, 412 F.2d 926, 928 (1st Cir. 1969); *accord Transcon. Bus Sys., Inc.*, 383 F.2d at 473.

This Court discussed the Board's regulatory framework for rate-publication authority in *Transcontinental Bus Systems, Inc.*:

> The Board is empowered and charged under § 1002 with the responsibility of enforcing the foregoing [Section 403 and 404] requirements as well as other provisions of the Act. Section 1002 gives the Board the power, either upon

the filing of a complaint or on its own motion, to suspend and investigate tariffs when there is a reasonable ground to believe that a violation of the Act has been established. Under the language of the section, the Board has broad discretionary powers with respect to whether to investigate or suspend a tariff, *Nebraska Dept. of Aeronautics v. CAB*, 298 F.2d 286 (8 Cir. 1962)….

*Transcon. Bus Sys., Inc.*, 383 F.2d at 477-78 (5th Cir. 1967); *accord Lichten v. E. Airlines, Inc.*, 189 F.2d 939, 940-41 (2d Cir. 1951).

Section 411 of the 1958 Act, the precursor and identical authority to 49 U.S.C. § 41712, authorized the Board to conduct an adjudicatory investigation to determine whether a carrier engaged in unfair and deceptive practices and unfair methods of competition after notice and hearing. "Practices determined to be in violation of this section 'shall' be the subject of a cease-and-desist order." *Nader v. Allegheny Airlines*, 426 U.S. 290, 300 (1976).

Section 411 was enacted as a mirror authority to that of Section 5 of the Federal Trade Commission Act, as amended by the Wheeler-Lea Act of 1938. Primarily, these provisions sought to restrain anticompetitive conduct such as that prohibited by the Clayton and Sherman Acts, as well as other limited areas of consumer protection. Section 411 was not a rate-publication authority. This was consistent with case law, legislative history of Section 403, 404, and 411, as well as the historical

– 13 –

reliance of Section 411 authority by the board in its enforcement orders and other regulatory decisions.

In hearings to consider legislation expanding the Department's Section 411 authority in 1992, examples of unfair or deceptive practices regulated by the Department were described to include "misrepresentation of quality of service, type or size of aircraft, departure times, points served, numbers of stops, total trip time, misrepresentation of fares and charges, and misrepresentations that discounts are available when they are not." *Airline Advert. Reform Act of 1991*, at 2, *Hearing before the Subcomm. on Aviation of the H. Comm. on Public Works and Transportation*, 102nd Cong. (Sept. 24, 1992).

Under section 411 the Board enforced against conduct **other than publication of pricing information**, such as the truthfulness of a statement advertising air travel services, or if an airline misrepresented the terms and conditions of its services in advertisements—for example, issuing a confirmed ticket when, because of undisclosed overbooking, a confirmed reservation did not guarantee a seat on the flight.

I.  **The Airline Deregulation Act of 1978 Abolished Nearly All Direct Government Regulation Over Domestic Carrier Routes, Pricing, Services, And Accommodations**

The Deregulation Act promoted to the maximum extent possible competitive forces to improve service, stimulate innovation, and lower fares in an industry historically "*constrained by excessive regulation*" and "*bureaucracy.*" 124 Cong. Rec. H38525-26 (Oct. 14, 1978) (statement of Rep. Harsha); *accord Morales v. TWA*, 504 U.S. 374, 378 (1992) ("Congress, determine[ed] that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality . . . of air transportation services'…." (citations omitted); 124 Cong. Rec. H38521 (Oct. 14, 1978) (statement of Rep. Anderson) (the Deregulation Act "requires the [Department] to place maximum reliance on actual and potential competition; to encourage entry by new carriers; to strengthen small air carriers; and to encourage low-fare service.").

"In 1984, additional statutory amendments were required to actually phase out CAB; Congress codified these in the 'CAB Sunset Act,' which transferred CAB's duties to other agencies. Pub. L. No. 98-443, 98 Stat. 1703 (1984)." *Statland v. Am. Airlines*, 998 F.2d 539, 540-41 (7th Cir. 1993). By that time, Section 403 rate-filing requirements were already phasing out, and only "sections [404 and 411] on which

all existing consumer protection regulations for airline passengers are based" remained from the 1958 Act. *Id.* Only the single sentence relating to "safe and adequate" air transportation remained from Section 404 and moved to what is now 49 U.S.C. § 41702. H.R. Rep. No. 98-1025 (Conf. Rep.), at 14. Section 411 became 49 U.S.C. § 41712. Authority over interstate (domestic) air transportation was eliminated from Section 403, and it was moved to 49 U.S.C. Chapter 415 which applies only to Foreign Air Transportation.

Innovation and new entry continued in the decades following deregulation, enabling new entrant airlines like Spirit and Frontier to introduce and pioneer the ULCC model, which provides the most value and choice to customers who likely would not fly otherwise. Indeed, this was the quintessential goal of deregulation in bringing "[e]ntirely new groups of consumers previously precluded from air travel due to high costs … in the market for airline tickets." 124 Cong. Rec. S37418 (Oct. 14, 1978) (statement of Sen. Kennedy). Sales and advertising of unbundled fares and ancillary fees have now been a common practice of the industry since at least 2010.

## II. The Department Already Addressed the Issue of Making Optional Service Fee Information Available Through Less Burdensome Means on A Carrier's Website in its 2011 Rulemaking

In 2010, the Department proposed "requir[ing] carriers that have a Web site accessible to the general public to disclose all fees for optional services to consumers through a prominent link on their homepage that leads directly to a listing of those fees…." 75 Fed. Reg. 32318, 32329 (June 8, 2010). This proposal was the Department's solution to making Optional Service fees more conspicuous for consumers:

> The Department feels that having all of the fees for optional services in one place for consumers to review will help ensure that consumers do not encounter such charges unexpectedly and that they can more easily compare these charges among competing carriers. Additionally, disclosure as proposed will result in this important cost information being presented in a clear and concise form and reduce the prospect of delays at the airport and in-flight that can occur when the consumer is unaware of charges for optional services.

*Id.* The Final Rule cemented this solution. 76 Fed. Reg. 23110, 23110 (Apr. 25, 2011) (creating 14 C.F.R. § 399.85, Notice of baggage fees and other fees). Today, all airlines have duly adopted this requirement, ensuring that every traveler knows exactly what the cost of their air travel will be, before making a purchase. *See* 89 Fed. Reg. at 34673 ("[c]arriers selling tickets in the United States **already display baggage fees, and any ticket restrictions information on their websites**, as required by existing regulation (14 C.F.R. § 399.85(d)" (emphasis added)).

### III. The Department Re-Opened the Issue of Publishing Rate Information for Optional Services in 2014 and After a 10-year Rulemaking Fraught with Inconsistent Government Positions Finally Landed on the 2024 Rule

The Department issued an NPRM to reopen this issue in 2014, 79 Fed. Reg. 29970, 29970 (May 23, 2014), which it ultimately withdrew, finding it unnecessary:

> The Department is committed to protecting consumers from hidden fees and to ensuring transparency. However, we do not believe that Departmental action is necessary to meet this objective at this time. The Department's existing regulations already provide consumers some information regarding fees for ancillary services.

