No. 24-60231 c/w 24-60373

# In the United States Court of Appeals For the Fifth Circuit

### No. 24-60231

AIRLINES FOR AMERICA; ALASKA AIRLINES, INC.; AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; HAWAIIAN AIRLINES, INC.; JETBLUE AIRWAYS CORP.; UNITED AIRLINES, INC.; NATIONAL AIR CARRIER ASSOCIATION; INTERNATIONAL AIR TRANSPORT ASSOCIATION

*Petitioners,*

*v.*

DEPARTMENT OF TRANSPORTATION,

*Respondent.*

*consolidated with*
### No. 24-60373

SPIRIT AIRLINES, INC.,

*Petitioner,*

*and*

FRONTIER GROUP HOLDINGS, INC.,

*Petitioner-Intervenor,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

On Petition for Review of a Final Rule of the U.S. Department of Transportation
Agency No. 89 Fed. Reg. 34620

## Joint Reply Brief for Petitioners in Case No. 24-60373

Joanne W. Young
*Counsel of Record*
David M. Kirstein
Donald L. Crowell III
KIRSTEIN & YOUNG PLLC
1750 K Street NW, Suite 700
Washington, DC  20006
(202) 331-3348

*Counsel for Spirit Airlines, Inc. and
Frontier Group Holdings, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

**No. 24-60373**, *Spirit Airlines, Inc. v. U.S. Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

| Petitioner: | Counsel for Petitioner: |
| --- | --- |
| Spirit Airlines, Inc. | Joanne W. Young |
| | David M. Kirstein |
| | Donald L. Crowell |
| | Kirstein & Young PLLC |

Petitioner Spirit Airlines, Inc. is a publicly traded corporation with its stock publicly listed under the ticker "SAVE". It has no parent corporation. No publicly held corporation holds 10% or more of its stock.

| Petitioner-Intervenor: | Counsel for Petitioner-Intervenor: |
| --- | --- |
| Frontier Group Holdings, Inc. | Joanne W. Young |
| | David M. Kirstein |
| | Donald L. Crowell |
| | Kirstein & Young PLLC |

Petitioner-Intervenor Frontier Group Holdings, Inc. (hereinafter, "Frontier Airlines") is a publicly traded corporation with its stock publicly listed under the ticker "ULCC." It has no parent corporation. No publicly held corporation holds 10% or more of its stock.

| Respondent: | Counsel for Respondent: |
|---|---|
| United States Department of Transportation | Brian M. Boynton |
| | Michael S. Raab |
| | Martin Totaro |
| | Subash Iyer |
| | Paul M. Geier |
| | Blane A. Workie |
| | Paula Lee |
| | Emily Kveselis |

| Other Interested Parties: | Counsel for Interested Parties: |
|---|---|

The certificates of interested persons that have and will be filed by the Petitioners in *Airlines for America, et al. v. Department of Transportation* (No. 24-60231), which has been consolidated with this case, are hereby incorporated by reference. The certificates of interested persons that have been filed by *amici* in case 24-60373 and 24-60231 are also hereby incorporated.

Dated: October 30, 2024          Respectfully submitted,

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................................... i

Table of Contents ...................................................................................... iii

Table of Authorities ................................................................................... v

Introduction ............................................................................................... 1

Argument ..................................................................................................... 4

    I.   Congress Continues to Expressly Limit the Department's Rate-Publication Authority to Foreign Air Transportation in 49 U.S.C. § 41504 and the Rule Would Fundamentally Revise the Statute Beyond What Congress Has Allowed. ........................................................ 4

        A.  The Department's Reading of Section 41712 Authority is Impermissible Because it Would Render an Entire Chapter of the U.S. Code Authorizing Ratemaking in Foreign Air Transportation Superfluous ............................................................ 5

        B.  The Government Concedes that the Power to Regulate Publication of Rates is Inherently Part of a Tariff System, Which Congress Abolished for Domestic Air Transportation ..................... 8

        C.  The Power to Decide Which Services are "Critical" to Air Transportation and Subject to Excessive Regulatory Control are of Monumental Political and Economic Significance ................... 10

    II.  The Government is Compelling Commercial Advertising of a Service and the Rule Does Not Involve "Warnings or Disclaimers", Which Distinguishes this Case from Zauderer and Its Progeny.......................... 15

        A.  Compelled Advertisement of an Optional Product is Not Reasonably Related to Preventing Deception of Consumers ....... 16

B.  The Rule Creates an Excessive Magnitude of Requirements, Well Beyond the Carefully Calculated Government Action Required Under *Zauderer*................................................................18

C.  *Zauderer* Should be Distinguished Here Because it Does not Provide Sufficient Constitutional Protections Against Compelled Product Advertisements .............................................21

D.  Nothing About the D.C. Circuit Spirit Case Related to the 2011 Rulemaking is Relevant to this Case ............................................22

III. The Department's Regulatory Impact Analysis is Unreasonable and Ignores Critical Implementation Cost Data the Department was Aware of and Discussed in the Final Rule ...........................................24

IV. There is no Waiver Defense in Rulemaking Challenges in this Circuit ..30

Conclusion ...................................................................................................32

Certificate of Compliance ...........................................................................33

Certificate of Service...................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Am. Airlines, Inc. v. N. Am. Airlines, Inc.,*
351 U.S. 79 (1956) ................................................... 11

*BCCA Appeal Group v. U.S. EPA,*
355 F.3d 817 (5ᵗʰ Cir.) ............................................. 30

*Biden v. Nebraska,* 600 U.S. 477 (2023) ..................... 10

*Board of Trs. of the State Univ. of N.Y. v.
Fox,* 492 U.S. 469 (1989) .......................................... 18

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S.
204 (1988) ............................................................... 5

*Carr v. Saul,* 593 U.S. 83 (2021) ............................... 30

*Cent. Hudson Gas & Elec. Corp. v. Pub.
Serv. Comm'n,* 447 U.S. 557 (1980) ................ 15, 16, 23

*Chem. Mfrs. Ass'n v. U.S. EPA,* 870 F.2d 177
(5th Cir. 1989) ......................................................... 24

