No. 24-60231 c/w No. 24-60373

---

In the
# United States Court of Appeals
## for the Fifth Circuit

---

No. 24-60231

---

AIRLINES FOR AMERICA; ALASKA AIRLINES, INC.;
AMERICAN AIRLINES, INC.; DELTA AIR LINES, INC.; HAWAIIAN AIRLINES, INC.;
JETBLUE AIRWAYS CORPORATION; UNITED AIRLINES, INC.; NATIONAL AIR
CARRIER ASSOCIATION; INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners,*

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent;*

consolidated with

---

No. 24-60373

---

SPIRIT AIRLINES, INC.,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

---

On Petition for Review of a Final Rule of the
United States Department of Transportation
Agency No. 89 Fed. Reg. 34,620

---

**PETITION FOR REHEARING EN BANC
OF PETITIONERS IN CASE NO. 24-60231**

---

*(counsel information on inside cover)*

Alisha Q. Nanda
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

**No. 24-60231**, *Airlines for America et al. v. Department of Transportation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are so the judges of this Court may evaluate possible disqualification or recusal.

## I.     Petitioners

Petitioner Airlines for America has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner National Air Carrier Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner International Air Transport Association has no parent corporation, and no corporation holds a 10% or greater ownership interest in it.

Petitioner Alaska Airlines, Inc., is a wholly owned subsidiary of Alaska Air Group, Inc., a publicly held corporation. Blackrock, Inc., and The Vanguard Group each own 10% or more of Alaska Air Group, Inc.'s stock. No other publicly held corporation holds 10% or more of Alaska Airlines, Inc.'s or Alaska Air Group, Inc.'s stock.

Petitioner American Airlines, Inc., is a wholly owned subsidiary of American Airlines Group Inc., a publicly held corporation. No other publicly held corporation holds 10% or more of its stock.

Petitioner Delta Air Lines, Inc., is a publicly held corporation. It has no parent corporation. The Vanguard Group owns 10% or more of Delta's stock. No other publicly held corporation holds 10% or more of its stock.

Petitioner Hawaiian Airlines, Inc., is a wholly owned subsidiary of Hawaiian Holdings, Inc., which is a wholly owned subsidiary of Alaska Air Group, Inc., a publicly held corporation. Blackrock, Inc., and The Vanguard Group each own 10% or more of Alaska Air Group, Inc.'s stock. No other publicly held corporation holds 10% or more of Hawaiian Airlines, Inc.'s, Hawaiian Holdings, Inc.'s, or Alaska Air Group, Inc.'s stock.

Petitioner JetBlue Airways Corporation is a publicly held corporation. It has no parent corporation, and Blackrock, Inc. owns 10% or more of JetBlue Airways Corporation stock. No other publicly held corporation holds 10% or more of JetBlue Airways Corporation's stock.

Petitioner United Airlines, Inc., is a wholly owned subsidiary of United Airlines Holdings Inc. No other publicly held corporation holds 10% or more of United Airlines, Inc.'s stock.

## II.    Respondent

The United States Department of Transportation is an agency of the federal government.

## III.    Interested parties

### A.    Counsel for Petitioners

Counsel for Petitioners in the litigation are:

- Shay Dvoretzky, Alisha Nanda, Parker Rider-Longmaid, Steven Marcus, and Nicole Welindt; Skadden, Arps, Slate, Meagher & Flom LLP, for all Petitioners

- Paul W. Hughes, Andrew A. Lyons-Berg, and Nicole E. Wittstein; McDermott Will & Emery LLP for Petitioners Airlines for America, Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., JetBlue Airways Corporation, and United Airlines, Inc.

### B.    Opposing counsel

Opposing counsel in the litigation are:

- Urja Mittal, Nicholas S. Crown, and Michael Raab, U.S. Department of Justice

- Judith S. Kaleta, U.S. Department of Transportation

### C.    Other interested parties

The Court consolidated this case, No. 24-60231, and *Spirit Airlines, Inc. v. Department of Transportation*, No. 24-60373. Petitioners in No. 24-60231 incorporate the certificates of interested persons that have been filed in

connection with *Spirit Airlines*, No. 24-60373. Petitioners in No. 24-60231 also incorporate the certificate of interested persons that have been filed by *amici* in both this case and *Spirit Airlines*, No. 24-60373.

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.

Dated: March 14, 2025        */s/ Shay Dvoretzky*
                                Shay Dvoretzky

                                *Counsel for Petitioners*

**RULE 40(b)(2) STATEMENT**

The panel decision conflicts with the decisions of this Court and other courts of appeals; rests on a premise rejected by an earlier motions panel in this same case; leaves in place a Department of Transportation (DOT) rule that would upend the way airlines interact with their customers, at great cost, and with no demonstrated benefit; and sends inconsistent and confusing messages to DOT on remand about what to do next. These extraordinary circumstances require the full Court's intervention.

**1.** This case involves a challenge to a DOT regulation, *Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) (Rule), that purports to impose a code of rules telling airlines exactly when, where, and how to disclose ancillary-fee information—sometimes even with DOT-scripted language. A motions panel stayed the Rule. *Airlines for America v. Department of Transportation*, 110 F.4th 672, 677 (5th Cir. 2024) (Stay Op. 8 (attached)). That stay panel held that DOT exceeded its authority because the Rule "doesn't just prohibit" unfair conduct by airlines—which is all that 49 U.S.C. § 41712 authorizes—but instead "prescribes" a "code of online disclosure practices," no matter whether existing practices are unfair. Stay Op. 3-4.

Despite the stay panel's firm conclusion, the merits panel dodged the authority question. Op. 21. Instead, the merits panel held that DOT violated the Administrative Procedure Act (APA) by failing to provide an opportunity to comment on key data purportedly supporting the Rule. Op. 25-31. The panel remanded, but without vacatur—which is the *default* remedy required by the APA—because, it said, the stay remained in place. Op. 30-31.

> **2.**    The Court should review the merits panel decision en banc.

*First*, the decision conflicts with decisions of this Court and other courts of appeals. Remanding without vacatur "is justifiable only in 'rare cases' satisfying two conditions": "there must be a 'serious possibility' that the agency will be able to correct the rule's defects on remand; and vacatur "would produce 'disruptive consequences.'" *Chamber of Commerce of the U.S. v. U.S. Securities & Exchange Commission*, 88 F.4th 1115, 1118 (5th Cir. 2023). Those conditions are rarely met when an agency violates the APA's notice-and-comment requirements. *Id.* at 1118 & n.2; *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020). The panel disregarded this well-established rule, which this case cannot satisfy.

*Second*, the merits panel justified ignoring that rule by observing that the stay remains in effect. But that reasoning only compounds the

intracircuit conflict. Remand without vacatur requires a "serious possibility" that the agency will "justify"—and thus adhere to—"its decision on remand." *See Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). Here, remand without vacatur can be justified only if DOT could adhere to the Rule. But the premise of the stay—the same stay the panel relied on for its remand without vacatur—is that DOT *lacks* authority for the Rule. What's more, vacatur cannot produce disruptive consequences because—like the stay supposedly justifying *not* vacating—it would preserve the status quo.

*Third*, the panel decision thus creates an impossible situation on an exceptionally important issue. The decision tells DOT that the Court expects DOT to adhere to the Rule (the justification for remanding without vacatur) but that DOT also likely lacks authority for the Rule (the justification for the stay supposedly justifying the remand without vacatur). As the APA violation makes clear, DOT's Rule is a solution in search of a problem. Spurred by vigorous competition in a market Congress deregulated, airlines efficiently disclose ancillary fees in user-friendly ways. The Rule substitutes DOT's preference by unlawful fiat, with no evidence of overall consumer benefit and ample evidence that complying will cost airlines many millions of dollars. But rather than leave the new Administration free to abandon the

ill-conceived Rule, the panel's remand without vacatur sows confusion and forces the Administration to confront a rule that members of this Court have already held unlawful.

The Court should grant en banc review. And the Court could do so efficiently simply by amending the panel opinion to vacate the Rule—the result that longstanding precedent requires.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................i

RULE 40(b)(2) STATEMENT ................................................................. v

TABLE OF AUTHORITIES ...................................................................x

STATEMENT OF THE ISSUE MERITING REHEARING EN BANC.............1

STATEMENT OF PROCEEDINGS AND DISPOSITION ...............................1

STATEMENT OF FACTS ....................................................................7

ARGUMENT ...................................................................................8

    A.    The panel's remand without vacatur conflicts with
         precedent from this Court and other courts of appeals. ............10

    B.    The merits panel's decision is internally contradictory and
         creates intracircuit conflict with the stay panel's decision........14

    C.    The panel decision puts DOT and the airlines in an
         impossible situation on a critically important issue. .................15

CONCLUSION ...............................................................................17

CERTIFICATE OF COMPLIANCE ...................................................18

CERTIFICATE OF SERVICE ............................................................19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airlines for America v. Department of Transportation,*
110 F.4th 672 (5th Cir. 2024) (Stay Op.) ..................................... v, 1, 6, 13, 14

*Airlines for America v. Department of Transportation,*
127 F.4th 563 (5th Cir. 2024) (Op.) ..................................................... vi, 1, 6, 7,
.......................................................................................... 12, 13, 14, 15

*American Airlines, Inc. v. Wolens,*
513 U.S. 219 (1995) ................................................................................. 2

*Bridgeport Hospital v. Becerra,*
108 F.4th 882 (D.C. Cir. 2024) ......................................................... 11

*Chamber of Commerce of the U.S. v. U.S.*
*Securities & Exchange Commission,*
88 F.4th 1115 (5th Cir. 2023) ................................................ vi, 8, 10, 11, 12

*Cigar Ass'n of America v. U.S. Food & Drug Administration,*
126 F.4th 699 (D.C. Cir. 2025) .................................................... 10, 11

*Environmental Defense Fund v. Federal Energy Regulatory Commission,*
2 F.4th 953 (D.C. Cir. 2021) ............................................................. 11

*Humane Society of the U.S. v. Zinke,*
865 F.3d 585 (D.C. Cir. 2017) ......................................................... 11

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024) ......................................................................... 11

*Montana Wildlife Federation v. Haaland,*
127 F.4th 1 (9th Cir. 2025) ......................................................... 10, 11

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ......................................................................... 1, 2

*Natural Resources Defense Council v. Wheeler,*
955 F.3d 68 (D.C. Cir. 2020) ...................................................... vi, 12

*Restaurant Law Center v. U.S. Department of Labor,*
120 F.4th 163 (5th Cir. 2024) .......................................................... 10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ................................................................. vii

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) ................................................................10

**STATUTES AND REGULATIONS**

Administrative Procedure Act,
   5 U.S.C. § 551 *et seq.* .................................................. vi, vii, 1, 7, 10, 11

   5 U.S.C. § 706(2) ....................................................................................11

Airline Deregulation Act of 1978,
   49 U.S.C. § 1371 *et seq.* ......................................................................1, 2

49 U.S.C. § 41712 ................................................................. v, 1, 4, 6, 14

*Enhancing Transparency of Airline Ancillary Service Fees*,
   87 Fed. Reg. 63,718 (Oct. 20, 2022) ....................................................3, 5

*Enhancing Transparency of Airline Ancillary Service Fees*,
   89 Fed. Reg. 34,620 (Apr. 30, 2024) ........................... v, vi, vii, viii,
   ......................................................................... 1, 3, 4, 5, 6, 7, 8,
   ......................................................................... 9, 10, 12, 13, 14, 15, 17

**OTHER AUTHORITIES**

Airlines for America, Comment Letter on Proposed Rule
   *Enhancing Transparency of Airline Ancillary Service Fees*
   (Jan. 23, 2023), DOST-OST-2022-0109-0090 ................................................2, 5

Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025) ......................9, 15

Regulatory Impact Analysis on Final Rule
   *Enhancing Transparency of Airline Ancillary Service Fees*
   (Apr. 23, 2024), DOST-OST-2022-0109-0753................................................5, 6

Regulatory Impact Analysis on Proposed Rule
   *Enhancing Transparency of Airline Ancillary Service Fees*
   (Sept. 25, 2022), DOST-OST-2022-0109-0002 ...................................................3

## STATEMENT OF THE ISSUE MERITING REHEARING EN BANC

The question is whether the panel should have vacated the Rule based on DOT's notice-and-comment violation, as required by precedent from this Court and other courts of appeals, where the panel's justification both conflicts with that default rule and rests on a stay that presupposes that the agency *cannot* lawfully adhere to the Rule on remand.

