# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2025

Lyle W. Cayce
Clerk

---

No. 24-60231

---

AIRLINES FOR AMERICA; ALASKA AIRLINES, INCORPORATED; AMERICAN AIRLINES, INCORPORATED; DELTA AIR LINES, INCORPORATED; HAWAIIAN AIRLINES, INCORPORATED; JETBLUE AIRWAYS CORPORATION; UNITED AIRLINES, INCORPORATED; NATIONAL AIR CARRIER ASSOCIATION; INTERNATIONAL AIR TRANSPORT ASSOCIATION,

*Petitioners,*

*versus*

DEPARTMENT OF TRANSPORTATION,

*Respondent,*

CONSOLIDATED WITH

---

No. 24-60373

---

SPIRIT AIRLINES, INCORPORATED,

*Petitioner,*

*versus*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

---

Petitions for Review from an order of the
Department of Transportation
Agency No. 89 Fed. Reg. 34620

---

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges*.

HAYNES, *Circuit Judge*:

In 2024, the Department of Transportation ("DOT") issued a final rule under 49 U.S.C. § 41712(a) requiring airlines to disclose certain fees upfront when potential customers search for itineraries. *See* Enhancing Transparency of Airline Ancillary Service Fees [hereinafter "Rule"], 89 Fed. Reg. 34620 (Apr. 30, 2024). Two groups of airlines now challenge the Rule as unauthorized by Congress and unlawful under the Administrative Procedure Act ("APA").

We hold that DOT has authority to make rules under § 41712(a). However, we ultimately REMAND this particular Rule, as DOT failed to fully comply with the requirements of the APA.

## I.    Background

### A. Legislative Background

Under the Federal Aviation Act of 1958, the Civil Aeronautics Board regulated the interstate airline industry. *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 279–80 (2014). "Pursuant to this authority, the Board closely regulated air carriers, controlling, among other things, routes, rates, and services." *Id.* at 280. The Board also had authority "to take administrative action against certain deceptive trade practices." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). Specifically, Congress empowered the Board to "investigate and determine whether any air carrier . . . has been or is engaged in unfair or deceptive practices or unfair methods of competition" and to "order such air carrier . . . to cease and desist from such practices or

No. 24-60231
c/w No. 24-60373

methods" upon finding after "notice and hearing" that the air carrier was engaged in the same. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 296 n.7 (1976) (quoting § 411 of the Federal Aviation Act, 72 Stat. 769 (formerly codified at 49 U.S.C. § 1381 (1976))).

"In 1978, however, Congress enacted the [Airline Deregulation Act (the "Deregulation Act")], which sought to promote 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive market forces and on actual and potential competition.'" *Ginsberg*, 572 U.S. at 280 (quoting 49 U.S.C. § 40101(a)(6), (12)(A)). The Deregulation Act "provided that [the Civil Aeronautics Board] would be dismantled in 1985." *Statland v. Am. Airlines, Inc.*, 998 F.2d 539, 540 (7th Cir. 1993). It also "eliminated the government's ability to set airfares." *Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 408 (D.C. Cir. 2012). But the Deregulation Act did not abolish the federal government's power to investigate and prohibit unfair or deceptive practices in air transportation; instead, Congress transferred the power to the DOT. *Ginsberg*, 572 U.S. at 288–89; *Morales*, 504 U.S. at 378–79; *Spirit Airlines*, 687 F.3d at 408; *Statland*, 998 F.2d at 541. Such power is now codified in 49 U.S.C. § 41712, whose relevant language echoes § 411 of the Federal Aviation Act of 1958:

> On the initiative of the Secretary of Transportation or the complaint of an air carrier . . . or ticket agent, and if the Secretary considers it is in the public interest, the Secretary may *investigate and decide whether an air carrier . . . has been or is engaged in an unfair or deceptive practice or an unfair method of competition* in air transportation or the sale of air transportation. If the Secretary, after notice and an opportunity for a hearing, finds that an air carrier . . . is engaged in an unfair or deceptive practice or unfair method of competition, the Secretary *shall order the air carrier . . . to stop the practice or method.*

49 U.S.C. § 41712(a) (emphasis added).

No. 24-60231
c/w No. 24-60373

## B. Administrative Background

Before it was dismantled pursuant to the Deregulation Act, the Civil Aeronautics Board issued rules pursuant to § 41712's predecessor, § 411 of the Federal Aviation Act. *United Air Lines v. Civ. Aeronautics Bd.*, 766 F.2d 1107, 1111 (7th Cir. 1985) ("The Board has been issuing rules based on section 411 since 1960."). Such rules included provisions relating to overbooking, notice of passenger contract terms, and liability for lost luggage. *Id.*

DOT has likewise issued regulations pursuant to § 41712 for decades. For example, in 1999, DOT promulgated a rule requiring carriers, when selling service under a single flight number but requiring a change of aircraft, to provide passengers written notice that they "must change aircraft en route even though [the] ticket may show only one flight number." 14 C.F.R. § 258.5(c); *see id.* § 258.4 (stating that the holding out of such service "is prohibited as an unfair or deceptive practice or an unfair method of competition within the meaning of [§ 41712] unless . . . carriers and ticket agents follow the requirements of this part").

Further, effective January 2012, sellers of air transportation became required to notify consumers "of the potential for a price increase that could take place prior to the time that the full amount agreed upon has been paid by the consumer," including but not limited to increases in baggage prices or fuel surcharges. 14 C.F.R. § 399.89. More recently, DOT issued a rule requiring carriers to "provide a passenger on a [domestic] flight experiencing a tarmac delay at a U.S. airport the opportunity to deplane before the tarmac delay exceeds three hours in duration," subject to certain exceptions. 14 C.F.R. § 259.4(c)(1); *see id.* § 259.4(h) (stating that a carrier's "failure to comply . . . will be considered to be an unfair and deceptive practice within the meaning of" § 41712); Tarmac Delay Rule, 86 Fed. Reg. 23260, 23270–71 (May 3, 2021) (publishing the rule).