82 Fed. Reg. 58778, 58778 (Dec. 14, 2017).

In 2022, the issue was re-opened, yet again, in the instant rulemaking. 87 Fed. Reg. 63718, 63718 (Oct. 20, 2022). The Final Rule at issue was published on April 30, 2024. 89 Fed. Reg. at 34620.

In adopting the Rule, the Department took the first step towards slamming the door on an era of innovation and free-market competition mandated by Congress. Contrary to deregulation, the Rule creates a code of proper conduct on fundamental aspects of airline business models by imposing the following requirements, as relevant here:

- "Each … carrier that provides fare, schedule, and availability information for air transportation within, to, or from the United States to [ticket agents] … must disclose fee and policy information for critical ancillary fee services to that entity. … [in a form that is] useable, current, accurate, and sufficient to ensure compliance by such entities." 89 Fed. Reg. at 34677;

- Fees cannot be displayed through a hyperlink. 89 Fed. Reg. at 34621, 34650;

- Carriers and ticket agents selling airline tickets must disclose critical ancillary service fees **on the first page of their online platforms** where consumers are directed after searching flight options on other online platforms. 89 Fed. Reg. at 34622;

- Carriers and ticket agents must disclose fees for critical ancillary services as passenger-specific itinerary information if a consumer conducts a passenger-specific itinerary search. 89 Fed. Reg. at 34654-56;

- Airlines and ticket agents must disclose fees and policies for critical ancillary services on airlines' or ticket agents' online platforms. 89 Fed. Reg. at 34675-77;

Throughout the rulemaking, both Spirit and Frontier submitted comments actively voicing their concerns that the Rule would harm competition, increase costs, and ultimately result in consumer confusion—not consumer protection. Frontier emphasized the ULCC business model as one of the reasons why air travel is affordable for millions of Americans, and how "[i]f finalized, the [Rule] would make it impossible for ULCCs to continue to offer consumers the benefit of unbundled service options and ultra-low fares as they do today." Frontier Airlines, The NPRM is a Solution Searching for a Problem: Consumer Confusion, Not Consumer Protection, 12 (Mar. 30, 2023), DOT-OST-2022-0109-0728. Frontier highlighted that, "[a]s compared to [the] bundled business models [of other, larger carriers], the unbundled ULCC model is more transparent, more economically efficient, and delivers lower total trip costs, enabling increased access to air travel for all." *Id.* at 2.

Spirit emphasized the unique benefit of its unbundled model. "When the consumer has entered their itinerary, Spirit provides multiple opportunities to choose either bundled ancillary services or individual ancillary services." Comments of Spirit Airlines, Inc., 5 (Jan. 23, 2023), DOT-OST-2022-0109-0092. Spirit also highlighted the importance of deregulation and how much the pro-competitive regulatory environment of the past half-century has primarily benefited, consumers, which "led to the real domestic price per mile for airline tickets declining more than 50% since 1979." *Id.* at 9. Indeed, empowering consumers to choose how they want to travel is the entire purpose of the unbundled model.

## SUMMARY OF THE ARGUMENT

The Department seeks to re-instate rate-publication requirements from a pre-deregulation which Congress eliminated. This will drastically alter key aspects of the marketing and sales of airline services. It forces airlines, with just a few months' notice, to fundamentally restructure their sales, distribution, marketing technology, and display of price information which is familiar to and has served to the satisfaction of hundreds of millions of passengers for more than a decade.

The Rule creates a breathtaking number of requirements and imposes on the airlines an impossible deadline to implement the broad technological restructuring needed to comply. Airlines with dynamic pricing models like Spirit and Frontier are

extraordinarily and disproportionately burdened by the cost of information technology changes required to implement the Rule's requirements for displaying rates based on individual customer searches.

The Rule should be vacated—not only because it is unlawful and unconstitutional, but because it is unprecedented and would harm the most vulnerable cost-sensitive members of the traveling public worst. *First*, the Department lacks the authority to mandate the publication of rates for interstate (domestic) air transportation services, *i.e.*, the time, place, and manner of publishing rates for optional baggage services. Congress abolished any prior authority the Government held in this area through deregulation. This Government intrusion not only seeks to stifle an era of innovation and cost-reductions by mandating the return of rate-publication requirements just like pre-1985 tariffs, but it attempts to control discrete aspects of commercial decisions down to micro-managing the negotiated contractual relationship between airlines and ticket agents (travel agents) by requiring what information airlines provide to those agents– severely undermining airline control of product distribution.

*Second*, the Rule is arbitrary and capricious. The Government failed to consider the statutory mandates and legislative history of deregulation legislation which

require maximum reliance on low-cost competition from smaller carriers like Frontier and Spirit. The Government provided no basis to support its arbitrary 6- and 12-month implementation timelines during which airlines must re-invent their entire technology infrastructure just to provide already easily available information for Optional Services on a real-time basis millions of times each day. *See generally*, ECF No. 12-2, Special Appendix to Opposed Emergency Mot. for Stay, at SA18-SA51, No. 24-60373 (5th Cir. July 26, 2024) (explaining the over $1 billion in harm the rule would impose collectively on Spirit and Frontier due in part to the Rule's 6- and 12-month implementation timelines).

Further, the Department prepared an economic regulatory analysis with no basis in fact, ignoring the cost to nearly every airline, ticket agent, and other third-party for implementing the technology required to facilitate the rule requirements. The cost-benefit Regulatory Impact Analysis conjured up alleged benefits for millions of passengers who have no need for the information at the time, place, and manner required by the Rule because either they do not purchase Optional Services, or they can quickly see the cost of those services through the hyperlinks provided on the first look/page.

*Third*, the Rule violates the First Amendment by restricting airlines and ticket agents from truthfully advertising the price of standalone airfare tickets, when less

restrictive means exist and are already in place to provide consumers information regarding optional services and products (Optional Services). *See generally Cent. Hudson Gas & Elec. Corp*, 447 U.S. at 562-63; *Sorrell*, 564 U.S. at 572. Information about these services is available on a first-look basis through prominent links on both airline websites. Current practices do not harm the asserted government interest in ensuring consumers who want Optional Services know the price before purchasing a flight—which is exactly the position the government took when it concluded a prior rulemaking on this same issue. *See* 82 Fed. Reg. at 58778.

One of the best attributes of the ULCC model used by both Frontier and Spirit is that consumers have **full autonomy to choose** what services they want, and to not choose (and not pay for) services they do not want. The Department side-stepped the fundamental purpose of deregulation and instead bulldozed ahead with the Rule they wanted to implement from the very beginning ten years ago. In doing so the Department proceeded without statutory authority, without considering required information, and in violation of First Amendment protections over core commercial speech.