*Duncan v. Walker,* 533 U.S. 160(2001) ....................... 6

*El Paso Elec. Co. v. FERC,* 76 F.4th 352 (5th
Cir. 2023) ............................................................... 24

*Exelon Wind 1, LLC v. Nelson,* 766 F.3d 380
(5th Cir. 2014) .......................................................... 5

*Expressions Hair Design v. Schneiderman,*
581 U.S. 37 (2017) ................................................... 15

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...................................................... 5

*FTC v. Mandel Brothers, Inc.*, 359 U.S. 385
(1959) ........................................................................ 5

*Gustafson v. Alloyd Co.*, 513 U.S. 561(1995) ........................... 5

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th
421(5th Cir. 2021) ...................................................... 24

*In re R. M. J.*, 455 U.S. 191 (1982) .................................. 16

*Janus v. Am. Fed'n of State, Cnty., & Mun.*
*Employees, Council 31*, 585 U.S. 878
(2018) ...................................................................... 15

*MCI Telecomms. Corp. v. AT&T Co.*, 512
U.S. 218 (1994) ........................................................... 9

*Mich. v. EPA*, 576 U.S. 743 (2015) .................................. 25

*Milavetz, Gallop & Milavetz, P.A. v. United*
*States*, 559 U.S. 229 (2010) ...................................17, 21, 22

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383
(2024) ...................................................................... 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*
*Auto. Ins. Co.*, 463 U.S. 29 (1983) .............................. 25

*Nat'l Ass'n of Home Builders v. EPA*, 682
F.3d 1032 (D.C. Cir. 2012) ........................................ 24

*Seabrook v. United States Envtl. Prot.*
*Agency*, 659 F.2d 1349 (5th Cir. 1981) ...................... 30

*Sims v. Apfel*, 530 U.S. 103 (2000) .................................. 30

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................................................. 15

*Spirit Airlines, Inc. v. United States DOT*, 687 F.3d 403 (D.C. Cir. 2012) ............................... 23

*Texas v. United States EPA*, 91 F.4th 280 (5th Cir. 2024) ............................................................ 5

*Transcon. Bus Sys., Inc. v. Civil Aeronautics Bd.*, 383 F.2d 466 (5th Cir. 1967) ...................... 11

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............... 6

*U.S. Nav. Co. v. Cunard S.S. Co.*, 284 U.S. 474 (1932) ....................................................... 11

*United States v. Lauderdale Cnty.*, 914 F.3d 960 (5th Cir. 2019) ............................................ 5

*United States v. Stephen Bros. Line*, 384 F.2d 118 (5th Cir. 1967) ..................................... 11

*United States v. United Foods*, 533 U.S. 405 (2001) ....................................................... 15

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ....................................................... 4

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............ 14

*Wheeler v. Pilgrim's Pride Corp*, 591 F.3d 355 (5th Cir. 2009) ........................................... 11

*Wortman v. All Nippon Airways*, 854 F.3d 606 (9th Cir. 2017) ........................................... 9

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985) .............. iii, iv, 4, 15, 16, 17, 18, 21, 22, 23

## Statutes

15 U.S.C. § 45(a) ................................................... 12

15 U.S.C. § 57a ................................................... 12

49 U.S.C. § 40102(a)(39) ........................................ 8

49 U.S.C. § 41501(1) ............................................. 7

49 U.S.C. § 41504 ...................................... iii, 3, 4, 6, 7

49 U.S.C. § 41712 ............................. iii, 2, 5, 6, 8, 10, 12

49 U.S.C. Chapter 415 ..................................... 2, 6, 7, 9

## Other Authorities

Airlines for America Request to stay the effective date of Enhancing
Transparency of Airline Ancillary Service Fees, 89 Fed. Reg. 34,620
(Apr. 30, 2024), DOT-OST-2022-0109-0796 (A4A Letter) ................................. 31

Comments of American Airlines (Jan. 23,
2023), DOT-OST-2022-0109-0102 ........................................................ 26

Comments of Booking Holdings, Inc. (Jan.
23, 2023), DOT-OST-2022-0109-0565 ................................................. 26

Comments of Frontier Airlines (Jan. 23,
2023), DOT-OST-2022-0109-0020 ........................................................ 29

Comments of Travelport (Jan. 23, 2023),
DOT-OST-2022-0109-0094 ................................................................... 26

Comments of United States Tour Operators
Association(Jan. 23, 2023), DOT-OST-
2022-0109-0089 ................................................................................... 26

DOT Denial of Spirit Airlines' Request to Stay the Effective
Date of the Ancillary Service Fees Rule (June 28, 2024),
DOT-OST-2022-0109-0834 ................................................................ 31

DOT Response to A4A Letter Motion to Stay
Ancillary Fees Rule (June 10, 2024),
DOT-OST-2022-0109-0833 ................................................... 31

Frontier Airlines March 30, 2023
Presentation (Mar. 30, 2023), DOT-OST-
2022-0109-0728 ................................................................... 27

National Air Carrier Association (NACA)
Comments (Jan. 23, 2023), DOT-OST-
2022-0109-0087 .............................................................. 25, 28

Regulatory Impact Analysis on Final Rule
(Apr. 23, 2024), DOT-OST-2022-0109-
0753 ....................................................................... 25, 28, 29

Spirit Airlines Request for Stay of Ancillary
Service Rule (06-05-2024), DOT-OST-
2022-0109-0809 ................................................................... 31

**Rules**

82 Fed. Reg. 58778 (Dec. 14, 2017) .......................................... 18

89 Fed. Reg 65272 (Aug. 9, 2024) ........................................... 11

89 Fed. Reg. 34620 (Apr. 30, 2024) ...................................... 9, 10

**Regulations**

14 C.F.R. §221.3 ......................................................................... 8

**Legislation**

Airline Deregulation Act of 1978, Pub. L. 95-
504, 92 Stat. 1705 (1978) ..................................................... 2, 6

Civil Aeronautics Act of 1938, Sec. 403, Pub
L. 706, 52 Stat. 973 ................................................................ 3

Federal Aviation Act of 1958, Pub. L. 85-
726, 72 Stat. 731 (1958) .................................................. 2, 5, 8

# INTRODUCTION

The Government would have this Court believe its new Rule for advertising Optional Services is an easy-to-implement notice of specific "fees." It thinks customers should see these fees immediately with the actual fare to make shopping more convenient for some travelers. But its brief is constructed to mislead this Court by focusing on prior rules significantly different in scope and purpose from its current attempt to mandate how, when, and where airlines must advertise products that are entirely optional for travel. In addition to the arguments adopted by the Court in issuing a stay, the Government is wrong for several reasons—primarily because it cannot overcome the lack of statutory authority to force 186 pages of unprecedented regulatory requirements on the industry.