## STATEMENT OF PROCEEDINGS AND DISPOSITION

The Rule mandates when, where, and how airlines must disclose ancillary-fee information to consumers during the online booking process. The Court stayed the Rule pending review, because the Rule "enacts a code of online disclosure practices"—a prescriptive command that 49 U.S.C. § 41712 does not authorize. Stay Op. 4. The merits panel, however, avoided that issue, instead holding that DOT violated the APA's notice-and-comment requirements by resting its analysis on data the public never saw. Op. 21, 26-30. The panel then remanded the Rule without vacating it—and without concluding that DOT could adhere to the Rule, despite the stay panel's holding that the Rule exceeded DOT's authority. Op. 30-31.

**1.** Congress enacted the Airline Deregulation Act because it determined that "'maximum reliance on competitive market forces' would

best further 'efficiency, innovation, and low prices.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). Congress thus left "the selection and design of marketing mechanisms" "to the airlines themselves." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 230 (1995). The result has been an overwhelming success for consumers and airlines alike. Fares have reached "historically low" levels. Airlines for America (A4A) Comments Attachment C 5, 11, DOT-OST-2022-0109-0090. And because airlines offer several "ancillary services"—like checked bags, seat selection, and refundable tickets—consumers can "customize their travel experience to meet budget and individual travel preferences and needs." *Id.* at 15-17, 19-20.

Airlines transparently disclose ancillary services and fees in uncluttered, consumer-friendly ways. They also share that information with ticket agents through contractual agreements that promote consumer choice. Indeed, transparency is the only way to succeed in this "highly competitive" market. *Id.* at 19. Consumers know that each airline has its menu of options, that not every menu looks the same, and that the different options meet different needs and often cost money.

**2.** The Rule would upend those successful practices, which maximize consumer choice, and replace them with DOT's preferred code of fair competition—a solution in search of a problem.

**a.** In 2022, DOT proposed mandating ancillary-fee disclosures in particular ways, in particular places, and at particular stages in the air-travel search process. *See Enhancing Transparency of Airline Ancillary Service Fees*, 87 Fed. Reg. 63,718 (Oct. 20, 2022). DOT claimed its proposed mandates would be "helpful to consumers." *Id.* at 63,721. But DOT admitted that a total "lack of data," *id.* at 63,732, meant it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs," 2022 Regulatory Impact Analysis at ii, DOT-OST-2022-0109-0002.

**b.** In 2024, DOT issued the Rule anyway.

The Rule mandates how airlines and ticket agents must disclose fees for ancillary services, like "transporting the first checked bag, the second checked bag, or a carry-on bag" and "the ability for a consumer to cancel or change a reservation." 89 Fed. Reg. at 34,675. The Rule requires those disclosures at "the first time that fare and schedule information is disclosed," and prohibits disclosure through hyperlinks. *Id.* Disclosures must state "not available" or something similar when a critical ancillary service is

unavailable. *Id.* For "passenger-specific" searches, carriers must also make "passenger-specific" disclosures "tak[ing] into account" "the passenger's status in the airline's frequent flyer program," "military status," and "status as a holder of a particular credit card." *Id.* And before purchase, carriers must conspicuously disclose "weight and dimension limitations" for first and second checked bags and carry-on bags, and "components of change and cancellation policies." *Id.* at 34,676. Carriers must also display, verbatim, whenever offering "a seat selection for a fee: 'A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel.'" *Id.* Moreover, carriers must disclose this ancillary fee information to ticket agents in a manner "useable, current, accurate, and sufficient to ensure" ticket agents' compliance with the Rule. *Id.* at 34,677.

DOT claimed (*id.* at 34,627) authority to issue the Rule under 49 U.S.C. § 41712, which authorizes DOT to "investigate and decide whether" a covered entity "has been or is engaged in an unfair or deceptive practice." If DOT so finds "after notice and an opportunity for a hearing," it may "order" the entity "to stop the practice." *Id.*

DOT purported to justify the Rule with cost-benefit data the public never saw. DOT tried fixing its "lack of data" problem from the 2022 notice, 87 Fed. Reg. at 63,732, with a new Regulatory Impact Analysis (2024 RIA), DOT-OST-2022-0109-0753. The 2024 RIA relied on "new research" from Nicholas Rupp, 2024 RIA 16, published *after* the public comment period. *See id.*; 89 Fed. Reg. at 34,625. DOT conceded that, even with that research, its new results were "driven by values of uncertain parameters." 2024 RIA 25. DOT also dismissed cost-benefit survey data submitted during the comment period, 2024 RIA 16, that accounted for 50% of 2019 U.S. roundtrip airline travelers and found that only 20% of passengers pay for a checked bag. A4A Comments Attachment B 9-10 & n.7. DOT instead relied on a university survey concluding "that 46 percent of student participants consider baggage fee information when they search for airfare." 2024 RIA 16-18, 26-27.

DOT estimated that the benefits of the Rule would "range from $365 million to $484 million annually," and that the Rule would cost consumers "$239 million to $331 million annually." 89 Fed. Reg. at 34,622. DOT estimated that the Rule would cost air carriers and ticket agents $46 million. 2024 RIA, at ii. Ultimately DOT concluded that there was a "roughly 53%" chance that the "net benefits" would be "positive," likely ranging from

"$30.3 million to $254 million," 2024 RIA, at i—a wild guess putting the top of the range at more than eight times the bottom.

**3.** The Airlines sought this Court's review and a stay pending review. Docs. 1, 16, 31. The Court stayed the Rule, holding that it "likely exceeds DOT's authority." Stay Op. 1-2. The stay panel observed that § 41712 authorizes DOT only to "stop" unfair or deceptive practices, but "the Rule doesn't just prohibit—it prescribes." Stay Op. 4 (alteration adopted). Put differently, "the Rule essentially enacts a code of online disclosure practices," which is "not authorized by the statute." *Id.* Because the Airlines showed they likely would succeed on their statutory authority challenge, the stay panel didn't reach the Airlines' other challenges. Stay Op. 3 & n.2.

**4.** The merits panel left the stay in place and remanded the Rule without vacating it. Op. 31. The panel "conclude[d] that DOT has the power to make rules under § 41712" as a general matter, provided that the rules "specifically address[] unfair or deceptive practices being conducted by airlines." Op. 12, 21. But the panel did "not determine whether *this* Rule is fully authorized by § 41712," Op. 12—that is, the issue the stay panel had decided against DOT when it held that "the Rule doesn't just prohibit—it prescribes," Stay Op. 4 (alteration adopted).

Instead, the Court held that DOT violated the APA's notice-and-comment requirements by justifying the Rule using "critical" "new data" "without affording an opportunity for comment." Op. 26-28. The Court explained that "[i]t was only after the public comment period closed that DOT, using the Rupp study, justified its conclusion that hundreds of millions of dollars in annualized benefits would result from reduced search costs." Op. 28-29. Because the new data "supplied the basic assumption" supporting DOT's cost-benefit analysis; DOT's reliance on that data produced an "imprecise" range of benefits; and the "net societal benefits amounted to a 'coin flip,'" the Court questioned "whether DOT would have issued the same Rule" had it provided an opportunity to comment on the new data. Op. 28, 30 (alterations adopted). The Court thus "remand[ed] the Rule to DOT so it can afford Petitioners an opportunity to comment on the new data." Op. 30.

But the Court declined to vacate the Rule. Because it was "leaving the stay of the Rule in place," the Court saw "no need to vacate it at this time." Op. 30-31.

## STATEMENT OF FACTS

The relevant facts are set out above (at 1-7).

**ARGUMENT**

The full Court should grant rehearing and issue an amended opinion vacating the Rule. Petitioners also respectfully suggest that the Court excise the unnecessary discussion of DOT's statutory authority generally, which doesn't confront the key reasons the stay panel found the Rule unlawful or provide guidance to DOT on remand.

**A.**    In remanding without vacatur solely because the Rule is stayed, the panel opinion conflicts with precedent from this Court and other courts of appeals. The well-established standard for remand without vacatur requires "a 'serious possibility' that the agency will be able to correct the rule's defects on remand" and a finding that vacatur "would produce 'disruptive consequences.'" *Chamber of Commerce*, 88 F.4th at 1118. The panel ignored those conditions, which aren't satisfied. *First*, there is no serious possibility that DOT can adhere to the Rule on remand. For one thing, DOT purported to justify the Rule with cost-benefit data the public never saw. Public comment would have made clear that the data supplies no sound basis for the Rule. There is also no "serious possibility" that DOT could adhere to the Rule on remand because the Rule exceeds DOT's statutory authority, as the stay panel recognized. *Second*, vacatur would not be disruptive. Just the opposite:

like the stay, it would preserve the status quo rather than let a disruptive Rule take effect.

**B.** The merits panel's decision creates additional intracircuit conflict. The panel justified remanding without vacatur by pointing to the stay. The result is internal contradiction and intracircuit conflict. Remand without vacatur contemplates that DOT likely can lawfully adhere to the Rule. But the stay panel's determination that DOT exceeded its statutory authority — a determination the merits panel didn't disturb, but rather relied on to maintain the stay — means that DOT *cannot* lawfully issue the Rule. The merits panel decision thus *relies on and conflicts with* the stay panel decision.

**C.** The merits panel decision creates an unnecessary dilemma on a critically important issue. The decision tells DOT that it must conduct notice-and-comment proceedings because it likely will adhere to the Rule, while simultaneously telling DOT that it likely lacks authority to do just that. Even putting that confusion aside, the decision ties the new Administration's hands by forcing it to confront an unauthorized Rule purporting to solve a nonexistent problem. *Contra* Exec. Order No. 14,219, 90 Fed. Reg. 10,583, 10,583 (Feb. 19, 2025) (agencies must identify for rescission regulations exceeding statutory authority or failing cost-benefit balancing). After all, DOT

couldn't quantify benefits, and its guesses ranged from one amount to another eight times higher, all to replace airline practices, honed by competition, that work. Vacatur—the only remedy that doesn't conflict with this Court's and other courts of appeals' precedent—would allow DOT to abandon the Rule as unauthorized and unwarranted, rather than require it to conduct further proceedings for a Rule it should never have promulgated.