No. 24-60231
c/w No. 24-60373

## C. Procedural History

In 2022, DOT proposed a new rule that would require airlines to disclose—upfront—the prices of certain ancillary fees, such as those for checking a bag or canceling a flight, during the online booking process. *See* Enhancing Transparency of Airline Ancillary Service Fees [hereinafter "Notice of Proposed Rulemaking," or "NPRM"], 87 Fed. Reg. 63718 (Oct. 20, 2022). The proposed rule aimed to increase transparency and thus allow consumers "to determine the true cost of travel and to adequately compare airline pricing." *Id.* at 63721. Indeed, the Deregulation Act was issued for the purpose of saving money. DOT also proposed amending 14 C.F.R. § 399.85 to provide that the failure to disclose these fees "on the first page displayed when a consumer conducts a search for air transportation when fare and schedule information is shown" is "an unfair and deceptive practice" within the meaning of § 41712. *Id.* at 63736–38.

### 1. *The 2022 regulatory impact analysis*

After the Office of Management and Budget determined that the proposed rule required an assessment of potential costs and benefits,[1] DOT prepared a regulatory impact analysis (the "2022 RIA"). *See* Doc. No. DOT-OST-2022-0109-0002,[2] https://perma.cc/F9E8-HFL9; *see also* NPRM, 87 Fed. Reg. at 63732 (summarizing 2022 RIA). In a section titled "Need for regulation," the 2022 RIA said the "main premise underlying the proposed rule" was that "a market failure may exist because airline consumers may have inadequate information about ancillary fees before

---

[1] *See* Exec. Ord. No. 12866, Regulatory Planning and Review, 58 Fed. Reg. 51735 (Sept. 30, 1993), § 6(a)(3)(B)(ii), (C) (requiring, where applicable, assessment of potential costs and benefits of regulatory action).

[2] Unless otherwise specified, all citations to the administrative record will be to the rulemaking docket labeled DOT-OST-2022-0109, available at Regulations.gov.

buying tickets." 2022 RIA at 1. It acknowledged that although consumers "can sometimes acquire [the] information on their own," they are more likely to do so "when search costs are low." *Id.* at 5; *see also id.* ("When consumers can easily acquire the information . . . , they can eliminate the [information] asymmetry through their own actions, albeit with the cost of additional time and effort.").

The 2022 RIA further said it was "not possible at this time" to "quantitatively evaluat[e] the effects of the rule" due to "a lack of data and other significant uncertainties," and thus it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs." *Id.* at i–ii. But DOT concluded that the proposed rule "would yield societal benefits if it leads to reduced deadweight loss . . . or reduced search costs," and it calculated a "hypothetical example range" of societal benefits "using methods from earlier rulemakings." NPRM, 87 Fed. Reg. at 63732.[3]

For example, assuming that "1% of passengers compared prices [including ancillary fees] before the proposed rule" and that "those passengers save 2 minutes of searching after the rule," DOT calculated that $4.9 million in annual search cost savings would result, or $0.73 in time savings per passenger. 2022 RIA at 21.[4] DOT acknowledged, however, that its numbers were highly speculative: it "d[id] not have information to estimate the number of passengers who already compare fares with ancillary fees included or the amount of time they would save due to the proposed

---

[3] DOT defines "deadweight loss" as "the reduction of excess consumption of air travel" that "occurs because consumers who are unaware of ancillary service fees behave as if the price for air travel is lower than it is." Rule, 89 Fed. Reg. at 34668.

[4] This calculation "assume[d] that passengers search for fares on their own time without compensation and estimate[d] the value of this time using the median post-tax wage for United States workers, which was $22.00 per hour in 2021." 2022 RIA at 21.

rule," so it cautioned that its "discussion of potential time savings benefits [was] only illustrative." *Id.*

### 2. Public comments

DOT sought comments regarding the costs of implementing the proposed rule and regarding "the key uncertainties for quantifying or monetizing the economic effects of the proposed rule." NPRM, 87 Fed. Reg. at 63732. Commenters, including the trade association Airlines for America ("A4A"), questioned the proposed rule's benefits.

A4A argued that the proposed disclosure requirements would do more harm than good by "consum[ing] scarce screen real estate." Comments of Airlines for America at 38 (Jan. 23, 2023) [hereinafter A4A Comments], Doc. No. 90, https://perma.cc/T7LV-8DWB. A4A's comments included a regulatory impact assessment prepared for A4A by Campbell-Hill Aviation Group, LLC. *See generally* Attach. B [hereinafter Campbell-Hill Survey], A4A Comments. The Campbell-Hill Survey estimated that the proposed disclosure rule would result in net benefits of negative $33.7 billion and "will do much more harm than good." Campbell-Hill Survey at 6. For example, the survey argued that only 20 percent of all passengers pay for a first checked bag, making the proposed disclosure rule "only relevant to one of every five passengers." *Id.* at 10.

For its part, Frontier Airlines contended that the proposed rule "would make it impossible . . . to offer consumers the benefit of unbundled service options and ultra-low fares." Presentation of Frontier Airlines (Mar. 30, 2023) at 12, Doc. No. 728, https://perma.cc/FY8C-PW7H.[5] The public comment period closed on April 6, 2023. Rule, 89 Fed. Reg. at 34625.

---

[5] As described by petitioners Frontier Airlines and Spirit Airlines, an "unbundled" fare model offers customers "a base fare for air transportation" and the option to "select

No. 24-60231
c/w No. 24-60373

### 3. *The 2024 RIA*

DOT promulgated the final Rule a year later on April 30, 2024. In doing so, it published a new Regulatory Impact Analysis (the "2024 RIA")[6] supporting the Rule's benefits for consumers. *See* Rule, 89 Fed. Reg. at 34669 (stating that the 2024 RIA was "developed in support of this final rule" and contained "modifi[cations] in response to public comments and further consideration by the Department").

The 2024 RIA noted that in light of new data, DOT had reevaluated the benefits of the Rule for consumers with respect to time savings. *See* 2024 RIA at 16. It cited a study by Nicholas Rupp, dated December 15, 2023, that concluded that the "amount of time needed to determine airfares inclusive of checked bag fees" was longer on airline sites compared to online travel sites like Travelocity or Expedia "due to the increase[d] effort needed to find information on baggage fees during airfare search." *Id.* DOT "use[d] Rupp's finding" to raise its estimate of consumer time savings that would result from the Rule. *Id.* The 2024 RIA also responded to A4A's estimate that only 20 percent of consumers pay to check bags,[7] noting that "baggage fee information is not necessarily irrelevant for consumers who do not pay to check bags" and citing the Rupp study's finding that "46 percent of student participants consider baggage fee information when they search for airfare." *Id.* "Thus," DOT concluded, "while we estimate time savings benefits using 20 percent, this is only for illustrative purposes. We view 46 percent [from the Rupp study] and 61 percent [from a 2023 A4A survey in which 61

---

as needed or desired . . . ancillary services such as the ability to change or cancel flights, select specific seats, or take a checked bag."