## STANDARD OF REVIEW

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right…." 5 U.S.C. § 706. When an agency acts pursuant to its rulemaking authority, a reviewing court determines whether the resulting regulation exceeds the agency's statutory authority or is arbitrary and capricious. *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (citing *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990)). As this Court recently held, "where 'Congress wanted to provide for' reporting and disclosure of certain information, 'it did so explicitly.'" *Nat'l Assoc. of Priv. Fund Mgrs. v. SEC*, Case No. 23-60471 (5th Cir., June 5, 2024) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 440 (2002)).

## ARGUMENT

### I.  Congress Abolished Government Rate-Publication Authority for Interstate (Domestic) Air Transportation Services

The Deregulation Act abolished Government authority to require airlines to publish prices for fares and optional services at specific times, places, and in specific ways through the rescission of section 403(a) of the 1958 Act, "the heart of common-carrier" regulatory schema. *MCI Telecomms. Corp.* v. *Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994). In the context of the Interstate Commerce Act, which served as [the 1938 Act's] model … rate filing was Congress's chosen means of preventing

unreasonableness and discrimination in charges. *MCI Telecomms. Corp.*, 512 U.S. at 229 (citing *Texas and Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 440, (1907); *Robinson v. Baltimore and Ohio R. Co.,* 222 U.S. 506, 508-509 (1912)).

Under section 1002(d), the Board reviewed alleged violations of sections 404 and 403, after "notice and hearing," to determine whether a practice was "unjust, unreasonable, unduly preferential and prejudicial, unjustly discriminatory and otherwise unlawful." *Trailways of New England, Inc. v. Civ. Aeronautics Bd.*, 412 F.2d 926, 928 (1st Cir. 1969); *accord Transcon. Bus Sys., Inc.*, 383 F.2d at 473.

> The Board's regulation requires that the tariff schedule contain not only the rates and charges but also the terms, conditions, or other provisions which 'affect the rates, fares or charges.' Therefore the schedule must contain provisions with respect to all services and facilities which affect the rates, and it appears clear to us that a requirement of reconfirmation of space has a direct effect upon the fares charged. In *Trammell v. Eastern Air Lines*, D.C.W.D.S.C., 136 F.Supp. 75 (1955), where a passenger failed to reconfirm his reservation and as a consequence his space was sold to another, it was held that the passenger was bound by the tariff provision requiring reconfirmation.

*Goodman v. Nat'l Airlines, Inc.*, 201 A.2d 877, 880 (D.C. 1964).

Section 411 of the 1958 Act, now 49 U.S.C. § 41712, authorized the Board to investigate an alleged unfair or deceptive practice or unfair methods of competition "by an air carrier, foreign air carrier or ticket agent," and after notice and hearing order the carrier or ticket agent to "stop the practice or method." That section never

granted the Government rate-publication authority for fares, any other charges associated with air transportation, or their terms and conditions. Under section 411, the Board could challenge specific conduct **other than where and how prices were published**, such as the truthfulness of advertising air travel services or the misrepresentation of the terms and conditions of its services. Meanwhile, Rate-publication powers and regulations came exclusively from Section 403.

Removal of Section 403 and 404 authority advanced the Congressional intent to promote innovation, such as offering the public unbundled, lower-cost air fare and services. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995) (citations omitted). Even the removal of a single, material word must be given meaning, as the "most likely inference in these circumstances is that Congress deliberately dropped the term." *U. S. v. Wells*, 519 U.S. 482, 493 (1997) (cited by Scalia & Garner, at 257). "Far less consequential agency rules have run afoul of the major questions doctrine." *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 595 U.S. 109, 122-23 (2022) (citing *MCI Telecomms. Corp.*, 512 U.S. at 231 (eliminating rate-filing requirement)).

If the incorrect, alternative reading of Section 411/41712 the Government proposes were to be accepted, the effects of such an expansive interpretation of government power would reach far beyond the air transportation statutes at issue before this Court. Every federal agency which shares identical authority to prevent unfair/deceptive trade practices modeled on the Interstate Commerce Commission powers, such as the FTC through Section 5 of the Federal Trade Commission Act, would instantly have far-reaching authority to dictate how and even whether any good or service is advertised in any industry, economy-wide under the asserted justification of providing convenience or minimizing confusion.

## A. The Rule Creates a Penalty for Not Publishing Ancillary Service Rates at the Time, Place, and in the Manner Prescribed by the Government, Exactly Like a Pre-Deregulation Tariff

"Rate filings are, in fact, the essential characteristic of a rate-regulated industry. It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—-- and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." *MCI Telecomms. Corp.*, 512 U.S. at 230-31. Prior to deregulation, the Government "require[d] carriers to disclose specific information to passengers" regarding charges for air transportation, whether by publication or by "imposing special notice requirements with respect to any specific

tariff rule." Order 81-8-30, CAB Docket 37481 (Aug. 6, 1981). This included placing required information on the face of a ticket or at places where customers interacted with the airline (*e.g.*, at airport and ticket sales offices).

"[T]he Act's Procedural and Administrative Provisions … are premised upon the tariff-filing requirement …." *MCI Telecomms. Corp.*, 512 U.S. at 230-31. "The provisions allowing customers and competitors to challenge rates as unreasonable or as discriminatory, *see* 47 U.S.C. §§ 204, 206-208, 406, would not be susceptible of effective enforcement if rates were not publicly filed." *MCI Telecomms. Corp.*, 512 U.S. at 230-31 (citing *Maislin Indus., U.S. v. Primary Steel*, 497 U.S. 116, 132 (1990)).

"In order to render rates definite and certain, and to prevent discrimination and other abuses, the statute required the filing and publishing of tariffs specifying the rates adopted by the carrier, and made these the *legal* rates, that is, those which must be charged to all shippers alike." *Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370, 384 (1932).

The Rule ignores the purpose of deregulation by re-introducing specifically how, when, and where airlines publish rates for specific air transportation services— in this case the cost of a carry-on bag, the first checked bag, the second checked bag, and any other service the Department deems "critical" in the future. This epitomizes

the Department's view of an "idealized" standard product for air travel, contrary to Congressional intent of promoting innovation and a diversity of offerings in air travel. By dictating how airlines display **services not required for a customer to fly**, the Department acts as if it holds the same pre-deregulation authority exercised by the CAB under provisions of law terminated by Congress. In doing so, the Department fails to give "*real and substantial effect*" to acts of Congress. *Stone v. INS*, 514 U.S. 386, 397 (1995). No matter how it is framed, the Rule either regulates publication of fares or their underlying terms and conditions—both amount to reinstatement of now-abolished rate-filing requirements.

### B. The Department Previously Observed that Prohibited Conduct Under Section 41712 Requires Deception or Threats to Competition

How an entity promotes and sells its products is the *sine qua non* of a competitive marketplace. "Section 411 was modeled closely after § 5 of the Federal Trade Commission Act, which similarly prohibits 'unfair methods of competition in commerce, and unfair or deceptive acts or practices' and provides for issuance of a complaint 'if it shall appear to the Commission that a proceeding by it . . . would be to the interest of the public.' 38 Stat. 719, as amended, 15 U.S.C. § 45." *Am. Airlines, Inc. v. N. Am. Airlines, Inc.*, 351 U.S. 79, 82 (1956). Section 41712 was always intended to focus on violations akin to those prohibited by the Clayton and Sherman Acts and other very limited areas unrelated to the publication of airline practices.