As addressed here: 1) Congress specifically withdrew Government authority to tell airlines how, when, and where they must advertise prices for optional products and services related to air travel; 2) the Rule lacks credible evidence to support its flawed regulatory analysis which significantly underestimates the cost and complexity of implementing the Rule—especially as applied to smaller airlines serving fare-conscious travelers; and 3) the Rule does not involve any warning or disclaimer, but rather regulates **content** by suppressing fare-only advertisements and compelling advertisement of products and services in violation of the First Amendment.

First, decades prior to enactment of the Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705 (1978) [1978 ADA], Congress had enacted two statutes common to public utilities which regulated air carrier pricing: (a) a tariff system for approving/confirming all rates and charges by requiring their publication in a specific document available to the public at specific locations, which was intended to prevent *unjust or discriminatory* pricing practices (Sections 403 and 404 of the Federal Aviation Act of 1958, Pub. L. 85-726, 72 Stat. 731 (1958) [1958 Act], and today 49 U.S.C. Chapter 415 which survives only for foreign air transportation); and (b) authority to investigate and enforce against **other practices** unrelated to publication of rates and charges which were *unfair or deceptive* (Section 411 of the 1958 Act, today 49 U.S.C. § 41712). As a key element of deregulation and to encourage the introduction of low-fare carriers, Congress abolished the Department's power to dictate and require publication of fares and charges under section 403 over domestic air transportation.

Unable to counter this argument, the Government ignores it by misinterpreting the effect and purpose of the Rule. The Government rests its case on this Court agreeing it is unlawful to advertise a product which can lawfully be sold—*i.e.*, the cost which any consumer can pay to travel. The Government cannot hide the fact

that it seeks to sidestep Congress and re-regulate this industry. It does so most glaringly by attempting to bootstrap the cost of bags to the price of a seat—mirroring pre-deregulation tariffs.

The surprising error of the Government's position is its argument that the rate-publication authority under section 403—which was the law for 40 years before deregulation, *see* Civil Aeronautics Act of 1938, Sec. 403, Pub L. 706, 52 Stat. 973 (1938)—and the current 49 U.S.C. § 41504 have always been superfluous because the Department could require carriers to publish various prices, rates, charges, and terms in specific locations (e.g. websites) by labeling a current industry practice as deceptive. This reading is a fundamental change in the statutory scheme, deviating from Congress's decision in 1938, 1958, and 1978 to define and limit the Government's powers to regulate publication of prices in air transportation. The Government ignores these clear Congressional parameters, and its approach does not pass muster under basic tenets of statutory interpretation or the Major Questions doctrine.

Second, the Government argues this Court must put on a blindfold to review the Department's basis for promulgating the Rule (the Regulatory Impact Analysis analysis)—one which: a) underestimates the initial cost to the airlines by billions of

dollars; b) underestimates the technological difficulties of actually providing the baggage fees on the first screen and with multiple permutations required by the Rule; and c) literally makes up the alleged time consumers will save under the Rule. Precedent holds that this kind of flawed analysis is arbitrary and capricious.

Third, the Rule is designed to undermine the prerogative of airlines to determine how, when, and where to promote their **optional** products and services which are **not required to fly** and, importantly, which a significant percentage of passengers do not want to purchase. The Rule compels advertisement of a product. It does not require a disclaimer or warning, which makes the Government's reliance on *Zauderer* misplaced and inappropriate. Despite the hyperbolic language used by the Government in its brief about preventing confusion, it strains credulity to believe that reasonable travelers, including first-timers, purchase flights without awareness of what they buy at what cost.

## ARGUMENT

### I. Congress Continues to Expressly Limit the Department's Rate-Publication Authority to Foreign Air Transportation in 49 U.S.C. § 41504 and the Rule Would Fundamentally Revise the Statute Beyond What Congress Has Allowed.

It is "axiomatic" that "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown*

*Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Determining the scope of that authority requires the Court to evaluate the whole text, "interpret[ing] the statute 'as a symmetrical and coherent regulatory scheme,' ... and 'fit, if possible, all parts into an harmonious whole,'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959)).

### A. The Department's Reading of Section 41712 Authority is Impermissible Because it Would Render an Entire Chapter of the U.S. Code Authorizing Ratemaking in Foreign Air Transportation Superfluous

"It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Texas v. United States EPA*, 91 F.4th 280, 298 (5th Cir. 2024) (quoting *United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (internal quotation marks omitted)); *see also Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 399-400 (5th Cir. 2014) (noting this is "the most basic interpretive canon"). Here, the Government's contention that the unfair and deceptive practices authority in 49 U.S.C. § 41712 grants it power to regulate publication of airline rates and charges runs afoul of these fundamental guideposts. This reading renders superfluous the essential authorities for price publication regulation in air transportation—formerly in sections 403-404 of the 1958 Act, and today in 49

U.S.C. Chapter 415 applying only to Foreign Air Transportation. The Government's construction here renders these provisions "insignificant if not wholly superfluous," and is an impermissible reading of the statute. *TRW Inc. v. Andrews*, 534 U.S. 19 (2001) (quoting *Duncan v. Walker*, 121 S. Ct. at 2125 (2001)).