### A. The panel's remand without vacatur conflicts with precedent from this Court and other courts of appeals.

In remanding without vacating the Rule, the panel departed from the decisions of this Court and other courts of appeals.

**1.** When an agency violates the APA, the "default rule is that vacatur is the appropriate remedy." *Chamber of Commerce*, 88 F.4th at 1118 (alteration adopted). "Departing from that default rule is justifiable only in 'rare cases' satisfying two conditions." *Id.* "[T]here must be a 'serious possibility' that the agency will be able to correct the rule's defects on remand," and "vacating the challenged action would produce 'disruptive consequences.'" *Id.*; *see Texas v. United States*, 126 F.4th 392, 418 (5th Cir. 2025); *Restaurant Law Center v. U.S. Department of Labor*, 120 F.4th 163, 177 (5th Cir. 2024) (collecting cases). Other courts of appeals follow the same rule. *See,*

*e.g.*, *Montana Wildlife Federation v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025); *Cigar Ass'n of America v. U.S. Food & Drug Administration*, 126 F.4th 699, 705-06 (D.C. Cir. 2025).

That strict vacatur rule follows from the APA's text: when an agency has acted unlawfully, a court "shall … set aside" the action. 5 U.S.C. § 706(2). Indeed, some judges have questioned whether remand without vacatur is *ever* permissible. *Bridgeport Hospital v. Becerra*, 108 F.4th 882, 890 & n.5 (D.C. Cir. 2024). At minimum, the APA's text makes vacatur the default and "means what it says," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 393 (2024). Courts may not expand the remand-without-vacatur exception.

The first condition isn't met—meaning vacatur is required—when the action suffers from "one or more serious procedural or substantive deficiencies." *Chamber of Commerce*, 88 F.4th at 1118. When the agency's analysis reflects "major shortcomings that go to the heart" of the challenged action, *Humane Society of the U.S. v. Zinke*, 865 F.3d 585, 614-15 (D.C. Cir. 2017), or "it is far from certain that [the agency] 'chose correctly,'" *Environmental Defense Fund v. Federal Energy Regulatory Commission*, 2 F.4th 953, 976 (D.C. Cir. 2021), the court must vacate. Thus, when a regulation has been "promulgated in violation of notice-and-comment requirements," "remand without vacatur

would not be appropriate." *Chamber of Commerce*, 88 F.4th at 1118 n.2. That's because "the entire premise of notice-and-comment requirements is that an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures." *Natural Resources Defense Council*, 955 F.3d at 84-85.

2.    Had the merits panel followed this well-established precedent, it would have vacated the Rule.

*First*, there is no there is no "'serious possibility' that the agency will be able to correct the rule's defects on remand." *Chamber of Commerce*, 88 F.4th at 1118. DOT violated bedrock notice-and-comment requirements, and that violation goes to the heart of the Rule, because DOT "supplied the basic assumption" for its assessment of the Rule's costs and supposed benefits with data the public never saw. Op. 28 (alterations adopted). "It was only after the public comment period closed that DOT, using the Rupp study, justified its conclusion that hundreds of millions of dollars in annualized benefits would result from reduced search costs." Op. 28-29. Because the new data played a critical role in DOT's decision to issue the Rule, and because DOT's reliance on that data produced an "imprecise" range of benefits, "to put it mildly," there is every reason to "question whether DOT would

have issued the same Rule" had the public been given an opportunity to comment on the new data. Op. 28, 30.

There is also no serious possibility that DOT could issue the same Rule because DOT likely lacks authority for the Rule. Although the merits panel did not confront that question, it also did not disturb the stay panel's conclusion that the Rule likely exceeds DOT's statutory authority. *See* Op. 21; Stay Op. 3-4. The motions panel stayed the Rule because it "enacts a code of online disclosure practices," which is "not authorized by the statute." Stay Op. 4. And the merits panel *relied* on that stay to justify not vacating the Rule. That got things exactly backwards. The only panel to have reached the Airlines' core statutory authority argument has concluded that DOT *cannot* correct the Rule's defects on remand, meaning vacatur is required.

*Second*, the circumstances do not show that vacatur would be disruptive. Just the opposite is true: vacatur would preserve the status quo, protecting the Airlines from costly, unnecessary regulation and thus also protecting consumers from costly, unnecessary clutter. As the stay panel found, letting the Rule take effect would inflict "irreparable harm" on the Airlines by forcing them "to expend significant resources reengineering their websites to comply with the Rule." Stay Op. 7.

- 13 -

In sum, under the well-established rule for remand without vacatur, which the panel refused to apply, vacatur was required. The resulting conflict warrants correction by the full Court.

**B.    The merits panel's decision is internally contradictory and creates intracircuit conflict with the stay panel's decision.**

The merits panel's decision also conflicts with the stay panel's decision, creating intracircuit conflict. The merits panel justified not vacating the Rule because it was keeping the stay in effect. But as just explained, that novel approach departs from the well-established requirements that there must be a serious possibility that the agency will adhere to its action on remand and that vacatur would be disruptive.

Relying on the stay to conclude otherwise doesn't make sense. The premise for the stay is that the Rule "enacts a code of online disclosure practices," which "is not authorized by" § 41712, Stay Op. 4, meaning DOT *cannot* adhere to the Rule on remand. What's more, the stay panel found irreparable harm to the Airlines if the Rule were to go into effect. Stay Op. 7. Rather than disagree with those holdings, the merits panel *relied on them* by keeping the stay in place, all while saying it was ducking the authority issue,

Op. 21. The stay and merits panel decisions thus irreconcilably conflict and require the full Court's intervention to amend the opinion to require vacatur.

## C.    The panel decision puts DOT and the Airlines in an impossible situation on a critically important issue.

The panel decision doesn't just conflict with precedent on two important issues. It also sows confusion and creates unresolvable problems for DOT on remand, all to protect a rule that is unnecessary and unlawful.

The decision simultaneously tells DOT to begin new notice-and-comment proceedings to justify the Rule *and* that DOT likely lacks authority to adhere to the Rule it must justify. The decision thus raises questions about whether DOT may simply abandon the rulemaking proceeding—as vacatur would clearly permit. *See also* 90 Fed. Reg. at 10,583. And it does so despite serious questions about whether DOT could point to evidence that benefits outweigh costs—an issue on which the Court should have allowed the new Administration to make its own judgment.

As Petitioners have explained above and in their briefs (Br. 55-59; Reply 23-24), the Rule is a costly solution in search of a nonexistent problem. The Airlines, propelled by competitive market forces, already transparently disclose ancillary-fee information. DOT's preference-by-fiat would only

clutter consumers' screens and burden their booking experiences. DOT's estimate for the range of net benefit figures spans nearly an order of magnitude—a clear admission that DOT was guessing, not reasoning. Vacatur would allow the process to come to its natural end, rather than force DOT to continue playing a cost-benefit game of darts in the dark.

## CONCLUSION

The Court should rehear the case en banc and issue an amended opinion vacating the Rule and excising the unnecessary discussion of statutory authority.

Dated: March 14, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*

Alisha Q. Nanda
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116

Nicole Welindt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 94301

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g) and 40(d)(2), I hereby certify that (1) this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 40(d)(3) and Fifth Circuit Rule 40.2.5, because it contains 3,899 words, as calculated by Microsoft Word, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f); and (2) this petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: March 14, 2025        */s/ Shay Dvoretzky*
                                  Shay Dvoretzky

                                  *Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2025, I electronically filed the foregoing petition and following opinions with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: March 14, 2025              */s/ Shay Dvoretzky*
                                   Shay Dvoretzky

                                   *Counsel for Petitioners*

**EXHIBIT A:**
**MERITS PANEL OPINION**

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2025

Lyle W. Cayce
Clerk

————————

No. 24-60231

————————

AIRLINES FOR AMERICA; ALASKA AIRLINES, INCORPORATED;
AMERICAN AIRLINES, INCORPORATED; DELTA AIR LINES,
INCORPORATED; HAWAIIAN AIRLINES, INCORPORATED;
JETBLUE AIRWAYS CORPORATION; UNITED AIRLINES,
INCORPORATED; NATIONAL AIR CARRIER ASSOCIATION;
INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners,*

*versus*

DEPARTMENT OF TRANSPORTATION,

*Respondent,*

CONSOLIDATED WITH

————————

No. 24-60373

————————

SPIRIT AIRLINES, INCORPORATED,

*Petitioner,*

*versus*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

---

Petitions for Review from an order of the
Department of Transportation
Agency No. 89 Fed. Reg. 34620

---

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges*.

HAYNES, *Circuit Judge*:

In 2024, the Department of Transportation ("DOT") issued a final rule under 49 U.S.C. § 41712(a) requiring airlines to disclose certain fees upfront when potential customers search for itineraries. *See* Enhancing Transparency of Airline Ancillary Service Fees [hereinafter "Rule"], 89 Fed. Reg. 34620 (Apr. 30, 2024). Two groups of airlines now challenge the Rule as unauthorized by Congress and unlawful under the Administrative Procedure Act ("APA").

We hold that DOT has authority to make rules under § 41712(a). However, we ultimately REMAND this particular Rule, as DOT failed to fully comply with the requirements of the APA.

## I.    Background

### A. Legislative Background

Under the Federal Aviation Act of 1958, the Civil Aeronautics Board regulated the interstate airline industry. *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 279–80 (2014). "Pursuant to this authority, the Board closely regulated air carriers, controlling, among other things, routes, rates, and services." *Id.* at 280. The Board also had authority "to take administrative action against certain deceptive trade practices." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). Specifically, Congress empowered the Board to "investigate and determine whether any air carrier . . . has been or is engaged in unfair or deceptive practices or unfair methods of competition" and to "order such air carrier . . . to cease and desist from such practices or

methods" upon finding after "notice and hearing" that the air carrier was engaged in the same. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 296 n.7 (1976) (quoting § 411 of the Federal Aviation Act, 72 Stat. 769 (formerly codified at 49 U.S.C. § 1381 (1976))).

"In 1978, however, Congress enacted the [Airline Deregulation Act (the "Deregulation Act")], which sought to promote 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Ginsberg*, 572 U.S. at 280 (quoting 49 U.S.C. § 40101(a)(6), (12)(A)). The Deregulation Act "provided that [the Civil Aeronautics Board] would be dismantled in 1985." *Statland v. Am. Airlines, Inc.*, 998 F.2d 539, 540 (7th Cir. 1993). It also "eliminated the government's ability to set airfares." *Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 408 (D.C. Cir. 2012). But the Deregulation Act did not abolish the federal government's power to investigate and prohibit unfair or deceptive practices in air transportation; instead, Congress transferred the power to the DOT. *Ginsberg*, 572 U.S. at 288–89; *Morales*, 504 U.S. at 378–79; *Spirit Airlines*, 687 F.3d at 408; *Statland*, 998 F.2d at 541. Such power is now codified in 49 U.S.C. § 41712, whose relevant language echoes § 411 of the Federal Aviation Act of 1958:

> On the initiative of the Secretary of Transportation or the complaint of an air carrier . . . or ticket agent, and if the Secretary considers it is in the public interest, the Secretary may *investigate and decide whether an air carrier . . . has been or is engaged in an unfair or deceptive practice or an unfair method of competition* in air transportation or the sale of air transportation. If the Secretary, after notice and an opportunity for a hearing, finds that an air carrier . . . is engaged in an unfair or deceptive practice or unfair method of competition, the Secretary *shall order the air carrier . . . to stop the practice or method.*

49 U.S.C. § 41712(a) (emphasis added).

## B. Administrative Background

Before it was dismantled pursuant to the Deregulation Act, the Civil Aeronautics Board issued rules pursuant to § 41712's predecessor, § 411 of the Federal Aviation Act. *United Air Lines v. Civ. Aeronautics Bd.*, 766 F.2d 1107, 1111 (7th Cir. 1985) ("The Board has been issuing rules based on section 411 since 1960."). Such rules included provisions relating to overbooking, notice of passenger contract terms, and liability for lost luggage. *Id.*

DOT has likewise issued regulations pursuant to § 41712 for decades. For example, in 1999, DOT promulgated a rule requiring carriers, when selling service under a single flight number but requiring a change of aircraft, to provide passengers written notice that they "must change aircraft en route even though [the] ticket may show only one flight number." 14 C.F.R. § 258.5(c); *see id.* § 258.4 (stating that the holding out of such service "is prohibited as an unfair or deceptive practice or an unfair method of competition within the meaning of [§ 41712] unless . . . carriers and ticket agents follow the requirements of this part").