[6] *See* Doc. No. 753, https://perma.cc/SG5T-EF53.

[7] Of course, knowing one has to pay to check a bag may cause far fewer people to check a bag.

percent of respondents said they wanted checked bag fees reported in initial airfare displays] as more plausible proxies for the percentage of consumers who find information on ancillary fees relevant to their search for airfare and use those as primary estimates." *Id.* at 16–18.

Overall, the 2024 RIA estimated that the Rule would provide net benefits ranging from $30.3 million to $254 million annually, with a 53 percent probability "of net benefits being positive." *Id.* at i. This 53 percent probability was based on "plausible assumptions about the percentage of consumers who consider ancillary fees when they purchase airfare." Rule, 89 Fed. Reg. at 34668. The $30.3 million and $254 million figures were the result of two calculations, the lower of which used the Rupp study to estimate that 46 percent of consumers consider ancillary fees when searching for airfare. 2024 RIA at 24 (cost-benefit table). Both estimates accounted for approximately $5.5 million reduction in deadweight loss. *Id.*

The bulk of the assumed benefits in both estimates was attributable to a "[r]eduction in search time for consumers interested in ancillary service fees when they search for airline tickets." *Id.* DOT acknowledged that its cost-benefit analysis was "highly sensitive to the percentage of consumers who consider ancillary fee information relevant to their airfare purchase decision." *Id.* DOT also estimated that the Rule would result in a transfer of $543 million annually from airlines to consumers—an amount that represents what consumers currently overpay in fees. *Id.* at i–ii; *see also* Rule, 89 Fed. Reg. at 34622, 34668 (summarizing 2024 RIA).

### 4. *The final Rule*

The final Rule provides that airlines must make clear and conspicuous disclosures regarding the costs of "critical ancillary services," defined as "(1) transporting a first checked bag, second checked bag, and carry-on bag; and (2) changing or canceling a reservation." *Id.* at 34621. These disclosures must occur at "the first point at which a fare is quoted for a particular flight

No. 24-60231
c/w No. 24-60373

itinerary." *Id.* at 34649. They also may not occur via a hyperlink because "displaying fees in that manner would disrupt the consumer's search." *Id.* at 34650.

Otherwise, the Rule allows for flexibility. Various display choices remain available; website platforms can disclose the fees "through a pop-up, in expandable text, *or by other means.*" *Id.* (emphasis added). Further, airlines and ticket agents may "enabl[e] consumers to opt out of receiving fee information for a first checked bag, a second checked bag, or a carry-on bag during the search process," so long as the consumer "affirmatively indicates that no one in their booking party plans to travel with a first checked bag, a second checked bag, or a carry-on bag." *Id.* at 34657. In other words, the regulated entities retain some discretion as to how they implement the disclosure requirements.

### 5. *Litigation*

On May 10, 2024, A4A and a group of airlines (together "Airline Petitioners") petitioned for review in this court and moved for a stay of the Rule pending the outcome of their petition. We have jurisdiction over the petition pursuant to 49 U.S.C. § 46110. *See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1012 (D.C. Cir. 2002). A panel of our court granted the requested stay on July 29, 2024. *See Airlines for Am. v. DOT*, 110 F.4th 672, 674 (5th Cir. 2024).[8]

Meanwhile, on June 28, 2024, Spirit Airlines filed a similar petition in the Eleventh Circuit. Since the A4A petition was filed first, the Spirit petition was transferred to this court. *See* 28 U.S.C. § 2112(a)(5). After

---

[8] This opinion is meaningful and helpful although it has some differences in what we say and address here. While we very carefully consider such rulings, a merits panel is not bound by the motions panel in the same case. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013).

Frontier Airlines intervened in Spirit's case in support of Spirit, we consolidated the A4A and Spirit petitions. We will refer to Spirit and Frontier together as "SF Petitioners" and we list both groups together as simply "Petitioners."

## II.   Discussion

Petitioners' challenges to the Rule fall into three categories. First, they argue that DOT does not have statutory authority under 49 U.S.C. § 41712 to issue the Rule. We review questions of statutory interpretation de novo. *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019).

Second, Petitioners contend that the Rule violates the APA. Under the APA, we must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

Third, SF Petitioners argue that the Rule violates the First Amendment. Because we ultimately remand the Rule under the APA for further consideration, we decline for now to reach the First Amendment question.

### A.  Rulemaking Authority

Petitioners argue that DOT exceeded its statutory authority in issuing the Rule because 49 U.S.C. § 41712 merely provides adjudicatory authority to the agency—not prescriptive rulemaking authority. Airline Petitioners focus on the statute's use of the word "stop," § 41712(a), stressing that "stop means stop, not prescribe" and that the "prohibitory power in § 41712(a)" is conditioned "on DOT's making individualized findings"

through case-by-case adjudication. Further, Airline Petitioners contend that even if § 41712(a)'s text can otherwise be read to support DOT's authority to issue the Rule, the major questions and nondelegation doctrines prohibit it.

We conclude that DOT has the power to make rules under § 41712 and that this power is not inconsistent with the major questions or nondelegation doctrines. But because we hold below that the Rule at issue here must be remanded under the APA, we need not determine whether *this* Rule is fully authorized by § 41712.

### 1. Forfeiture

At the threshold, DOT argues that Petitioners conceded the agency's rulemaking authority during the notice-and-comment process and thus forfeited their statutory challenge, citing our decision in *BCCA Appeal Group. v. EPA*, 355 F.3d 817, 828 (5th Cir. 2003) ("Generally, in considering a petition for review from a final agency order, this court will not consider questions of law which were neither presented to nor passed on by the agency.").[9] In reply, Petitioners argue that *City of Seabrook v. EPA*, 659 F.2d 1349, 1360 (5th Cir. Unit A Oct. 1981), controls and that they are allowed to raise legal challenges not made before the agency in the first instance.

For two reasons, we agree with Petitioners. First, *Seabrook* was the first case in this court addressing whether a litigant who challenges agency action on grounds not raised during notice and comment has forfeited the

---

[9] DOT specifically cites comments by A4A, Spirit, and Frontier. *See* A4A Comments at 3–4 ("Regulations that empower consumers to make intelligent choices in a competitive marketplace are consistent with airline deregulation."); Comments of Spirit Airlines, Inc. (Jan. 23, 2023), at 6, Doc. No. 92, https://perma.cc/9D7V-2229 ("Current Regulations Encourage Innovation[.]"); Comments of Frontier Airlines (Jan. 23, 2023) at 5, Doc. No. 84, https://perma.cc/YQU8-L57H ("The 2011 regulations have worked well . . . .").