In 1992, seven years after passage of the CAB Sunset Act, the Department observed that unfair and deceptive practices contemplated in Section 411 required some form of deception or threat to airline competition. It stated:

> The Association's petition assumes in large part that we should prohibit practices considered unfair by some consumers or businesses, even if they involve no deception or threat to airline competition. This is an incorrect reading of section 411, for that section does not give us unlimited authority to regulate airline practices. To adopt the more expansive interpretation of section 411 proposed by the Association would frustrate Congress' decision that the public will benefit if airline fares and services are determined by market forces rather than government regulation. . . .
>
> Furthermore, even apart from Congress' decision to deregulate the airline industry, the courts have held that section 5 [of the FTC Act] does not give the FTC unlimited authority to proscribe competitive practices that it considers unfair or undesirable.

Order 92-5-60, Dep't of Transp. Dockets 46280 & 47539 (May 29, 1992); *accord House Comm. on Pub. Works and Transp. Rep.* on the *Civ. Aeronautics Bd. Sunset Act of 1983*, H.R. Rep. No. 98-793 (May 21, 1984).

There is no evidence Congress intended 49 U.S.C. 41712 to authorize Department micromanagement of the competitive marketplace under the guise of "simplifying" transactions. *Cf. N. Am. Airlines, Inc. v. Civ. Aeronautics Bd.*, 228 F.2d 432,

n.13 (1955) ("It would seem that the function of the Board like that of the Commission in situations such as this has limitations; certainly under the guise of prohibiting unfair or deceptive practices or unfair methods of competition, it may not impose a code of fair competition upon an industry" (citations omitted)).

Based on the elimination of rate-publication authority for interstate air transportation and the legislative history of the ADA, it is clear that Congress rejected this kind of indirect price control. *See also Morales*, 504 U.S. at 388-89 ("compelling or restricting price advertising surely 'relates to' price." (quotation omitted)). There is no evidence that Congress ever authorized the use of rate-publication authority in connection with enforcement against unfair and deceptive practices—a wholly different sphere of regulation. Consumer regulations like overbooking or refund policies where consumers are locked in and have no choice or options are very different from making a voluntary choice about price publication for determining which airline to fly and what services to purchase. Such regulations are completely unlike rate publication elements of carrier pricing which were left to competition by that Deregulation Act.

This is consistent with the Congressional mandate in the ADA of a hands-off regulatory scheme to support innovative, low-cost services. *See* 49 U.S.C. § 40101 (policy factors); § 41109 (restricting the Department from "adding or changing

schedules, equipment, *accommodations*, and facilities for providing the authorized

transportation *to satisfy business development and public demand*.”).

### C. The Department's Actions Violate the Major Questions Doctrine by Attempting to Re-Implement Rate-Regulation Authority in Interstate Air Transportation, which Congress Eliminated

Congress has shown that it can and will provide regulatory authority, such as

in 49 U.S.C. Chapter 417 addressing the “Operations of Carriers”, if it intends for the

Department to address new issues including in consumer protection. Over the years,

Congress has added new provisions to Chapter 417 when it wants the Department

to regulate in new ways. These areas have included, *e.g.*, individuals with disabili-

ties, wheelchairs, joint venture agreements, musical instruments, strollers, cell

phones, etc. But the Department can point to nothing that shows Congress wanted

it to regulate the publication of rates for interstate (domestic) air travel.

Further evidence of Congressional intent to eliminate Department authority

over Rate-publication requirements is shown by the transfer of rate-filing authorities

from Section 403 of the 1958 Act to 49 U.S.C. § 41504 which applies *only to foreign*

*air transportation* and has been largely abdicated by the Department since 1999. *See*

49 U.S.C. § 41504 (“In the way prescribed by regulation by the Secretary of Trans-

portation, every air carrier and foreign air carrier shall file with the Secretary, **pub-**

**lish, and keep open to public inspection, tariffs showing the prices for the** *foreign air*

*transportation* … [which] (1)shall contain—…(B)a **statement of the prices** in money of the United States…." (emphasis added)).

Shortly after the Deregulation Act was passed, the Board considered whether the Act "does not prohibit carriers from posting tariffs for sales before the date of transportation to be performed afterward, or even that it requires such posting …." 47 Fed. Reg. 14892, 14892 (Apr. 7, 1982). The Board concluded "that the intent of the statute would be best fulfilled by reading it to prohibit tariff filings for transportation provided after the sunset date," and prohibited carriers from doing so, accordingly. *Id.*

Through this Rule, the Department intends to reinstate a rate-filing requirement like what the Supreme Court held violated the Major Questions doctrine in *MCI*. *MCI* presented the inverse situation where Congress had *not* eliminated a statutory rate-filing requirement for telecommunications carriers, but the FCC determined it would eliminate such requirement industry-wide by regulation.

The Court further explained its reasoning in *Whitman*:

> Just as we found it "highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion -- and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements," *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co., supra,* at 231, so also we find it implausible that Congress would

– 33 –

give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards. Accord *Christensen* v. *Harris County,* 529 U.S. 576, 590, 146 L. Ed. 2d 621, 120 S. Ct. 1655, n. (2000) (SCALIA, J., concurring in part and concurring in judgment) ("The implausibility of Congress's leaving a highly significant issue unaddressed (and thus 'delegating' its resolution to the administering agency) is assuredly one of the factors to be considered in determining whether there is ambiguity".

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468-69 (2001).

The Department's unlawful Rule here is no different, except that Congress **did** eliminate rate-filing requirements through the Deregulation Act and the Department is now trying to re-implement them by regulatory fiat in contravention of law. Importantly, nothing "in the [1958] Act gives the Board license to resort to the full spectrum of board social policy considerations … [beyond] factors which Congress has by statute deemed material, and those factors which regulatory practice in the transportation industry has, through experience, found relevant." *Transcon. Bus Sys., Inc.*, 383 F.2d at 484. "[W]hile the [Department] has acquired an expertise in matters relating to air transportation, that expertise does not extend to and include all the social policy factors which it here argues it may evaluate and consider." *Id.*

"Precedent teaches that there are 'extraordinary cases' in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic

and political significance' of that assertion, provide a 'reason to hesitate before con-

cluding that Congress' meant to confer such authority." *W. Va. v. EPA*, 597 U.S. 697,

700-01 (2022) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120,

159-60 (2000)).

## II.  The Rule violates the Administrative Procedure Act Because the Department Implemented an Arbitrary Decision without Considering All Required Information

Agency action under the APA must be ignored if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"Arbitrary and capricious review focuses on whether an agency articulated a rational

connection between the facts found and the decision made." *Mex. Gulf Fishing Co.

v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *ExxonMobil Pipe-

line Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (internal quota-

tion marks and citation omitted)). The agency is required to consider all "relevant

factors" before making a reasoned decision. *E.g.*, *Mich. v. EPA*, 576 U.S. 743, 743

(2015).