The Government's brief lacks coherent statutory analysis involving the Department's rate-publication authority contained in 49 U.S.C. Chapter 415. Spirit and Frontier Br. 15-16. Indeed, not a single provision of Chapter 415 is mentioned in the Government's brief. Instead, the Government incorrectly argues the 1978 ADA "recognizes a distinction between regulations that set price levels and regulations that reinforce the market through greater disclosure and protections against unfair or deceptive practices, encouraging the latter because they improve the functioning of markets rather than replace their operations." Gov. Br. 57. But the Government provides **not a single example** of when, if ever, prior to passage of the 1978 ADA the Department promulgated price disclosure regulations under its Section 411/41712 authority, as opposed to its Section 403/41504 rate-publication authority. *Cf.* Spirit and Frontier Br. 9-14 (providing examples of price publication regulation under Sec. 403). Moreover, the Government points to nowhere in the 1978 ADA or its history

where Congress granted the Department authority to micromanage how airlines advertise their products. Rather the law was passed specifically to leave such decisions to the management of individual airlines.[1]

49 U.S.C. Chapter 415 is exclusively where the Department's authority to regulate the publication of price information is contained—after Deregulation, it has been restricted to international air passenger transportation. Crucial to this case, 49 U.S.C. § 41504 sets out the absolute scope of the Department's regulatory authority to regulate publication of prices:

> "In the way **prescribed by regulation** by the Secretary of Transportation, every air carrier and foreign air carrier shall file with the Secretary, **publish, and keep open to public inspection**, tariffs showing the **prices for the foreign air transportation** provided between places served by the carrier …."

Today, 49 U.S.C. § 41501(1) requires airlines to establish and maintain "reasonable prices, classifications, rules, and practices **related to foreign air transportation**" (emphasis added).[2] By definition, the term "price" includes any "rate, fare or

---

[1] Instead, the Government attempts to subvert this fundamental point by focusing the Court on red herrings like Change and Cancellation fees—something Spirit and Frontier have eliminated for travelers under nearly all circumstances.

[2] By regulation the Department has largely abolished these tariff filing requirements for over 120 countries with which the U.S. has "Open Skies" bilateral air transportation agreements.

charge" for air transportation. 49 U.S.C. § 40102(a)(39). A charge is and has historically been defined by DOT to mean "**the amount charged for baggage**, in excess of the free allowance, accompanying or checked by a passenger or for any other service ancillary to the passenger's carriage." 14 C.F.R. §221.3. Pre-deregulation, the price and terms of any charges to transport baggage—carry-on, checked, or otherwise—were all required to be in published tariffs. 1958 Act, Sec. 403.

### B. The Government Concedes that the Power to Regulate Publication of Rates is Inherently Part of a Tariff System, Which Congress Abolished for Domestic Air Transportation

Responding to Spirit and Frontier, the Government acknowledges rate publication powers are inherent to a rate-regulated statutory scheme. Gov. Br. 51. In doing so, it reveals in plain sight what the airlines have argued all along: this Rule is a blatant attempt to sidestep Congress and re-regulate a key element of a deregulated airline industry—*i.e.*, how products are advertised and sold. Under the Government's interpretation, statutory authority to regulate an entire industry under a common-carrier tariff system has apparently never been needed.

Bypassing express choices by Congress to eliminate the Department's authority to regulate the publication of the cost of air travel products, the Government's misdirected argument goes that Section 41712—a statute providing authority to adjudicate specific instances of unfair or deceptive conduct—authorizes it to compel

advertisements for any product precisely in the manner it dictates. The same statute, according to the Government, also authorizes it to demand carriers adhere to published rates, subject to civil penalties for violations. 89 Fed. Reg. at 34664 (extending "broad prohibition on increases to all ancillary service fees, regardless of whether these items are purchased along with the air transportation …to … critical ancillary services."). At base, the Government's argument renders sections of 49 U.S.C. Chapter 415 "superfluous, void, or insignificant," because it suggests 49 U.S.C. § 41712 provides identical authority.

If this seems like a rate-regulated common carrier system, it is because the Department is implementing all the characteristics of one. "Rate filings are, in fact, the essential characteristic of a rate-regulated industry," *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994); *see also Wortman v. All Nippon Airways*, 854 F.3d 606, 614 (9th Cir. 2017) ("We have previously applied the filed rate doctrine to circumstances in which the relevant rates *were not literally filed*." (citations omitted)). Yet, the Government provides nothing to support its position that Congress intended it to exercise rate-publication authority inherent to a tariff system outside of a rate-regulated industry.

### C. The Power to Decide Which Services are "Critical" to Air Transportation and Subject to Excessive Regulatory Control are of Monumental Political and Economic Significance

Use of a "subtle device" such as the authority to adjudicate certain unfair/deceptive practices like tarmac violations "is not authorization for agency action of 'enormous importance.'" *Biden v. Nebraska*, 600 U.S. 477, 518 (2023) (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994)). The Government contends the Rule avoids a major-questions concern because "[a]ll the Rule does is to modify current disclosure requirements so that they more effectively target hidden fees." This is a far cry from reality. The Government cannot seriously suggest its reading of what Section 41712 authorizes—which would apply equally to the Federal Trade Commission with identical unfair/deceptive practices authority covering the entire U.S. economy, Spirit and Frontier Br. 27—is not "a matter of vast economic or political significance." Gov. Br. 58.

Underlying the Rule is the Department's belief it found a loophole to the Constitution allowing it to determine which products or services related to air travel, but not required to fly, are "critical" and subject to any level of regulation the Government deems necessary—undermining the express purpose of deregulation. *See* 89 Fed. Reg. at 34639 (defining "critical ancillary service to mean "any ancillary service that is critical to consumers' purchasing decisions"). The Court should not be misled

to believe this is a one-time attempt. Indeed, the Department already sought to cash in further on this strategy in a separately-pending Rulemaking through which it seeks to similarly regulate "**basic services** that **used to be included in the ticket price**… that carriers and ticket agents must include as part of the fare to avoid engaging in an unfair or deceptive practice." 89 Fed. Reg 65272, 65289 (Aug. 9, 2024).