Further, effective January 2012, sellers of air transportation became required to notify consumers "of the potential for a price increase that could take place prior to the time that the full amount agreed upon has been paid by the consumer," including but not limited to increases in baggage prices or fuel surcharges. 14 C.F.R. § 399.89. More recently, DOT issued a rule requiring carriers to "provide a passenger on a [domestic] flight experiencing a tarmac delay at a U.S. airport the opportunity to deplane before the tarmac delay exceeds three hours in duration," subject to certain exceptions. 14 C.F.R. § 259.4(c)(1); *see id.* § 259.4(h) (stating that a carrier's "failure to comply . . . will be considered to be an unfair and deceptive practice within the meaning of" § 41712); Tarmac Delay Rule, 86 Fed. Reg. 23260, 23270–71 (May 3, 2021) (publishing the rule).

No. 24-60231
c/w No. 24-60373

## C. Procedural History

In 2022, DOT proposed a new rule that would require airlines to disclose—upfront—the prices of certain ancillary fees, such as those for checking a bag or canceling a flight, during the online booking process. *See* Enhancing Transparency of Airline Ancillary Service Fees [hereinafter "Notice of Proposed Rulemaking," or "NPRM"], 87 Fed. Reg. 63718 (Oct. 20, 2022). The proposed rule aimed to increase transparency and thus allow consumers "to determine the true cost of travel and to adequately compare airline pricing." *Id.* at 63721. Indeed, the Deregulation Act was issued for the purpose of saving money. DOT also proposed amending 14 C.F.R. § 399.85 to provide that the failure to disclose these fees "on the first page displayed when a consumer conducts a search for air transportation when fare and schedule information is shown" is "an unfair and deceptive practice" within the meaning of § 41712. *Id.* at 63736–38.

### 1. *The 2022 regulatory impact analysis*

After the Office of Management and Budget determined that the proposed rule required an assessment of potential costs and benefits,[1] DOT prepared a regulatory impact analysis (the "2022 RIA"). *See* Doc. No. DOT-OST-2022-0109-0002,[2] https://perma.cc/F9E8-HFL9; *see also* NPRM, 87 Fed. Reg. at 63732 (summarizing 2022 RIA). In a section titled "Need for regulation," the 2022 RIA said the "main premise underlying the proposed rule" was that "a market failure may exist because airline consumers may have inadequate information about ancillary fees before

---

[1] *See* Exec. Ord. No. 12866, Regulatory Planning and Review, 58 Fed. Reg. 51735 (Sept. 30, 1993), § 6(a)(3)(B)(ii), (C) (requiring, where applicable, assessment of potential costs and benefits of regulatory action).

[2] Unless otherwise specified, all citations to the administrative record will be to the rulemaking docket labeled DOT-OST-2022-0109, available at Regulations.gov.

buying tickets." 2022 RIA at 1. It acknowledged that although consumers "can sometimes acquire [the] information on their own," they are more likely to do so "when search costs are low." *Id.* at 5; *see also id.* ("When consumers can easily acquire the information . . . , they can eliminate the [information] asymmetry through their own actions, albeit with the cost of additional time and effort.").

The 2022 RIA further said it was "not possible at this time" to "quantitatively evaluat[e] the effects of the rule" due to "a lack of data and other significant uncertainties," and thus it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs." *Id.* at i–ii. But DOT concluded that the proposed rule "would yield societal benefits if it leads to reduced deadweight loss . . . or reduced search costs," and it calculated a "hypothetical example range" of societal benefits "using methods from earlier rulemakings." NPRM, 87 Fed. Reg. at 63732.[3]

For example, assuming that "1% of passengers compared prices [including ancillary fees] before the proposed rule" and that "those passengers save 2 minutes of searching after the rule," DOT calculated that $4.9 million in annual search cost savings would result, or $0.73 in time savings per passenger. 2022 RIA at 21.[4] DOT acknowledged, however, that its numbers were highly speculative: it "d[id] not have information to estimate the number of passengers who already compare fares with ancillary fees included or the amount of time they would save due to the proposed

---

[3] DOT defines "deadweight loss" as "the reduction of excess consumption of air travel" that "occurs because consumers who are unaware of ancillary service fees behave as if the price for air travel is lower than it is." Rule, 89 Fed. Reg. at 34668.

[4] This calculation "assume[d] that passengers search for fares on their own time without compensation and estimate[d] the value of this time using the median post-tax wage for United States workers, which was $22.00 per hour in 2021." 2022 RIA at 21.

rule," so it cautioned that its "discussion of potential time savings benefits [was] only illustrative." *Id.*

### 2. *Public comments*

DOT sought comments regarding the costs of implementing the proposed rule and regarding "the key uncertainties for quantifying or monetizing the economic effects of the proposed rule." NPRM, 87 Fed. Reg. at 63732. Commenters, including the trade association Airlines for America ("A4A"), questioned the proposed rule's benefits.

A4A argued that the proposed disclosure requirements would do more harm than good by "consum[ing] scarce screen real estate." Comments of Airlines for America at 38 (Jan. 23, 2023) [hereinafter A4A Comments], Doc. No. 90, https://perma.cc/T7LV-8DWB. A4A's comments included a regulatory impact assessment prepared for A4A by Campbell-Hill Aviation Group, LLC. *See generally* Attach. B [hereinafter Campbell-Hill Survey], A4A Comments. The Campbell-Hill Survey estimated that the proposed disclosure rule would result in net benefits of negative $33.7 billion and "will do much more harm than good." Campbell-Hill Survey at 6. For example, the survey argued that only 20 percent of all passengers pay for a first checked bag, making the proposed disclosure rule "only relevant to one of every five passengers." *Id.* at 10.

For its part, Frontier Airlines contended that the proposed rule "would make it impossible . . . to offer consumers the benefit of unbundled service options and ultra-low fares." Presentation of Frontier Airlines (Mar. 30, 2023) at 12, Doc. No. 728, https://perma.cc/FY8C-PW7H.[5] The public comment period closed on April 6, 2023. Rule, 89 Fed. Reg. at 34625.

---

[5] As described by petitioners Frontier Airlines and Spirit Airlines, an "unbundled" fare model offers customers "a base fare for air transportation" and the option to "select

### 3. The 2024 RIA

DOT promulgated the final Rule a year later on April 30, 2024. In doing so, it published a new Regulatory Impact Analysis (the "2024 RIA")[6] supporting the Rule's benefits for consumers. *See* Rule, 89 Fed. Reg. at 34669 (stating that the 2024 RIA was "developed in support of this final rule" and contained "modifi[cations] in response to public comments and further consideration by the Department").

The 2024 RIA noted that in light of new data, DOT had reevaluated the benefits of the Rule for consumers with respect to time savings. *See* 2024 RIA at 16. It cited a study by Nicholas Rupp, dated December 15, 2023, that concluded that the "amount of time needed to determine airfares inclusive of checked bag fees" was longer on airline sites compared to online travel sites like Travelocity or Expedia "due to the increase[d] effort needed to find information on baggage fees during airfare search." *Id.* DOT "use[d] Rupp's finding" to raise its estimate of consumer time savings that would result from the Rule. *Id.* The 2024 RIA also responded to A4A's estimate that only 20 percent of consumers pay to check bags,[7] noting that "baggage fee information is not necessarily irrelevant for consumers who do not pay to check bags" and citing the Rupp study's finding that "46 percent of student participants consider baggage fee information when they search for airfare." *Id.* "Thus," DOT concluded, "while we estimate time savings benefits using 20 percent, this is only for illustrative purposes. We view 46 percent [from the Rupp study] and 61 percent [from a 2023 A4A survey in which 61

---

as needed or desired . . . ancillary services such as the ability to change or cancel flights, select specific seats, or take a checked bag."

[6] *See* Doc. No. 753, https://perma.cc/SG5T-EF53.

[7] Of course, knowing one has to pay to check a bag may cause far fewer people to check a bag.

percent of respondents said they wanted checked bag fees reported in initial airfare displays] as more plausible proxies for the percentage of consumers who find information on ancillary fees relevant to their search for airfare and use those as primary estimates." *Id.* at 16–18.

Overall, the 2024 RIA estimated that the Rule would provide net benefits ranging from $30.3 million to $254 million annually, with a 53 percent probability "of net benefits being positive." *Id.* at i. This 53 percent probability was based on "plausible assumptions about the percentage of consumers who consider ancillary fees when they purchase airfare." Rule, 89 Fed. Reg. at 34668. The $30.3 million and $254 million figures were the result of two calculations, the lower of which used the Rupp study to estimate that 46 percent of consumers consider ancillary fees when searching for airfare. 2024 RIA at 24 (cost-benefit table). Both estimates accounted for approximately $5.5 million reduction in deadweight loss. *Id.*

The bulk of the assumed benefits in both estimates was attributable to a "[r]eduction in search time for consumers interested in ancillary service fees when they search for airline tickets." *Id.* DOT acknowledged that its cost-benefit analysis was "highly sensitive to the percentage of consumers who consider ancillary fee information relevant to their airfare purchase decision." *Id.* DOT also estimated that the Rule would result in a transfer of $543 million annually from airlines to consumers—an amount that represents what consumers currently overpay in fees. *Id.* at i–ii; *see also* Rule, 89 Fed. Reg. at 34622, 34668 (summarizing 2024 RIA).

### 4. *The final Rule*

The final Rule provides that airlines must make clear and conspicuous disclosures regarding the costs of "critical ancillary services," defined as "(1) transporting a first checked bag, second checked bag, and carry-on bag; and (2) changing or canceling a reservation." *Id.* at 34621. These disclosures must occur at "the first point at which a fare is quoted for a particular flight

itinerary." *Id.* at 34649. They also may not occur via a hyperlink because "displaying fees in that manner would disrupt the consumer's search." *Id.* at 34650.