No. 24-60231
c/w No. 24-60373

challenge in court. The *Seabrook* panel determined that "courts should not generally hold a petitioner estopped from objecting to an agency rule because his specific objection was not made during the 'notice and comment' period." *Id.* So, to the extent that *BCCA* contradicts it, we follow *Seabrook* under the rule of orderliness. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

Second, our precedent suggests that forfeiture is most apt when a petitioner raises an *arbitrary and capricious* challenge before the courts and makes arguments not developed during underlying rulemaking proceedings. *Compare, e.g.*, *BCCA Appeal Grp.*, 355 F.3d at 829 n.10 (arbitrary and capricious challenge forfeited), *and Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998) (arbitrary and capricious challenge forfeited), *with Am. Forest & Paper Ass'n v. EPA,* 137 F.3d 291, 295, 297 (5th Cir. 1998) (statutory authority challenge not forfeited). Here, DOT argues that Petitioners forfeited their challenge to its rulemaking authority under § 41712—a matter of statutory interpretation we determine de novo, with no deference owed to the agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). DOT's interpretation of § 41712(a) merely holds persuasive value, at best. *See id.* at 2262 (reaffirming *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)). Thus, in line with the dichotomy that *BCCA–Seabrook* suggests, it would run afoul of the judicial function to abstain from deciding this purely legal matter simply because the agency has yet to weigh in. We thus reject DOT's forfeiture argument and proceed to the merits of Petitioners' statutory challenge.

No. 24-60231
c/w No. 24-60373

### 2. *Statutory interpretation*

Airline Petitioners and SF Petitioners both argue that DOT lacks power to promulgate regulations like the Rule at issue here. Airline Petitioners focus mostly on the text of § 41712. SF Petitioners mostly make policy arguments grounded on the Deregulation Act. We address both arguments below.

#### a. <u>Statutory text and framework</u>

Airline Petitioners' argument centers on their contention that § 41712 grants DOT only adjudicative authority, not prescriptive authority. They do not cite any case in which a court held that an agency with conceded adjudicatory power similar to the power granted in § 41712 nevertheless did not have rulemaking power. Instead, they focus on § 41712's use of the word "stop." 49 U.S.C. § 41712(a) (stating that after notice and hearing, DOT may order an air carrier to "stop" unfair or deceptive practices). Airline Petitioners read the "stop" provision to "condition[] the prohibitory power in § 41712(a) on DOT's making individualized findings" and to "limit[] the reach of the prohibitory power to the particular airline under investigation." In response, DOT argues that this argument is foreclosed, both by the plain text of the statutory framework and by Supreme Court precedent.

We agree with DOT that the agency has authority to issue some prescriptive rules under § 41712, specifically in the context of needing to stop the problems that the rule is addressing. Our conclusion is based primarily on the plain text of the statutory framework. For example, 49 U.S.C. § 40113(a) grants the Secretary authority to "take action" he "considers necessary to carry out" Part A ("Air Commerce and Safety") of Subtitle VII ("Aviation Programs"), which contains § 41712, "*including . . . prescribing regulations*" (emphasis added).

No. 24-60231
c/w No. 24-60373

Another section of Part A, § 46301, expressly discusses rules issued under § 41712. That section sets forth civil penalties for violating "a regulation prescribed" under Chapter 417 ("Operations of Carriers") of Title 49, which includes § 41712. *Id.* § 46301(a)(1)(A)–(B). The maximum penalty is generally $75,000, or $1,100 if the violator is an individual or small business concern. *Id.* § 46301(a)(1). The penalty provision exempts five sections of Chapter 417, but not § 41712. *Id.* § 46301(a)(1)(A). Further, § 46301 singles out § 41712, raising the maximum penalty to $2,500 for individuals or small business concerns that violate "section 41712 (*including a regulation prescribed* or order issued under such section)." *Id.* § 46301(a)(5)(D) (emphasis added).

We are not persuaded by Airline Petitioners' argument that other Title 49 provisions' express use of the word "prescribe" forecloses the possibility that Congress authorized prescriptive rulemaking under § 41712, which does not use that term. All of Airline Petitioners' examples of Congress expressly using the word "prescribe" come in the context of *mandatory* directives to engage in rulemaking. For example, 49 U.S.C. § 40103 provides that the Administrator of the Federal Aviation Administration "*shall* prescribe air traffic regulations." *Id.* § 40103(b)(2) (emphasis added). But Airline Petitioners do not quote the word "shall"; they characterize the provision as merely "authoriz[ing]," rather than requiring, the Administrator to prescribe such regulations.

Airline Petitioners also elide the word "shall" in § 44903. That section directs the Administrator of the Transportation Security Administration (1) to prescribe regulations to protect passengers and property against criminal violence and aircraft piracy and (2) to prescribe requirements for screening or inspection of individuals and property before entry into a secured area of an airport. 49 U.S.C. § 44903(b) ("The Administrator *shall* prescribe regulations to protect passengers and property

No. 24-60231
c/w No. 24-60373

. . . against an act of criminal violence or aircraft piracy." (emphasis added));
*id.* § 44903(h)(4)(B) (stating that the Administrator "*shall* prescribe specific
requirements for . . . screening and inspection" (emphasis added)). Again,
Airline Petitioners characterize this provision as merely *authorizing*, rather
than requiring, such regulations.

This distinction between mere authorization and affirmative
command undermines Airline Petitioners' argument. Once the distinction
becomes clear, it makes perfect sense that § 41712 would not expressly
mention prescriptive regulation because (1) it, unlike §§ 40103 and 44903,
does not *require* the Secretary to issue prescriptive regulations and (2) the
Secretary *already* has *discretionary* rulemaking authority under § 40113. *See*
49 U.S.C. § 40113(a) (providing that the Secretary "*may*" prescribe
necessary regulations (emphasis added)); *Me. Cmty. Health Options v. United
States*, 590 U.S. 296, 310 (2020) ("Unlike the word 'may,' which implies
discretion, the word 'shall' usually connotes a requirement." (quotation
omitted)).[10]

Supreme Court precedent bolsters our conclusion. In *American
Hospital Ass'n v. NLRB*, 499 U.S. 606, 608 (1991), the Court heard a
challenge to an NLRB rule pertaining to bargaining units in the hospital
industry. The rule provides that the NLRB will generally recognize only
eight bargaining units for employees of acute-care hospitals: registered

---

[10] The other aviation provisions Airline Petitioners cite also use the word "shall."
*See* FAA Reauthorization Act of 2018, div. B, tit. IV, subtit. A, § 421, 132 Stat. 3186, 3337
("[T]he Secretary of Transportation *shall* promulgate regulations that require each
covered air carrier to promptly provide a refund . . . ." (emphasis added)); FAA Extension,
Safety, and Security Act of 2016, tit. II, subtit. C, § 2305, 130 Stat. 615, 640 ("[T]he
Secretary of Transportation *shall* issue final regulations to require an air carrier or foreign
air carrier to promptly provide to a passenger an automated refund . . . ." (emphasis
added)).