"Courts must exercise their independent judgment in deciding whether an

agency has acted within its statutory authority, as the APA requires." *Loper Bright

Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). Courts do not rely on an agency

assertion that the scope of a rule is authorized under its rulemaking authority. *Id.* (citing *Mich.*, 576 U.S. at 743).

### A. The Department Failed to Reasonably Consider The Effects of the Rule on Competition, Efficiency, Innovation, Low Prices, and the Continued Strengthening of Small Air Carriers as Expressly Required by 49 U.S.C. § 40101

The Department ignored its "unique obligation to consider the effect of a new rule upon" the numerous statutory mandates contained in section 40101, which are the express purpose of the Deregulation Act. *Bus. Roundtable v. SEC* 647 F.3d 1144, 1149 (D.C. Cir. 2011). Congress directed the Department to consider whether the Rule is "in the public interest and consistent with public convenience and necessity." 49 U.S.C. § 40101. "The standards to be applied by the [Department] in enforcing the Act are broadly stated in § [40101], *PAN AM v. U.S.*, 371 U.S. 296, 308 (1963):

- "placing maximum reliance on competitive market forces and on actual and potential competition," § 40101(a)(6);

- "avoiding unreasonable industry concentration, excessive market domination, monopoly powers, and other [anticompetitive] conditions," § 40101(a)(6);

- "the continued strengthening of small air carriers to ensure a more effective and competitive airline industry," § 40101(a)(13);

- "the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices," § 40101(a)(4);

- "encouraging, developing, and maintaining an air transportation system relying on actual and potential competition—
  (A) to provide efficiency, **innovation**, and low prices; and
  (B) to decide on the variety and quality of, and determine prices for, air transportation services." § 40101(a)(12).

The Rule failed to consider, or indeed even acknowledge, many of these factors. During a House conference report where the Airline Deregulation Act was debated and discussed in October 1978, Congressman Johnson of California went to the floor to emphasize a purpose behind deregulation was to open up competition to benefit smaller airlines like Spirit and Frontier:

> "The public interest under the new statute is permitting the forces of the free marketplace to operate as quickly as possible. … This is particularly important for the smaller airlines…**In sum, Congress does not want the Civil Aeronautics Board or the Justice Department to attempt to regulate the structure of this industry beyond the purview of the antitrust laws.** Such an attempt would be inconsistent with the rapid deregulation of airline routes and rates which the administration sought and the bill portends."

H.R. Rep. No. 96-5, at 984 (1979) (emphasis added).

While the Department uses the word "competition" 57 times in the Rule, not once does it analyze the Rule's impact on competition beyond one-sentence, threadbare conclusion amounting to the Department simply disagreeing with many commenters. *See, e.g.,* 89 Fed. Reg. at 34627-28 ("The harm that consumers experience

is not outweighed by benefits to consumers or competition because consumer confusion about applicable bag fees harms, rather than benefits, competition and creates less than optimal purchasing decisions by consumers."). Nothing in the ADA is intended to guarantee every consumer will make an "optimal purchasing decision," and Spirit and Frontier are unaware of any federal agency that has ever asserted such a basis for a regulation. Moreover, the Department's burden "*is **not** satisfied by an agency decision that ignores an important aspect of the problem before it or relies upon a threadbare explanation.*" *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (emphasis added) (holding that DOT failed to consider the impact of its decision on competition).

### B. The Department's Economic Assessment Leaves Out Hundreds of Millions to Billions of Dollars in Implementation Costs and Is Otherwise Based on Threadbare or Unreliable Factual Information.

It is axiomatic that "an agency must cogently explain why it exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). Under the APA, agency action must be set aside as arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," *id.* at 43, or failed to consider a "relevant factor[]," *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023) (citation omitted).

"An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040. (D.C. Cir. 2012). "[F]ailure to 'apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious and not in accordance with law." *Bus. Roundtable v. SEC*, 263, 647 F.3d 1144, 1148 (2011) (quoting *Chamber of Commerce*, 412 F.3d 133, 144 (D.C. Cir. 2005); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (stating the rule was arbitrary and capricious because agency failed to consider a factor required by statute)). Courts "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

In conducting this "searching and careful" analysis, *Marsh*, 490 U.S. at 378 (citation omitted), the Court may consider only the reasoning "articulated by the

agency itself," *State Farm*, 463 U.S. at 50. Here, the Department has failed to articulate a satisfactory explanation for the Rule under the statutory parameters Congress has established.

To comply with the APA, the Department was required to assess the economic implications of its actions under various laws, including the policy factors established in 49 U.S.C. § 40101 ("the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity"); *see also* 5 U.S.C. §§ 603, 604 (Regulatory Flexibility Act); 44 U.S.C. § 3501 et seq. (Paperwork Reduction Act); 2 U.S.C. § 1532 (Unfunded Mandates Reform Act); Exec. Order No. 13563, 76 Fed. Reg. at 3821 (Jan. 18, 2011) (requiring agencies to "tailor . . . regulations to impose the least burden on society" and account for "the costs of cumulative regulations").

In violation of these statutory duties, the Department makes up costs and benefits, and ignores the economic policy factors Congress demanded it consider. Section 40101 does not permit the Department to punt on these hard questions in quantifying costs. When conducting a cost-benefit analysis, an agency "must identify benefits that 'bear a rational relationship to the costs imposed.'" *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) (alteration adopted; citation omitted). Here, these obligations were not met.

1. **The Department Completely Ignored the Extensive Up-front and Ongoing Implementation Costs to Implement the Rule for Carriers that Utilize Dynamic Pricing**

The Department shockingly came up with implementation costs for the Rule which failed to account for dozens of U.S. air carriers, many more foreign air carriers operating in the United States, and the thousands of ticket agents worldwide that must comply with the Rule, as well as the distinction between the cost to implement these rules for static pricing versus dynamic pricing models. The RIA relies on information in part, or cherry-picked, from three general sources to determine the up-front, "one-time" implementation costs:

**Table 8. Carrier cost estimates throughout rulemakings ($2022)**

**2014 industry study**
*Cost of providing baggage fee info to ticket agents*

| | |
|---|---|
| Initial | $39,657,283 |
| Recurring | $4,406,365 |
| Five-year total PV | $55,328,945 |
| Annualized (2% discount rate) | $11,738,500 |

*Cost of updating websites*

| | |
|---|---|
| Initial | $ 77,111,383 |
| Recurring | $13,953,488 |
| Five-year total PV | $127,688,707 |
| Annualized (2% discount rate) | $27,090,231 |

**2017 SNPRM**

| | |
|---|---|
| Annual costs | $38,952,727 |
| Five-year Total PV | $183,602,103 |
| Annualized (2% discount rate) | $38,952,727 |

**A4A comment on 2023 NPRM**

| | |
|---|---|
| Initial | $86,500,000 |
| Recurring (maintenance) | $9,000,000 |
| Recurring (supply agents information) | $8,800,000 |
| Five-year Total PV | $151,252,520 |
| Annualized (2% discount rate) | $32,089,492 |

Regulatory Impact Analysis, at 22 (Apr. 2024), DOT-OST-2022-0109-0753 (2024 RIA).