Here, the Court must consider how the Government's interpretation would drastically alter the related FTC authority which "Congress intended … should have like interpretation, application, and effect." *United States v. Stephen Bros. Line*, 384 F.2d 118, 122 n.10(5th Cir. 1967) (quoting *U.S. Nav. Co. v. Cunard S.S. Co.*, 284 U.S. 474, 480, (1932); *see also, e.g.*, *Am. Airlines, Inc. v. N. Am. Airlines, Inc.*, 351 U.S. 79, 82 (1956) ("We may profitably look to judicial interpretation of § 5 as an aid in the resolution of the questions raised here under § 411 [of the Civil Aeronautics Act].")); *Wheeler v. Pilgrim's Pride Corp*, 591 F.3d 355, 366-67 (5th Cir. 2009) (Jones, C.J., Reavley, J., Smith, J., Owen, J., concurring) ("[L]anguage of the [Packers & Stockyards Act] … meaning had been firmly established in numerous court decisions that placed definite limits on the authority of, respectively, the Interstate Commerce Commission and Federal Trade Commission."); *Transcon. Bus Sys., Inc. v. Civil Aeronautics Bd.*, 383 F.2d 466, 480 (5th Cir. 1967) ("Since the Civil Aeronautics Act of 1938 was modeled after the I.C.C. Act, the latter provides an

appropriate guide in construing the section before us." (citing *American Airlines*, 351 U.S. at 81)).

Section 41712 mirrors Section 5 of the Federal Trade Commission Act's authority. 15 U.S.C. 45(a).[3] In the FTC's case, the power it could wield with Section 5 under the Government's interpretation here would be tremendous. Based on how the Department supports the Rule here—*i.e.* that a small group of consumers upset an advertisement about product A does not also include advertisement of separate products B, C, and D—the impact to FTC regulatory authority would be an enormous, economy-wide power grab.

Take an example of a grocery store chain advertising coupons on its public facing website. The FTC could, based on complaints from some consumers who find it too hard to calculate the cost of breakfast, determine milk, cereal, bowls, and spoons are "critical" products in the breakfast sector of the grocery industry. Under the Department's approach, the FTC would be empowered to issue a rule requiring

---

[3] 15 U.S.C. § 57a provides a general rulemaking authority for the FTC to define unfair/deceptive practices. However it is limited to the meaning of unfair/deceptive practices in Section 5 of the FTC Act (15 U.S.C. § 45(a)), which is consistent with and would not alter this analysis addressing the meaning of Section 5. *See id.* §57a (granting authority to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title.")).

grocery stores to include the additional prices for milk, bowls, and spoons in any advertisement where the cost of cereal is provided.

Not everyone purchases or even enjoys milk with their cereal. Some individuals do not drink milk due to preference or health reasons. And not everyone who purchases cereal eats it in a bowl with a spoon. Under the Department's reasoning, none of this matters because the Government received complaints from a relatively miniscule number of consumers.

In another example of a national fast-food restaurant chain operating with a franchisee model, the national brand decides to run a promotion for a $2 cheeseburger on its website. Some consumers who typically purchase "combo meals" complain to the FTC they are confused about the total cost of eating out at fast-food burger restaurants, particularly because advertisements for entrees like cheeseburgers do not typically list the cost of fries or a drink.

The Government's approach allows the FTC to issue a rule, just like the Optional Services Rule, finding soft drinks and fries are "critical" components of fast-food restaurants. The FTC rule could require every fast-food restaurant providing menu prices on its website to include on the same page as any food item the cost of purchasing a 4-ounce portion of fries and an 8-ounce soft drink. For customers who enter a geographic location, the websites must list the local price of the fries and soft

drink if they differ based on location or specific franchise. If a burger restaurant has a rewards program, the cost of the fries and soft drink must account for any discounts or rewards available to them through that program.

Based on the Government's approach, this level of intrusive regulation would be okay to impose on gas stations, dentists, attorneys, clothing retailers, doctors—every profession and industry one can imagine—without Congress having spoken a word to indicate any federal agency should hold such enormous power. "Even if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions" such as the one at issue here. *West Virginia v. EPA*, 597 U.S. 697, 730 (2022) (quoting W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 288 (2016)).

There is no question that the Rule as applied to the airline industry, and how the Government could utilize the same power across the broader economy, is an "unprecedented assertion of authority to regulate a matter of vast economic or political significance." Gov. Br. 56 (quoting *West Virginia v. EPA*, 597 U.S. 697, 716, 721, 728 (2022)). It violates the major questions doctrine, and the Rule must be vacated.

## II. The Government is Compelling Commercial Advertising of a Service and the Rule Does Not Involve "Warnings or Disclaimers", Which Distinguishes this Case from Zauderer and Its Progeny

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Employees, Council 31*, 585 U.S. 878, 892 (2018) (citations omitted). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views," such as a preference for consumers to purchase certain optional services in air travel. *United States v. United Foods*, 533 U.S. 405, 410-11 (2001) (citations omitted).

The Rule here can be understood in two ways: (1) suppression of content, where the content is the "pricing scheme that [airlines] seek to employ," *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 44 (2017); or (2) compelled advertisement where the content is each optional service airlines must promote. Because the "purpose and practical effect" of the Rule is "to suppress speech" based on its content (here a product itself), heightened scrutiny such as that identified in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), or *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980).

Contrary to the Government's assertion, *Zauderer* does not apply because this case deals with content restrictions and compelled speech. The government action

here is not a requirement to include "**[warnings] or [disclaimers]**" which the Court held might be appropriate in certain situations "in order to dissipate the possibility of consumer confusion or deception." *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 651 (1985) (brackets in original) (quoting *In re R. M. J.*, 455 U.S. 191, 201 (1982)). Rather, the Government is compelling the advertisement of commercial products—a carry-on bag service, a checked bag service, etc. Airlines must advertise, and promote in a specific format, a product separate from the airfare which the Government wants to highlight. It is a violation of the law to advertise only the true and accurate price of air travel for the millions of fare-conscious passengers who do not purchase any or all Optional Services.