Otherwise, the Rule allows for flexibility. Various display choices remain available; website platforms can disclose the fees "through a pop-up, in expandable text, *or by other means*." *Id.* (emphasis added). Further, airlines and ticket agents may "enabl[e] consumers to opt out of receiving fee information for a first checked bag, a second checked bag, or a carry-on bag during the search process," so long as the consumer "affirmatively indicates that no one in their booking party plans to travel with a first checked bag, a second checked bag, or a carry-on bag." *Id.* at 34657. In other words, the regulated entities retain some discretion as to how they implement the disclosure requirements.

### 5. Litigation

On May 10, 2024, A4A and a group of airlines (together "Airline Petitioners") petitioned for review in this court and moved for a stay of the Rule pending the outcome of their petition. We have jurisdiction over the petition pursuant to 49 U.S.C. § 46110. *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1012 (D.C. Cir. 2002). A panel of our court granted the requested stay on July 29, 2024. *See Airlines for Am. v. DOT*, 110 F.4th 672, 674 (5th Cir. 2024).[8]

Meanwhile, on June 28, 2024, Spirit Airlines filed a similar petition in the Eleventh Circuit. Since the A4A petition was filed first, the Spirit petition was transferred to this court. *See* 28 U.S.C. § 2112(a)(5). After

---

[8] This opinion is meaningful and helpful although it has some differences in what we say and address here. While we very carefully consider such rulings, a merits panel is not bound by the motions panel in the same case. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).

Frontier Airlines intervened in Spirit's case in support of Spirit, we consolidated the A4A and Spirit petitions. We will refer to Spirit and Frontier together as "SF Petitioners" and we list both groups together as simply "Petitioners."

## II.  Discussion

Petitioners' challenges to the Rule fall into three categories. First, they argue that DOT does not have statutory authority under 49 U.S.C. § 41712 to issue the Rule. We review questions of statutory interpretation de novo. *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019).

Second, Petitioners contend that the Rule violates the APA. Under the APA, we must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

Third, SF Petitioners argue that the Rule violates the First Amendment. Because we ultimately remand the Rule under the APA for further consideration, we decline for now to reach the First Amendment question.

### A.  Rulemaking Authority

Petitioners argue that DOT exceeded its statutory authority in issuing the Rule because 49 U.S.C. § 41712 merely provides adjudicatory authority to the agency—not prescriptive rulemaking authority. Airline Petitioners focus on the statute's use of the word "stop," § 41712(a), stressing that "stop means stop, not prescribe" and that the "prohibitory power in § 41712(a)" is conditioned "on DOT's making individualized findings"

through case-by-case adjudication. Further, Airline Petitioners contend that even if § 41712(a)'s text can otherwise be read to support DOT's authority to issue the Rule, the major questions and nondelegation doctrines prohibit it.

We conclude that DOT has the power to make rules under § 41712 and that this power is not inconsistent with the major questions or nondelegation doctrines. But because we hold below that the Rule at issue here must be remanded under the APA, we need not determine whether *this* Rule is fully authorized by § 41712.

### 1. *Forfeiture*

At the threshold, DOT argues that Petitioners conceded the agency's rulemaking authority during the notice-and-comment process and thus forfeited their statutory challenge, citing our decision in *BCCA Appeal Group. v. EPA*, 355 F.3d 817, 828 (5th Cir. 2003) ("Generally, in considering a petition for review from a final agency order, this court will not consider questions of law which were neither presented to nor passed on by the agency.").[9] In reply, Petitioners argue that *City of Seabrook v. EPA*, 659 F.2d 1349, 1360 (5th Cir. Unit A Oct. 1981), controls and that they are allowed to raise legal challenges not made before the agency in the first instance.

For two reasons, we agree with Petitioners. First, *Seabrook* was the first case in this court addressing whether a litigant who challenges agency action on grounds not raised during notice and comment has forfeited the

---

[9] DOT specifically cites comments by A4A, Spirit, and Frontier. *See* A4A Comments at 3–4 ("Regulations that empower consumers to make intelligent choices in a competitive marketplace are consistent with airline deregulation."); Comments of Spirit Airlines, Inc. (Jan. 23, 2023), at 6, Doc. No. 92, https://perma.cc/9D7V-2229 ("Current Regulations Encourage Innovation[.]"); Comments of Frontier Airlines (Jan. 23, 2023) at 5, Doc. No. 84, https://perma.cc/YQU8-L57H ("The 2011 regulations have worked well . . . .").

challenge in court. The *Seabrook* panel determined that "courts should not generally hold a petitioner estopped from objecting to an agency rule because his specific objection was not made during the 'notice and comment' period." *Id.* So, to the extent that *BCCA* contradicts it, we follow *Seabrook* under the rule of orderliness. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

Second, our precedent suggests that forfeiture is most apt when a petitioner raises an *arbitrary and capricious* challenge before the courts and makes arguments not developed during underlying rulemaking proceedings. *Compare, e.g.*, *BCCA Appeal Grp.*, 355 F.3d at 829 n.10 (arbitrary and capricious challenge forfeited), *and Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998) (arbitrary and capricious challenge forfeited), *with Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295, 297 (5th Cir. 1998) (statutory authority challenge not forfeited). Here, DOT argues that Petitioners forfeited their challenge to its rulemaking authority under § 41712—a matter of statutory interpretation we determine de novo, with no deference owed to the agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). DOT's interpretation of § 41712(a) merely holds persuasive value, at best. *See id.* at 2262 (reaffirming *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)). Thus, in line with the dichotomy that *BCCA–Seabrook* suggests, it would run afoul of the judicial function to abstain from deciding this purely legal matter simply because the agency has yet to weigh in. We thus reject DOT's forfeiture argument and proceed to the merits of Petitioners' statutory challenge.

No. 24-60231
c/w No. 24-60373

### 2. *Statutory interpretation*

Airline Petitioners and SF Petitioners both argue that DOT lacks power to promulgate regulations like the Rule at issue here. Airline Petitioners focus mostly on the text of § 41712. SF Petitioners mostly make policy arguments grounded on the Deregulation Act. We address both arguments below.

#### a.  Statutory text and framework

Airline Petitioners' argument centers on their contention that § 41712 grants DOT only adjudicative authority, not prescriptive authority. They do not cite any case in which a court held that an agency with conceded adjudicatory power similar to the power granted in § 41712 nevertheless did not have rulemaking power. Instead, they focus on § 41712's use of the word "stop." 49 U.S.C. § 41712(a) (stating that after notice and hearing, DOT may order an air carrier to "stop" unfair or deceptive practices). Airline Petitioners read the "stop" provision to "condition[] the prohibitory power in § 41712(a) on DOT's making individualized findings" and to "limit[] the reach of the prohibitory power to the particular airline under investigation." In response, DOT argues that this argument is foreclosed, both by the plain text of the statutory framework and by Supreme Court precedent.

We agree with DOT that the agency has authority to issue some prescriptive rules under § 41712, specifically in the context of needing to stop the problems that the rule is addressing. Our conclusion is based primarily on the plain text of the statutory framework. For example, 49 U.S.C. § 40113(a) grants the Secretary authority to "take action" he "considers necessary to carry out" Part A ("Air Commerce and Safety") of Subtitle VII ("Aviation Programs"), which contains § 41712, "*including . . . prescribing regulations*" (emphasis added).

14

Another section of Part A, § 46301, expressly discusses rules issued under § 41712. That section sets forth civil penalties for violating "a regulation prescribed" under Chapter 417 ("Operations of Carriers") of Title 49, which includes § 41712. *Id.* § 46301(a)(1)(A)–(B). The maximum penalty is generally $75,000, or $1,100 if the violator is an individual or small business concern. *Id.* § 46301(a)(1). The penalty provision exempts five sections of Chapter 417, but not § 41712. *Id.* § 46301(a)(1)(A). Further, § 46301 singles out § 41712, raising the maximum penalty to $2,500 for individuals or small business concerns that violate "section 41712 (*including a regulation prescribed* or order issued under such section)." *Id.* § 46301(a)(5)(D) (emphasis added).

We are not persuaded by Airline Petitioners' argument that other Title 49 provisions' express use of the word "prescribe" forecloses the possibility that Congress authorized prescriptive rulemaking under § 41712, which does not use that term. All of Airline Petitioners' examples of Congress expressly using the word "prescribe" come in the context of *mandatory* directives to engage in rulemaking. For example, 49 U.S.C. § 40103 provides that the Administrator of the Federal Aviation Administration "*shall* prescribe air traffic regulations." *Id.* § 40103(b)(2) (emphasis added). But Airline Petitioners do not quote the word "shall"; they characterize the provision as merely "authoriz[ing]," rather than requiring, the Administrator to prescribe such regulations.

Airline Petitioners also elide the word "shall" in § 44903. That section directs the Administrator of the Transportation Security Administration (1) to prescribe regulations to protect passengers and property against criminal violence and aircraft piracy and (2) to prescribe requirements for screening or inspection of individuals and property before entry into a secured area of an airport. 49 U.S.C. § 44903(b) ("The Administrator *shall* prescribe regulations to protect passengers and property

. . . against an act of criminal violence or aircraft piracy." (emphasis added)); *id.* § 44903(h)(4)(B) (stating that the Administrator "*shall* prescribe specific requirements for . . . screening and inspection" (emphasis added)). Again, Airline Petitioners characterize this provision as merely *authorizing*, rather than requiring, such regulations.

This distinction between mere authorization and affirmative command undermines Airline Petitioners' argument. Once the distinction becomes clear, it makes perfect sense that § 41712 would not expressly mention prescriptive regulation because (1) it, unlike §§ 40103 and 44903, does not *require* the Secretary to issue prescriptive regulations and (2) the Secretary *already* has *discretionary* rulemaking authority under § 40113. *See* 49 U.S.C. § 40113(a) (providing that the Secretary "*may*" prescribe necessary regulations (emphasis added)); *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." (quotation omitted)).[10]

Supreme Court precedent bolsters our conclusion. In *American Hospital Ass'n v. NLRB*, 499 U.S. 606, 608 (1991), the Court heard a challenge to an NLRB rule pertaining to bargaining units in the hospital industry. The rule provides that the NLRB will generally recognize only eight bargaining units for employees of acute-care hospitals: registered

---

[10] The other aviation provisions Airline Petitioners cite also use the word "shall." *See* FAA Reauthorization Act of 2018, div. B, tit. IV, subtit. A, § 421, 132 Stat. 3186, 3337 ("[T]he Secretary of Transportation *shall* promulgate regulations that require each covered air carrier to promptly provide a refund . . . ." (emphasis added)); FAA Extension, Safety, and Security Act of 2016, tit. II, subtit. C, § 2305, 130 Stat. 615, 640 ("[T]he Secretary of Transportation *shall* issue final regulations to require an air carrier or foreign air carrier to promptly provide to a passenger an automated refund . . . ." (emphasis added)).

nurses, physicians, other professionals, technical employees, skilled maintenance employees, clerical employees, guards, and other nonprofessional employees. 29 C.F.R. § 103.30(a). The NLRB promulgated the rule pursuant to § 6 of the National Labor Relations Act ("NLRA"), which allows the NLRB to make, pursuant to the APA, "rules and regulations as may be necessary to carry out the provisions" of the NLRA. 29 U.S.C. § 156. In turn, § 9(b) of the NLRA directs the NLRB to "decide in each case whether . . . the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b). In *American Hospital Ass'n*, the challenger argued that because § 9(b) of the NLRA requires the NLRB to make bargaining unit determinations "in each case," the NLRB cannot "us[e] general rules to define bargaining units." 499 U.S. at 608.