No. 24-60231
c/w No. 24-60373

nurses, physicians, other professionals, technical employees, skilled maintenance employees, clerical employees, guards, and other nonprofessional employees. 29 C.F.R. § 103.30(a). The NLRB promulgated the rule pursuant to § 6 of the National Labor Relations Act ("NLRA"), which allows the NLRB to make, pursuant to the APA, "rules and regulations as may be necessary to carry out the provisions" of the NLRA. 29 U.S.C. § 156. In turn, § 9(b) of the NLRA directs the NLRB to "decide in each case whether . . . the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b). In *American Hospital Ass'n*, the challenger argued that because § 9(b) of the NLRA requires the NLRB to make bargaining unit determinations "in each case," the NLRB cannot "us[e] general rules to define bargaining units." 499 U.S. at 608.

In a unanimous opinion, the Supreme Court upheld the NLRB rule. *Id.* at 609. First, the Court concluded that the general NLRB rulemaking authority set forth in § 6 of the NLRA "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act." *Id.* at 609–10. This general grant of NLRB authority is analogous to Title 49's general grant to the Secretary of Transportation of rulemaking authority. *See* 49 U.S.C. § 40113(a).

The Court then rejected the challenger's argument that NLRA § 9(b)'s "in each case" language limits the grant of general authority in § 6. *Am. Hosp. Ass'n*, 499 U.S. at 610. Observing that the requirement that the NLRB "exercise its discretion in every disputed case cannot fairly or logically be read to command the Board to exercise standardless discretion in each case," the Court held that "*even if a statutory scheme requires individualized determinations*, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *Id.* at 612 (emphasis

No. 24-60231
c/w No. 24-60373

added); *see also Lopez v. Davis*, 531 U.S. 230, 244 (2001) (reaffirming *American Hospital Ass'n* and stating that even if statute required individualized determinations, federal agency was not "required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding" (internal quotation marks and citation omitted)). We think the Supreme Court's interpretation of NLRA § 9 is equally applicable to 49 U.S.C. § 41712. In other words, even though § 41712 "requires individualized determinations," DOT "has the authority to rely on rulemaking to resolve certain issues of general applicability" under that provision, as Airline Petitioners point to no statute in which Congress has "clearly expresse[d] an intent to withhold that authority." *Am. Hosp. Ass'n*, 499 U.S. at 612.

Airline Petitioners' attempt to distinguish *American Hospital Ass'n* is not persuasive. Airline Petitioners say *American Hospital Ass'n* "didn't concern legislative rules" and instead concerned an NLRB "policy statement telling regulated parties how it would exercise its enforcement discretion in future adjudications." But that is not true. The provision challenged in *American Hospital Ass'n* is the same type of provision challenged here: a final rule issued pursuant to the APA. *Compare* Rule, 89 Fed. Reg. at 34620, *with* Collective-Bargaining Units in the Health Care Industry, 54 Fed. Reg. 16,336, 16,336, 16,347 (Apr. 21, 1989) (publishing "Final rule" at issue in *American Hospital Ass'n* pursuant to 5 U.S.C. § 553).

Further, Airline Petitioners make a distinction that is largely without a difference. They do not explain how, as a practical matter, a rule issued under the APA is different than a "statement telling regulated parties how [an agency] w[ill] exercise its enforcement discretion in future adjudications." Assuming the Rule is otherwise lawful in stopping the deceptive or unfair acts of the airline, Airline Petitioners will not automatically be subject to civil penalties upon its effective date. If the Rule

No. 24-60231
c/w No. 24-60373

were to take effect and the Secretary suspects that an air carrier is violating it, the Secretary would have discretion to (in other words, he "may") "investigate and decide" whether the carrier is in fact doing so, and the carrier would be entitled to "notice and an opportunity for a hearing" before being subject to any "order . . . to stop" or to any other penalty.  49 U.S.C. § 41712(a).   Like many typical legislative or prescriptive enactments, administrative rules often provide regulated parties fair notice concerning the conduct the government will consider unlawful in future adjudications— here, such notice concerns the conduct DOT will consider an unfair or deceptive practice.  *See* 49 U.S.C. § 41712(a) (allowing Secretary to prohibit "unfair or deceptive practice[s]"); Rule, 89 Fed. Reg. at 34675–77 (revising 14 C.F.R. § 399.85 to provide that DOT "considers the failure to provide and adhere to the disclosures required by this section to be an unfair and deceptive practice within the meaning of" § 41712).  As the Supreme Court said of the NLRB rule in *American Hospital Ass'n*, "[T]he Board must still apply the rule 'in each case.'"  499 U.S. at 613.  So too here.

In short, Supreme Court precedent and the plain text of the statutory framework containing § 41712 show that DOT has authority to issue rules under that provision to stop unfair or deceptive practices.  We next consider whether that authority conflicts with the Deregulation Act.

### b.  History of airline deregulation

Petitioners' Deregulation Act argument centers on that law's repeal of the Federal Aviation Act's rate-filing requirements.   Prior to the Deregulation Act, air carriers were required to file with the Civil Aeronautics Board "tariffs showing all rates, fares, and charges for air transportation" and to keep the tariffs "open to public inspection."  Federal Aviation Act of 1958, tit. IV, § 403(a), 72 Stat. 731, 758.  SF Petitioners contend that the abolition of this requirement precludes DOT from issuing the Rule because it "re-

No. 24-60231
c/w No. 24-60373

introduc[es] specifically how, when, and where airlines publish rates for specific air transportation services."