These sources in turn make estimates based on a select few airlines which primarily utilize static pricing for Optional Services. In practice, this means that while base fare prices could be dynamic (data-driven to meet real-time demand), the cost of checking a first bag on *e.g.*, United would cost $40 regardless of the route, date flown, or price paid for the base fare.

Because the Optional Service prices remain relatively constant, the technological resources and both up-front/ongoing costs to make the majority of the display changes the Rule requires is exponentially lower for static-pricing operations than what it will cost the majority of airlines like Spirit and Frontier which use dynamic pricing for Optional Services. For static pricing, a box of text on a search results page can show a customer that "all first checked bags are $40." For Dynamic pricing, the cost of each Optional Service is primarily demand-driven and can vary based on dates flown, markets, loyalty/rewards program status, or other factors.

Massive amounts of computational resources are required to calculate the dynamic price of just one flight—but now the Rule will require each flight on a search results page to show next to it the price for each Optional Service the Department wants on a real-time basis. As reflected in the declarations of the ULCC CEOs, these costs are magnitudes apart and the Department completely ignored them— weighing the Regulatory Impact Analysis in a misleading way to appear to show a net benefit.

Indeed, Spirit's $50-$100 million estimate for up-front harms to implement the Rule (including both costs and foregone revenues)—just one relatively small airline—exceeds the total costs the Department estimates for the dozens of domestic and foreign airlines, combined under all three sources cited in the 2024 RIA. Adding in costs for Frontier further widens the gap.

The ongoing implementation costs, including that of providing hundreds of ticket agents with the information in real-time is just as fatally flawed. Indeed, the Rule will "immediately hit [the ULCCs] … with enormous and unrecoverable compliance costs–which would inevitably be passed on to [travelers]." *Career Colls. & Sch. of Tex.*, 98 F.4th at 255.

Importantly, the 2024 RIA fails to account for the myriad factors that must be dealt with from the commercial and operational side for such significant changes.

Before the Rule was issued, Spirit planned major upgrades to its customer-facing IT systems, and its relationship with its principal third-party vendor contractually limits any work it can do for Rule compliance between October 2024 and January 2025. If Spirit does not make these changes, it will not be able to support current reservation demand, let alone the exponential increase in price/fee searches the Rule's requirements will cause. If the Rule is implemented, absent major upgrades even beyond those currently contracted, Spirit's systems for fare information, ticket reservations, refunds, loyalty program, websites and mobile applications, airport boarding and ticketing, baggage handling and tracking, and customer service channels will become too slow or impossible for customers to use. *See generally*, Spirit Airlines Request for Stay of Ancillary Service Rule, DOT-OST-2022-0109-0809 (June 5, 2024); ECF No. 12-2, (Declaration of Edward M. Christie III, President and Chief Executive Officer, Spirit Airlines, Inc.).

Frontier, even if it had unlimited financial resources, is not able to provide travel agents (accounting for approximately 28% of its annual revenue) with the amount of real-time Optional Services pricing information required under the Rule's October 2024 deadline. Frontier will be forced to stop selling tickets through these channels cutting off over $1 billion in annual revenue. ECF No. 12-2, at SA35-SA51 (Declaration of Barry L. Biffle, Chief Executive Officer, Frontier Group Holdings, Inc.

d/b/a Frontier Airlines). The millions of customers who previously purchased Frontier tickets through these channels will no longer have access to low fares on their preferred websites with no guarantee these customers would look elsewhere for Frontier flights.

### 2. The Rule's "Benefits" Are Either Made Up or Not Drawn from Any Reliable Source.

The Department handwaves at unquantifiable benefits to consumers to justify high quantified costs. The estimated benefits are somewhere between $30.3 million and $254 million, more than eight times the low range estimate. 2024 RIA, at i. This huge range "is indicative of significant uncertainty in key parameters" with "the most significant driver of the results [being] the estimate of the number of consumers who consider Optional Services information relevant to their purchase of airline tickets." *Id.* Using more "plausible estimates" the Department asserts, "the probability of net benefits being positive is roughly 53 percent." *Id.* In other words, even relying on broad assumptions to arrive at estimates with "significant uncertainty," the Rule is still barely more likely than not to be of benefit.

Not only do these speculative benefits not outweigh the unquantifiable costs, they do not even outweigh the quantifiable ones. Airlines present Optional Services as a choice after customers have already selected their base fare in order to reduce confusion. Comments of Spirit Airlines, Inc., 3-5, 9-11. Separating the non-optional

base fare from Optional Services makes it clear to consumers that the Optional Services are indeed a matter of choice. *Id.* The ULCCs' approach avoids overwhelming customers with an avalanche of numbers at the very outset, particularly information that many customers are not interested in at all. *Id.* at 10. Spirit further noted that "because only two complaints were submitted to the Department about the transparency of Spirit's ancillary fees in the first quarter of [2023], consumers need to be able to opt out of useless information." *Id.* at 11.

The Department acknowledges that the Rule may cause confusion, but in calculating the potential cost of this confusion, they do not bother adducing indicative figures. 2024 RIA, 18-19. The Department estimates that "consumers who would not find information on ancillary fees relevant to their airfare search" will spend 25 more seconds each on a search of airline fares if ancillary fees are required to be placed up front. *Id.* at 19. However, the 25-second figure was pulled from a survey of A4A members and not from actual market research. *Id.* The real impact could be exponentially greater, especially if the delay causes the customer to drop their purchase altogether.

Further, the Department explicitly only applies this delay to searches on airline websites and not to searches on online ticket agent (OTA) websites, because

"[online ticket agent] websites attempt to display ancillary fee information with air-fares to the extent they have the information." *Id.* These assertions of zero cost are hidden in impenetrable language:

> OTA websites attempt to display ancillary fee information with airfares to the extent they have the information. While OTAs would probably need to adjust their displays to conform to the requirements of the final rule, only lim-ited, if any, new information would be required. There-fore, we apply the 25 second increase in search time only to searches conducted on airline sites and assume that search times for OTAs are unaffected. In addition, we as-sume that the additional time affects only consumers who would not find information on ancillary fees relevant to their airfare search. These consumers would incur time costs to navigate information that they are not interested in. Consumers for whom the information is relevant incur extra costs to seek out the information in the baseline. However, in both the baseline and under the rule, con-sumers who consider ancillary fees when they purchase airfare undertake the time needed to process that infor-mation. Thus, we do not assign time costs for consumers who currently consider ancillary fees when they purchase airfare.

*Id.* This is nothing more than regulatory gobbledygook, devoid of a factual basis.