A. Compelled Advertisement of an Optional Product is Not Reasonably Related to Preventing Deception of Consumers

Even under *Zauderer*, the Government still bears the burden of establishing that a restriction on commercial speech is "only in the service of a substantial governmental interest." *Zauderer*, 471 U.S. 626, 638 (1985) (quoting *Cent. Hudson*, 447 U.S. at 566). *Zauderer* is suited to a unique context where the underlying commercial speech has little or no constitutional worth and corrective speech will help prevent consumer deception. *See Zauderer*, 471 U.S. at 651. An "essential feature[]" of the disclaimers in *Zauderer* was that they were aimed at "inherently misleading commercial advertisements." *See Milavetz, Gallop & Milavetz, P.A. v. United States*,

559 U.S. 229, 250 (2010). But when the government, as here, seeks to regulate lawful, non-misleading speech, there is no basis to apply a standard less strict than *Central Hudson*, regardless of whether the regulation restricts speech or compels a disclosure. *See Cent. Hudson*, 447 U.S. at 564-66.

Here, the Government argues that practices which have been in place since the 2011 Rule—and have been mainstays in the industry for decades—have suddenly become deceptive. The determinative question is whether *the commercial speech at issue* is deceptive or misleading. This is a standard the Government cannot meet here, because what the Rule actually seeks is to save mere *seconds* of time for a small fraction of travelers. Importantly, the speech the Government wants to prohibit in this case is no more than **the full and accurate cost of what any person can pay to travel without Optional Services**—something that is undisputedly non-deceptive, and which millions of passengers on Spirit, Frontier, and other airlines regularly choose.

Conversely, the advertisement in *Zauderer* "was found to be misleading on its face, and the regulation in that case did not mandate the specific form or text of the disclosure." *Milavetz,* 559 U.S. at 255-57 (Thomas, J. concurring in part and in the judgment) ("*Zauderer* does not stand for the proposition that the government can

constitutionally compel the use of a scripted disclaimer in any circumstance in which its interest in preventing consumer deception might plausibly be at stake.").

### B. The Rule Creates an Excessive Magnitude of Requirements, Well Beyond the Carefully Calculated Government Action Required Under *Zauderer*.

Under *Zauderer*, the Government's speech restrictions must support a "substantial" government goal for which the cost must "be carefully calculated." *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). The Government "bears the burden of justifying its restrictions." *Fox*, 492 U.S. at 481. This Rule is a far cry from carefully calculated restrictions, and well beyond the actions taken to infringe speech in any of the cases the Government cites in its brief.

The Government reiterated its position in 2017, 82 Fed. Reg. 58778, 58778 (Dec. 14, 2017), that the 2011 Rule ensured consumers had access to the information needed for Optional Services. This weighs against its argument now that there are no reasonable alternatives to the Rule. The Rule also implicates more than just the airlines by interfering directly with airline contracts with third parties, including ticket agents and other service providers airlines engage to serve the traveling public. And it also compels private, protected speech and mandates sharing of private business information that is flat-out intrusive.

Third, the Government's assertion that the Rule "simply requires the further disclosure of ancillary fees" is completely false. The Rule contains pages of requirements necessitating extensive explanation by the Department to convey what is prohibited or compelled. In addition to displaying Optional Service Prices on the fare and schedule search result pages, some of the additional requirements include:

- Airlines and ticket agents are not permitted to use expandable text, hyperlinks, or other means to display the Optional Services. 89 Fed. Reg. at 34675.

- When providing prices for each Optional Service, airlines must calculate numerous passenger-specific factors, regardless of whether the search is conducted on the airline's or a third-party's website, including:

  - Frequent flyer program status

  - Military status

  - Credit card holder status

  - Geography

  - Travel dates

  - Cabin class

  - Ticketed fare class. *Id.*

- Optional Service pricing must be disclosed on the very first page of their online platforms where consumers are directed after searching for flights, even if on a third-party entity's platform. *Id.*

- Airlines and ticket agents **are generally prohibited from enabling consumers to opt out of receiving Optional Services**. *Id.*

- Airlines and ticket agents must disclose identical Optional Service pricing on all platforms, such as website, mobile, or phone app, notwithstanding any differences in screen space or functionality. *Id.*

- Airlines must establish technical means for providing real-time anonymous and passenger-specific data to third-party ticket agents for every itinerary search conducted, and for all three unique Critical Ancillary Service prices. *Id.*

- Airlines and ticket agents advertising percentage-off discounts of a flight, ticket, or fare must apply the percentage-off discount to a price which includes all taxes, charges, and fees. 89 Fed. Reg. at 34674.

Any Customer wanting to purchase an Optional Service can already see the relevant prices in a matter of seconds through a link on the main page of an airline website. Once a consumer begins the reservation process by searching for a flight, they can choose to add Optional Services immediately after selecting the fare and schedule they want—**literally within seconds**—via the link for baggage. Reasonable

consumers are not "deceived" by this straightforward process. If a consumer adds an ancillary product or service, the booking price will immediately and accurately reflect that price. Airlines are not in the business of deceiving customers, which would quite clearly be against their self-interest in the free and open marketplace Deregulation introduced. Customers, too, have an interest in enjoying the flexibility and benefits the cost-conscious pricing model provides.

C. *Zauderer* Should be Distinguished Here Because it Does not Provide Sufficient Constitutional Protections Against Compelled Product Advertisements

The First Amendment infringement in this case is unprecedented because the Government is mandating the advertisement of a separate product, versus warnings or disclaimers about the product the commercial entity itself chooses to advertise. If the Court were inclined to apply a *Zauderer*-like test, it should distinguish this case based on these unique factors. Recently in *NetChoice*, Justice Thomas reiterated long-held "skeptic[ism] of the premise on which *Zauderer* rests—that, in the commercial-speech context, the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2412 (2024) (Thomas, J. concurring in judgment) (quoting *Milavetz,* 559 U.S. at 255 (Thomas, J., concurring in part and concurring in judgment)). As Justice Thomas stated in *Milavetz,* the Court

has "refused in other contexts to attach any 'constitutional significance' to the difference between regulations that compel protected speech and regulations that restrict it." 559 U.S. at 255 (2010).