In a unanimous opinion, the Supreme Court upheld the NLRB rule. *Id.* at 609. First, the Court concluded that the general NLRB rulemaking authority set forth in § 6 of the NLRA "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act." *Id.* at 609–10. This general grant of NLRB authority is analogous to Title 49's general grant to the Secretary of Transportation of rulemaking authority. *See* 49 U.S.C. § 40113(a).

The Court then rejected the challenger's argument that NLRA § 9(b)'s "in each case" language limits the grant of general authority in § 6. *Am. Hosp. Ass'n*, 499 U.S. at 610. Observing that the requirement that the NLRB "exercise its discretion in every disputed case cannot fairly or logically be read to command the Board to exercise standardless discretion in each case," the Court held that "*even if a statutory scheme requires individualized determinations*, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *Id.* at 612 (emphasis

added); *see also Lopez v. Davis*, 531 U.S. 230, 244 (2001) (reaffirming *American Hospital Ass'n* and stating that even if statute required individualized determinations, federal agency was not "required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding" (internal quotation marks and citation omitted)). We think the Supreme Court's interpretation of NLRA § 9 is equally applicable to 49 U.S.C. § 41712. In other words, even though § 41712 "requires individualized determinations," DOT "has the authority to rely on rulemaking to resolve certain issues of general applicability" under that provision, as Airline Petitioners point to no statute in which Congress has "clearly expresse[d] an intent to withhold that authority." *Am. Hosp. Ass'n*, 499 U.S. at 612.

Airline Petitioners' attempt to distinguish *American Hospital Ass'n* is not persuasive. Airline Petitioners say *American Hospital Ass'n* "didn't concern legislative rules" and instead concerned an NLRB "policy statement telling regulated parties how it would exercise its enforcement discretion in future adjudications." But that is not true. The provision challenged in *American Hospital Ass'n* is the same type of provision challenged here: a final rule issued pursuant to the APA. *Compare* Rule, 89 Fed. Reg. at 34620, *with* Collective-Bargaining Units in the Health Care Industry, 54 Fed. Reg. 16,336, 16,336, 16,347 (Apr. 21, 1989) (publishing "Final rule" at issue in *American Hospital Ass'n* pursuant to 5 U.S.C. § 553).

Further, Airline Petitioners make a distinction that is largely without a difference. They do not explain how, as a practical matter, a rule issued under the APA is different than a "statement telling regulated parties how [an agency] w[ill] exercise its enforcement discretion in future adjudications." Assuming the Rule is otherwise lawful in stopping the deceptive or unfair acts of the airline, Airline Petitioners will not automatically be subject to civil penalties upon its effective date. If the Rule

were to take effect and the Secretary suspects that an air carrier is violating it, the Secretary would have discretion to (in other words, he "may") "investigate and decide" whether the carrier is in fact doing so, and the carrier would be entitled to "notice and an opportunity for a hearing" before being subject to any "order . . . to stop" or to any other penalty. 49 U.S.C. § 41712(a). Like many typical legislative or prescriptive enactments, administrative rules often provide regulated parties fair notice concerning the conduct the government will consider unlawful in future adjudications—here, such notice concerns the conduct DOT will consider an unfair or deceptive practice. *See* 49 U.S.C. § 41712(a) (allowing Secretary to prohibit "unfair or deceptive practice[s]"); Rule, 89 Fed. Reg. at 34675–77 (revising 14 C.F.R. § 399.85 to provide that DOT "considers the failure to provide and adhere to the disclosures required by this section to be an unfair and deceptive practice within the meaning of" § 41712). As the Supreme Court said of the NLRB rule in *American Hospital Ass'n*, "[T]he Board must still apply the rule 'in each case.'" 499 U.S. at 613. So too here.

In short, Supreme Court precedent and the plain text of the statutory framework containing § 41712 show that DOT has authority to issue rules under that provision to stop unfair or deceptive practices. We next consider whether that authority conflicts with the Deregulation Act.

### b. History of airline deregulation

Petitioners' Deregulation Act argument centers on that law's repeal of the Federal Aviation Act's rate-filing requirements. Prior to the Deregulation Act, air carriers were required to file with the Civil Aeronautics Board "tariffs showing all rates, fares, and charges for air transportation" and to keep the tariffs "open to public inspection." Federal Aviation Act of 1958, tit. IV, § 403(a), 72 Stat. 731, 758. SF Petitioners contend that the abolition of this requirement precludes DOT from issuing the Rule because it "re-

introduc[es] specifically how, when, and where airlines publish rates for specific air transportation services."

But, importantly, the Rule is a disclosure requirement, not a rate-filing requirement. Under the Rule, air carriers do not have to file rates or tariffs with any government agency; they have to disclose certain fees to *consumers* "whenever fare and schedule information is provided for flights to, within, and from the United States." Rule, 89 Fed. Reg. at 34620. Further, as explained above, the Deregulation Act did not abolish the federal government's authority to prohibit unfair or deceptive practices or unfair methods of competition in the airline industry. *Compare* 49 U.S.C. § 41712(a), *with* Federal Aviation Act of 1958, tit. IV, § 411, 72 Stat. 731, 769. Indeed, the federal government has been issuing rules, including disclosure rules, based on § 41712 and its predecessor "since 1960." *United Air Lines*, 766 F.2d at 1111; *see, e.g.*, Notice of Terms of Contract of Carriage, 47 Fed. Reg. 52128, 52130, 52135 (Nov. 19, 1982) (codified as amended at 14 C.F.R. § 253.7) (promulgating rule pursuant to § 411 of the Federal Aviation Act stating that a "passenger shall not be bound by any terms restricting refunds . . . , imposing monetary penalties . . . , or permitting the carrier to raise the price, unless the passenger receives conspicuous written notice . . . on or with the ticket."); Statements of General Policy, 49 Fed. Reg. 49440, 49440 (Dec. 20, 1984) (codified as amended at 14 C.F.R. § 399.84) (promulgating rule pursuant to § 411 of the Federal Aviation Act stating that any advertising by an air carrier is an "unfair or deceptive practice" unless "the price stated is the entire price to be paid by the customer"). Accordingly, we reject

No. 24-60231
c/w No. 24-60373

Petitioners' argument that the Deregulation Act precludes DOT from issuing the Rule.[11]

We thus hold as a general matter that DOT has authority to issue rules under § 41712 as long as such rules are consistent with the statutory language and specifically addressing unfair or deceptive practices being conducted by airlines. Given our decision below to remand the particular Rule at issue here, however, we need not go further and evaluate at this juncture whether any specific requirement of the Rule, as currently written, goes beyond DOT's authority to promulgate regulations implementing § 41712's text. For example, Airline Petitioners take issue with an aspect of the Rule requiring that, if an airline offers a consumer a seat selection for a fee, the airline make a specific three-sentence disclosure written into the Rule. *See* Rule, 89 Fed. Reg. at 34645 (requiring the following disclosure under certain circumstances: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel."). We decline for now to reach the question whether this requirement regarding seat-assignment disclosure impermissibly goes beyond mere implementation of § 41712 and bleeds too far into prescription of *particular* fair practices, perhaps at the expense of other fair practices.[12]

---

[11] In *United Air Lines*, the Seventh Circuit read the history of deregulation similarly and likewise held that the rulemaking authority at issue here survived the abolition of the Civil Aeronautics Board. *See* 766 F.2d at 1110–12.

[12] *But cf. Murphy v. NCAA*, 584 U.S. 453, 474–75 (2018) (acknowledging that that the distinction between prescription and prohibition is "empty"); *Rochester Tel. Co. v. United States*, 307 U.S. 125, 143 (1939) (likewise stating that the distinction "serves no useful purpose").

No. 24-60231
c/w No. 24-60373

### 3. *Major questions doctrine*

Our conclusion is not inconsistent with the major questions doctrine. Airline Petitioners argue that the question of DOT's rulemaking authority is of such "vast economic and political significance" that this panel should hesitate before concluding it exists here. *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (quotation omitted). We disagree.

The few cases in which the Supreme Court has applied the major questions doctrine instruct lower courts to hesitate before accepting a "colorable textual basis" for agency authority when confronted with structural, separation-of-powers concerns. *West Virginia,* 597 U.S. at 722. These worries are at their peak when an agency claims power to regulate conduct far beyond the "history and the breadth of the authority" that it has traditionally asserted. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Those concerns are not present in this case. At bottom, DOT has argued that § 41712(a) authorizes APA rulemaking. This interpretation is hardly novel; DOT has long promulgated rules targeting unfair or deceptive practices in the airline industry, and it has long claimed the authority to do so. *See, e.g.*, *United Air Lines,* 766 F.2d at 1111 ("The Board has been issuing rules based on section 411 [the statutory predecessor] since 1960."). Further, Airline Petitioners concede that § 41712 prohibits airlines from engaging in unfair or deceptive practices and allows DOT to bring adjudicative proceedings to enforce that prohibition. A conclusion that DOT can enforce the same provision via rulemaking is not so groundbreaking as to be barred by the major questions doctrine. *See Brown & Williamson*, 529 U.S. at 160.

The major questions doctrine is not a talisman to be invoked by concerned litigants whenever they are beholden to new administrative

requirements. Petitioners concede that they already disclose ancillary fees, through hyperlinks on their websites. Requiring that these disclosures merely move to a more prominent position on the websites is not a vastly significant economic or political issue like student loan forgiveness, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023); vaccine mandates, *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring); or healthcare tax credits worth billions of dollars, *see King v. Burwell*, 576 U.S. 473, 485–86 (2015). In sum, concluding that DOT can issue rules under § 41712 does not work a "radical or fundamental change," *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 229 (1994), to the statute's concededly valid requirement that airlines refrain from engaging in "unfair or deceptive practice[s]" or else risk adjudication by DOT, 49 U.S.C. § 41712(a).

### 4. *Nondelegation doctrine*

Finally, we reject Airline Petitioners' argument that if § 41712 permits rulemaking, such power would violate the nondelegation doctrine. In other words, according to Airline Petitioners, if Congress has authorized prescriptive authority under § 41712, then DOT is impermissibly exercising legislative power. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

The Supreme Court has held that there are two ways a delegation of authority to an agency can violate the nondelegation doctrine: (1) Congress failed to provide an "intelligible principle" by which the agency can exercise its authority; or (2) the power granted to the agency is vast beyond measure, akin to the ability to "regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring fair competition." *Whitman*, 531 U.S. at 474 (internal quotation marks and citation omitted). Under this governing standard, the Supreme Court has approved statutes that delegate extremely broad authority to agencies. *See,*

*e.g.*, *Gundy v. United States*, 588 U.S. 128, 145–48 (2019) (plurality opinion); *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("Congress simply cannot do its job absent an ability to delegate power under broad general directives.").