But, importantly, the Rule is a disclosure requirement, not a rate-filing requirement. Under the Rule, air carriers do not have to file rates or tariffs with any government agency; they have to disclose certain fees to *consumers* "whenever fare and schedule information is provided for flights to, within, and from the United States." Rule, 89 Fed. Reg. at 34620. Further, as explained above, the Deregulation Act did not abolish the federal government's authority to prohibit unfair or deceptive practices or unfair methods of competition in the airline industry. *Compare* 49 U.S.C. § 41712(a), *with* Federal Aviation Act of 1958, tit. IV, § 411, 72 Stat. 731, 769. Indeed, the federal government has been issuing rules, including disclosure rules, based on § 41712 and its predecessor "since 1960." *United Air Lines*, 766 F.2d at 1111; *see, e.g.*, Notice of Terms of Contract of Carriage, 47 Fed. Reg. 52128, 52130, 52135 (Nov. 19, 1982) (codified as amended at 14 C.F.R. § 253.7) (promulgating rule pursuant to § 411 of the Federal Aviation Act stating that a "passenger shall not be bound by any terms restricting refunds . . . , imposing monetary penalties . . . , or permitting the carrier to raise the price, unless the passenger receives conspicuous written notice . . . on or with the ticket."); Statements of General Policy, 49 Fed. Reg. 49440, 49440 (Dec. 20, 1984) (codified as amended at 14 C.F.R. § 399.84) (promulgating rule pursuant to § 411 of the Federal Aviation Act stating that any advertising by an air carrier is an "unfair or deceptive practice" unless "the price stated is the entire price to be paid by the customer"). Accordingly, we reject

No. 24-60231
c/w No. 24-60373

Petitioners' argument that the Deregulation Act precludes DOT from issuing the Rule.[11]

We thus hold as a general matter that DOT has authority to issue rules under § 41712 as long as such rules are consistent with the statutory language and specifically addressing unfair or deceptive practices being conducted by airlines. Given our decision below to remand the particular Rule at issue here, however, we need not go further and evaluate at this juncture whether any specific requirement of the Rule, as currently written, goes beyond DOT's authority to promulgate regulations implementing § 41712's text. For example, Airline Petitioners take issue with an aspect of the Rule requiring that, if an airline offers a consumer a seat selection for a fee, the airline make a specific three-sentence disclosure written into the Rule. *See* Rule, 89 Fed. Reg. at 34645 (requiring the following disclosure under certain circumstances: "A seat is included in your fare. You are not required to purchase a seat assignment to travel. If you decide to purchase a ticket and do not select a seat prior to purchase, a seat will be provided to you without additional charge when you travel."). We decline for now to reach the question whether this requirement regarding seat-assignment disclosure impermissibly goes beyond mere implementation of § 41712 and bleeds too far into prescription of *particular* fair practices, perhaps at the expense of other fair practices.[12]

---

[11] In *United Air Lines*, the Seventh Circuit read the history of deregulation similarly and likewise held that the rulemaking authority at issue here survived the abolition of the Civil Aeronautics Board. *See* 766 F.2d at 1110–12.

[12] *But cf. Murphy v. NCAA*, 584 U.S. 453, 474–75 (2018) (acknowledging that that the distinction between prescription and prohibition is "empty"); *Rochester Tel. Co. v. United States*, 307 U.S. 125, 143 (1939) (likewise stating that the distinction "serves no useful purpose").

No. 24-60231
c/w No. 24-60373

### 3. *Major questions doctrine*

Our conclusion is not inconsistent with the major questions doctrine. Airline Petitioners argue that the question of DOT's rulemaking authority is of such "vast economic and political significance" that this panel should hesitate before concluding it exists here. *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (quotation omitted). We disagree.

The few cases in which the Supreme Court has applied the major questions doctrine instruct lower courts to hesitate before accepting a "colorable textual basis" for agency authority when confronted with structural, separation-of-powers concerns. *West Virginia,* 597 U.S. at 722. These worries are at their peak when an agency claims power to regulate conduct far beyond the "history and the breadth of the authority" that it has traditionally asserted. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Those concerns are not present in this case. At bottom, DOT has argued that § 41712(a) authorizes APA rulemaking. This interpretation is hardly novel; DOT has long promulgated rules targeting unfair or deceptive practices in the airline industry, and it has long claimed the authority to do so. *See, e.g.*, *United Air Lines,* 766 F.2d at 1111 ("The Board has been issuing rules based on section 411 [the statutory predecessor] since 1960."). Further, Airline Petitioners concede that § 41712 prohibits airlines from engaging in unfair or deceptive practices and allows DOT to bring adjudicative proceedings to enforce that prohibition. A conclusion that DOT can enforce the same provision via rulemaking is not so groundbreaking as to be barred by the major questions doctrine. *See Brown & Williamson*, 529 U.S. at 160.

The major questions doctrine is not a talisman to be invoked by concerned litigants whenever they are beholden to new administrative

requirements. Petitioners concede that they already disclose ancillary fees, through hyperlinks on their websites. Requiring that these disclosures merely move to a more prominent position on the websites is not a vastly significant economic or political issue like student loan forgiveness, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023); vaccine mandates, *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring); or healthcare tax credits worth billions of dollars, *see King v. Burwell*, 576 U.S. 473, 485–86 (2015). In sum, concluding that DOT can issue rules under § 41712 does not work a "radical or fundamental change," *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 229 (1994), to the statute's concededly valid requirement that airlines refrain from engaging in "unfair or deceptive practice[s]" or else risk adjudication by DOT, 49 U.S.C. § 41712(a).

### 4. *Nondelegation doctrine*

Finally, we reject Airline Petitioners' argument that if § 41712 permits rulemaking, such power would violate the nondelegation doctrine. In other words, according to Airline Petitioners, if Congress has authorized prescriptive authority under § 41712, then DOT is impermissibly exercising legislative power. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

The Supreme Court has held that there are two ways a delegation of authority to an agency can violate the nondelegation doctrine: (1) Congress failed to provide an "intelligible principle" by which the agency can exercise its authority; or (2) the power granted to the agency is vast beyond measure, akin to the ability to "regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring fair competition." *Whitman*, 531 U.S. at 474 (internal quotation marks and citation omitted). Under this governing standard, the Supreme Court has approved statutes that delegate extremely broad authority to agencies. *See,*

No. 24-60231
c/w No. 24-60373

*e.g.*, *Gundy v. United States*, 588 U.S. 128, 145–48 (2019) (plurality opinion); *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("Congress simply cannot do its job absent an ability to delegate power under broad general directives.").