The Department similarly makes convenient, baseless assumptions to assert the Rule's benefits. To arrive at the Rule's predicted time saved per search, the De-partment multiplies the percentage of searches that lead to a purchase by the aver-age time spent per search. *Id.* at 14-15. The problem is that the Department pulls

the average time spent per search, two minutes, from an example the Department itself conjured up in 2022 RIA initially prepared for the Rule. *Id.* at 15. (referring Regulatory Impact Analysis, 21 (Sep. 26, 2022), DOT-OST-2022-0109-0002 (2022 RIA). This whole-cloth assumption cannot be used as the basis of any prediction. For all the Department shows, and as the airlines have argued, the Rule will *cost* consumers time by confusing them. If the Department had opened a comment period for the 2024 Regulatory Impact Analysis, which it failed to do, the commenters would have pointed out the baselessness of the Department's calculations.

> The Department confessed in the 2022 RIA that they would have no way to "quantitatively evaluat[e] the effects of the rule" and further that "**it is also not possible to quantify whether the proposed rule would yield benefits that exceed costs.**" [2022 RIA at i-ii] . . . The RIA also acknowledges that the "same uncertainties that prevent estimating the primary effects also *preclude assessing the potential secondary effects, including effects on airfares*, ancillary fees, or GDS contracts with carriers and ticket agents." [2022 RIA at ii-iii].

Comments of Frontier Airlines, 12 (Jan. 23, 2023), DOT-OST-2022-0109-0020.

Not only does the Department fail to provide any foundation for its costs and benefits, but the Department also never showed evidence of a problem to be alleviated. As Frontier explained in response to the 2022 NPRM:

> According to the Department's own data, there were just 94 family seating complaints and only 260 "baggage fees" complaints filed against U.S. carriers with the Department

> in 2021 (the year after the ACPAC recommendation). …
> Given that U.S. airlines carried approximately
> 674,000,000 passengers during 2021, this equates to a
> rate of just one family seating complaint per 7,000,000
> passengers and just one baggage fee complaint per
> 2,500,000 passengers.

Supplemental Comments of Frontier Airlines, 8-9 (Apr. 6, 2023), DOT-OST-2022-0109-0739.

As a further example, the entire "deadweight claim" conjured up in the RIA, even if true, is irrelevant because customers are fully aware of the total cost before they purchase any service. Under the 24-hour refund rule, any consumer can make a purchase and continue for 24 hours to look at other carrier options before committing to a fare.

The other eyebrow-raising "Uncertainty Analysis" mentions a Monte Carlo simulation as a "way to model the probability of different outcomes in a process that cannot easily be predicted due to the intervention of random variables." 2024 RIA at 25. The "Uncertainty Analysis" states specifically:

> The results of the analysis are driven by values of uncertain parameters. We do not have reliable measures for the share of passengers who consider information about ancillary fees when they search for airline tickets, or the amount of time these passengers will save while searching for air travel on airline and non-airline websites under the final rule. For consumers who do not consider fee information, the increase in time burden is also uncertain."

*Id.* at 25. Because the Department did a cost-benefit analysis "driven by values of uncertain parameters," the outcomes produced are faulty and not based on market realities. Knowing consumers is the livelihood of these airlines, and the fact that the Department is trying to replace the customer relationship with something vague that was produced by a computer is further proof of the Government overstepping its authority.

In this case, the Department's cost-benefit analysis rests on the "serious flaw" previous courts have warned us about. Further, the Supreme Court in *Loper Bright* ruled that "[t]he deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA." 14 S.Ct. at 2263. Therefore, the Court here must hold the Department's Rule unreasonable as its legitimacy relies entirely on a flawed cost-benefit analysis.

## C.  The Department Failed to Address Significant Points Raised by the Public Comments

"[T]o determine whether the agency considered the relevant factors, the court must [also] decide whether the agency addressed any 'significant points . . . raised by the public comments.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *Huawei Technologies*, 2 F.4th at 449). The Department's failure to do so here provides another basis for the Rule to be vacated.

Commenters—including Spirit, Frontier, and others—raised numerous concerns about how the Rule would harm low-fare competition including based on the disproportionate cost the Rule would bear on smaller, low-cost carriers, 89 Fed. Reg. at 34639. The Department's primary way of responding to these valid comments was to be dismissive with the bold and unsubstantiated statement: "Rather than placing ULCCs at a competitive disadvantage, the Department expects that this rule will promote competition by making fees for critical ancillary services more transparent for consumers." *Id.* Similar hackneyed responses were made to nearly every comment that did not support the Department's end-goal of re-regulation. These issues include, among others:

- Ignoring the cost of lost revenue, infrastructure upgrades, and other system overhauling needed to ancillary service pricing in the form the Rule requires.
- Failing to account for disruption to consumers who will lose access to low-cost fares.
- The failure to weigh how less-restrictive tools, like the first look hyperlink to optional fees and the 24-hour refund requirement, already ensure consumers know exactly what price they pay.

While the Department spent many pages in the Rule regurgitating comments, its responses to them lacked the meaningful consideration to avoid Arbitrary and Capricious classification. When commenters raised the serious concern that the Rule would destroy the "business model of unbundled offerings," the Department simply

concluded: "The rule does not prohibit such a model, and by improving the disclosure of fees associated with ancillary services, the Department believes that the rule helps to improve the model by making it more transparent to consumers." 89 Fed. Reg. at 34634.

### III. The Rule Violates the First Amendment by Affirmatively Restricting Truthful Advertising of Standalone Airfare Tickets and Compelling Airlines to Sell and Advertise Add-On Products Not Required for Air Travel

"Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72 (2011). The ability to advertise standalone airfare prices without *optional* add-on services is protected commercial speech under the First Amendment, since it is a lawful activity and not "more likely to deceive the public than to inform it." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 563-64 (citing *Friedman v. Rogers*, 440 U.S. 1, 12-13 (1979)).

Whereas here, "the government creates 'a regulation of speech because of disagreement with the message it conveys,'" *Sorrell*, 564 U.S. at 566 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))— *i.e.*, that consumers need more

than just a standalone airfare to travel— or discriminates against the speakers, *id.*, "The First Amendment requires heightened scrutiny." *Id.*[2]

## A. The Rule Fails First Amendment Intermediate Scrutiny

To satisfy intermediate scrutiny, the Department bears the burden of establishing: (1) the government has a substantial interest in restricting how airlines advertise standalone airfares on their own websites; (2) the Rule directly advances the government interest; and (3) the Rule is narrowly tailored to achieve the interest such that "*a more limited restriction on commercial speech*" could not. *Cent. Hudson Gas & Elec. Corp*, 447 U.S. at 564. "As in other contexts, these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but *also that the law does not seek to suppress a disfavored message*." *Sorrell*, 564 U.S. at 572 (emphasis added) (citing *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662-63 (1994)).

---

[2] The Department showed agreement with this understanding, when it raised First Amendment concerns under its own regulatory practices in a 2021 NPRM. *See* Airfare Advertising, Advanced Notice of Proposed Rulemaking, Docket DOT-OST-2021-0007 (Jan. 15, 2021) (emphasizing that the Supreme Court "recently made clear that expansively applying legal standards to uphold laws imposing restrictions on the size and appearance of speech is inconsistent with its governing precedent.").