The possible impact of this case is one in which the Government decides what products any company ultimately must advertise or sell. The Court should consider an exception to *Zauderer* based on this distinction, which accounts for this extraordinary intrusion into commercial speech, and which exacts no less scrutiny than would apply in *Central Hudson*. *See Milavetz,* 559 U.S. at 256 (Thomas, J., concurring in part and in the judgment) ("I would be willing to reexamine *Zauderer* and its progeny in an appropriate case to determine whether these precedents provide sufficient First Amendment protection against government-mandated disclosures.").

### D. Nothing About the D.C. Circuit Spirit Case Related to the 2011 Rulemaking is Relevant to this Case

The Government hangs its hat heavily throughout its brief on the 2012 decision by the D.C. Circuit in *Spirit Airlines*—selectively quoting from the 2-1 majority decision which dealt with different circumstances, a completely different rule, and was in a different circuit which has no precedential effect here. *Spirit* dealt with a challenge to certain provisions of the 2011 Rule primarily because Spirit, Allegiant Air, and Southwest Airlines wanted to "inform[] [their] customer base of the huge tax burden that the federal government imposes on air travel" by displaying it at the

end of checkout "with equal prominence, the breakdown … between base fare, airline-imposed fees, and government taxes and fees." *Spirit Airlines, Inc. v. United States DOT*, 687 F.3d 403, 411 (D.C. Cir. 2012). Ironically, the impetus for this challenge was because the Government was "bury[ing] in fine print the taxes and fees that the government itself imposes on air transportation," in a Rule purportedly for the purpose of promoting transparency. *Id.*

The dissent by Judge Randolph in *Spirit* criticizes the majority's reliance on *Zauderer* as providing "less than full constitutional protection." 687 F.3d at 421. Judge Randolph wrote—and we agree—that "[f]or commercial speech the current test, despite criticism is still *Central Hudson Gas & Electric Corp.*" *Id.* 421-22. Importantly, as discussed in Section II, *supra*, the *Zauderer* test the majority relied on in *Spirit* does not apply to what is here a much more restrictive and suppressive rule. Here, the Rule forces airlines to advertise products selected by the Government in the way the Government directs. The challenged provisions of the 2011 Rule instead dealt with the Government quite literally seeking to hide its taxes within the price of an airline base fare—contrary to common practices across every other industry. These two regulations are worlds apart in scope, intrusiveness, and constitutional scrutiny invoked.

### III. The Department's Regulatory Impact Analysis is Unreasonable and Ignores Critical Implementation Cost Data the Department was Aware of and Discussed in the Final Rule

Contrary to the Government's assertion, Petitioners are not asking this Court to "second-guess" the agency. Gov. Br. 91. Rather, the airlines point out areas where the Department either failed to consider an issue or merely pantomimed analysis—the type of missteps that render a rule arbitrary and capricious. Spirit and Frontier Br., Sec. II.B.

While agencies may not be required to conduct their own studies in all cases, it does not follow that an agency can rely on agency expertise rather than a reasonable explanation. *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023). The Court's duty here is "not to undertake [its] own economic study, but to determine whether the [agency] 'has established in the record a reasonable basis for its decision.'" *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quoting *Chem. Mfrs. Ass'n v. U.S. EPA*, 870 F.2d 177, 251 (5th Cir. 1989)).

Reasonableness is the standard here. Because the Department ignored integral cost analysis data it knew was material, the Rule rests on a "serious flaw" which "render[s] the rule unreasonable." *Id.* at 452 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)).

One relevant factor the Department failed to consider is the cost to comply with the Rule for airlines that use dynamic pricing for ancillary services. *See, e.g.,* National Air Carrier Association (NACA) Comments, 5 (Jan. 23, 2023), DOT-OST-2022-0109-0087 (discussing ULCC ancillary fee dynamic pricing). For Spirit alone, this is at least a $50-$100 million oversight. Pet. Br. at 41-45. The Department ignored these costs entirely. Instead, it lumped dynamic and static pricing costs together to create faulty implementation and ongoing cost estimates for every domestic airline, foreign airline, and ticket agent operating in the United States. Regulatory Impact Analysis on Final Rule [RIA], 18-21 (Apr. 23, 2024), DOT-OST-2022-0109-0753 (citing Campbell-Hill Aviation Group, DOT-OST-2022-0109-0090, attachment B).

To satisfy its burden under the APA and 49 U.S.C. § 40101, the Department was required to consider the disparity in compliance costs for static versus dynamic pricing due to the disproportionate impact the Rule would have on "small air carriers" utilizing dynamic pricing. 49 U.S.C. § 40101(a)(13). Failing to do so makes the Rule "unlawful [since] it does not rest 'on a consideration of the relevant factors.'" *Mich. v. EPA*, 576 U.S. 743, 743 (2015) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Several comments discussed how the Rule would impose drastic costs on carriers using dynamic pricing, and others specifically noted the unique cost hurdles for ULCCs. *E.g.*, Comments of Travelport, 10-11 (Jan. 23, 2023), DOT-OST-2022-0109-0094 (explaining how ULCCs offer varying discounts based on the passenger's military status, airline membership, cargo space availability and weight-and-balance demands and more dynamic pricing factors); Comments of United States Tour Operators Association, 23 (Jan. 23, 2023), DOT-OST-2022-0109-0089 (describing dynamic fee waivers); Comments of American Airlines, 27-28 (Jan. 23, 2023), DOT-OST-2022-0109-0102 (estimating loading delays due to displaying dynamic ancillary fees); Comments of Booking Holdings, Inc., 22-23 (Jan. 23, 2023), DOT-OST-2022-0109-0565 (describing how loading delays due to dynamic pricing will discourage customers conducting "exploratory searches").

Further costing consumers time, and as Frontier made clear in its presentation to the Department, the difficulty of reading a cluttered screen will frustrate and slow the customer booking experience.