Here, the governing statutory scheme provides an intelligible standard to DOT akin to one we recently upheld against a nondelegation challenge. In *Mayfield v. DOL,* 117 F.4th 611, 621 (5th Cir. 2024), we held that the statutory directive in the Fair Labor Standards Act ("FLSA") to "eliminate substandard labor conditions that are detrimental to the health, efficiency, and general wellbeing of workers" was sufficient to guide the Department of Labor when it issued the "Minimum Salary Rule," which raised the minimum income that workers must receive before they are exempt from FLSA protections. Because the FLSA's text provided "*some* guidance" to DOL, there failed to be a nondelegation concern. *Id.* Here, too, DOT has received guidance from Congress: it can only issue those rules that are "appropriate" and "necessary" to carrying out the substantive provisions of Part A. 49 U.S.C. § 40113(a). The substantive provision at issue here, § 41712, puts further limitations on DOT's rulemaking power, allowing only rules designed to stop "unfair or deceptive practice[s] or unfair method[s] of competition." *Id.* § 41712(a). This certainly meets the standard of an intelligible principle. *See Gundy*, 588 U.S. at 146 (plurality opinion) (describing standard as "not demanding"). Further, DOT's authority to issue rules preventing unfair and deceptive practices in airline commerce is not akin to "regulat[ing] the entire economy." *Whitman*, 531 U.S. at 474. For these reasons, we hold that Congress's delegation of rulemaking

authority to DOT under § 41712 comports with the many other instances of delegation that have been upheld.[13]

## B. APA Compliance

The APA instructs courts to set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Such procedure requires a notice of proposed rulemaking to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and directs the issuing agency to "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments." *Id.* § 553(b)(3), (c). Agencies have a duty "to identify and make available . . . data that it has employed in reaching the decisions to propose particular rules." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir.

---

[13] Airline Petitioners also contend that DOT exceeded its statutory authority because the practices it seeks to regulate are not "unfair" or "deceptive" under § 41712. We agree with DOT that the APA's arbitrary-and-capricious standard applies to this argument. Airline Petitioners cite *Loper Bright* and *Garland v. Cargill*, 602 U.S. 406 (2024), but those cases involved disputes about the meaning of statutory language. *See Loper Bright*, 603 U.S. at 380–84; *Cargill*, 602 U.S. at 412. Here, by contrast, Airline Petitioners do not challenge DOT's definitions of the relevant statutory terms "unfair" and "deceptive"; in fact, Airline Petitioners adopt DOT's definitions as their own. Moreover, the definitions necessarily implicate DOT's predictive judgment, *see* 89 Fed. Reg. at 34627 (defining an unfair practice as one that "causes *or is likely to cause* substantial injury . . ." and a deceptive practice as one that "*is likely to* mislead a consumer . . ." (emphases added)), and DOT exercised its predictive judgment in issuing the rule, *see, e.g.*, *id.* at 34634 (predicting that absent the Rule, "consumers of air transportation *may* have difficulty understanding the actual and potential costs of accessing the air transportation between different carriers" (emphasis added)). When a determination involves an agency's "predictive judgment," the arbitrary-and-capricious standard applies. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422–23 (2021); *cf. Loper Bright*, 603 U.S. at 380–84 (presenting yes-or-no question whether agency could impose data collection costs—a question that could be answered in the present without predictive judgment); *Cargill*, 602 U.S. at 417–21 (similar). We need not reach the merits of this arbitrary-and-capricious challenge in light of our decision to remand.

1991) (per curiam) (quotation omitted).  Thus, "[a]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Id.* (quotation omitted).  If an agency promulgates a rule based on "completely new and different data" that "supplant[s]" or "replace[s] its original data," the agency may need to "afford interested parties an opportunity to challenge the underlying factual data relied upon." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 200–02 (5th Cir.), *clarified on reh'g*, 885 F.2d 253 (5th Cir. 1989); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–83 (5th Cir. 2021) (remanding rule to relevant agency because agency had changed the primary justification for the rule based on new data).

"At the same time ... an agency may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Solite Corp.*, 952 F.2d at 484 (alterations adopted) (internal quotation marks and citation omitted); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Chamber of Com. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023) (stating that challenged rule survives review if error "clearly had no bearing on the procedure used or the substance of the decision reached" (quotation omitted)).

Airline Petitioners argue that DOT justified the Rule using cost-benefit data—specifically data from the Rupp study—that was not available during the notice-and-comment period.  They contend that this data is central to the Rule rather than merely supplementary.

We agree.  DOT's reliance on new data here resembles the SEC's reliance on materials outside the rulemaking record in *Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006).  There, the D.C. Circuit had

No. 24-60231
c/w No. 24-60373

remanded an SEC rule to the agency because the SEC had not satisfied its obligation under the Investment Company Act of 1940 to determine the economic implications of the rule. *Id.* at 894.[14]  On remand, the SEC had declined to reopen the rulemaking record for further comment, concluding that the D.C. Circuit's concerns could be addressed by information in the existing record and publicly available information outside the record. *Chamber of Com.*, 443 F.3d at 895.  When the case returned to the D.C. Circuit, the court held that the SEC violated the APA by relying on extra-record material that "did not merely supplement the rulemaking record" but rather "suppl[ied] the basic assumptions used by the Commission to establish the range of costs that [regulated parties] are likely to bear in complying with the [rule]." *Id.* at 901–02.  When doing so, the D.C. Circuit clarified that an agency must generally provide an opportunity for comment on "data critical to support a rule" even if the extra-record data is meant to cure a deficiency in the existing record. *Id.* at 903.  A request the SEC had made in its notice of proposed rulemaking for comments and empirical data on costs "did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the Commission would base its cost estimates on . . . extra-record survey data." *Id.* at 904.

In this case, like the SEC in *Chamber of Commerce*, DOT relied on "extra-record material critical to its cost[-benefit] estimates"—here, the

---

[14] *See also* 15 U.S.C. § 80a-2(c) (relevant section of Investment Company Act requiring SEC to "consider . . . whether [a] [rulemaking] action will promote efficiency, competition, and capital formation"); *cf.* NPRM, 87 Fed. Reg. at 63732 (stating that under executive order, assessment of potential benefits and costs of instant Rule was required); 49 U.S.C. § 40101(a)(6), (12)(A) (stating that under Deregulation Act, Secretary of Transportation shall consider "efficiency, innovation, and low prices" and "maximum reliance on competitive market forces and on actual and potential competition" to be in the public interest); 49 U.S.C. § 41712(a) (allowing Secretary to investigate unfair or deceptive practices if "it is in the public interest").

Rupp study—"without affording an opportunity for comment." *Id.* at 908. The study "did not merely supplement the rulemaking record"; rather, it "suppl[ied] the basic assumption[]" used by DOT to arrive at the low end of its range of the estimated net benefits to be delivered by the Rule. *Id.* at 901–02; *see* 2024 RIA at 16–18, 24. DOT's estimate of net benefits— somewhere between $30 million and $254 million annually, *see* Rule, 89 Fed. Reg. at 34668—is somewhat imprecise, to put it mildly. Where the low end of the range was based on a study outside the administrative record and where the probability that the Rule would produce net societal benefits was calculated as merely 53 percent, *see* Rule, 89 Fed. Reg. at 34668, DOT should have allowed Petitioners the opportunity to comment on the study. Indeed, DOT acknowledged in the 2024 RIA that its cost-benefit methodology is "highly sensitive to the percentage of consumers who consider ancillary fee information relevant to their airfare purchase decision," and one of DOT's two inputs for that percentage (46 percent) came from the Rupp study—at the expense of the lower 20 percent figure provided by A4A. 2024 RIA at 24; *see id.* at 16–18. DOT has therefore "fail[ed] to reveal" a "portion[] of the technical basis for a proposed rule in time to allow for meaningful commentary." *Solite Corp.*, 952 F.2d at 484 (quotation omitted).

DOT argues that the Rupp study "merely elaborate[d] on the Department's point in the proposed rule that the new disclosure requirements would benefit consumers," but DOT mischaracterizes its earlier position. In fact, DOT expressly acknowledged at the NPRM stage that it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs," 2022 RIA at ii, and that the rule would only "yield societal benefits if it leads to reduced deadweight loss . . . or reduced search costs," NPRM, 87 Fed. Reg. at 63732. It was only after the public comment period closed that DOT, using the Rupp study, justified its conclusion that hundreds of millions of dollars in annualized benefits would

result from reduced search costs.  2024 RIA at 24; *see id.* at 16–18 (taking 46 percent scenario from Rupp study).

DOT cites *Chemical Manufacturers Ass'n v. EPA*, in which a number of companies challenged pollution regulations.  870 F.2d at 184.  There, the EPA had announced its intent to prepare an economic-impact study relying on an "industry-wide" database containing Dun & Bradstreet data covering the years 1976–81.  *Id.* at 201.  After industry members commented that the database was outdated and "did not have adequate data for plants whose sales exceeded $10 million annually," the EPA announced in the preamble to the final rules that it had relied on newer Dun & Bradstreet data that the EPA did not reveal.  *Id.*  The new data was "edited in the same manner" as the older data and was used "to increase the size of the entire data base, to increase the number of plants in the 'greater than $10 million sales' category . . . , and to update the data base to cover the period from 1981 to 1986."  *Id.*  The EPA "also relied on data that had earlier been obtained from other sources," and it "did not supplant its economic-impact study, or replace its original data with completely new and different data, but, in response to industry criticisms, updated and expanded one of several data sources."  *Id.* at 202.  We thus concluded that the EPA's use of the updated and expanded Dun & Bradstreet data "did not require further notice and comment."  *Id.*

Here, DOT did not merely "update[]" or "expand[] one of several data sources."  *Id.*  Instead, the agency issued a cost-benefit analysis based in large part on a study outside the administrative record.  Unlike the updated Dun & Bradstreet data in *Chemical Manufacturers*, the Rupp study here had no antecedent in the underlying rulemaking proceedings.  *See id.* at 201 (stating that new data was "edited in the same manner" as the older data and was used to merely update preexisting database).  Nor was the Rupp study an "industry-wide" document.  *Id.* at 201.  Instead, it was based on the

No. 24-60231
c/w No. 24-60373

preferences of students; yet DOT used it to calculate cost-benefit estimates with respect to all airline customers. *See* 2024 RIA at 16–18, 24.[15]

Nor may DOT rely solely on its solicitation of comments regarding quantifying costs and benefits or on the fact that at the time of the NPRM, the agency could not say whether its proposal would produce net societal benefits. An agency cannot "generally . . . rely, without affording comment, on data critical to support a rule solely because the existing record contains a deficiency that extra-record data might cure." *Chamber of Com.*, 443 F.3d at 903.

DOT contends that Petitioners were not prejudiced by its failure to afford public comment on the Rupp study, *see* 5 U.S.C. § 706 (stating that "due account shall be taken of the rule of prejudicial error"), but we cannot agree under the circumstances presented here. As Airline Petitioners say, DOT's 53 percent probability of net societal benefits amounted to a "coin flip." Given those odds, and given DOT's acknowledgement that it pulled from the Rupp study a number to which its cost-benefit methodology was "highly sensitive," 2024 RIA at 24, we question whether DOT would have issued the same Rule had Petitioners been given the chance to challenge the Rupp data. *See Chamber of Com.*, 443 F.3d at 904 (stating that failure to comply with notice and comment "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure" (quotation omitted)).

We therefore remand the Rule to DOT so it can afford Petitioners an opportunity to comment on the new data. Vacatur is often the appropriate remedy for unlawful agency action. *See Braidwood Mgmt., Inc. v. Becerra*, 104

---

[15] At this juncture, we express no opinion on the merits of DOT's decision to extrapolate its conclusion from the Rupp study. We hold only that DOT should have given Petitioners an opportunity to comment on the study.