Here, the governing statutory scheme provides an intelligible standard to DOT akin to one we recently upheld against a nondelegation challenge. In *Mayfield v. DOL,* 117 F.4th 611, 621 (5th Cir. 2024), we held that the statutory directive in the Fair Labor Standards Act ("FLSA") to "eliminate substandard labor conditions that are detrimental to the health, efficiency, and general wellbeing of workers" was sufficient to guide the Department of Labor when it issued the "Minimum Salary Rule," which raised the minimum income that workers must receive before they are exempt from FLSA protections. Because the FLSA's text provided "*some* guidance" to DOL, there failed to be a nondelegation concern. *Id.* Here, too, DOT has received guidance from Congress: it can only issue those rules that are "appropriate" and "necessary" to carrying out the substantive provisions of Part A. 49 U.S.C. § 40113(a). The substantive provision at issue here, § 41712, puts further limitations on DOT's rulemaking power, allowing only rules designed to stop "unfair or deceptive practice[s] or unfair method[s] of competition." *Id.* § 41712(a). This certainly meets the standard of an intelligible principle. *See Gundy*, 588 U.S. at 146 (plurality opinion) (describing standard as "not demanding"). Further, DOT's authority to issue rules preventing unfair and deceptive practices in airline commerce is not akin to "regulat[ing] the entire economy." *Whitman*, 531 U.S. at 474. For these reasons, we hold that Congress's delegation of rulemaking

No. 24-60231
c/w No. 24-60373

authority to DOT under § 41712 comports with the many other instances of delegation that have been upheld.[13]

## B. APA Compliance

The APA instructs courts to set aside agency action found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Such procedure requires a notice of proposed rulemaking to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and directs the issuing agency to "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments." *Id.* § 553(b)(3), (c). Agencies have a duty "to identify and make available . . . data that it has employed in reaching the decisions to propose particular rules." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir.

---

[13] Airline Petitioners also contend that DOT exceeded its statutory authority because the practices it seeks to regulate are not "unfair" or "deceptive" under § 41712. We agree with DOT that the APA's arbitrary-and-capricious standard applies to this argument. Airline Petitioners cite *Loper Bright* and *Garland v. Cargill*, 602 U.S. 406 (2024), but those cases involved disputes about the meaning of statutory language. *See Loper Bright*, 603 U.S. at 380–84; *Cargill*, 602 U.S. at 412. Here, by contrast, Airline Petitioners do not challenge DOT's definitions of the relevant statutory terms "unfair" and "deceptive"; in fact, Airline Petitioners adopt DOT's definitions as their own. Moreover, the definitions necessarily implicate DOT's predictive judgment, *see* 89 Fed. Reg. at 34627 (defining an unfair practice as one that "causes *or is likely to cause* substantial injury . . ." and a deceptive practice as one that "*is likely to* mislead a consumer . . ." (emphases added)), and DOT exercised its predictive judgment in issuing the rule, *see, e.g., id.* at 34634 (predicting that absent the Rule, "consumers of air transportation *may* have difficulty understanding the actual and potential costs of accessing the air transportation between different carriers" (emphasis added)). When a determination involves an agency's "predictive judgment," the arbitrary-and-capricious standard applies. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422–23 (2021); *cf. Loper Bright*, 603 U.S. at 380–84 (presenting yes-or-no question whether agency could impose data collection costs—a question that could be answered in the present without predictive judgment); *Cargill*, 602 U.S. at 417–21 (similar). We need not reach the merits of this arbitrary-and-capricious challenge in light of our decision to remand.

1991) (per curiam) (quotation omitted). Thus, "[a]n agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Id.* (quotation omitted). If an agency promulgates a rule based on "completely new and different data" that "supplant[s]" or "replace[s] its original data," the agency may need to "afford interested parties an opportunity to challenge the underlying factual data relied upon." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 200–02 (5th Cir.), *clarified on reh'g*, 885 F.2d 253 (5th Cir. 1989); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–83 (5th Cir. 2021) (remanding rule to relevant agency because agency had changed the primary justification for the rule based on new data).

"At the same time . . . an agency may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Solite Corp.*, 952 F.2d at 484 (alterations adopted) (internal quotation marks and citation omitted); *see also* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Chamber of Com. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023) (stating that challenged rule survives review if error "clearly had no bearing on the procedure used or the substance of the decision reached" (quotation omitted)).

Airline Petitioners argue that DOT justified the Rule using cost-benefit data—specifically data from the Rupp study—that was not available during the notice-and-comment period. They contend that this data is central to the Rule rather than merely supplementary.

We agree. DOT's reliance on new data here resembles the SEC's reliance on materials outside the rulemaking record in *Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006). There, the D.C. Circuit had

remanded an SEC rule to the agency because the SEC had not satisfied its obligation under the Investment Company Act of 1940 to determine the economic implications of the rule. *Id.* at 894.[14]  On remand, the SEC had declined to reopen the rulemaking record for further comment, concluding that the D.C. Circuit's concerns could be addressed by information in the existing record and publicly available information outside the record. *Chamber of Com.*, 443 F.3d at 895.  When the case returned to the D.C. Circuit, the court held that the SEC violated the APA by relying on extra-record material that "did not merely supplement the rulemaking record" but rather "suppl[ied] the basic assumptions used by the Commission to establish the range of costs that [regulated parties] are likely to bear in complying with the [rule]." *Id.* at 901–02.  When doing so, the D.C. Circuit clarified that an agency must generally provide an opportunity for comment on "data critical to support a rule" even if the extra-record data is meant to cure a deficiency in the existing record. *Id.* at 903.  A request the SEC had made in its notice of proposed rulemaking for comments and empirical data on costs "did not place interested parties on notice that, in the absence of receiving reliable cost data during the comment period, the Commission would base its cost estimates on . . . extra-record survey data." *Id.* at 904.

In this case, like the SEC in *Chamber of Commerce*, DOT relied on "extra-record material critical to its cost[-benefit] estimates"—here, the

---

[14] *See also* 15 U.S.C. § 80a-2(c) (relevant section of Investment Company Act requiring SEC to "consider . . . whether [a] [rulemaking] action will promote efficiency, competition, and capital formation"); *cf.* NPRM, 87 Fed. Reg. at 63732 (stating that under executive order, assessment of potential benefits and costs of instant Rule was required); 49 U.S.C. § 40101(a)(6), (12)(A) (stating that under Deregulation Act, Secretary of Transportation shall consider "efficiency, innovation, and low prices" and "maximum reliance on competitive market forces and on actual and potential competition" to be in the public interest); 49 U.S.C. § 41712(a) (allowing Secretary to investigate unfair or deceptive practices if "it is in the public interest").