1.  **There is No Substantial Government Interest in Restricting the Sale of Lawful Transportation Products (*e.g.* a Travel Ticket that Does Not Include Optional Services)**

The Rule here primarily attacks not outward advertising, but the website product of airlines and ticket agents that consumers seek out to find air fares. The Department cannot establish a substantial interest in restricting how airlines advertise air transportation services which can lawfully be sold (*e.g.*, a travel ticket not including Optional Services) just as it cannot restrict airlines from selling standalone fares to consumers seeking them out. Such restriction on speech interferes with every statutory policy factor directing the Department to be hands-off in supporting competition—the entire purpose of the ADA.

The primary interest asserted in the Rule is the implausible assertion that "[i]t appears that consumers are generally unaware of the amount of the ancillary fees that apply to them when they book tickets." 89 Fed. Reg. at 34624. This conclusion is undermined by nearly 50 years of innovation since deregulation, and at least 14 years where separate pricing for some optional services such as a checked bag has been offered by all but one major U.S. airline. Other Department imposed fare disclosure rules have been in place for decades. Under these rules, industry practice has assured **full disclosure of all components of the final price before purchase** and reflects only products selected by the consumer.

The Rule also appears to assert there is some kind of government interest in purportedly providing a few seconds of convenience to consumers who might want to compare the costs of a Department-specified type of bundled fare product. These reasons cannot and do not carry the Government's burden under the *Central Hudson* test.

### 2. Affirmatively Restricting Airlines from Displaying Accurate Prices for Air Travel Without Optional Services Does Not Directly and Materially Advance any Government Interest

The Department "cannot regulate speech that poses no danger to the asserted state interest." *Cent. Hudson Gas & Elec. Corp*, 447 U.S. at 565. Unlike in *Spirit Airlines*, 687 F.3d 403, 413-414 (D.C. Cir. 2012), the Rule presents an affirmative limitation on speech. Forbidding airlines from presenting the base fare uncrowded by Optional Service fees affirmatively limits the airlines message that customers do not need to pay for a single Optional Service. In short, it tells airlines: no, you cannot *only* advertise the sale of a seat. It telegraphs to customers that they, too, should only consider purchasing travel after they have considered traveling with the Government's pre-determined Optional Services.

The Department asserts that the Rule reasonably relates to a valid interest because it "aims to prevent consumer confusion about the total price they have to pay." ECF No. 41, Response to Mot. for Stay, at 20-21 (quoting *Spirit Airlines, Inc.*,

687 F.3d at 414-15). However, as this brief discusses in the section on the Department's failure to conduct a proper Regulatory Impact Analysis, the Department based this Rule on **one** family seating complaint per 7,000,000 passengers and just **one** baggage fee complaint per 2,500,000 passengers in 2021. 87 Fed. Reg. at 63723 & n.31; *see also* Number of Consumer Complaints Received by the U.S. DOT OACP regarding Ancillary Fees, 2019-2021, Docket DOT-OST-2022-0109-0021; Full-Year 2021 and December 2021 U.S. Airline Traffic Data, BTS Newsroom (Mar. 10, 2022), https://www.bts.gov/newsroom/full-year-2021-and-december-2021-us-airline-traffic-data (showing the number of travelers to compare to the number of complaints). So few complaints across so many travelers indicates there is no confusion for the Department to prevent.

The Department also asserts that the Rule advances the governmental interest of "ensuring the accuracy of commercial information in the marketplace" because it is "clearly and directly advanced by a regulation requiring" upfront disclosure. ECF No. 41, at 21 (quoting *Spirit Airlines*, 687 F.3d at 415). To the contrary, airlines do not promote inaccurate information about Optional Services. And the Government's explanation fails to account for the narrow tailoring requirement because various less-restrictive means exist and are already in place. *E.g.*, 14 C.F.R. § 259.5 (b)(4).

Here, the Rule arbitrarily determines consumers are harmed because they are shown only the price of a ticket—the legitimate cost to travel including all mandatory fees and taxes—without immediately seeing pricing for add-on Optional Services in which the customer may have no interest, nor is required to purchase to travel.

### 3. The Rule is Not Narrowly Tailored and Ignores Less-Restrictive Means like Existing Fare Disclosure Requirements and the 24-Hour Refund Rule

The Government cannot "completely suppress information when narrower restrictions on expression would serve its interest." *Cent. Hudson Gas & Elec. Corp,* 447 U.S. at 565. Optional Service pricing is already available through less restrictive means under existing regulations. As the Rule references, "[14 C.F.R. § 399.85(b)] requires airlines and ticket agents to disclose clearly and prominently on the first screen with a fare quotation for a specific itinerary **that additional airline fees for baggage may apply and where consumers can see these fees.**" 89 Fed. Reg. at 34622. Today, airlines do this through a link on the first page. The Rule crosses the boundary of disclosure requirements into the realm of mandating the advertisement of a product.

On Spirit and Frontier websites, anyone can immediately find the cost of optional services before and during the booking process (and always prior to purchase). After a traveler selects their flight, they have the choice to add whichever optional services fit their needs. This is a common-sense practice, and the Rule provides no substantive explanation supporting the Department's assertion otherwise. Like Spirit and Frontier, nearly every carrier also offers fare packages that include Optional Services in the price.

Most of the customers whom Frontier and Spirit attract are those who prefer the entirely unbundled model they provide. If these customers are suddenly faced with a desktop or mobile screen cluttered with dozens of pricing options at one time when they are only trying to purchase a base fare ticket, they are much less likely to follow through and purchase a ticket. If customers are stuck trying to navigate a page with dozens and dozens of confusing prices, they are less likely to follow through with their purchase. Airlines are already incentivized to serve customers in such a way that they will want to come back.

Because the Rule restricts truthful advertising for lawful activities, seeks to advance interests directly contrary to deregulation, and ignores today's far less intrusive means to provide consumers access to fare component information, it violates the First Amendment.

## CONCLUSION

This Court should grant the petition for review and vacate the Rule.

Dated: September 9, 2024                Respectfully submitted,


                                        /s/ Joanne W. Young
                                        Joanne W. Young
                                        jyoung@yklaw.com
                                        *Counsel of Record*
                                        David M. Kirstein
                                        dkirstein@yklaw.com
                                        Donald L. Crowell III
                                        dcrowell@yklaw.com
                                        **Kirstein & Young PLLC**
                                        1750 K Street NW, Suite 700
                                        Washington, DC  20006
                                        Phone: (202) 331-3348
                                        Fax: (202) 331-3933

                                        *Counsel for Spirit Airlines, Inc. and
                                        Frontier Group Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify under Federal Rule of Appellate Procedure 32(g) that (1) this filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(e) because, as calculated by Microsoft Word, it contains 12,939 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f); and (2) this filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Charter font.

Dated: September 9, 2024

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on September 9, 2024, I electronically filed the foregoing Joint Opening Brief for Petitioners in Case No. 24-60373 with the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system.

Dated: September 9, 2024

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*