Frontier Airlines March 30, 2023 Presentation, 17 (Mar. 30, 2023), DOT-OST-2022-0109-0728.



*Id.*

The Government argues screen clutter is not an issue, because the Department permitted pop-up links. Gov. Br. 82-83 (citing 89 Fed. Reg. at 34650). Pop-up links are not a viable option, because pop-up blockers (a kind of software program built into common web browsers such as Google Chrome, Mozilla Firefox, and Safari that prevents pop-ups from appearing) are too prevalent for carriers to rely on them as a means of informing customers. A customer with a pop-up blocker may not realize it is active, click to see the pop-up, and become frustrated when no prices appear. Carriers cannot afford to frustrate their customers, so are forced to use the confusing screen clutter pictured above.

As noted by NACA, the issue intensifies with phone screens, because carriers will need to provide the litany of prices on the screen's limited real estate. NACA Comments, 5, DOT-OST-2022-0109-0087. Hyperlinks to a separate page could solve this issue, *id.*, and do solve it under current regulations, but the Rule forbids this, 89 Fed. Reg. at 34650.

This failure to account for the effect of clutter on search time helps the Department arrive at a net annual benefit of $30.3 million to $253.3 million per year. RIA, at 24 (Table 11). This number stands in stark contrast to the Campbell-Hill Reports estimated net benefit of ***negative*** $33.7 billion over ten years. A4A Comments, Attachment B, 18-19 (Jan. 23, 2023), DOT-OST-2022-0109-0090 (Figure

11). The two reports arrive at this striking difference due to the Department's purported annual benefits of $402.6 million to $533.9 million for the combined reduction of search times on airline and non-airline websites. In contrast, the Campbell-Hill Report estimates $32.2 million in time saved over a period ten times longer.

The Department bases its time savings on a study measuring "the amount of time needed to determine airfares inclusive of checked bag fees" on airline websites compared to OTA websites, RIA at 16, but completely ignores how screen clutter and confusion would eat into the purported time savings. This time loss is not accounted for at all in the RIA's cost assessment, which only measures time lost to processing delays. RIA at 18-19.

Contrary to the Department's assertions, Gov. Br. 91-92, Frontier and Spirit informed the Department of these issues in their comments. Comments of Frontier Airlines, 8-13 (Jan. 23, 2023), DOT-OST-2022-0109-0020 (discussing the effect on smaller carriers, including due to technological hurdles for ancillary service pricing algorithms); Comments of Spirit Airlines, 9-11 (Jan. 23, 2023), DOT-OST-2022-0109-0092 (discussing how placing all information upfront overwhelms consumers); Frontier Airlines March 30, 2023 Presentation, 7, 12, 14 (Mar. 30, 2023), DOT-OST-2022-0109-0728 (discussing screen clutter and disproportionate harm to ULCCs).

## IV. There is no Waiver Defense in Rulemaking Challenges in this Circuit

The Government primarily relies on *BCCA Appeal Group v. U.S. EPA*, 355 F.3d 817 (5th Cir.) for its threadbare assertion of waiver. Gov. Br. 24. It failed to point out 5th Circuit case law before *BCCA* holding that "courts should not generally hold a petitioner estopped from objecting to an agency rule because his specific objection was not made during the 'notice and comment' period," *Seabrook v. United States Envtl. Prot. Agency*, 659 F.2d 1349, 1360 (5th Cir. 1981), as well as the more recent *Southwestern Elec. Power Co. v. EPA* case where this Court held the *BCCA* waiver precedent invalid because of its conflict with *Seabrook*. 920 F.3d at 1022 n.23 (5th Cir. 2019). Because 5th Circuit case law provides no waiver defense in notice-and-comment rulemaking challenges, the Government's argument fails.

*Seabrook* and *Southwest Elec.* are consistent with Supreme Court waiver doctrine, which only requires in some situations that "parties give an agency an opportunity to address an issue before seeking judicial review of that question." *Carr v. Saul*, 593 U.S. 83, 88 (2021). The extent to which courts impose such a requirement "depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Carr*, 593 U.S. at 88-89, (2021) (quoting *Sims v. Apfel*, 530 U.S. 103, 109 (2000)). Notice-and-Comment Rulemaking pro-

ceedings fall at the lowest end of the "adversarial" spectrum, even below the "inquisitorial" Social Security Claim proceedings in *Carr* and *Sims* where "the reasons for a court to require issue exhaustion are much weaker." *Carr*, 593 U.S. at 89 (2021) (quoting *Sims*, 530 U. S., at 110).

Nor could the Government establish a waiver defense even if it applied because the parties presented their arguments, DOT-OST-2022-0109-0809 (Spirit Letter); DOT-OST-2022-0109-0796 (A4A Letter), and the Government took full opportunity to address the issues now raised before this court. DOT-OST-2022-0109-0834 (DOT Letter to Spirit); DOT-OST-2022-0109-0833 (DOT Letter to A4A). The Government ignores these facts, never making a complete waiver argument.

# CONCLUSION

This Court should grant the petition for review and vacate the Rule.

Dated: October 30, 2024                    Respectfully submitted,


                                           /s/ Joanne W. Young_____
                                           Joanne W. Young
                                           jyoung@yklaw.com
                                           *Counsel of Record*
                                           David M. Kirstein
                                           dkirstein@yklaw.com
                                           Donald L. Crowell III
                                           dcrowell@yklaw.com
                                           **Kirstein & Young PLLC**
                                           1750 K Street NW, Suite 700
                                           Washington, DC  20006
                                           Phone: (202) 331-3348
                                           Fax: (202) 331-3933

                                           *Counsel for Spirit Airlines, Inc. and
                                           Frontier Group Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify under Federal Rule of Appellate Procedure 32(g) that (1) this filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(e) because, as calculated by Microsoft Word, it contains 6495 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f); and (2) this filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Charter font.

Dated: October 30, 2024

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on October 30, 2024, I electronically filed the foregoing Joint Opening Brief for Petitioners in Case No. 24-60373 with the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system.

Dated: October 30, 2024

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, Inc. and Frontier Group Holdings, Inc.*