No. 24-60231
c/w No. 24-60373

F.4th 930, 952 (5th Cir. 2024), *cert. granted*, No. 24-316, ___ S. Ct. ___, 2025 WL 65913 (U.S. Jan. 10, 2025).[16] But it is not always required. *See, e.g., Tex. Ass'n of Mfrs.*, 989 F.3d at 389-90. Because we are leaving the stay of the Rule in place, we see no need to vacate it at this time.[17]

## III. Conclusion

For the above reasons, we REMAND the Rule to DOT. The current Rule shall remain stayed until the matters required above are met.

---

[16] It is important that, on remand, both sides consider what makes sense in this context and allows for passengers to be clearly aware of the extra costs (such as checked bags) but not unable to clearly consider the dates and times of their travels.

[17] Since we remand to the agency, we need not reach Petitioners' remaining arguments under the APA's arbitrary-and-capricious standard.

**EXHIBIT B:**
**STAY PANEL OPINION**

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2024

Lyle W. Cayce
Clerk

No. 24-60231

_____

AIRLINES FOR AMERICA; ALASKA AIRLINES, INCORPORATED;
AMERICAN AIRLINES, INCORPORATED; DELTA AIR LINES,
INCORPORATED; HAWAIIAN AIRLINES, INCORPORATED;
JETBLUE AIRWAYS CORPORATION; UNITED AIRLINES,
INCORPORATED; NATIONAL AIR CARRIER ASSOCIATION;
INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners,*

*versus*

DEPARTMENT OF TRANSPORTATION,

*Respondent.*

_____

Appeal from the Department of Transportation, National Transportation
Safety Board
Agency No. 89 Fed. Reg. 34,620

_____

Before HAYNES, WILLETT, and DUNCAN, *Circuit Judges.*

STUART KYLE DUNCAN, *Circuit Judge*:

Several airlines and airline associations seek a stay pending review of
a recent Department of Transportation ("DOT") Rule that regulates how
airlines disclose fees to consumers during the booking process. Finding the

Rule likely exceeds DOT's authority and will irreparably harm airlines, we GRANT the requested stay and EXPEDITE the petition for review.[*]

## I.

On April 30, 2024, DOT issued a Rule regulating how airlines communicate certain fees to customers during the booking process. *See Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620 (Apr. 30, 2024) ["Rule"]. The Rule dictates when and how airlines must disclose "ancillary service fees"—generally speaking, baggage or change fees.[1] The goal is to streamline booking and protect consumers from surprise charges. *See id.* at 34,620. DOT estimates the Rule will create net societal benefits between $30.3 million and $253.5 million and save consumers $543 million per year. *Id.* at 34,668–69. The Rule took effect July 1, 2024. Airlines must provide fee data to third-party ticket agents by October 30, 2024, and their own platforms must comply with the Rule by April 30, 2025. *Id.* at 34,667.

On May 31, 2024, various airlines and airline associations ("Petitioners") asked DOT to stay the Rule while it sought review. When DOT declined, Petitioners challenged the Rule in our court and sought a stay pending review under 5 U.S.C. § 705. Petitioners argue the Rule (1) exceeds DOT's authority; (2) is arbitrary and capricious; and (3) wrongly bypassed notice and comment.

---

[*] JUDGE HAYNES would grant expedited appeal. With respect to the request for a stay of the Rule, as a member of the motions panel, she would grant a temporary administrative stay for a brief period of time and defer the question of the stay pending appeal to the oral argument merits panel which would receive this case.

[1] *See id.* at 34,621 (defining ancillary services as "(1) transporting a first checked bag, second checked bag, and carry-on bag; and (2) changing or canceling a reservation"); *see also* 14 C.F.R. § 399.85 (codifying requirements).

## II.

We evaluate a stay request by considering:

> (1) [W]hether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009). Factors one and two are the "most critical." *Ibid.*

## A.

On the first factor, Petitioners make a strong showing that the Rule exceeds DOT's authority.[2]

The relevant statute authorizes the DOT Secretary to:

> [I]nvestigate and decide whether an air carrier . . . has been or is engaged in an unfair or deceptive practice or an unfair method of competition in . . . the sale of air transportation.

49 U.S.C. § 41712(a). If the Secretary "finds" the carrier has done so, "after notice and an opportunity for a hearing," then "the Secretary shall order the air carrier . . . to stop the practice or method." *Ibid.* By its terms, then, the statute authorizes DOT to adjudicate whether certain practices are "unfair or deceptive" and, if so, to order the carrier to "stop" them.

The Rule goes far beyond adjudication, however. It mandates, often in great detail, a host of disclosure practices. *See generally* 89 Fed. Reg. at 34,621 (summarizing provisions). For instance, fees must be disclosed at a specific stage in a customer's "itinerary search process"—"the first point

---

[2] So, we need not address Petitioners' other challenges to the Rule.

where a fare and schedule is provided in connection with a specific flight itinerary." *Ibid.* Fees may be displayed "using pop-ups, expandable text, or other means," but not "through a hyperlink." *Ibid.* Some disclosures must convey specified content.[3] Sometimes that content is prescribed verbatim.[4]

As Petitioners correctly put it, "[t]he Rule doesn't just prohibit—it prescribes." And it does so outside the adjudicatory process set out by § 41712(a). That is, the Secretary does not purport to "find," following "notice and . . . a hearing," that a carrier's online sale "practice" is "unfair or deceptive" and then order a carrier to "stop" it. *See* 49 U.S.C. § 41712(a). Rather, the Rule essentially enacts a code of online disclosure practices. That is not authorized by the statute. *See, e.g., Clean Water Action v. United States Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions.").

If Congress wanted to authorize this kind of legislative rulemaking, it could have drawn on language from other provisions. *Cf.* 49 U.S.C. § 40103(b)(2) (authorizing Federal Aviation Administration to "*prescribe air traffic regulations* on the flight of aircraft"); *id.* § 44903(b) (authorizing Transportation Security Administration to "*prescribe regulations* to protect passengers and property . . . against an act of criminal violence or

---

[3] *See, e.g., ibid.* (requiring disclosures in response to a "passenger-specific itinerary search" to incorporate "frequent flyer," "military," and "credit card" status); *ibid.* (disclosures must include "first checked, second checked, or carry-on baggage fees" absent special circumstances).

[4] *See id.* at 34,676 (mandating "the following notice on any page or step of the booking process" where customers can pay for a seat). This is the required notice: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel." *Ibid.*

aircraft piracy") (emphases added). But such language is found nowhere in § 41712(a), indicating Congress did not confer that authority on DOT here. *See Polselli v. IRS*, 598 U.S. 432, 439 (2023) ("We assume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act.") (cleaned up).

DOT's defense of the Rule fails to grapple with § 41712(a)'s text. Instead, the agency points to a general provision authorizing the Secretary to "take action [he] . . . considers necessary to carry out" his duties, "including conducting investigations, *prescribing regulations*, standards, and procedures, and issuing orders." 49 U.S.C. § 40113(a) (emphasis added). That does not help DOT's argument. As we have held before, "[t]he grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carrying out.'" *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020). Reading the catch-all authority in § 40113(a) to justify the Rule would obliterate the directly applicable textual limits spelled out in § 41712(a).[5]

DOT then pivots to the agency's "history" of promulgating regulations under § 41712, pointing to a handful of rules issued since 1982. That argument also fails. The Supreme Court has rejected the theory that agency practice can defeat a statute's text by "adverse possession." *Rapanos*

---

[5] DOT also points to 49 U.S.C. § 46301(a), which imposes civil penalties for violating a laundry list of provisions across 13 chapters, including § 41712, and also for violating "a regulation prescribed" under any of those provisions. *See* 49 U.S.C. § 46301(a)(1)(A), (B). But § 46301(a)—which references numerous provisions besides § 41712—says nothing about whether § 41712(a) in particular authorizes legislative rulemaking. And the fact that § 46301(a) references provisions that expressly authorize such rulemaking (*see, e.g.*, 49 U.S.C. §§ 40103(b) and 44903(b)) only underscores that § 41712(a) does not.

*v. United States*, 547 U.S. 715, 752 (2006); *see also Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 241 (5th Cir. 2024) ("[Agencies'] near-exclusive reliance on agency custom is irreconcilable with the judicial obligation to interpret the statute that Congress actually enacted.").[6]

Finally, DOT relies on *United Air Lines, Inc. v. C.A.B.*, 766 F.2d 1107 (7th Cir. 1985), where a sister circuit construed the precursors to §§ 41712(a) and 40113(a) to confer legislative rulemaking power. *Id.* at 1111–12. We find *C.A.B.* unpersuasive for several reasons. First, while recognizing that § 41712(a) "creates an adjudicative procedure," *C.A.B.* failed to draw the natural inference, well established in our canons of statutory construction,[7] that the section therefore *excludes* legislative rulemaking. *Id.* at 1111. Second, *C.A.B.* reasoned that the agency's "history" of issuing such regulations somehow confirmed its authority to do so. *Id.* at 1111–12. We have rejected that reasoning. *See Career Colleges*, 98 F.4th at 241. Finally, *C.A.B.* relied on legislative history to prove that Congress expected DOT to continue its predecessor's practice of issuing legislative rules. 766 F.2d at 1112 (citing H.R. Rep. No. 793, 98th Cong., 2d Sess. 4 (1984)). "But legislative history is not the law," *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018)), nor can it "muddy clear

---

[6] We also disagree with DOT that Congress "ratified the Department's authority to prescribe practices under § 41712." In the examples DOT cites, Congress did not address the Secretary's authority to promulgate the Rule. *See* H.R. 3935, 118th Cong. tit. V, subtitle A, § 513(a), (b)(3). That is why DOT's brief claims only that "Congress . . . *did not question* . . . the Department's authority to issue [the Rule]." Red Br. at 8 (emphasis added). But "congressional silence lacks persuasive significance . . . particularly where administrative regulations are inconsistent with the controlling statute." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (citations omitted).

[7] *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("The expression of one thing implies the exclusion of others").

statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also United States v. Nazerzadeh*, 73 F.4th 341, 347 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 396 (2023) (where a text is unambiguous, "we are not permitted to look to the legislative history") (quoting *Goswami v. Am. Collections Enter., Inc.*, 377 F.3d 488, 492 (5th Cir. 2004)).

In sum, Petitioners have made a strong showing that the Rule exceeds the agency's authority under 49 U.S.C. § 41712(a).

## B.

Petitioners meet the remaining *Nken* factors.

Petitioners have submitted ample evidence detailing the irreparable harm they will suffer absent a stay. For instance, they will have to expend significant resources reengineering their websites to comply with the Rule. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."); *Career Colleges*, 98 F.4th at 236 ("[a]lleged compliance costs need only be more than de minimis") (quotation omitted). DOT suggests Petitioners have not shown that these harms are irreparable, but "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). And there does not appear to be any way Petitioners could recover their compliance costs.

"The balance-of-harms and public-interest factors merge when the government opposes an injunction." *Career Colleges,* 98 F.4th at 254. Petitioners have shown they are likely to suffer significant and irreparable harm from the Rule. That Rule likely goes well beyond the authority Congress has given DOT, and "there is generally no public interest in the

perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

## III.

Petitioners' motion for stay of the Rule pending review is GRANTED and the petition is EXPEDITED to the next available oral argument panel.