Rupp study—"without affording an opportunity for comment." *Id.* at 908. The study "did not merely supplement the rulemaking record"; rather, it "suppl[ied] the basic assumption[]" used by DOT to arrive at the low end of its range of the estimated net benefits to be delivered by the Rule. *Id.* at 901–02; *see* 2024 RIA at 16–18, 24. DOT's estimate of net benefits— somewhere between $30 million and $254 million annually, *see* Rule, 89 Fed. Reg. at 34668—is somewhat imprecise, to put it mildly. Where the low end of the range was based on a study outside the administrative record and where the probability that the Rule would produce net societal benefits was calculated as merely 53 percent, *see* Rule, 89 Fed. Reg. at 34668, DOT should have allowed Petitioners the opportunity to comment on the study. Indeed, DOT acknowledged in the 2024 RIA that its cost-benefit methodology is "highly sensitive to the percentage of consumers who consider ancillary fee information relevant to their airfare purchase decision," and one of DOT's two inputs for that percentage (46 percent) came from the Rupp study—at the expense of the lower 20 percent figure provided by A4A. 2024 RIA at 24; *see id.* at 16–18. DOT has therefore "fail[ed] to reveal" a "portion[] of the technical basis for a proposed rule in time to allow for meaningful commentary." *Solite Corp.*, 952 F.2d at 484 (quotation omitted).

DOT argues that the Rupp study "merely elaborate[d] on the Department's point in the proposed rule that the new disclosure requirements would benefit consumers," but DOT mischaracterizes its earlier position. In fact, DOT expressly acknowledged at the NPRM stage that it was "not possible to quantify whether the proposed rule would yield benefits that exceed costs," 2022 RIA at ii, and that the rule would only "yield societal benefits if it leads to reduced deadweight loss . . . or reduced search costs," NPRM, 87 Fed. Reg. at 63732. It was only after the public comment period closed that DOT, using the Rupp study, justified its conclusion that hundreds of millions of dollars in annualized benefits would

result from reduced search costs. 2024 RIA at 24; *see id.* at 16–18 (taking 46 percent scenario from Rupp study).

DOT cites *Chemical Manufacturers Ass'n v. EPA*, in which a number of companies challenged pollution regulations. 870 F.2d at 184. There, the EPA had announced its intent to prepare an economic-impact study relying on an "industry-wide" database containing Dun & Bradstreet data covering the years 1976–81. *Id.* at 201. After industry members commented that the database was outdated and "did not have adequate data for plants whose sales exceeded $10 million annually," the EPA announced in the preamble to the final rules that it had relied on newer Dun & Bradstreet data that the EPA did not reveal. *Id.* The new data was "edited in the same manner" as the older data and was used "to increase the size of the entire data base, to increase the number of plants in the 'greater than $10 million sales' category . . . , and to update the data base to cover the period from 1981 to 1986." *Id.* The EPA "also relied on data that had earlier been obtained from other sources," and it "did not supplant its economic-impact study, or replace its original data with completely new and different data, but, in response to industry criticisms, updated and expanded one of several data sources." *Id.* at 202. We thus concluded that the EPA's use of the updated and expanded Dun & Bradstreet data "did not require further notice and comment." *Id.*

Here, DOT did not merely "update[]" or "expand[] one of several data sources." *Id.* Instead, the agency issued a cost-benefit analysis based in large part on a study outside the administrative record. Unlike the updated Dun & Bradstreet data in *Chemical Manufacturers*, the Rupp study here had no antecedent in the underlying rulemaking proceedings. *See id.* at 201 (stating that new data was "edited in the same manner" as the older data and was used to merely update preexisting database). Nor was the Rupp study an "industry-wide" document. *Id.* at 201. Instead, it was based on the

No. 24-60231
c/w No. 24-60373

preferences of students; yet DOT used it to calculate cost-benefit estimates with respect to all airline customers. *See* 2024 RIA at 16–18, 24.[15]

Nor may DOT rely solely on its solicitation of comments regarding quantifying costs and benefits or on the fact that at the time of the NPRM, the agency could not say whether its proposal would produce net societal benefits. An agency cannot "generally . . . rely, without affording comment, on data critical to support a rule solely because the existing record contains a deficiency that extra-record data might cure." *Chamber of Com.*, 443 F.3d at 903.

DOT contends that Petitioners were not prejudiced by its failure to afford public comment on the Rupp study, *see* 5 U.S.C. § 706 (stating that "due account shall be taken of the rule of prejudicial error"), but we cannot agree under the circumstances presented here. As Airline Petitioners say, DOT's 53 percent probability of net societal benefits amounted to a "coin flip." Given those odds, and given DOT's acknowledgement that it pulled from the Rupp study a number to which its cost-benefit methodology was "highly sensitive," 2024 RIA at 24, we question whether DOT would have issued the same Rule had Petitioners been given the chance to challenge the Rupp data. *See Chamber of Com.*, 443 F.3d at 904 (stating that failure to comply with notice and comment "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure" (quotation omitted)).

We therefore remand the Rule to DOT so it can afford Petitioners an opportunity to comment on the new data. Vacatur is often the appropriate remedy for unlawful agency action. *See Braidwood Mgmt., Inc. v. Becerra*, 104

---

[15] At this juncture, we express no opinion on the merits of DOT's decision to extrapolate its conclusion from the Rupp study. We hold only that DOT should have given Petitioners an opportunity to comment on the study.

No. 24-60231
c/w No. 24-60373

F.4th 930, 952 (5th Cir. 2024), *cert. granted*, No. 24-316, ___ S. Ct. ___, 2025 WL 65913 (U.S. Jan. 10, 2025).[16] But it is not always required.  *See, e.g., Tex. Ass'n of Mfrs.*, 989 F.3d at 389-90.  Because we are leaving the stay of the Rule in place, we see no need to vacate it at this time.[17]

## III.    Conclusion

For the above reasons, we REMAND the Rule to DOT.  The current Rule shall remain stayed until the matters required above are met.

---

[16] It is important that, on remand, both sides consider what makes sense in this context and allows for passengers to be clearly aware of the extra costs (such as checked bags) but not unable to clearly consider the dates and times of their travels.

[17] Since we remand to the agency, we need not reach Petitioners' remaining arguments under the APA's arbitrary-and-capricious standard.